IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

SHAWN GREEN,

                Plaintiff,

      v.                                    Civil Action No.
                                          9:07-CV-0351 (GTS/DEP)

DARWIN LaCLAIR, Superintendent,
Great Meadow Correctional Facility, *et al.,*

                Defendants.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

SHAWN GREEN, *Pro Se*
97-A-0801
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN        ROGER W. KINSEY, ESQ.
Attorney General of the               Assistant Attorney General
State of New York
The Capitol
Albany, NY 12224-0341

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

    Plaintiff Shawn Green, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights.  In his complaint, as amended, plaintiff asserts a host of claims arising from his incarceration and based upon events alleged to have occurred largely during 2006 and 2007, naming as defendants several employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), including the superintendent of the prison facility in which he was housed at the relevant times, and requesting both monetary and injunctive relief.

As a result of prior procedural developments several of the defendants originally named by the plaintiff have been dropped from the action.  The remaining defendants now move for summary judgment seeking dismissal of plaintiff's claims on various grounds.  In their motion, defendants assert that plaintiff has failed to demonstrate personal involvement in the alleged constitutional violations on the part of defendants LaClair, Woods, and Potter, and additionally has failed to state a cause of action upon which relief may be granted, arguing further that in any event they are protected from suit under the doctrine of qualified immunity.  For the reasons set forth below, I recommend that defendants'

motion be granted with regard to all of the claims in plaintiff's complaint,

except as to plaintiff's Eighth Amendment exercise claim.

I.     BACKGROUND[1]

Plaintiff is a prison inmate entrusted to the care and custody of the

DOCCS; though he is presently being housed in another facility, at the

time of the events detailed in his complaint plaintiff was designated to the

Great Meadow Correctional Facility ("Great Meadow"), located in

Comstock, New York.   *See generally* Amended Complaint (Dkt. No. 93).

Plaintiff subscribes to the religious beliefs of the Nation of Islam ("NOI").

*Id.* at ¶ 17.   At various times during the course of his incarceration at

Great Meadow plaintiff was confined for disciplinary reasons within the

facility's special housing unit ("SHU"), where some of the events forming

the basis for his claims occurred.   *See*, *e.g.*, at ¶¶ 14-15.   Green claims to

suffer from various medical conditions including inflammation and/or

irritation of the skin, irritable bowel syndrome, and diabetes, for which he

uses prescribed medications.   *Id.* at ¶ 16.

---

[1]     In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.   *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).   It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Generally speaking, plaintiff alleges that while incarcerated at Great Meadow he was 1) subjected to unlawful retaliation, in the form of harassment, assaults, and the issuance of false misbehavior reports for having filed grievances; 2) subjected to discrimination with respect to certain DOCCS policies relating to recreation and exercise, the denial of his requested program placement, and additionally to the extent that he was prevented from participating in certain NOI religious observances and was deprived of his medications; and, 3) exposed to conditions alleged by him to have constituted cruel and unusual punishment, including the denial of his medications and of exercise.[2]  *See generally* Amended Complaint (Dkt. No. 93).  Utilizing the Inmate Grievance Program ("IGP") at Great Meadow, plaintiff filed nine separate grievances relating to the constitutional deprivations alleged in his complaint.[3]  *See* McClure Decl.

---

[2]     To the extent necessary in order to address defendants' specific arguments, plaintiff's claims will be further detailed in the ensuing portions of this report.

[3]     New York prison inmates are subject to an IGP established by the DOCCS to address complaints regarding prison conditions.  *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* at §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.*  at §

(Dkt. No. 145-5) Exh. A; Blood Decl. (Dkt. No. 145-7) Exh. A; Elmi Decl. (Dkt. No. 145-9) Exhs. A and B; Laclair Decl. (Dkt. No. 145-12) Exhs. A and B; Nesmith Decl. (Dkt. No. 145-15) Exh. A; Winchell Decl. (Dkt. No. 145-17) Exhs. A and B.; Woods Decl. (Dkt. No. 145-20) Exh. A.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on April 2, 2007.  Dkt. No. 1.  The matter has since been plagued by a tortured procedural history spanning over a period of nearly five years.  Initially, after approval of his application for leave to proceed *in forma pauperis* and the occurrence of brief but somewhat complicated procedural matters, plaintiff was granted leave to submit an amended complaint, which he ultimately filed on February 5, 2008.  Dkt. No. 20.  As a result of subsequent dismissal motions, which were directed to the plaintiff's second amended complaint, several defendants and claims were eliminated from the lawsuit.  *See* Dkt. No. 85.

Plaintiff's third amended complaint, Dkt. No. 93, which is now the operative pleading, was accepted for filing by decision issued by the court

_____

701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* at § 701.5(d).

on July 2, 2010.  Dkt. No. 104.  In that decision, plaintiff's Eighth

Amendment claims against defendant Whalen were dismissed from that

pleading, as were all claims against defendants Carpenter, Eastman,

Baisley, D. Sawyer, Looman, Vedder, Shepanksi, D. Williams, C. Russell,

C. Charboneau, B. Winchell, J. Allen, J. Daniel, the CORC, C. Goodman,

and Richard W. Potter.  *Id.*  Remaining as defendants in the action are

Darwin LaClair, the former Superintendent at Great Meadow; Corrections

Sergeant Scott Winchell; former Corrections Captain Robert K. Woods;

Imam Abdulkadir Elmi; Corrections Officer Charles Blood; Corrections

Officer Randy McClure; Nurse Practitioner ("NP") Fisher Nesmith; and the

Estate of Richard W. Potter, a former Deputy Superintendent at the

facility.[4]

On August 31, 2010, following the close of discovery, the matter was

stayed for a period while efforts were made to mediate the case.  Dkt. No.

115.  When that endeavor failed to produce a resolution, the stay was

lifted.  *See* Text Order of 1/04/11.  What followed were the filing of various

additional non-dispositive motions by the plaintiff, including motions to

---

[4]     Richard W. Potter, who is deceased, is alleged to have been the
administrative deputy superintendent at Great Meadow.  Upon plaintiff's application to
the court, Potter's estate was substituted in his place as a defendant on June 3, 2011.
Dkt. No. 138.

compel discovery and extend the discovery deadline, a motion to substitute the Estate of Richard W. Potter, a motion for recusal, and various applications for reconsideration.  *See* Dkt. Nos. 107, 124, 138-39, 158.

On July 29, 2011, the remaining defendants moved for summary judgment.  Dkt. No. 145.  In support of their motion, defendants argue that 1) plaintiff has failed to show personal involvement on the part of defendants LaClair, Woods, and Potter; 2) plaintiff has failed to state a claim upon which relief may be granted; 3) defendants are entitled to qualified immunity; and, 4) with regard to his demand for injunctive relief, plaintiff has failed to meet his burden and, in any event, lacks standing to pursue that remedy.  Plaintiff has since opposed defendants' motion.  Dkt. No. 149.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgement Standard

7

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the

failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  Summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades*

*Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002)

(citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511

(summary judgment is appropriate only when "there can be but one

reasonable conclusion as to the verdict").[5]

> B.    Retaliation

Plaintiff asserts retaliation claims against defendants Sergeant

Winchell and R. McClure, alleging that he suffered various acts of reprisal

by those defendants due to his filing of grievances.  In their motion,

defendants argue that plaintiff's claims of retaliation are not only

conclusory but contradicted by the uncontroverted facts in the record.

---

[5]    Although plaintiff has submitted what purports to be a Local Rule 7.1(a)(3) Statement in opposition to defendants' motion, that document fails to comply with the requirements of the rule.  *See* Dkt. No. 149-3.  The consequences of this failure are potentially significant.  By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3).  Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases) (copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff); *see also Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).  This notwithstanding, a court has broad discretion in determining whether to overlook a party's failure to strictly comply with its local rules.  *The Travelers Indemnity Co. of Ill. v. Hunter Fan Co.*, No. 99 CIV 4863, 2002 WL 109567, at *7 (S.D.N.Y. Jan. 28, 2002) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).  In the exercise of my discretion and in deference to plaintiff's *pro se* status, since it is fairly obvious from his submissions which facts are in dispute, I recommend that the court overlook plaintiff's failure to follow the requirements of Local Rule 7.1(a)(3).

In order to establish a claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002).  If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct."  *Mount Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires careful consideration of

the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two.  When such claims, which are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing plaintiff's retaliation claims.  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002).

It is worth emphasizing that the right to petition the government for the redress of grievances has long been recognized as a fundamental right that derives from the First Amendment, *Franco v. Kelly*, 854 F.2d 584, 590 (1988), *overruled on other grounds, Swierkiewicz*, 534 U.S. 506, 122 S. Ct. 992; this is a core constitutional right, and does not arise merely out of the DOCCS regulations.[6]  "*Franco* recognized that prisoners must be permitted the "free and uninhibited access'" to both administrative and judicial forums for the purpose of seeking redress of grievances.'"

---

[6]     Conversely, it is well established that "[i]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."  *Shell v. Brzesniak*, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005).

*Alnutt v. Cleary*, 913 F. Supp. 160, 169 (W.D.N.Y. 1996) (quoting *Franco*).

There can be little doubt that if prison officials were permitted to retaliate

against inmates for filing grievances found to be lacking in merit, inmates'

First Amendment rights would suffer a severe chilling effect for fear of

reprisal.  To the extent that plaintiff claims that defendants McClure and

Winchell retaliated against him for the grievances he filed, he therefore

appears to satisfy the protected activity element of a retaliation claim.

### 1.     Plaintiff's Claims Against Sergeant Winchell

With regard to defendant Sergeant Winchell, plaintiff alleges that on

September 28, 2006, he reappeared before the Great Meadow program

committee, which he claims was spearheaded by that defendant, and was

denied placement in the vacant positions of hospital porter and inmate

program associate ("IPA").  Third Amended Complaint (Dkt. No. 93) ¶ 14,

p.3; *see also* Green Decl. (Dkt. No. 149) ¶ 4-5.  Plaintiff alleges further

that on October 3, 2006 defendant Winchell entered the facility's south

messhall where plaintiff and other NOI members were eating their

Ramadan meals and proceeded to search "sahoor bags," leaving their

contents strewn all over the tables in the area, and also threatening to

issue NOI members misbehavior reports without any cause.  Green Decl.

(Dkt. No. 149) ¶ 4.  Plaintiff additionally claims that he filed a harassment complaint against defendant Winchell on October 11, 2006, who in retaliation had other officers assault him and then cover it up, and additionally falsely accuse him of several rule violations as set forth in a misbehavior report issued to plaintiff on October 16, 2006.  *Id.* at ¶ 6.

The record before the court shows that on September 28, 2006 plaintiff filed a grievance, assigned Grievance No. 41.401-06, complaining of a "Sergeant Williams" denying plaintiff's desired program assignment.  Winchell Decl. (Dkt. No. 145-17) Exh. 1.  In that grievance plaintiff expresses his disgruntlement, stating that "Sgt. Williams denied grievant the programs for disciplinary history without reviewing all grievant records and recommendation for specific program and consider the skills, aptitude and custodial history . . .which is unlawfully discriminatory."  *Id.*  Upon investigation of the grievance by an assigned investigator, on or about October 2, 2006, it was discovered that plaintiff was assigned to electric class because he had a vocational requirement and that he was placed on the rotunda porter evening waiting list.  *See id.*  Although there were no notations made from plaintiff's interview with the program committee regarding his requests for a hospital porter or IPA position, a subsequent

14

review of plaintiff's disciplinary records by the grievance investigator revealed that during 2006, while housed at another DOCCS facility, plaintiff committed a serious rules violation which prevented his assignment to his desired program positions.  *See id.*  It was further noted that in order to receive a better position the plaintiff would have to improve his behavior.  *See id.*

On October 16, 2006, plaintiff was issued a misbehavior report by C. Russell, who is no longer a defendant in this lawsuit, for disobeying a direct order, being out of place, and providing false information.  Green Decl. (Dkt. No. 149) Attachment p.1.  The misbehavior report was co-signed by Corrections Officer B. Winchell, who has also been dismissed from this action.  *See id.*  In the misbehavior report, C. Russell reported that on that date at approximately 6:50 p.m. he was standing in the hallway preparing to make a run back to the Dog Block from the commissary with approximately twenty-two inmates who had completed making purchases from the commissary.  *See id.*  Green was returning with a group from NOI and stepped out from the back and started to walk past Russell.  Russell directed Green to stop and asked where he was going.  *See id.*  Green responded that he was going back to his cell and

started to walk away.  *See id.*  Russell ordered Green to stop, once again,

and to produce his identification card; when asked where he was coming

from, Green responded that he was coming from the messhall and denied

being with the NOI group.  *See id.*  Russell advised Green that the only

way he would be coming from the messhall was if he was with the NOI

group, and Green stated, "so what."  *Id.*  After a Tier II disciplinary hearing

regarding the misbehavior report, plaintiff was found guilty and sentenced

to thirty days of keeplock confinement.[7]  Green Decl. (Dkt. No. 149) ¶ 7.

On November 9, 2007, however, Green was advised that the

superintendent had reversed the findings and ordered all references to the

disciplinary proceeding expunged from his records.  *See id.* at Attachment

p. 6.

On October 24, 2006, plaintiff filed a grievance, designated

Grievance No. 41.591-06, against defendant Sergeant Winchell claiming

retaliation for unspecified previous grievances file by Green against

---

[7]     The DOCCS conducts three types of inmate disciplinary hearings.  *See* 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

defendant Winchell and alleging that Winchell conspired with Corrections

Officer B. Winchell, C. Russell, C. Charboneau, and Sergeant Looman to

assault him as well as to subject him to disciplinary confinement based

upon a false misbehavior report issued on October 16, 2006.  Winchell

Decl. (Dkt. No. 145-17) Exh. B.  The grievance was investigated and,

based upon a determination that there was no evidence to support

plaintiff's allegations, was found to be without merit.  *See id.*

    In support of defendants' motion, defendant Sergeant Winchell

states that to the extent that he may have served on the program

committee allegedly responsible for denying plaintiff's request for work

placement, it was strictly on a relief basis; he has no recollection of having

had any interaction with plaintiff, or of Green filing a grievance against

him.  Winchell Decl. (Dkt. No. 145-17) ¶¶ 5, 7.

    With regard to the first alleged retaliatory act committed by Winchell

– denying plaintiff his preferred program assignment – even assuming,

without deciding, that such conduct is sufficiently adverse to sustain a

retaliation cause of action, plaintiff's retaliation claim nonetheless fails.  At

the outset, plaintiff has failed to identify any protected activity that could

possibly have prompted this denial.  Broadly construing plaintiff's

allegations, it appears to be his claim that Sergeant Winchell's actions were motivated by plaintiff's grievances. Yet, plaintiff has not identified a single grievance that actually predated the denial of his requested program assignment on September 28, 2006. Instead, plaintiff refers only to Grievance Nos. 41.406-06 and 41.591-06, dated September 28, 2006 and October 24, 2006, respectively.[8] Third Amended Complaint (Dkt. No. 93) ¶ 5. Having failed to identify protected conduct for which he suffered retaliation by defendant Sergeant Winchell, plaintiff's claim fails on this basis alone.

Moreover, even assuming plaintiff had established that he engaged in protected activity prior to the alleged retaliatory conduct, his claim is nonetheless deficient. Sergeant Winchell denies serving as program committee director, or even serving on that committee, except perhaps on a relief basis. It should be noted, moreover, that defendant Winchell is not even named in Grievance No. 41.406-06, nor are there any allegations of retaliation contained therein. Consistent with defendant Winchell's denial, in that grievance identified a "Sgt. Williams" as the committee chair and complained that his was discriminated against. In the face of these

---

[8]  The September 28, 2006 grievance challenges the program assignment denial, and therefore could not have served to unlawfully motivate that denial.

established facts plaintiff has failed to come forward with any evidence creating an issue of fact as to Sergeant Winchell's involvement in the program assignment denial.  As a result, even if plaintiff had presented evidence of protected conduct, his retaliation claim fails at the second element insofar as he has produced no evidence suggesting that Sergeant Winchell as involved in the alleged retaliatory adverse action.

The second act of retaliation purportedly committed by defendant Winchell concerns the issuance of a false misbehavior report.  I note, however, that standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional conduct.  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S. Ct. 1273 (1988)).  The further assertion that the false misbehavior report has been prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, can suffice to state a claim for retaliation.  *Franco*, 854 F.2d at 589.

The misbehavior report issued to plaintiff on October 16, 2006 followed his filing of Grievance No. 41.406-06 in which he complained regarding his program assignment, but pre-dated Grievance No. 41.591-

19

06, in which he complained of Sergeant Winchell's retaliation.  With regard to the former, plaintiff has identified no evidence of any relation between that grievance, which does not even name defendant Winchell, and the October 16, 2006 misbehavior report, and there is simply nothing in the record to suggest the that defendant Winchell was involved in either.[9]

In view of the foregoing, it seems clear that with regard to his retaliation claim against defendant Winchell, plaintiff has failed both to identify protected conduct in which he engaged and to adduce evidence from which a reasonable factfinder could conclude that defendant Winchell committed any retaliatory act.  For these reasons, defendants' motion should be granted with respect to plaintiff's retaliation claim against Sergeant Winchell.

### 2.    Plaintiff's Claims Against Defendant McClure

Plaintiff claims that defendant McClure subjected him to harassment on two separate instances.  Green Decl. (Dkt. No. 149) ¶ 16.  On

---

[9]    Although the October 16, 2006 misbehavior report was signed by Corrections Officer B. Winchell, plaintiff merely alleges his belief that the he is a relative of Sergeant Winchell's, Plaintiff's Decl. (Dkt. No. 149) ¶ 6, but has produced no evidence of any actual connection between that officer and defendant Sergeant Scott Winchell.

February 4, 2007, defendant McClure allegedly approached Green in the

messhall during an evening meal and proceeded to taunt him concerning

his filing of grievances, instructed him to go the back of the company line,

and directed the food servers to give plaintiff smaller rations of food.  *Id.*

Plaintiff also alleges that later that evening during recreation defendant

McClure sought out plaintiff and seized his identification card under false

pretenses.  *See id.*  Liberally construing plaintiff's submissions, it appears

to be his contention that defendant McClure was acting in response to

grievances filed by Green on December 28, 2006, assigned Grievance

No. 41.977-06, regarding a DOCCS policy applicable to use of the gym

facilities as between general population and honor block inmates, and on

January 26, 2007, designated No. 42.196-07, complaining that NOI

members were not placed on religious call out by Imam Elmi.  In support

of defendants' motion, defendant McClure states that he has no

recollection of ever encountering plaintiff and that, in general, in the

course of his duties as a corrections officer he does not harass inmates

and does not deny any inmate access to the gym when entitled to use the

facility.  McClure Decl. (Dkt. No. 145-5) ¶¶ 8-9.

Plaintiff's retaliation claims against defendant McClure suffer from

21

similar deficiencies as that against Sergeant Winchell.  Plaintiff appears to rely solely on the temporal proximity of the grievances to the alleged acts of misconduct by defendant McClure to establish his retaliation claim. Temporal proximity alone, however, is insufficient to carry plaintiff's burden of proof beyond the pleading stage.  *Ethier v. City of Cohoes*, 2006 WL 1007780, at *7 (N.D.N.Y. Apr. 18, 2006) (McAvoy, S.J.) (citing cases); *Freeman v. Goord*, No. 02 Civ. 9033(PKC), 2005 WL 3333465, at *7 (S.D.N.Y. Dec. 7, 2005).  The grievances at issue did not involve defendant  McClure, and plaintiff has failed to adduce any facts indicating defendant McClure knew that he had engaged in protected conduct.  *See, e.g., Crosswell v. McCoy*, No. 9:01–CV–00547, 2003 Wl 962534, at *8 (N.D.N.Y. Mar. 11, 2003) (Sharpe, M.J.) (finding that plaintiff failed to show that there was a causal connection between the protected speech and the adverse action where there was nothing in the record showing that defendant knew of the grievance filed the same day that he took the alleged adverse action).

Plaintiff's retaliation claims against defendant McClure fail for yet another, independent reason.  To meet the second, adverse action element of the governing test a plaintiff is required to establish retaliatory

conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *Dawes*, 239 F.3d at 492-93 (citations omitted). "Otherwise, the retaliatory act is simply *de minimis*, and therefore outside the ambit of constitutional protection." *Id.*; *see also Roseboro v. Gilllespie*, 791 F. Supp. 2d 353, 366 n.19 (S.D.N.Y. 2011) (citing cases). McClure's alleged harassment of Green, including taunting him and taking his identification card, does not suffice to support the adverse action element of a retaliation claim. *Roseboro*, 791 F. Supp. 2d at 374 (finding that plaintiff's retaliation claim failed because an inmate "'has no right to redress simply because [an officer] made a hostile or derogatory comment about him.'") (quoting *Davidson v. Bartholome*, 460 F. Supp. 2d 436, 446 (S.D.N.Y.2006) (denying retaliation claim where a sergeant "became hostile and began cursing" at the plaintiff and threatened to issue a " 'false' " misbehavior report)) (alteration in original) (other citations omitted); *see also Davis v. Goord*, 320 F.3d 346, 353 (2d Cir.2003); *Johnson v. Brown*, No. 9:09-CV-0002, 2010 WL 6243352, at *7 (N.D.N.Y. Sep. 3, 2010) (Peebles, M.J.), *report and recommendation adopted*, 2011 WL 1097864 (N.D.N.Y. Mar 22, 2011) (Suddaby, J.).

Because the record contains no evidence from which a reasonable

factfinder could conclude that plaintiff was subjected to constitutionally significant adverse action, and that there exists a causal connection between his filing of grievances and that adverse action, I recommend that the court grant this portion of defendants' motion and also dismiss plaintiff's retaliation cause of action as against defendant McClure.

C.    Discrimination

In addition to retaliation, plaintiff alleges that he was subjected to discrimination at the hands of the defendants.  The contours of that claim are even more nebulous than those associated with his retaliation cause of action.  Plaintiff claims that Sergeant Winchell's denial of his requested program assignment, defendant Nesmith's delay in providing him medical treatment, and defendant Elmi's failure to ensure NOI members received certain religious services were all actions motivated by discrimination. Additionally, Green challenges as discriminatory the DOCCS' gym recreation policy prohibiting general population inmates using the gym from using the D-Block yard and gym showers, as well as a policy that prevents keeplock inmates from wearing anything other than state-issued long underwear for outside recreation in the winter.

"The Equal Protection Clause of the Fourteenth Amendment

24

commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated as alike." *City of Cleburne, Tx. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985) (citation omitted).  The Equal Protection Clause, however, does not forbid all classifications.  *Curtis v. Pataki*, No. 96-CV-425, 1997 WL 614285, at *3 (N.D.N.Y Oct. 1, 1997) (Pooler, J. & DiBianco, M.J.) (citing *Nicholas v. Tucker*, 114 F.3d 17, 20 (2d Cir.1997)).   Unless either a fundamental right is implicated or a distinction is created that burdens a suspect class, defendants need only demonstrate that their challenged actions were rationally related to a legitimate government interest.  *Id.* (citations omitted).  Inmates are not a suspect classification; therefore, prison administrators, when making classifications, need only demonstrate a rational basis for their distinctions.  *Allen v. Cuomo*, 100 F.3d 253, 260 n.1 (2d Cir. 1996); *Hameed v. Coughlin*, 37 F. Supp. 2d 133, 137 (N.D.N.Y. 1999) (citing *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119, 134, 97 S.Ct. 2532 (1977)).

Absent the showing of a suspect class, an inmate can also prevail on an equal protection claim based upon a class of one by showing that

he or she was treated differently from other similarly-situated inmates without any rational basis.  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 158-89 (2d Cir. 2006).  To succeed on this theory, a "plaintiff must establish an extremely high level of similarity" between him or herself and the person to whom he or she is making the comparison.  *Diaz v. Fischer*, No. 08-CV-1208, 2010 WL 1132772, at *11 (N.D.N.Y. Feb. 23, 2010) (Homer, M.J.) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005)) (internal quotations omitted), *report and recommendation adopted*, 2010 WL 1133074 (N.D.N.Y. Mar. 23, 2010) (Kahn, J.).

        1.    <u>Plaintiffs' Equal Protection Claims Against Defendants</u>
                <u>Winchell, Nesmith, and Elmi</u>

Plaintiff's equal protection claims against Sergeant Winchell, N.P. Nesmith, and Imam Elmi remain conclusory and speculative.  *See, e.g.*, *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) ("complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").  For the essentially the same reasons stated with regard to his retaliation cause of action, plaintiff's claim against Sergeant Winchell fails; not only has plaintiff failed to adduce evidence that Sergeant Winchell was involved in the challenged

program assignment decision, but in this instance plaintiff has also failed to identify how he was treated differently than others who were similarly situated.  In fact, contrary to his current claim of discrimination, plaintiff admits that he was advised that the his poor disciplinary record was the reason he could not be given his requested assignment.  The making of programming decisions based upon such factors as an inmate's disciplinary record would seem to be entirely rational and establishes a legitimate nondiscriminatory basis for those decisions.

To the extent that plaintiff's discrimination claims encompass defendant Nesmith, such a claim is equally problematic.  Plaintiff merely alleges that in November 2006 defendant Nesmith delayed plaintiff's medical treatment as to certain ailments and that he was never provided an explanation for such discriminatory acts.  Once again, at the outset plaintiff has completely failed to identify how he was treated differently than others similarly situated.

Turning to the claim against defendant Elmi, it appears to be plaintiff's contention that this defendant discriminated against members of the NOI 1) based upon his alleged failure to place plaintiff on a call out list on January 25, 2007 so that he could confer with an NOI minister during

his visit to Great Meadow, as well as during "other monthly visits"; 2) by failing to provide a "reasonable excuse" why special food was not provided for the NOI Savior's Day event; and, 3) for failing to reserve space for that celebration.  Plaintiff's Memorandum of Law (Dkt. No. 149-2) p. 2.  In support of defendants' motion defendant Elmi, who at the relevant times was the Coordinating Chaplain at Great Meadow, has submitted a declaration describing the applicable procedures.  *See generally Elmi Decl.* (Dkt. No. 145-9).  At the outset, Elmi states that his responsibilities include coordinating religious services and ensuring that inmates are able to practice their chosen religion, and that all faiths are treated equally.  *Id.* at ¶¶ 3, 6.  Defendant Elmi explains that, contrary to plaintiff's assertion, no call out is required for plaintiff or any other member of the NOI to attend congregate services.  *Id.* at ¶ 8.  Instead, attendance at those services is handled on a "drop off" basis, and plaintiff had a right to attend such services utilizing this procedure, but apparently neglected to do so. *Id.*  In fact, in response to plaintiff's grievance, designated Grievance No. 42.196-07, in which he made the same complaint, plaintiff was specifically advised that no call out is necessary.  Elmi Decl. (Dkt. No. 145-9) Exh. A.

Imam Elmi explains further that he did not receive timely notice of

28

the planning of Savior Day celebration for February 26, 2006, having been first advised of the event on February 13, 2007, just thirteen days before the religious celebration.  *Id.* at ¶ 12.  Nonetheless, upon receipt of that notice, he reserved a place for the celebration, compiled a list of attendees, and inmate cooks were assigned.  *Id.*  The food services administrator, and not Elmi, is responsible for special meals at religious events.  *Id.* at ¶ 11.  The food services administrator informed the NOI that given the late notice of the event, no special meal would be available.[10]  *Id.* at ¶ 12.  Finally, Imam Elmi unequivocally states that the lack of notice, and not discrimination, was the sole reason that the special meal was not provided for the February 26, 2007 NOI celebration.  *Id.* at ¶ 13.

In a grievance, designated as No. 42.601-07, plaintiff complained that there had been no special meal available to NOI members on that date.  In his response to that grievance, the superintendent specifically advised that call out was not required to attend NOI services and that

---

[10]     Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983.  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  Since defendant Elmi was not personally involved in failing to make the special meal available, he cannot be held liable for any alleged discrimination resulting from plaintiff's claim in this regard.

requests for special event meals must be received by the food services administrator a minimum of thirty days prior to the event, followed by a final count of participants two weeks before. *Id.* at Exh. B. The evidence in the record before the court shows that the NOI members failed to comply with these requirements, making their first request for a special meal less than two weeks before their scheduled celebration.

While discrimination based upon on religion may support an equal protection violation, to prove such a claim a plaintiff "must present evidence that he was treated differently from similarly situated members of other religions." *Ramsey v. Goord*, 661 F. Supp. 2d 370, 398 (W.D.N.Y. 2009) (quoting *Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999)) (internal quotations omitted). In the first instance, plaintiff has not specifically identified any other religious groups which, he claims, were treated differently than the NOI. Moreover, in the face of defendants' proof, plaintiff has failed to come forward with any facts suggesting a discriminatory motive on the part of defendant Elmi. Based the facts within the record before the court, no reasonable factfinder could conclude that defendant Elmi discriminated against plaintiff on the basis of his religion.

30

2.    Claims Based Upon the DOCCS Recreation Policies

Lastly, plaintiff also challenges two DOCCS policies relating to recreation.  To succeed on these claims, which are premised upon different treatment among classes of inmates, and not upon a suspect class, the plaintiff must show "that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.' "  *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S. Ct. 1475 (2001)).

The first DOCCS policy with which plaintiff takes issue is a former policy that prevented keeplock inmates from wearing anything but state-issued clothing during recreation.  On October 27, 2006, plaintiff filed a prison grievance, assigned No. 41.532-06, complaining that while in keeplock he was not permitted to wear his personal long underwear, asserting that as a result he was effectively denied keeplock recreation. *See* Laclair Decl. (Dkt. No. 145-12) Exh. B.  Defendant LaClair granted plaintiff's grievance on December 12, 2006 "to the extent that inmates will be allowed to wear state or personal long Johns while attending keep lock

exercise." *Id.*  In alleging that the relevant DOCCS policy was discriminatory, once again, plaintiff's complaint as well as his submissions in response to defendants' motion fail to demonstrate that keeplocked inmates were treated differently than similarly situated inmates, and the record contains no evidence which could conceivably allow a reasonable factfinder to conclude that this recreation policy was discriminatory.

Plaintiff also contends that the DOCCS policy under which honor block inmates are permitted to access the D-block yard and gym showers, while those in general population are not, is discriminatory.  Third Amended Complaint (Dkt. No. 93) ¶ 12.  This is a claim that presents a slightly closer question.  In this claim, plaintiff has at least alleged two different classes of inmates –  honor block and general population – were treated differently.[11]  Unfortunately, plaintiff has not shown that this policy is not reasonably related to any legitimate penological interest, and even when affording plaintiff the benefit of all favorable inferences that can be drawn from the evidence in the record, there is nothing in the record to

---

[11]      There seems to be some confusion on this point, in that while defendants assert that as an honor block inmate plaintiff was not deprived of access to the D-Block yard and gym showers, Woods Decl. (Dkt. No. 145-20) ¶11, plaintiff states that he was never eligible for honor block housing, Plaintiff's Memorandum (Dkt. No. 149-2) at p. 9, presumably due to his disciplinary record.  This apparent dispute is irrelevant in light of my ultimate recommendation regarding this claim.

suggest that the policy was motivated by anything but permissible penological goals.  To the contrary, it can fairly be inferred by the distinction itself that the privilege of using the D-Block yard and gym showers is intended to reward inmates who are housed in the honor block.

As to the various grounds for plaintiff's discrimination claims, I have concluded that plaintiff has failed to establish, as a matter of law, the definitive existence of a suspect classification.  Additionally, with regard to all of his claims except for that regarding the use of D-Block yard and gym showers for recreation, plaintiff has not even shown that he was treated differently than any other similarly situated inmate.  Finally, with regard to plaintiff's challenge to the policy prohibiting general population inmates from accessing D-Block yard and the gym showers, I have concluded that no reasonable juror could find that this policy lacks a rational basis.  For all of these reasons, I recommend granting defendants' motion for summary judgment as it relates to plaintiff's equal protection claims.

D.    Eighth Amendment

In his complaint, as amended, plaintiff asserts two claims failing with the ambit of the Eighth Amendment, alleging that he was deprived of exercise while in keeplock, and that he was denied certain medications.

33

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at

*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.  Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

      1.   <u>Exercise</u>

     It is well-established the Eighth Amendment protects an inmate's right to exercise.  *Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001) (citing *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996)).  That right, however, is not limitless, nor does it guaranty an inmate's ability to participate in all forms of recreation, including congregate recreational programming.  *Davidson v. Coughlin*, 968 F. Supp. 121, 129 (S.D.N.Y. 1997).  It should be noted, moreover, that occasional, isolated interruptions or denials of the right to exercise are considered constitutionally insignificant.  *See Branham* v. *Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996) (finding that keeping inmate on lockdown and "full

restraint" status without outdoor exercise for a period of approximately twenty-two days does not violate the Eighth Amendment); *Gibson v. City of New York*, No. 96 CIV. 3409 (DLC), 1998 WL 146688, *3 (S.D.N.Y. Mar. 25, 1998) (denial of recreation for eight days in a sixty-day period and the opportunity to exercise on two consecutive days found not constitutionally actionable); *Young v. Scully,* Nos. 91 Civ. 4332, 91 Civ. 4801, 91 Civ. 6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993) (holding that Eighth Amendment was not violated when inmate was deprived of exercise for periods lasting several days); and *Jordan v. Arnold*, 408 F. Supp. 869, 876-877 (M.D. Pa. 1976) (holding that Eighth Amendment not violated when inmates confined to special housing unit were allowed two hours of exercise per week).  On the other hand, it seems clear that a deprivation of exercise for twenty-eight days, or more, "presents a close constitutional case" which should be presented to a jury. *Williams*, 142 F. Supp. 2d at 426 (quoting *Davidson v. Coughlin*, 968 F. Supp. at 131).

Here, plaintiff has alleged that he was denied exercise for the entire thirty days that he was confined to keeplock.  *See* Third Amended Complaint (Dkt. No. 93) ¶ 25; Green Decl. (Dkt. No. 149) ¶ 7; Plaintiff's

36

Memorandum (Dkt. No. 142-9) p. 6.  Apparently misconstruing plaintiff's submissions, the defendants have addressed only a single instance in which defendant Blood is alleged to have been involved.  On November 4, 2006, while plaintiff was in keeplock, plaintiff filed Grievance No. 4.659-06 in which he asserted that defendant Blood directed the corrections officer taking the recreation list to deny plaintiff's request, which plaintiff realized had previously occurred several times while a Corrections Officer Gordon was on duty.  *See* Blood Decl. (Dkt. No. 145-8) Exh. A.  Upon investigation of this grievance Sergeant Hoy, who is not a defendant in this action, spoke with the plaintiff.  *See id.*  According to Sergeant Hoy's investigation report, plaintiff told him that "on the dates in question" he was not in his cell at the time when the keeplock recreation list was compiled because he was at the facility hospital for his daily insulin shots, and that plaintiff had not been aware of this fact until speaking with Sergeant Hoy.  *See id.*  Sergeant Hoy further reported that he advised plaintiff that in the future he should inform his hospital escort officer of his recreation request, and that Green said that he would do so.  *See id.*

In a declaration submitted in support of defendants' motion, defendant Blood states, "Plaintiff asserts that, on one occasion in October

37

2006, I instructed another officer to deny plaintiff's request for keeplock recreation."  Blood Decl. (Dkt.No. 145-7) ¶ 3.  Blood denies this allegation and asserts that plaintiff did not have recreation on the occasion in question because at the time the recreation list was taken, Green was receiving his daily insulin shot.  *Id.*  Defendants' have not submitted any other evidence addressing plaintiff's claim in this regard.

Plaintiff, on the other hand, asserts that the B-Block log book entries show that he was taken to the infirmary in the morning well in advance of the time that the keeplock recreation list is taken, and on this basis refutes the statements contained in the memorandum prepared by Sergeant Hoy.[12]  Plaintiff's Memorandum (Dkt. No. 149-2) p. 6.  Accordingly, plaintiff argues, there remain genuine issues of fact as to whether he was deprived of the opportunity to exercise daily while confined to keeplock for

_____

[12]    These log books were apparently provided to plaintiff in discovery, and at the direction of the court were filed by the defendants.  Dkt. Nos. 120-4 through 120-6. Contrary to plaintiff's contention, it is not at all clear from the log books that he was taken to the infirmary before the keeplock recreation was taken, largely because the handwritten entries are difficult to decipher.  The court notes, however, that one of the keeplock policies included within the discovery filed, Dkt. No. 120-7, indicates that keeplock inmates will notify their company officers before the breakfast meal if they want to exercise, and that is the only time that the list will be taken.  *See id.*  The log books show that morning meal run began at approximately 7:05 a.m., and in one instance that is legible, indicates that on October 19, 2006 plaintiff was escorted to the hospital at 7:55 p.m.  *See* Dkt. No. 120-5 at p. 12 (unnumbered).  When drawing all permissible inferences based upon this evidence, there is some support for a finding that the keeplock list was actually taken before plaintiff was taken to the infirmary.

thirty days.  *See id.*

Given the defendants' failure to address plaintiff's claim that he was denied exercise for the entire time that he confined to keeplock, I find that questions of fact remain as to whether plaintiff was denied exercise for a period of thirty days and if so, whether plaintiff's Eighth Amendment rights were violated.  For this reason, I recommend denial of defendants' motion for summary judgment with regard to this claim, but without prejudice to defendants' right to file a second summary judgment addressing this issue.

### 2.   Deprivation of Medications

Like plaintiff's exercise claim, his claim of medical indifference falls under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment and is informed by essentially the same principles.  *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 290, 291.  To satisfy their obligations under the Eighth Amendment in this regard, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates."  *Farmer*, 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S.Ct. 3194,

3200 (1984)) (internal quotations omitted).

Plaintiff's Eighth Amendment medical indifference claim must also satisfy both objective and subjective requirements.   *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).  Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).  With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'"  *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999); *see also Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir. 2006).

<div align="center">a.   <u>Objective Requirement</u></div>

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care . . .", and centers upon whether prison officials acted reasonably in treating

<div align="center">40</div>

the plaintiff. *Salahuddin*, 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id*. at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment. . . [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith*, 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith*, 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over

41

sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n.10 (quoting *Harrison v. Barkley*, 219 F.3d 132, 137 (2d Cir. 2000)).

Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir. 1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a "'reasonable doctor or patient would find important and worthy of comment or treatment'", a condition that "'significantly affects'" a prisoner's daily activities, or "'the existence of chronic and substantial pain.'" *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

In this instance, plaintiff alleges a mere delay in receiving medications for various ailments, including 1) Avandia, alleged to be a "sensitizer" for plaintiff's insulin injections; 2) Polycarbophil, which plaintiff claims is provided to him for treatment of irritable bowel syndrome; and 3)

multi-vitamins, which he states were prescribed due to inadequate nutritional intake.  Third Amended Complaint (Dkt. No. 93) ¶¶ 15-16. Plaintiff alleges that defendant Nesmith intentionally failed to provide him these medications after his admission to SHU on November 15, 2006, which caused him to suffer loss of appetite, constipation, and resistance to insulin.[13]  *Id.* at ¶ 15; *see also* Green Decl. (Dkt. No. 149) ¶¶ 11-12. Plaintiff further asserts that he was seen by defendant Nesmith on November 25, 2006 and told Nesmith that he had not received his medications, and that despite this, thereafter Nesmith still failed to dispense them.  Plaintiff's Memorandum (Dkt. No. 149-2) p. 10.  Nowhere does plaintiff state, however, how long the period of delay lasted.  Even more, the effects of the deprivation of which he complains, for the most part, are alleged to be quite minimal.  Plaintiff complains that he suffered a loss of appetite and constipation, effects which clearly are not the type of medical problems that would normally significantly interfere with plaintiff's daily activities or cause severe pain.  *See Ross v. McGinnis*, 2004 WL 1125177, * 10 (W.D.N.Y. Mar. 29, 2004) ("Plaintiff's complaints of

---

[13]    Plaintiff also asserts that a prison physician, Dr. Whalen, deprived him of special soaps that he requires due to a skin condition.  Plaintiff's claim against Dr. Whalen was previously dismissed from the action by decision and order of July 2, 2010.  *See* Dkt. No. 104.

43

abdominal pain, vomiting, heartburn, constipation, body odor and extreme body heat did not constitute a serious medical need."); *Black v. Fischer*, No. 9:08-CV-0232, 2010 WL 2985081, at * 10 (N.D.N.Y. Jul. 1, 2010) (Peebles, M.J.) (finding that constipation and an external hemorrhoid for a period of less than one month, with typical symptoms, including discomfort and minor bleeding, were not sufficiently serious to establish an Eighth Amendment claim) (citing cases).

Moreover, while plaintiff alleges that the delay in receiving medication also resulted in resistance to insulin, this conclusory assertion finds no support in the record.  In fact, plaintiff admits that he continued to receive insulin, and there is no evidence that he suffered any medical consequences from the delay in receiving Polycarbophil.[14]  Indeed, the plaintiff has not come forward with any evidence from which a reasonable factfinder could conclude that the symptoms he allegedly suffered as a result of the delay in receiving his prescribed medications presented a condition of urgency, resulted in degeneration of his health, or caused extreme pain; in other words, plaintiff has failed to present evidence

_____

[14]     According to defendants, Polycarbophil is used to treat constipation. Nesmith Decl. (Dkt. No. 145-15) ¶ 3.  Plaintiff has not produced any evidence which suggests that the failure to treat constipation impacts one's resistance to insulin.

sufficient to satisfy the objective requirement for establishing an Eighth

Amendment violation.  *See Tafari v. Weinstock*, No. 07CV0693, 2010 WL

3420424, at * 7 (W.D.N.Y. Aug. 7, 2010).

       b.    <u>Subjective Element</u>

The second, subjective, requirement for establishing an Eighth

Amendment medical indifference claim mandates a showing of a

sufficiently culpable state of mind, or deliberate indifference, on the part of

one or more of the defendants.  *Salahuddin*, 467 F.3d at 280 (citing

*Wilson*, 501 U.S. at 300, 111 S. Ct. at 2325).  Deliberate indifference, in a

constitutional sense, exists if an official "knows of and disregards an

excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he [or she] must also draw the inference."

*Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F. Supp. 2d at

546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2.  Deliberate

indifference is a mental state equivalent to subjective recklessness as the

term is used in criminal law.  *Salahuddin*, 467 F.3d at 280 (citing *Farmer,*

511 U.S. at 839-40, 114 S. Ct. 1970).

For the same reasons that plaintiff cannot prove the objective

element of a medical indifference claim, he similarly fails with respect to the subjective element.  Plaintiff's temporary loss of appetite and constipation did not expose him to substantial risk of harm, and thus defendants' did not act in knowing disregard of such a risk.

In sum, the record is devoid of any evidence suggesting that any defendant, or any prison official for that matter, was deliberately indifferent to plaintiff's medical needs.  After carefully reviewing the record before the court, I find that there are no material issues of fact with respect to plaintiff's Eighth Amendment medical indifference claim and that defendants' motion for summary judgment dismissing this claim should therefore be granted.

F.    Personal Involvement

Defendants LaClair, Woods, and Potter also move for summary judgment on the grounds that plaintiff has failed to demonstrate their personal involvement in the alleged constitutional violations.  As was previously mentioned, personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983.  *Wright,* 21 F.3d at 501 (citing *Moffitt,* 950 F.2d at 885 and *McKinnon,* 568 F.2d at 934).  As the Supreme Court relatively recently

affirmed, a defendant may only be held accountable for his or her actions under section 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, ___ 129 S. Ct. 1937, 1952 (2009). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

A supervisor cannot be held liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Responsibility on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*,

556 U.S. 662,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at

435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d

at 501.

Clearly, to the extent that plaintiff seeks to impose liability upon

LaClair, Woods, and Potter solely on the basis of their supervisory roles,

his claims must fail.  However, plaintiff has also alleged that these

defendants are responsible, as supervisors, for the denial of his program

assignment and Imam Elmi's failure to provide the religious

accommodation requested for the NOI, as well as for implementing two

alleged discriminatory policies, including the DOCCS' gym recreation

policy prohibiting general population inmates using the gym from using the

D-Block yard and gym showers and the policy that prevented keeplock

inmates from wearing anything other than state-issued long underwear for

outside recreation in the winter.  Plaintiff alleges that Potter and LaClair

became aware of the alleged discriminatory practices of the program

committee through grievances and failed to remedy them.  Third Amended

Complaint (Dkt. No. 93) ¶ 19.  Defendants argue that this claim fails

because LaClair and Potter cannot be held personally liable solely as a

result of a failure to properly process grievances.

48

At the outset, I have already concluded that plaintiff has failed to demonstrate that the program assignment denial implicates a constitutional right, and for this reason alone, it cannot provide a basis for liability against defendants Potter and LaClair.  Moreover, plaintiff has not shown that either Potter or LaClair actually received and reviewed his program grievance.  However, even if this were not case, plaintiff has not identified a sufficient basis for personal liability against these defendants.

It is true, as defendants contend, that in general a supervisory officer who merely processes a grievance based upon a violation that has already occurred and is not ongoing will not be found personally responsible.  *Gantt v. Lape*, No. 9:10-CV-0083, 2011 WL 673783, at *3 (N.D.N.Y. Jan. 18, 2011) (Lowe, M.J.) (citing *Rahman v. Fischer*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009)), *report and recommendation adopted*, 2011 WL 673782 (N.D.N.Y. Feb. 17, 2011) (Suddaby, J.).  In this case, the grievance plaintiff filed, even if reviewed by LaClair and Potter, complained solely that his desired program assignment was improperly denied without a full review of his skills, aptitude, and his disciplinary history.  Since plaintiff did not complain of any ongoing violation or unconstitutional policy, even if they reviewed plaintiff's grievance, there is

49

no basis for finding defendants Potter and LaClair personally liable on this claim.

For the same reasons, even if I had determined that plaintiff has shown a constitutional violation, LaClair, who is the only supervisory defendant implicated on this cause of action, could not be held personally liable for the alleged discriminatory treatment by Imam Elmi and N.P. Nesmith; plaintiff's grievances complaining of these incidents were confined to isolated occurrences as opposed to ongoing events.  *See Gantt*, 2011 WL 63783, at *3.

Defendant Woods is alleged to have implemented, and Potter and LaClair are alleged to have continued, the recreation policy that prevented general population inmates from utilizing the D-block yard and gym showers.  Again, even if I had not already concluded that plaintiff has failed to establish that this policy was constitutionally infirm, his claim would be subject to dismissal against these defendants for lack of personal involvement.  The record establishes not only that Woods is presently retired and has not worked at Great Meadow since 1998, when he was a captain, but that he did not create the policy in question and obviously could not have enforced it while plaintiff was at Great Meadow in

50

2006 and 2007.  *See generally* Woods Decl. (Dkt. No. 145-20).  Plaintiff's allegations against Potter on this claim again are conclusory; plaintiff has completely failed to identify Potter's role and how is was involved in creating or continuing the allegedly discriminatory policy.

Defendant LaClair stands on someone different footing as to both the recreation policy referenced above and the former exercise policy which prohibited inmates from wearing personal thermal underwear for outside recreation.[15]  Plaintiff filed grievances complaining of the discriminatory nature of both of these policies, and the evidence shows that that LaClair reviewed and made determinations as to both.  Notably, in response to plaintiff's grievance LaClair modified the outside recreation policy to allow inmates to wear personal long underwear.  Since I have determined that these policies were not discriminatory in a constitutional sense, they cannot form the basis for a claim against LaClair.  However, because this defendant, as superintendent, was clearly in a position to remedy any ongoing constitutional violation, granting defendants' motion

_____

[15]       In opposition to defendants' motion, plaintiff for the first time alleges that "P. Van Guilder" was responsible for implementing this keeplock recreation policy. Green Decl. (Dkt. No. 149) ¶ 9; *see also* Plaintiff's Memorandum (Dkt. No. 149-2) p.1. P. Van Guilder was never identified as a defendant in this action nor substituted for a "John Doe" defendant.  This procedural defect is without any significant effect, however, given my conclusion that the policy does not implicate a constitutional right.

with regard to defendant LaClair for lack of personal involvement as it relates to these two policies would be inappropriate.  *See Braxton v. Nichols*, No. 08 Civ. 08568(PGG), 2010 WL 1010001, at *9 and n.10 (S.D.N.Y. Mar. 18, 2010).

     G.    Injunctive Relief

     Defendants' final contention in their motion is that plaintiff lacks standing to pursue injunctive relief.  The issue presented, however, is more appropriately characterized as one of mootness.  A federal court has no authority to decide an issue when the relief sought can no longer be given, or is no longer needed. *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir.1983).  It is well settled in this circuit that transfer from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin*, 76 F.3d 504, 506 (2nd Cir. 1996) (citing *Young v. Coughlin*, 866 F.2d 567, 568 n. (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S. Ct. 3224 (1989), and *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986)); *Smith v. Artus*, No. 9:07-CV-1150, 2010 WL 3910086, at *29 (N.D.N.Y. Sep. 30, 2010) (Mordue, C.J.) (citations omitted); *Candelaria v. Greifinger*, No. 96-CV-0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

To the extent that plaintiff has sued the officials at Great Meadow in their official capacities, plaintiff's transfer out that facility effectively rendered his claim for injunctive relief moot. *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011).

IV.   SUMMARY AND RECOMMENDATION[16]

The record before the court demonstrates that plaintiff regularly avails himself of the DOCCS IGP and is prolific in his filing of grievances. Despite the breadth of his claims in this lawsuit, which were preceded by his filing of several prison grievances, the only claim for which there remains triable issues of material fact, based upon the present record, is Green's Eighth Amendment claim alleging he was denied exercise while in keeplock. Plaintiff has otherwise failed to demonstrate that any defendant retaliated against him for filing grievances, or any other constitutionally protected conduct. He has similarly identified no basis for his claims of discrimination, and likewise has failed to demonstrate a sufficiently serious deprivation with respect to the alleged delay in receiving his medications to warrant constitutional protection. Additionally, Green has not shown personal involvement on the part of Woods and Potter as to any alleged

---

[16]   Given my determination as to the merits of plaintiff's claims, I have opted not to address the defense of qualified immunity.

53

misconduct, and the only conceivable personal involvement of LaClair is in maintaining the former exercise policy prohibiting inmates from wearing personal clothing during outside recreation, a claim which ultimately falls on the merits.

Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment, Dkt. No. 145, be GRANTED as to all claims in plaintiff's complaint, with the exception of his Eighth Amendment claim against defendant Blood relating to the alleged deprivation of exercise during his keeplock confinement, but without prejudice to defendants' right to file a second motion for summary judgment as to this claim within thirty days of a decision and order adopting in full this report and recommendation.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      February 24, 2012
            Syracuse, NY



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

**\*1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681etseq. ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.*, 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton*, 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.*, 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

I. Hostile Environment

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

**B. Actual Knowledge / Deliberate Indifference**

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord*Davis, 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *SeeReese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7]*SeeReese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *seesupra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See*Murray, 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See*Murray, 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

☞  Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
THE TRAVELERS INDEMNITY COMPANY OF
ILLINOIS a/s/o the following entity and individuals:
Milstein Properties, Inc., Helen Abunasser, Jane
Everett, Stella Friedman, Zehava Mirkin, Arthur
Nadaner, Lisa Pettigrew, and Ziva Ben-Reuvan,
Plaintiff,
v.
HUNTER FAN COMPANY, INC., Capitol Lighting of
Paramus, Inc., M. Fortunoff of Westbury Corp., and
John Does "1" through "5", Defendants.
HUNTER FAN COMPANY, INC., Third Party
Plaintiff,
v.
Lionel HAMPTON, Lincoln Plaza Associates, Milford
Management Corp., One Lincoln Plaza Condominium,
20 West 64th Street Associates, Third Party Defendants.
**No. 99 CIV 4863 JFK.**

Jan. 28, 2002.

Robinson & Cole LLP, New York, NY, Michael B.
Golden, for Plaintiff, of counsel.

D'Amato & Lynch, New York, NY, Lloyd Herman, for
Defendant/Third Party Plaintiff Hunter Fan Co., Inc., of
counsel.

Gulino & Ryan, P.C., New York, NY, Joseph J. Gulino,
for Defendant Capitol Lighting of Paramus, Inc., of
counsel.

Lambert & Weiss, New York, NY, Richard Lambert, for
Third Party Defendant Lionel Hampton, of counsel.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, New
York, NY, Eugene T. Boule, for Third Party Defendant
Lincoln Plaza Associates, of counsel.

*OPINION and ORDER*

KEENAN, J.

**\*1** Before this Court are Cross Motions for summary
judgment of Defendant/Third Party Plaintiff Hunter Fan
and Defendant Capitol Lighting of Paramus. Hunter Fan
moves to dismiss the claims of plaintiff The Travelers
Indemnity Company of Illinois and all cross-claims and
counter claims. Capitol Lighting moves to dismiss the
claims of plaintiff Travelers Indemnity Company and
seeks indemnification, costs and attorneys' fees from
Hunter Fan. For the reasons outlined below, the Court
denies all motions.

*Background*

Plaintiff the Travelers Indemnity Company of Illinois
("Travelers") was and still is an Illinois corporation with
its principal place of business located in Hartford,
Connecticut. *See* Am. Compl. ¶ 4. Defendant/Third Party
Plaintiff Hunter Fan, Inc. ("Hunter") was and still is a
Delaware corporation with its principal place of business
located in Memphis, Tennessee. *Seeid.* ¶ 5. Defendant
Capitol Lighting of Paramus, Inc. ("Capitol") was and still
is a New Jersey corporation with its principal place of
business located at Route 17, Paramus, New Jersey. *Seeid.*
¶ 7. Third Party Defendant Lionel Hampton ("Hampton")
was, at all relevant times, the lessee and resident at 20
West 64th Street, Apt. 28K, New York, New York. *Seeid.*
¶ 12.

This Court has jurisdiction pursuant to 28 U.S.C. § 1332
because the action is between citizens of different states
and the matter in controversy exceeds the sum of $75,000,
exclusive of interest and costs.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

On January 7, 1997, a fire broke out in Hampton's apartment. The fire allegedly started in Hampton's bedroom when a halogen lamp fell over onto the bed setting fire to the bed linens. There is no evidence as to exactly how the lamp tipped over. The fire consumed Hampton's apartment and caused damage to the building, other apartments in the building, and three individuals. Travelers had issued property insurance policies to the owners and various tenants of the building, and pursuant to those policies paid out over one million dollars in claims arising from this fire. Travelers brought this subrogation action against Hunter and Capitol seeking reimbursement with interest of the amounts it had paid to settle these claims.

In its Amended Complaint, Travelers alleges that in or before February 1996, Hunter imported, distributed, and/or sold certain Halogen Adjustable Arm Torchiere Floor Lamps, model number 20727BL in black and model number 20727WH in white. Travelers alleges that Hunter distributed lamps to Defendant Capitol for resale to the public. Hampton's assistant Caprice Titone ("Titone") had purchased two lamps for Hampton, and purchased the fire-causing lamp (the "Lamp") at Capitol. Hampton's valet Rubin Cox ("Cox") assembled the Lamp. Hampton used both lamps in his bedroom in a position whereby the adjustable arm was horizontal to the floor allowing the shade and bulb to point toward the floor ("the downbridge position"). The first lamp fell over at least once burning a hole into the bedroom carpet. That lamp later broke and Hampton began to use the second lamp. Travelers alleges that the Lamp was defectively designed because, despite representations on the packaging, the Lamp did not meet applicable standards; the Lamp was inherently dangerous because the halogen bulb it required can reach temperatures of up to 970 degrees Fahrenheit; and the instructions furnished with the Lamp failed to warn of the Lamp's instability. Travelers asserts eight claims for relief including causes of action in strict liability, breach of warranty, and negligence. Hunter now moves for summary judgment to dismiss all claims brought by Travelers and all cross-claims and counter claims. Capitol moves to dismiss Travelers' claims and asserts claims for full indemnification and reimbursement of all costs, disbursements and legal fees from Hunter.

*Discussion*

**\*2** A motion for summary judgment may be granted under Fed.R.Civ.P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The moving parties bear the burden of proving that no material facts are in dispute. *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.3d 54, 57 (2d Cir.1987). When viewing the evidence, the Court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990); *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). In determining whether a genuine issue of fact has been raised, a court "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Donahue,* 834 F.3d at 57. Courts should "take care not to abort a genuine factual dispute prematurely and thus deprive a litigant of his day in court." *Id.* at 55. Once the movant shows that there are no genuine issues of material fact, the opposing party must produce sufficient evidence to permit a reasonable jury to return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 248, 256. If the court finds that there are factual disputes regarding material issues, summary judgment is not appropriate. *See id.* at 249; *see also Repp & K & R Music, Inc. v. Webber,* 132 F.3d 882, 890 (2d Cir.1997) ( "Clearly, the duty of a court on a motion for summary judgment is ... not to decide factual issues. In this regard, the court's task is issue identification, not issue resolution.").

I. *Hunter's Motion for Summary Judgment*

A. *Product Identification*[FN1]

> FN1. Capitol has adopted Hunter's arguments in its cross-motion for summary judgment. Therefore all references to and decisions made based on arguments made by Hunter will apply to Capitol.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Hunter argues that it cannot be held liable because Travelers cannot prove that Hunter manufactured the Lamp. In a products liability action, the plaintiff bears the burden of proving that the defendant manufactured the product at issue. *See* 210 E. 86 [th] *St. Corp. v. Combustion Eng'g, Inc.,* 821 F.Supp. 125, 142 (S.D.N.Y.1993). A plaintiff must establish by competent proof that the defendant manufactured and placed the injury-causing defective product into the stream of commerce. *Healey v. Firestone Tire & Rubber Co.,* 87 N.Y.2d 596, 601 (N.Y.1996). The evidence of a manufacturer's identity must establish that it is "reasonably probable, not merely possible or evenly balanced" that defendant was the source of the offending product. *Id.* at 601-02; *Moffett v. Harrison & Burrowes Bridge Contractors, Inc.,* 266 A.D .2d 652, 654 (N.Y.App.Div.1999). A manufacturer's identity may be established by circumstantial evidence, even if the allegedly defective product no longer exists. *Healey,* 87 N.Y.2d at 601. However, speculative or conjectural evidence of a manufacturer's identity is not enough. *Id.* at 602; *see also* *Franklin v. Krueger Int'l, Inc.,* No. 96 Civ. 2408, 1997 WL 691424, at [*]4 (S.D.N.Y. Nov. 5, 1997) (finding plaintiff's attorney's mere assertions that the defective chair resembled a chair manufactured by defendant shown in a photograph insufficient evidence).

**\*3** Hunter argues that its Model 20727 lamp is virtually identical to torchiere lamps manufactured or sold by numerous other companies and that there are several differences between Model 20727 and the Lamp, including differences in hole pattern and weight. Hunter claims that the marking "SF Made in Taiwan 211" found on the base of the Lamp is not used on Model 20727 lamps. Hunter claims it provides an Allen wrench and halogen bulb with every lamp and the absence of these items in the Lamp's packaging proves the Lamp was not a Hunter product. Capitol claims not to have sold any lamps during the relevant time period to Titone. Travelers has offered no evidence such as invoices, photos, other documents or deposition testimony to prove the Lamp's purchase thereby connecting it to a store and subsequently to a manufacturer.

Travelers responds that, while there is no receipt for the Lamp's purchase, there is a reimbursement check from Hampton to Titone dated March 1, 1996, indicating that the lamp was purchased before that date. (Titone Trans. at 65) Titone testified that she purchased two lamps for Hampton at Capitol and Fortunoff stores in New Jersey. Travelers argues that because Fortunoff was granted summary judgment and only Capitol remains as a distributor, Capitol sold the Hunter lamp during the relevant time period. Herman Lebersfeld, President of Capitol, testified that Capitol only sold lamps manufactured by Kenroy International, a subsidiary of Hunter. In particular, Capitol sold Hunter Model 20727 lamps during the relevant time period. (Lebersfeld Trans. at 20-22) Capitol cannot account for the sale of every Hunter lamp making it possible that one Model 20727 lamp was purchased by Titone. Travelers submits that it has not been established whether an Allen wrench came with the Lamp. Hampton's valet Rubin Cox assembled the lamp and testified that he does not remember seeing the wrench nor does he remember looking specifically for one. (Cox Trans. at 121) In addition, the physical remains of the Lamp, including the measurements of almost all of Lamp components, match Hunter exemplar lamps. The diameter of the base of the Lamp and the base of both Hunter exemplar lamps is the same. (Crombie Aff. ¶ 8) The lower and upper support poles of Model 20727 have the same diameter, length and weight as those of the Lamp. (Crombie Aff. ¶ 10)

Travelers has presented sufficient circumstantial evidence to create an issue of fact regarding whether Hunter was the manufacturer of the Lamp and Capitol was the distributor. Hampton's reimbursement check to Titone establishes a time frame for the Lamp's purchase, during which time Capitol cannot account for all of its sales of Model 20727 lamps. The similarity between the Lamp and Model 20727 has been shown to a "reasonable probability." Travelers has met its burden. Summary judgment is denied.

B. *Design Defect*

A defectively designed product is one which, when it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use. *Voss v. Black & Decker Manuf. Co.,* 59 N.Y.2d 102, 107 (N.Y.1983). A product may be defective when it contains a manufacturing flaw, is defectively designed, or is not accompanied by adequate warnings. *Liriano v. Hobart*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

*Corp.*, 92 N.Y.2d 232, 237 (N.Y.1998).

1. Design Defect

**\*4** Travelers claims that the Lamp was defectively designed and inherently dangerous because the surface of the halogen bulb reaches temperatures of up to 970 degrees Farenheit, the Lamp does not include a heat shield or other protective device to prevent the bulb from making contact with flammable objects, and the Lamp's design caused it to be inherently unstable and susceptible to tipping over. *See* Am. Compl. ¶¶ 70, 76-77. Hunter argues that the Lamp's design was not faulty, but that Hampton's use of the lamp in the downbridge position was misuse which caused it to tip over and ignite the fire. The claims of design defect and product misuse are thus intertwined. Accordingly, because issues of fact remain on the claim of product misuse, *seeinfra* Part I.D., the design defect claim must also be submitted to a jury.

2. Duty to Warn

Travelers alleges that the instructions that accompanied the Lamp failed to adequately warn consumers of the dangers associated with its heat, lack of a protective shield or screen, and its instability. *See* Am. Compl. ¶¶ 84, 89-90. Analyzing a failure to warn claim is an intensely fact-specific process which includes assessing the feasibility and difficulty of issuing warnings under the circumstances, the obviousness of the risk from actual use of the product, the knowledge of the particular product user, and proximate cause. *SeeAnderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 440 (S.D.N.Y.1999). A manufacturer may not be liable if the risks were sufficiently obvious to the user without a warning. Because of the factual nature of the inquiry, whether a danger is obvious is most often a jury question. *Id.* at 441;*Liriano,* 92 N.Y.2d at 309. Hunter argues that the danger here was obvious to Hampton based on his prior experience with the lamp falling over and burning a hole in the rug. However, courts have cautioned that judges should be wary of taking the issue of liability away from juries, even in situations where the relevant dangers might seem obvious. *Anderson,* 76 F.Supp.2d at 447. Therefore, whether the danger of using the lamp in the downbridge

manner was an obvious danger should be determined by a jury.

A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known, as well as a duty to warn of the danger of unintended uses of a product which are reasonably foreseeable. *Liriano,* 92 N.Y.2d at 237. A manufacturer may also be liable for failure to warn of foreseeable misuse. *Id.* at 240. Hunter argues that use in the downbridge position was not foreseeable because the Lamp was not depicted for use as a reading lamp. Hunter's expert Warren testified that proper use of the lamp was indicated by the diagrams, description as "torchiere" and the nature of the assembly. However, no language regarding what Hunter considered the "proper" configuration of its Model 20727 lamp is stated anywhere on the box, or anywhere on Hunter's Assembly Instructions. (Crombie Aff. ¶ 20) Paragraph 6 of Model 20727's Assembly Instructions states: "[t]he set screw is used to limit the movement of the arms. Raise the arm to a vertical position. Use the Allen wrench provided to turn in the set screw. To adjust the position of the arm assembly, loosen the adjusting handle, position the arms to the desired angle, then tighten the adjusting handle." Hunter's instructions allowed for adjustment to any position. The instructions do not warn against using the lamp in the downbridge position. Because the adequacy of warnings furnished by a manufacturer to avoid any foreseeable misuse by a consumer presents questions of fact, *Johnson v. Johnson Chem. Co., Inc.*, 588 N.Y.S .2d 607, 610 (N.Y.App.Div.1992), summary judgment is denied on this ground.

**\*5** Additionally, there is an issue of fact as to proximate cause. Travelers must show that the presence of a warning would have caused Hampton and his staff to change their behavior. Where "a warning would not have given [a user] any better knowledge of the [product's's] danger than he already had from prior use or than was readily discernible from observation, the absence of a warning could not have proximately caused his injuries." *Barnes v. Pine Tree Mach.*, 261 A.D.2d 295, 295-96 (N.Y.App.Div.1999). It is unknown whether, if Hunter had issued a warning against doing so, Hampton and his staff would not have used the lamp in the downbridge position. Hunter argues that the warning would not have had an effect because

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Hampton's prior experience with the first lamp falling over and burning the rug did not cause him to change his behavior. Hampton argues that because a serious fire did not result from these previous incidents, he was not aware of the possible damage. Further, because the first lamp ultimately broke, Hampton and his staff could have concluded that it fell over because it was always broken. Hunter contends that Cox's testimony regarding how similar he believed the two lamps to be shows that Hampton and his staff were aware of the dangers. (Cox. Trans. at 130) Therefore, there is an issue of fact as to what effect a warning would have had on the behavior of Hampton and his staff. Summary judgment is denied.

C. *Subsequent modification*

Hunter argues that it cannot be held liable because Cox improperly assembled the Lamp by not using the Allen wrench it claims it provides with every Model 20727 lamp. Hunter argues that using the lamp in the downbridge position would not have been possible had the setscrews been properly tightened with the Allen wrench. Hunter argues that this faulty assembly and use of the lamp in as unintended manner constituted a subsequent modification to the lamp.

When a consumer makes a subsequent modification which *substantially alters* the product and is the proximate cause of plaintiff's injuries, the manufacturer cannot be held liable. *Robinson v. Reed-Prentice,* 49 N.Y.2d 471, 485 (N.Y.1980) (emphasis added). A user's substantial modifications of a product that render a safe product defective are not the manufacturer's responsibility. *Id.* at 479. Material alterations that destroy the "functional utility of a key safety feature" are not a manufacturer's responsibility. *Id.* at 480. When a product's design incorporates a certain safety feature, a manufacturer may be held liable under a design defect theory even though the removal of that safety feature caused the accident, provided the product was purposefully manufactured to permit its use without the safety guard. *Lopez v. Precision Papers,* 67 N.Y.2d 871, 875 (N.Y.1986).

Hunter claims that the setscrews were a safety device; however, Hunter did not submit evidence that the setscrew

was intended or marked as a safety device. There were no warnings or instructions regarding using the lamp in a particular manner. Further, it is unclear whether the Allen wrench was in the box of the lamp Hampton purchased allowing for the recommended assembly. Therefore, issues of fact remain regarding substantial modification and summary judgment is denied.

D. *Product Misuse*

**\*6** Hunter claims that Hampton's use of the Lamp in the downbridge position constitutes misuse and absolves Hunter of liability. A manufacturer may be liable for failing to warn of foreseeable misuse of its product. *Liriano,* 700 N.E.2d at 304. Foreseeability requires knowledge of a certain misuse by the particular defendant or in the industry generally. *See Amatulli v. Delhi Constr. Corp.,* 77 N.Y.2d 525, 533 (N.Y.1991). Without evidence of knowledge, a defendant will not be held liable. *Id.* However, even when a consumer admits misuse, a question of fact remains regarding liability. The general rule is that there may be liability in such cases when it is proved that the abnormal use was reasonably foreseeable. *See Johnson Chem. Co.,* 588 N.Y.S.2d at 610, whether a particular misuse is reasonably foreseeable is ordinarily a jury question. *Id.* When a jury might conclude that plaintiff misused the product in a way which ought to have been foreseen by the defendants, an issue of fact has been demonstrated as to whether the warnings furnished by the defendant manufacturer were adequate. *Id.* Here, whether Hampton's use of the lamp was foreseeable and required a warning is a question of fact for the jury. Accordingly, summary judgment is denied.

E. *Breach of Warranty*

Travelers has conceded to Hunter's arguments regarding the warranty claims. Accordingly, those claims are dismissed.

F. *Capitol's Motion*

Capitol moved for summary judgment adopting Hunter's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

arguments on product identification and defectiveness, and making a separate argument on Travelers' negligence claim. Additionally, Capitol seeks indemnification and reimbursement from Hunter. In response, Hunter argues first that Capitol violated Local Civil Rule 56.1 by not submitting a sworn statement of material facts. Local Civil Rule 56.1 requires there "be annexed to the notice of motion [for summary judgment] a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion." Local Civ. R. 56.1(a). The rule further states that "[e]ach statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Local Civ. R. 56.1(d). Capitol submitted only the Declaration of its counsel Joseph J. Gulino in support of its motion which makes references to exhibits in two paragraphs when referring to its motion papers and to Lebersfeld's affidavit. (Gulino Decl. ¶¶ 5, 9)

Failure to comply with the requirements of Local Civil Rule 56.1 constitutes grounds for denial of a motion. *MTV Networks v. Lane,* 998 F.Supp. 390, 393 (S.D.N.Y.1998) (denying defendant's motion for summary judgment because his papers failed to establish the absence of a factual dispute); *see also Rossi v. New York City Police Dep't,* No. 94 Civ. 5113(JFK), 1998 WL 65999, at *4 (S.D.N.Y. Feb. 17, 1998) (denying plaintiff's motion for summary judgment for failure to comply with Local Civil Rule 56.1 by not annexing a short and concise statement of material facts). The moving party's failure to comply with the Rule is particularly troubling because the moving party bears the burden of demonstrating that there is no genuine issue of material fact. *Reiss, et al. v. County of Rockland,* No. 84 Civ.1906, 1985 WL 426, at *1 (S.D.N.Y. Mar. 19, 1985) (denying summary judgment where movant submitted no statement at all and granting leave to re-file in compliance with the rule). A court may decide not to consider any statements made by a party in their Rule 56.1 statement that are not supported by a citation to the record. *See Shepard v. Frontier Communication Servs.,* 92 F.Supp.2d 279, 284 (S.D.N.Y.2000) (granting defendants' motion for summary judgment where several statements of disputed facts were not supported by a citation to the record).

**\*7** A district court has broad discretion whether to overlook a party's failure to comply with local court rules. *Holtz v. Rockefelier & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001). While this Court could deny Capitol's motion on the basis of Capitol's failure to comply with Local Civil Rule 56.1, there is no need to do so on that basis as Capitol's motion is denied on other grounds.

A. *Negligence*

Capitol argues that it is not liable in negligence because the lamp was sold in a sealed container and no alterations were made to the lamp. Under New York law, a retailer can be held liable in negligence if it fails to detect a dangerous condition that it could have discovered during a normal inspection while the product was in its possession. *See McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 68 (1962); *Schwartz v. Macrose Lumber & Trim Co.,* 270 N.Y.S.2d 875, 886-87 (N.Y.Sup.Ct.1966). A seller has a duty to give reasonable warnings of known latent dangers. *McLaughlin,* 11 N.Y.2d at 68-69. However, a retailer cannot be held liable for injuries sustained from the contents of a sealed product even though a testimony have uncovered a potential danger; no such obligation is imposed on a retailer. *Brownstone v. Times Square Stage Lighting Co., Inc.,* 333 N.Y.S.2d 781, 782 (N.Y.App.Div.1972); *Alfieri v. Cabot Corp.,* 235 N.Y.S.2d 753, 757 (N.Y.App.Div.1962), *aff'd* 13 N.Y.2d 1027 (N.Y.1963).

Lebersfeld testified that Capitol assembled several of its lamps, including Model 20727, as floor models for display and sale to customers. (Lebersfeld Trans. at 149-50, 160) Titone also testified that the lamps she purchased were on display in the store showrooms (Titone Trans. at p. 21, 38, 92) and that the salesperson demonstrated using the lamp with the bulb tilted toward either the ceiling or floor. (*Id.* at 24) Capitol claims the packages were sealed and it had no duty to inspect them. No evidence has been submitted regarding whether Capitol inspected the display lamps. An inspection of those lamps may have revealed a danger. Therefore an issue of fact remains as to whether Capitol met its duty to inspect. Summary judgment is denied.

B. *Indemnification and Reimbursement*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)
(Cite as: 2002 WL 109567 (S.D.N.Y.))

Capitol argues that it is entitled to indemnification and reimbursement for fees, costs and disbursements from Hunter. Capitol argued that it engaged in no wrongdoing and full responsibility lies with Hunter. Capitol's motion for indemnification is premature.

Indemnity obligations can be created by contract or implied in law. Here there was no contractual agreement; the issue then is whether Capitol is entitled to common law indemnification. The right to indemnification may be implied by law to prevent an unfair result or the unjust enrichment of one party at the expense of another. *Cochrane v. Warwick Assoc., Inc.,* 723 N.Y.S.2d 506, 508 (N.Y.App.Div.2001). The right of common law indemnification belongs to parties found vicariously liable without proof of any negligence or active fault on their own part. *Colrer v. K Mart Corp.,* 709 N.Y.S.2d 758, 759 (N.Y.App.Div.2000). A finding that Capitol was negligent would preclude an indemnity award. Because an issue of fact remains as to Capitol's negligence, this Court cannot at this time find Hunter liable in indemnification. Capitol's motion is denied.

**\*8** Capitol has moved to recover attorney's fees and costs incurred during this litigation. The universal rule is not to allow a litigant to recover damages for the amounts incurred in the successful prosecution or defense of its rights. *Mighty Midgets Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12, 21-22 (N.Y.1979). Under the American Rule, no attorneys' fees are recoverable absent express statutory authority for such an award. *See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 616, 561-62 (1986); *Jane Doe v. Karadzic,* No. 93 Civ. 0878, 2001 WL 986545, at \*2 (S.D.N.Y. Aug. 28, 2001). Here this is no statutory authority for an award. Therefore, Capitol's motion is denied.

*Conclusion*

For the reasons outlined above, Hunter's and Capitol's Motions for summary Judgment are hereby denied. Capitol's motion for indemnification, and reimbursement for costs and fees is denied.

The parties are hereby given a Ready for Trial date of May 13, 2002. A copy of this Court's Pre-trial Requirements is forwarded to counsel with this Opinion.

SO ORDERED.

S.D.N.Y.,2002.
Travelers Indem. Co. of Illinois v. Hunter Fan Co., Inc.
Not Reported in F.Supp.2d, 2002 WL 109567 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Gary ETHIER, Plaintiff,
v.
CITY OF COHOES, New York, James Ward, Patrick
Abrams, and Jeffrey Guzy, Defendants.
No. 1:02-CV-1584.

April 18, 2006.

David Brickman, Office of David Brickman, Albany, NY,
for Plaintiff.

Gregg T. Johnson, Jacinda Hall Conboy, Girvin, Ferlazzo
Law Firm, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** Plaintiff Gary Ethier commenced the instant action
against Defendants claiming violations of his civil rights
in connection with his employment as a police officer for
the City of Cohoes, New York. Presently before the Court
is Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56 seeking dismissal of the Complaint in its
entirety.

**I. FACTS**

Plaintiff was a police officer with the City of Cohoes,
New York. During his first few years with the Cohoes
Police Department ("CPD") (1991-1993), Plaintiff was
trained and/or supervised by Defendants James Ward
("Ward") and Patrick Abrams ("Abrams"). On August 21,
1995, Plaintiff drove his police vehicle onto a curb and
sidewalk, nearly striking a pedestrian with the vehicle. As
a result of this incident, Plaintiff was the subject of an
internal investigation by the CPD. Plaintiff ultimately
pleaded guilty to violating Cohoes Police Department
General Order 0012-95 entitled "Rules of Conduct" and

agreed to undergo a psychological evaluation, undertake
remedial instruction on the operation of a police vehicle,
and take any tests deemed necessary by the psychologist.

On February 24, 1997, Plaintiff arrested Patrick
O'Donnell. After the arrest, but before Plaintiff transported
O'Donnell to the police station, O'Donnell suffered
injuries to his head and face. There also was damage to the
rear window of a police vehicle. As a result of this
incident, Plaintiff was the subject of an internal
investigation.

On January 8, 1998, while Plaintiff was in pursuit of
Richard Maynard, Mr. Maynard's body struck the ground
and/or a retaining wall on multiple occasions before
Plaintiff placed Maynard under arrest, causing Maynard to
suffer injury to his face. As a result of this incident,
Plaintiff was the subject of an internal investigation. This
investigation resulted in Plaintiff's pleading guilty in April
1998 to violating Cohoes Police Department General
Order 92-5 ("Off Duty Arrests"). As a result of this guilty
plea, Plaintiff agreed that he would receive a letter of
reprimand and thirty day suspension without pay, which
suspension was to be held in abeyance for one year unless
Plaintiff was found guilty of violating Cohoes Police
Department General Order 92-5 or 0019-48 ("Physical
Force") as a result of the January 8, 1998 incident
involving the arrest of Maynard.

On September 25, 1998, Plaintiff placed John Gaston
upon or against a police vehicle while attempting to arrest
him. During the course of the arrest, Gaston suffered
injury to his face and body and there was damage to the
police vehicle, including a dented fender and cracked
windshield. This incident resulted in an internal
investigation.

In 1998, there were discussions in the CPD regarding
Plaintiff's participation in the D.A.R.E. program with the
Cohoes City School District. School District officials
advised Defendants that if Plaintiff was permitted to
participate in the D.A.R.E. program, the school would
drop the program.[FN1]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

FN1. Although Plaintiff denies this allegation, he fails to point to any record evidence tending to suggest that it is not true. Accordingly, this fact is deemed admitted. N.D.N.Y.L.R. 7.1(a)(3).

**\*2** On February 3, 1999, Plaintiff effected a traffic stop of Eric Sawyer. Plaintiff kicked and struck Sawyer before restraining Sawyer, causing injury to Sawyer's face. This conduct resulted in another internal investigation.

On February 16, 1999, Plaintiff physically restrained Eugene Aquilina and pushed Nicole Brown while attempting to arrest Aquilina. Brown lodged a civil complaint against Plaintiff alleging excessive force and misconduct. This incident also was the subject of an internal investigation.

On March 5, 1999, Plaintiff physically restrained and maced Kyle Durocher while attempting to arrest him. Durocher filed a civil complaint against Plaintiff alleging excessive force and misconduct. This incident was the subject of an internal investigation.

On March 12, 1999, Plaintiff stopped a vehicle suspected of violating the New York State Vehicle and Traffic Law. According to Plaintiff, he smelled alcohol and believed the driver to be driving under the influence of alcohol. The driver of the vehicle was Defendant City of Cohoes Corporate Counsel, John Doherty. Plaintiff contends that he administered sobriety tests and an alco-sensor test to Doherty, all of which he failed. Plaintiff further contends that Sergeant Kubik, who was at the scene, spoke with Defendant Ward who advised that Plaintiff was to bring Doherty to the police station where he was to be released to someone who had not been drinking. When Plaintiff returned to the police station with Doherty, a taxi was called for Doherty and he was released. Plaintiff was neither reprimanded nor charged with respect to his conduct on March 12, 1999.

On March 17, 1999, Plaintiff was involved in a heated verbal exchange with CPD Detective Thomas Ross and his spouse at Mac's Tavern and Restaurant. By memorandum dated March 26, 1999, Plaintiff was advised that an internal investigation was being conducted with respect to the March 17 incident.

A meeting was conducted with CPD Chief Heslin, Defendant Ward, Lieutenant Ross, and Plaintiff concerning the March 17, 1999 incident. During the meeting, Plaintiff made a remark concerning Ross' wife, after which Ward ended the meeting and escorted Plaintiff out of the CPD.FN2

FN2. Plaintiff denied this assertion, which is contained in Defendant's N.D.N.Y.L.R. 7.1(a)(3) statement of material facts. The denial is not supported by a citation to the record as required by that rule. Accordingly, Defendants' assertion (and all other assertions to which Plaintiff asserted a blanket denial with no citation to the record) is deemed admitted. *See* n. 1 *supra.*

On or about March 22, 1999, Ward assigned Plaintiff to formal training. The formal training consisted of Plaintiff's being assigned to Sergeant Kubik when Kubik was working. When Kubik was not working, Plaintiff was to perform inside duties and not leave the police station without a supervisor. Plaintiff also was prohibited from assuming the duties of a tour supervisor. It was also ordered that Plaintiff would not be counted as manpower so, if the need arose, the CPD may have to call for overtime.

In April 1999, Plaintiff was directed to submit to a mental health evaluation. On April 22, 1999, Kubik prepared a memorandum indicating that Plaintiff had met the training objectives set forth on March 22, 1999. On April 28, 1999, Plaintiff was assigned to a two-man unit. Plaintiff continued to be prohibited from acting as a tour supervisor.

**\*3** On October 20, 1999, Plaintiff returned to unrestricted duty. Plaintiff consented to the withdrawal of all contractual grievances he and/or his union filed on his behalf between March 17, 1999 and October 20, 1999. On November 14, 1999, Plaintiff violated CPD Order 0057-95 by leaving his post without proper notification.

On March 24, 2000, Plaintiff entered a dwelling occupied by Hani Khalil. Plaintiff used physical force to arrest Khalil. Khalil lodged complaints against Plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

alleging an unlawful search, the use of excessive force, and misconduct. This resulted in an internal investigation.

On May 8, 2000, Plaintiff was issued a Notice of Discipline. Plaintiff requested an arbitration hearing concerning the Notice of Discipline. Following a full evidentiary hearing at which Plaintiff was represented by counsel, the arbitrator found Plaintiff guilty of various charges against him. Plaintiff was found guilty of violating CPD Order 12-95 (Rules of Conduct), 19-94 (Use of Force), 15-95 (Prisoners Detained in Cellblock),[FN3] 57-95 (Patrol Zones), and 98-95 (Constitutional Guarantees). In all, Plaintiff was found guilty of eight out of twenty-one charges. The arbitrator imposed a penalty of two months suspension without pay. There was no appeal of the arbitrator's decision.

> **FN3.** Plaintiff required Khalil to remove his pants while in the cell block without any reason to believe that such action was necessary.

On May 18, 2001, Plaintiff was again charged with misconduct. It was alleged that Plaintiff gave false testimony. Specifically, there was an allegation that Plaintiff was present during the arrest of Bret Woodworth, who claimed that the CPD used excessive force against him. At Woodworth's trial, Plaintiff denied remembering arresting Woodworth. Defendant Guzy, on the other hand, testified that Plaintiff was present during the arrest, raising a conflicting account of the incident. It was Plaintiff's position that he was outside during the arrest and, therefore, not present. At a subsequent administrative hearing, Guzy admitted that Plaintiff was not, in fact, involved in Woodworth's arrest. Defendants sought to terminate Plaintiff's employment if he was found guilty of the charges. These charges resulted in no guilty findings and Plaintiff was reinstated with all of his pay and benefits.

Plaintiff's police vehicle sustained damage on January 23, 2003. Plaintiff failed to timely report this damage. This was the subject of an internal investigation. On March 18, 2003, Plaintiff accepted the finding that he violated the CPD rules for failure to report damage to his vehicle. Plaintiff also accepted the disciplinary action of two week suspension without pay and forfeiture of two weeks accrued vacation.

Effective April 20, 2003, Plaintiff was appointed to a position of police officer with the Rennselaer Police Department. On April 21, 2003, Plaintiff voluntarily signed a letter of resignation and sent it to the CPD.

Based on the foregoing, Plaintiff commenced the instant action pursuant to 42 U.S.C. § 1983 alleging violations of his First, Fifth, and Fourteenth Amendment rights. Defendants now move to dismiss the Complaint in its entirety.

## II. STANDARD OF REVIEW

**\*4** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams*, 193 F.3d 581, 592 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the Court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant is able to establish a basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor. *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir.2002). However, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

522, 525-26 (2d Cir.1994), or on conclusory allegations or unsubstantiated speculation.  Scotto v. Almena, 143 F.3d 105, 114 (2d. Cir.1998). With this standard in mind, the Court will address Defendants' motion.

**III. DISCUSSION**

a. *Due Process*

Defendants move to dismiss the "stigma plus" due process claims on the grounds that: (1) Plaintiff's employment was not terminated and, thus, he was not deprived of a property interest; and (2) he was afforded due process of law with respect to the charges against him. Plaintiff has failed to respond to this portion of Defendants' motion, thereby indicating his consent to the dismissal of this claim. *See* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its entitlement to the relief requested therein, the non-moving party's failure to file or service any papers as this Rule requires shall be deemed as consent to the granting ... of the motion.")

With respect to the charges filed against Plaintiff, the uncontroverted evidence is that he was afforded all process due. Specifically, Plaintiff was given notice of the charges against him and was afforded the opportunity of a full pre-deprivation hearing at which time he could be represented by counsel, presented with the evidence against him, and present his own evidence. In several instances Plaintiff did not avail himself of this opportunity, *see* Def.'s Rule 7.1(a)(3) stmnt. at ¶¶ 33, 66, thereby waiving his due process claims. *Morrisroe v. Safir*, 1998 WL 709822, at *2 (S.D.N.Y.1998). In another instance, a full hearing was held at which several charges were upheld against Plaintiff. *Id.* at ¶¶ 42, 44, 52. Plaintiff declined to appeal the decision. *Id.* at ¶ 54. Plaintiff again invoked this procedure with respect to the perjury charges. After a full hearing, Plaintiff was acquitted of the charges. *Id.* at ¶¶ 62, 63, 64. It is, thus, evident that Plaintiff was afforded all process that was due. *See Patterson v. City of Utica*, 370 F.3d 322, 329 (2d Cir.2004).

**\*5** To the extent Plaintiff asserts a stigma-plus claim, that claim, too, must fail. "A person's interest in his or her

good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.... Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment." *Id.* at 329.

Here, Plaintiff fails to identify any such tangible interest. Plaintiff was not terminated from his employment with the CPD. Plaintiff does not point to any other actions undertaken by Defendant that amount to a loss of a sufficient tangible interest to sustain a stigma-plus claim. Assuming Plaintiff can identify other tangible interests, he fails to point to any false statements made public by Defendants for which he was not afforded a name clearing hearing. Although Plaintiff was the subject of several charges that resulted in his being suspended without pay for sixty days, Plaintiff was afforded a full hearing after which he was found not guilty of some of the charges against him and found guilty on eight of the charges. With respect to other charges or disciplinary actions against Plaintiff, he either withdrew his grievances or consented to the findings against him. *See.* Def's Rule 7.1(a)(3) stmnt. at ¶¶ 10, 33, 66. Thus, any employment decisions (such as his suspension) were based on charges found to be true and for which he was afforded the opportunity of a hearing. With respect to the perjury allegations, Plaintiff was afforded a full administrative hearing and exonerated of the charges. No employment action was taken against him on account of any alleged perjury. Accordingly, Plaintiff's due process claims must be dismissed. *Id.*

**b. First Amendment**

Plaintiff also claims that he was retaliated against for engaging in protected speech. Plaintiff contends that his desire to arrest Corporation Counsel Doherty constituted speech on a matter of public concern and that Defendants retaliated against Plaintiff for engaging in such protected speech. Although Plaintiff cites many cases for the proposition that speech directed at the integrity of government entities constitutes protected speech (a proposition with which this Court does not disagree), the fundamental problem with Plaintiff's claim is there is no evidence that he engaged in protected speech or that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

Defendants were aware of any such speech.

While the determination of whether speech is protected "may be somewhat fact-intensive, it presents a question of law for the court to resolve." *Johnson v. Ganim,* 342 F.3d 105, 112 (2d Cir.2003). Whether speech is protected depends on its context, form and content. *Connick v. Myers,* 461 U.S. 138, 147-48 (1983). Speech by a public employee is on a matter of public concern, and protected by the First Amendment, if it relates "to any matter of political, social, or other concern to the community." *Id.* at 146. "However, speech that relates primarily to matters of personal interest or internal office affairs, in which the individual speaks as an employee rather than as a citizen, will not support a First Amendment retaliation claim." *Kelly v. City of Mount Vernon,* 344 F.Supp.2d 395, 402 (S.D.N.Y.2004). Speech that arises in the usual course of a public official's duties is generally not protected. See *Cahill v. O'Donnell,* 75 F.Supp.2d 264, 273 (S.D .N.Y.1999)("A communication by an employee to an employer in the course of the employee's normal duties, in routine form, and containing standard contents, is not likely to address a matter of public concern."). Speech about individual or isolated problems within a police department, or one of its officers, are not matters of public concern. *Cahill,* 75 F.Supp.2d at 272 (internal office affairs are not matters of public concern.). As the Supreme Court has stated: "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case." *Connick,* 461 U.S. at 147-49. On the other hand, a claim of systemic or endemic problems in a public department might rise to the level of protected public speech. See *Collins v. Christopher,* 48 F.Supp.2d 397, 408 (S.D.N.Y.1999)(collecting cases),

**\*6** The uncontroverted evidence before the Court is that on March 12, 1999, Plaintiff pulled over a car that was being driven by Corporation Counsel Doherty. Plaintiff smelled alcohol emanating from the driver and, therefore, instructed the driver to exit the vehicle to perform sobriety tests. According to Plaintiff, Doherty failed the tests. Based upon Sergeant Kubiks' direction (Kubik having received orders from Defendant Abrams), Plaintiff did not arrest Doherty and, instead, drove him to

the police station where he was then released. There is no evidence in the record that Plaintiff expressed his desire to arrest Doherty, that he disagreed with Abrams's order not to arrest Doherty, that Plaintiff otherwise spoke out on the issue of letting Doherty go, that Plaintiff was raising concern about the covering up of the criminal acts of political figures, or was otherwise raising concern about endemic issues within the police department. The mere acts of performing his duties as a police officer by pulling Doherty over, administering sobriety tests, taking him to the police station, and letting him go were all within the course of Plaintiff's employment as a police officer and, therefore, not protected speech. See *Kelly,* 344 F.Supp.2d at 403 (finding that a police officer's investigations into illegal firearms which involved the mayor's son and the child of another police officer were not protected speech because they arose during a normal police investigation).

In support of his claim, Plaintiff cites to his Exhibit B which is a memorandum dated March 16, 1999 written from Plaintiff to Ward. That memorandum, however, does not evidence Plaintiff's having engaged in protected speech. A review of the memorandum reveals that it is Plaintiff's fact based recount to Abrams of the events of March 12, 1999. Nowhere in that memorandum does Plaintiff indicate that he wanted to arrest Doherty, that he thought Doherty should be arrested, that he disagreed with the decision to let Doherty go, that he was complaining about pervasive problems within the police department, or that he was discussing any problem within the CPD. In his memorandum of law, Plaintiff contends that he insisted that Doherty be arrested. Plaintiff points to no evidence to back this up.[FN4] Plaintiff does not even submit an affidavit stating that he intended his memorandum to be a report of wrongdoing within the CPD or to otherwise constitute speech on a matter of public concern. See *Morris v. Crow,* 142 F.3d 1379, 1382 (11th Cir.1998) ("Not only must the speech be related to matters of public interest, but the purpose of the expression must be to present such issues as matters of 'public' concern.") (holding that a police report prepared by a police officer concerning his investigation into a traffic accident did not constitute protected speech).[FN5]

FN4. The Court declines to scour the record in an attempt to find triable issues of fact. See

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

*Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted)

FN5. Moreover, there is evidence suggesting that Plaintiff's actions were motivated purely by his own personal self-interest. It appears that, at the time of the March 12 incident, Plaintiff was seeking to have a clause inserted into the relevant collective bargaining agreement ("CBA") whereby the municipality would indemnify officers for punitive damages awarded against them. Doherty opposed having such a clause in the CBA. There is testimony that Plaintiff had expressed a desire to "get back" at Doherty for his position on the issue.

Even if Plaintiff subjectively believed that he was engaging in protected speech, Abrams would not reasonably have understood Plaintiff's memorandum as complaining about government integrity or concealing the drunk driving of a political figure. There is no indication that there was endemic problems concerning the covering up by the CPD of the criminal activities by politicians or other systemic problems in the CPD. The only reasonable conclusion is that Plaintiff was speaking as a public employee and not as a public citizen. Accordingly, the Court finds that Plaintiff did not engage in protected speech. Plaintiff's First Amendment claims must, therefore, be dismissed.

*7 Even assuming, *arguendo,* that Plaintiff did engage in protected speech, there is insufficient evidence of a nexus between any such speech and any alleged adverse employment action. The Court recognizes the close temporal proximity between the March 12, 1999 arrest of Doherty and Plaintiff's being subjected to a change in his work duties commencing on March 22, 1999. The Court further recognizes that a close temporal relationship between the protected activity and the adverse employment action can give rise to an inference of causation. In this case, however, to hold that the temporal

relationship is sufficient would be to ignore the overwhelming uncontroverted evidence of Plaintiff's misconduct leading up to the March 26, 1999 letter changing Plaintiff's duties (the "March 26 letter") and the lack of any evidence tending to suggest that the Doherty incident had anything to do with Plaintiff's discipline. *See Simpson v. New York State Dept. of Civil Services,* 2006 WL 93011 (2d Cir. Jan. 9, 2006) ("While the temporal proximity of these events gives rise to an inference of retaliation for the purposes of appellant's prima facie case, without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext.") (citing *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir.1998) for the proposition that a "strong temporal connection between the plaintiff's complaint *and* other circumstantial evidence is sufficient to raise an issue with respect to pretext.") (emphasis in original); *Colon v. Coughlin,* 58 F.3d at 872-873; *Ayers v. Stewart,* 101 F.3d 687, 1996 WL 346049, at *1 (2d Cir.1996) (unreported decision); *Richter v. Monroe County Dept. of Social Serv.,* No. 01 Civ. 6409, 2005 WL 351052, at *14 (W.D.N.Y. Feb. 11, 2005) ("Temporal proximity alone is insufficient to carry plaintiff's burden of proof beyond the prima facie stage, and nothing she has submitted shows that she will be able to persuade a fact-finder that the retaliation played a part in her termination."); *Ziemba v. Thomas,* 390 F.Supp.2d 136, 157 (D.Conn.2005).

It is undisputed that Plaintiff had a lengthy history of misconduct, including the use of excessive force, going back to at least as far as 1995. In the first three months of 1999 alone, he was the subject of three complaints of the excessive use of force-one on February 3, 1999, another on February 16, 1999, and another on March 5, 1999. On March 17, 1999, after the March 12 Doherty incident involving Doherty and before the issuance of the March 26 letter, Plaintiff admits he was involved in a heated exchange with Detective Ross and his spouse. There is further evidence that, during a meeting later that day, Plaintiff insulted Detective Ross's wife, which caused Ward to end the meeting and escort Plaintiff out of the police station. On March 26, 1999, Plaintiff was ordered to undergo additional training, to be supervised by Kubik, and disqualified from being a tour supervisor.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

**\*8** This history of misconduct gave Defendants ample reason to require Plaintiff to undergo additional training and to require that Plaintiff be under the supervision of Kubik. Moreover, the terms of the March 26 letter clearly relate to Plaintiff's prior incidents of misconduct. Part of that training included reviewing with Plaintiff department policies on the rules of conduct and the use of force. Directive 1 and 3 of the March 26 letter obviously related to the incident between Plaintiff and Detective Ross. Specifically, those directives prohibited Plaintiff from entering the restaurant at which the incident occurred, prohibited Plaintiff from communicating with persons involved in the incident, and required Plaintiff to report any contact with any persons involved in the incident. Nothing about the March 26 letter tends to suggest that it was issued on account of the March 12 incident involving Doherty. Other than the previously discussed memorandum from Plaintiff to Ward, there is no evidence in the record that Plaintiff ever spoke to Ward or anybody else about the Doherty incident, or that any of the Defendants discussed the Doherty incident with Plaintiff or amongst themselves. In fact, Plaintiff specifically admitted that he never received a written reprimand concerning his conduct on March 12, 1999, nor did Plaintiff receive any disciplinary charges which referred to his conduct on March 12, 1999. Def.'s Rule 7.1(a)(3) stmnt. at ¶ 25. It, therefore, cannot be said that a fair minded trier of fact could reasonably conclude that the March 12 Doherty incident was a motivating factor in the March 26, 1999 change in Plaintiff's duties.

On March 15, 1999, Plaintiff made a request to Abrams to switch one of his days with Abrams. Abrams is purported to have responded "start acting like a cop and I'll treat you like one." Even assuming Abrams' refusal to switch days with Plaintiff was on account of protected speech, the refusal to switch a day of work is not an adverse employment action. Moreover, the evidence before the Court is that, although Abrams initially denied Plaintiff's request, he ultimately granted it.

Further, any claim that the March 12, 1999 incident caused the March 26, 1999 change in duties is time-barred. Plaintiff's Complaint was filed on December 23, 2002, which is more than three years after Plaintiff was returned to full active duty in October 1999 and long

after the issuance of the March 26, 1999 letter. The same reasoning would apply to any other claimed adverse employment actions that occurred prior to December 23, 1999, including Plaintiff's claim that he was illegally subjected to a mental health evaluation in March 1999, or that his request to switch certain days off was denied. These allegations are time-barred.

With respect to any other alleged employment actions identified by Plaintiff (a verbal counseling in March 2000, the March 2000 investigation into the Khalil incident, and any subsequent incidents), they all occurred long after the March 12, 1999 and, thus, no inferences of causation may be drawn between the timing of the March 12, 1999 Doherty incident and these other alleged adverse employment actions. Plaintiff has failed to point to sufficient other circumstantial evidence from which a fair-minded trier of fact could reasonably conclude that these other incidents in 2000 and later were on account of the March 12, 1999 Doherty incident.[FN6] Defendants did not take any employment actions against Plaintiff except as imposed by an independent arbitrator and/or as consented to by Plaintiff. Accordingly, no fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to adverse employment action on account of the March 12, 1999 Doherty incident.

> [FN6.] Plaintiff alleges that Sergeant Meeker stated "But it's Gary Ethier, and when it comes to Gary Ethier you know that there is special circumstances that we have to follow." This statement attributed to Sergeant Meeker does not come from an affidavit of Sergeant Meeker or deposition testimony from Sergeant Meeker. In fact, Plaintiff claims this statement to have made, but provides no citation in the record to support it. This statement is hearsay and will not be considered in connection with the pending motion.

## IV. CONCLUSION

**\*9** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN ITS ENTIRETY. Plaintiff's Complaint is DISMISSED. The Clerk of the Court shall close the file in this matter.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1007780 (N.D.N.Y.)

(Cite as: 2006 WL 1007780 (N.D.N.Y.))

   IT IS SO ORDERED.

N.D.N.Y.,2006.

Ethier v. City of Cohoes
Not Reported in F.Supp.2d, 2006 WL 1007780
(N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Darryl L. FREEMAN, Plaintiff,
v.
Glenn S. GOORD, Commissioner of the Dep't of
Correctional Services of the State of New York, et al.,
Defendants.
No. 02 Civ. 9033(PKC).

Dec. 7, 2005.
MEMORANDUM AND ORDER

CASTEL, J.

*1 Plaintiff Darryl L. Freeman, an inmate in the custody of the Department of Correctional Services of the State of New York ("DOCS"), brought this action pursuant to 42 U.S.C. § 1983, alleging constitutional violations by DOCS administration and staff. He alleges, *inter alia,* that defendants retaliated against him for previously filing a Section 1983 action (which has since been dismissed), and violated his First, Eighth and Fourteenth Amendment rights. Defendants Goord, Roy, Mazzuca, Ercole and Armstrong have moved for summary judgment on plaintiff's remaining claims.

For the reasons explained below, defendants' motion is granted.

*Procedural History*

Freeman filed his Amended Complaint ("AC") on January 14, 2003, naming as defendants 16 individuals, including four John Does.[FN1] Defendants moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(6). By Order dated September 8, 2004, I dismissed, with plaintiff's consent, all claims against defendants Block, Johnson, Smith and Travis. Plaintiff also represented that he did not seek to assert an Eighth Amendment claim based upon deliberate indifference to serious medical needs, so, to the extent the AC asserted such a claim, it was voluntarily dismissed. See Freeman v. Goord, 2004 WL 2002927 at *1-*2 (S.D.N.Y. Sept. 8, 2004) ("*Freeman I*" ). I also dismissed any purported claim against defendant Beasor, as the AC did not adequately allege his personal involvement in any constitutional deprivation. *Id.* at *6. Additionally, I dismissed claims against all defendants in their official capacities as barred by the Eleventh Amendment. *Id.* at *7.

> FN1. In my prior opinion on defendants' motion to dismiss, I observed that 14 defendants, including two Does, were named. Two Does, while not appearing in the caption of the AC, were, in fact, named as defendants in the body of the complaint, but never served. Plaintiff has failed, at the summary judgment stage, to come forward with the identity of the Doe defendants or explain his failure to do so. The claims against the Doe defendants are dismissed.

Defendants moved to dismiss plaintiff's retaliatory urinalysis claim on the ground of lack of exhaustion, and premised their motion on materials outside the pleadings. I converted that branch of defendants' motion into one for summary judgment, limited to the exhaustion issue, and afforded plaintiff an opportunity to submit evidence in opposition to summary judgment. *Id.* at *2-*4. After considering plaintiff's supplemental submission, I granted defendants' motion on exhaustion grounds, and dismissed plaintiff's claim based upon a retaliatory urinalysis. *See Freeman v. Goord, 2004 WL 2709849 (S.D.N.Y. Nov. 23, 2004)* ("*Freeman II*" ).

Familiarity with the decisions in *Freeman I* and *Freeman II* is assumed. I will set forth the facts relevant to the remaining claims, accepting plaintiff's version of the facts as true together with such other facts as are undisputed, and drawing all reasonable inferences in favor of the plaintiff.

*Background*

On August 16, 1999, plaintiff filed a complaint in this district seeking damages under 42 U.S.C. § 1983 for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

alleged violations of his Eighth Amendment right to be free from cruel and unusual punishment. The action was premised on alleged deliberate indifference to a serious medical condition. Plaintiff named as defendants several individuals who were then employed by DOCS at Fishkill Correctional Facility, where plaintiff was then housed. Defendant Goord, who was then, as he is now, DOCS Commissioner, was also named in plaintiff's prior suit, and is the only defendant here who was also a defendant in the 1999 action. Magistrate Judge Peck, to whom the case was assigned on consent, dismissed plaintiff's 1999 complaint at the summary judgment stage. *See* *Freeman v. Strack,* No. 99 Civ. 9878(AJP), 2000 WL 1459782 (S.D.N.Y. Sept. 29, 2000). No appeal was taken.

***2** On January 1, 2000, plaintiff was escorted from his housing unit at Fishkill to the gym area and was administered the urinalysis discussed in *Freeman II.* When he was returned to his cell, he observed the cell being searched by defendant Armstrong and another unidentified corrections officer. (Freeman Aff. ¶¶ 3-4) Later that evening, plaintiff spoke with a Sergeant Spaulding (not a defendant in this suit), and complained that the searching officers failed to leave a "cube search slip," failed to sign the unit log book indicating that they had conducted the search, and failed to leave the cell in the condition it had been in prior to the search. (*Id.* ¶ 4)

The next afternoon, January 2, 2000, while plaintiff was doing research in the law library, he was told to gather his papers and was escorted to the mess hall, where he was frisked, handcuffed and then taken to the facility's Special Housing Unit ("SHU"). He remained in the SHU until about 7:30 p.m., when he was transported from Fishkill to Downstate Correctional Facility. (*Id.* ¶¶ 5-6) Plaintiff claims to have been housed under SHU status, which is more restrictive than being housed with the general population of a correctional facility, for his entire stay at Downstate, a period of eight days. (*Id.* ¶¶ 6-7) [FN2] On January 7, 2000, plaintiff's security classification was changed from medium to maximum. (Ercole Decl. ¶ 20, Ex. B) Plaintiff was then transferred from Downstate to Attica Correctional Facility, departing Downstate on January 10 and arriving at Attica on January 11, 2000. (Freeman Decl. ¶ 7; Olmstead Decl. ¶ 5)

FN2. Although not material to the disposition of this motion, defendants contend that plaintiff was in the SHU for only five of those days, and was thereafter treated as a general population inmate. (Olmstead Decl. ¶¶ 4-5)

On January 25, 2000, plaintiff's wife wrote a letter to defendant Goord, inquiring as to why plaintiff had been transferred to Attica. (Roy Decl. ¶ 6) Goord forwarded the letter to defendant Roy for a response. Roy wrote back to Mrs. Freeman on February 16, 2000, and informed her that plaintiff's transfer to Attica was a result of "negative behavior." [FN3] (*Id.* ¶ 6, Ex. A)

FN3. The letters also mention plaintiff's temporary housing at Sing Sing Correctional Facility for purposes of a deposition. Plaintiff has not raised any claims related to his time at Sing Sing.

On August 7, 2000, plaintiff wrote a letter to Goord, complaining of his transfer to Attica and the change in his security classification. In that letter, plaintiff asserted that the transfer was "based on unsubstantiated allegations that were arbitrarily and capriciously enforced without the customary and regulatory benefit of presenting such allegation for disciplinary determination." Specifically, plaintiff wrote that he was "never issued a misbehavior report, [he] never had a hearing, neither was [he] ever informed why [he] was transferred from a medium correctional facility back to a maximum correctional facility." He wrote that other inmates accused of taking part in the same alleged strike or demonstration in which the administration had accused him of being involved had been issued misbehavior reports and thus had been afforded hearings on the alleged misbehavior. Plaintiff asserted that his transfer was "for retaliatory purposes; retaliatory because I chose to exercise my first amendment right to be free from cruel and unusual punishment." He requested that he be redesignated as a medium security inmate and moved to a facility closer to New York City. (Roy Decl. ¶ 7; AC Ex. 12) Defendant Roy was assigned to respond to this letter as well, and, on August 29, 2000, wrote back to plaintiff, informing him that a request for reduced security placement had already been received but, based on information received from the Office of Classification and Movement, had been denied after

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

review and consideration. Roy suggested that plaintiff seek the assistance of his assigned counselor for future transfer requests. (AC Ex. 13)

**\*3** On December 19, 2000, plaintiff again wrote to Goord, complaining that his transfer and change in classification were ordered despite the fact that he had not received a misbehavior report or been afforded a hearing. He also noted that requests for a change back to medium security had been submitted in March and June 2000, but denied. He requested a change in his security classification back to medium and a transfer to a medium security facility. (AC Ex. 15) Roy was once again assigned to respond to plaintiff's letter and, in a letter dated January 16, 2001, again suggested that plaintiff seek the assistance of his assigned counselor at his next quarterly review for matters regarding transfer requests. (Roy Decl. ¶ 12, Ex. C)

On February 8, 2001, plaintiff wrote a letter to defendant Mazzuca, with copies to defendants Goord and Ercole among others, in which he described his prior section 1983 suit and described the circumstances surrounding the January 1, 2000 urinalysis and cell search and plaintiff's subsequent transfer to Downstate and then Attica. He alleged in the letter that these actions were taken in retaliation for his prior lawsuit, and demanded that any reference to the reason for his transfer be excised from his records prior to his June 2001 parole hearing and that he be transferred back to Fishkill. (AC Ex. 17) Plaintiff received no response to this letter. (AC ¶ 41)

*Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir.1995) (citation

and quotation marks omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of its claim or defense, demonstrating that it is entitled to relief. The evidence on each material element, if unrebutted, must be sufficient to entitle the movant to relief in its favor, as a matter of law. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial" as to a material fact. Fed.R.Civ.P. 56(e). A fact is material if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Thus, in order to survive summary judgment, plaintiffs must come forth with more than a mere scintilla of evidence in support of their position; they must come forward with evidence "on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.), *cert. denied,* 524 U.S. 911 (1998). In the absence of any genuine dispute over a material fact, summary judgment is appropriate.

**\*4** Courts review *pro se* pleadings carefully and liberally and interpret such pleadings "to raise the strongest arguments that they suggest." *See e.g., Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citations omitted). This is especially true in the summary judgment context, where a *pro se* plaintiff's claims are subject to a final dismissal. *See Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) ("[S]pecial solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment.") (citation omitted). Plaintiff's *pro se* status, while implicating a more liberal interpretation of his pleadings, does not excuse him from the burden of coming forward with "concrete evidence

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

from which a reasonable juror could return a verdict" in his favor. *LaGrande v. Key Bank Nat'l Ass'n,* 393 F.Supp.2d 213, 219 (S.D.N.Y.2005) (citation and internal quotation marks omitted); *see also Miller v. New York City Health & Hosp. Corp.,* No. 00 Civ. 140(PKC), 2004 WL 1907310 at *9 (S.D.N.Y. Aug. 25, 2004). In reviewing a motion for summary judgment, the court may conduct a search of the record, and grant or deny summary judgment as the record indicates. *See* Fed.R.Civ.P. 56(c); *New England Health Care Employees Union, District 1199, SEIU AFL-CIO v. Mount Sinai Hosp.,* 65 F.3d 1024, 1030 (2d Cir.1995); *Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York,* 269 F.Supp.2d 424, 446 (S.D.N.Y.2003).

*Retaliation Claims*

In order to recover for alleged retaliation under section 1983, a plaintiff must establish the following three elements: (1) that the speech or conduct at issue is protected under the First Amendment; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the adverse action and the protected speech or conduct. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003). Even if an inmate plaintiff meets his burden under this three-pronged test, defendants are entitled to summary judgment if they can demonstrate that they would have taken the same action against the plaintiff absent any retaliatory motivation. *See Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002). "At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail." *Davidson v. Chestnut,* 193 F.3d 144, 149 (2d Cir.1999) (*per curiam* ). Courts employ a " 'presumption that a prison official's acts to maintain order are done for a proper purpose." ' *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.) (quoting *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995)), *cert. denied,* 525 U.S. 907 (1998). Thus, " [t]he conclusion that the state action would have been taken in the absence of improper motives is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage." ' *Hynes,* 143 F.3d at 657 (quoting *Lowrance v. Achtyl,* 20 F.3d 529,

535 (2d Cir.1994)).

*5 Courts have also taken note of the "ease with which claims of retaliation may be fabricated," and thus "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citation omitted) (affirming in part and vacating in part grant of summary judgment); *see also Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (affirming grant of 12(b)(6) motion), *overruled in part on other grounds by* Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002).

Filing lawsuits related to prison conditions is protected conduct. "Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right." *Colon,* 58 F.3d at 872. Thus, plaintiff has satisfied the first prong of the retaliation inquiry. As regards adverse actions taken against him, he complains that his cell was searched, he was transferred out of Fishkill (briefly to Downstate and then to Attica), and his security classification was changed from medium to maximum. He also complains that, as a result of the allegedly false accusations that he was involved in planning the strike, he was denied parole.

It is on the third prong of the retaliation inquiry that plaintiff's claims fail. Beyond the conclusory assertions of a causal connection between plaintiff's prior lawsuit and the actions described above, plaintiff has proffered no evidence that the prior suit played any role in defendants' decisions to take the actions described above.[FN4]

> FN4. Defendants would in any event be entitled to summary judgment on the retaliatory cell search claim. The Supreme Court has held that an inmate has no legitimate expectation of privacy in his cell and thus, "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson v. Palmer,* 468 U.S. 517, 525-26 (1984). District courts within this circuit have interpreted *Hudson* to mean that inmates have "no constitutional right to be free from cell searches of any kind, including

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

retaliatory cell searches." *Rodriguez v. McClenning*, 399 F.Supp.2d 228, 2005 WL 937483 at *6 (S.D . N.Y. Apr. 22, 2005) (collecting cases). As the only allegations against defendant Armstrong relate to the allegedly retaliatory cell search, she too is entitled to summary judgment. Plaintiff contends that his claim against defendant Armstrong is based on her "ransack[ing]" of his cell. (Freeman Dep. at 137) However, he admits that none of his property was damaged during the search. (*Id.* at 68-69) While plaintiff contends that the conduct of the search was in violation of a DOCS directive requiring that corrections officers, to the extent possible, leave a cell in the condition it was in prior to the search, even were that true, it would not rise to the level of a Due Process violation. *See Hudson*, 468 U.S. at 539-40 (deprivation of prisoner's property does not violate Due Process if adequate post-deprivation remedies are available); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir.1996) (New York provides adequate state court post-deprivation remedies for an inmate's loss of property).

Defendants, in support of their motion, have come forward with evidence of non-retaliatory motivations for the actions of which plaintiff complains. "[I]f the production of all relevant documents fails to add substance to the allegations and if the relevant officials submit affidavits explaining their reasons for the challenged actions, summary judgment dismissing the complaint may be granted...." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983). Defendant Ercole-who admittedly ordered both the search of plaintiff's cell and his temporary transfer from Fishkill to Downstate-describes in his detailed affidavit the circumstances that led to the search and the transfer out of Fishkill. Briefly, the search was ordered as part of the response to a potential inmate strike planned at Fishkill. Prison officials had learned that inmates were planning to take advantage of the anticipated "Y2K" crisis which was widely expected to occur as a result of computer malfunctions attributable to the change in date from 1999 to 2000. *See, e.g.,* 15 U.S.C. § 6601 *et. seq.* (describing "Y2K" problem and promulgating rules governing civil litigation arising from problem).

Specifically, officials learned that inmates planned to refuse to work or attend programs, and planned to "use force and/or intimidation against both staff and other inmates to accomplish these objectives." (Ercole Decl. ¶ 10)

*6 When prison officials heard about the planned strike, they launched an investigation under the supervision of an executive committee, of which Ercole and defendant Mazzuca were part. (Ercole Decl. ¶¶ 5-9) Based on the investigation, it was concluded that plaintiff was one of over 30 inmates who were suspected of being involved in the planned strike, and, as such, needed to be separated from other inmates. (*Id.* ¶ 15) The recommendation that plaintiff be separated from the other inmates was based on credible information, and that recommendation was approved by the executive committee after review of that information. (*Id.*) Ercole states that the search was necessary to gather potential evidence related to the strike, and to ensure safety and security at the facility, and the temporary transfer of inmates implicated in the strike was necessary to prevent the strike from taking place. (*Id.* ¶¶ 17-18) The DOCS records regarding plaintiff's transfer support the assertion that the basis for the transfer was separation from the Fishkill population to prevent the planned inmate strike. (Ercole Decl. Ex. C)

Ercole and Mazzuca have denied any motive related to plaintiff's prior lawsuit. Though plaintiff claims to have put both of these defendants on notice of his prior lawsuit, and attached to the AC typewritten memos to each of them dated "September 1999" in which he described the basis for the prior suit (AC Exs. 1 & 2), Ercole and Mazzuca have both stated that they have no recollection of receiving such memos. (*See* Ercole Decl. ¶ 22; Mazzuca Decl. ¶ 22) Mazzuca states that no evidence that such a memo was received could be found in the records kept by his office, though receipt of such a document would normally be recorded. (Mazzuca Decl. ¶ 22) Both Ercole and Mazzuca state that plaintiff's prior suit had no bearing on their decisions regarding the search of plaintiff's cell or the transfer from Fishkill to Downstate, and that such decisions were motivated solely by concerns uncovered during the investigation of the strike. (Ercole Decl. ¶¶ 24, 26; Mazzuca Decl. ¶ 24)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

Mazzuca and Ercole each state in their declarations that they played no role in the change in plaintiff's security classification from medium to maximum, nor the decision to transfer him to Attica after such change in classification, and that such decisions are made by the "Central Office in consultation with the Office of Classification and Movement." (Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21) While plaintiff named as a defendant a John Doe "Classification and Movement Analyst," he has failed, after the completion of discovery, to identify the actual individual. In any event, as with the other alleged retaliatory actions, plaintiff has failed to come forth with any evidence of a causal connection between the classification change or transfer to Attica and his prior section 1983 suit. Mazzuca and Ercole have similarly stated that they had no role in plaintiff's temporary assignment to the SHU while housed at Downstate, and plaintiff has failed to show any causal connection between his SHU assignment and his prior suit. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20)

**\*7** Here, plaintiff has failed entirely to come forth with any evidence that the alleged adverse actions were motivated in "substantial part" by his filing of the prior civil rights action. Scott, 344 F.3d at 287. In his affidavit opposing defendants' motion, plaintiff makes the conclusory statement that "[t]he adverse action taken against plaintiff by William Mazzuca, Fishkill's Acting Superintendent and Robert Ercole, Fishkill's Deputy Superintendent of Security was retaliatory." (Freeman Aff. ¶ 9) Conclusory allegations of retaliatory motivation are, of course, insufficient to withstand a motion for summary judgment. See, e.g., Scott, 344 F.3d at 287.

Plaintiff points as well to the period of just over four months that elapsed between the filing of his earlier action and the cell search and transfer out of Fishkill (with an attendant brief confinement in the SHU). (Freeman Aff. ¶ 15) Temporal proximity may serve as circumstantial evidence of retaliation. See Colon, 58 F.3d at 872. When the alleged retaliatory conduct takes place within a few days of the protected conduct, the temporal proximity alone may be sufficient to infer a causal connection. See, e.g ., Jordan v. Garvin, No. 01 Civ. 4393(LTS)(GWG), 2004 WL 302361 at *6 (S.D.N.Y. Feb. 17, 2004) (citation

omitted) (two days). A time lapse of over four months, however, standing alone, is insufficient to justify an inference of causal connection. See, e.g., Cobian v. New York City, No. 99 Civ 10533(KMW)(AJP), 2000 WL 1782744 at *18 (S.D.N.Y. Dec. 6, 2000) (collecting cases), aff'd, 23 Fed. Appx. 82 (2d Cir.2001). Even where the time between the protected activity and the alleged retaliatory action is as short as eleven days, summary judgment may be appropriate if the plaintiff fails to come forth with any evidence of retaliatory animus. See Brown v. Coughlin, 965 F.Supp. 401, 406 (W.D.N.Y.1997). Viewed in the light most favorable to plaintiff, the four month time period, standing alone and without any evidence of retaliatory animus, would not be sufficient to permit a reasonable jury to find in plaintiff's favor.

Finally, plaintiff asserts that he was "never charged with violating any rules or regulations" such that the search and transfer could be otherwise justified. (Id. ¶¶ 10, 15) However, as discussed above, defendants submitted affidavits and documentary evidence sufficient to demonstrate the reasons for the actions they took with regard to the search and the transfer out of Fishkill. Plaintiff has failed to adduce any evidence at all to dispute those reasons.

Along with his opposition papers, plaintiff includes the affidavits of two other inmates, Abdullah Y. Salahuddin and Michael Washington. Salahuddin merely states that he considers plaintiff to be "an open, honest and helpful educator and leader," and that he has "never known [plaintiff] to advocate anything negative or subversive." Salahuddin further states his "belief that [plaintiff] was falsely accused of negative behavior by Fishkill's Administration after he sought legal redress against them for violating his civil rights." He claims that similar retaliatory action was taken against him in response to his having taken "legal action," and that it is the "unwritten policy of Fishkill to get rid of any inmate that seeks legal redress against them whenever they violate a prisoners [sic] rights." Washington similarly attests to plaintiff's good character and states that plaintiff had, in November 1999, complained that he was being harassed and "felt that he was going to be set up because of his pending legal action against certain employee's [sic] at Fishkill." Washington also states that other unidentified

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

inmates had expressed to him their beliefs that plaintiff was "set up." Neither of these declarations constitutes admissible evidence bearing on the question of the required causal connection between plaintiff's prior section 1983 suit and the alleged retaliatory actions at issue here. Cf. Colon, 58 F.3d at 873 (defendant's alleged admission of the existence of a retaliatory scheme may constitute direct evidence of retaliation).

**8** Even if plaintiff had proffered some evidence of retaliatory motivation, defendants have shown that they would have taken the same actions against plaintiff on the valid basis resulting from their investigation of the potential Y2K strike at Fishkill. See Davidson, 193 F.3d at 149. Plaintiff was one of over 30 inmates who were subjected to cell searches and were transferred out of Fishkill as a result of the strike investigation. (Ercole Decl. ¶¶ 15, 17-18) Both the search and the temporary transfer were justified by the information uncovered during the strike investigation, which revealed that plaintiff was suspected of involvement in a potentially dangerous disruption of the prison's administration. In the face of such undisputed evidence, no reasonable jury could find in plaintiff's favor. Defendants are entitled to summary judgment on plaintiff's retaliation claims.

*Due Process Claims*

Plaintiff claims that his temporary confinement in the SHU at Downstate violated his constitutional right to Due Process under the Fourteenth Amendment. Inmates alleging Due Process violations resulting from prison discipline must establish that they have a protected liberty interest in being free from the punishment in question. See Sandin v. Conner, 515 U.S. 472, 483-84 (1995). While New York state law does create a liberty interest in not being confined to the SHU, see Palmer v. Richards, 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing Welch v. Bartlett, 196 F.3d 389, 394 n. 4 (2d Cir.1999)), such an interest is only implicated in the Due Process context by a particular punishment when such punishment " 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " Palmer, 364 F.3d at 64 (quoting Sandin, 515 U.S. at 484) (brackets in original). "In other words, actions under the Due Process Clause are reserved for prisoners enduring a hardship that

is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison." Welch, 196 F.3d at 392.

The Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate Due Process rights." Palmer, 364 F.3d at 64 (citations omitted). However, the Second Circuit has affirmed grants of summary judgment where the period of confinement is "exceedingly short"-shorter than the 30 days at issue in Sandin itself-and there is no indication that the conditions of confinement differed significantly from those normally endured by SHU inmates. Palmer, 364 F.3d at 65-66 (citing Hynes, 143 F.3d at 658-59; Arce v. Walker, 139 F.3d 329, 335-36 (2d Cir.1998); and Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996)).

Here, there is some dispute about the length of plaintiff's confinement in SHU conditions. Plaintiff claims to have been housed in SHU status for the entire period of his confinement at Downstate, a total of eight days. (Freeman Dep. 88-89, 14-45) Defendants contend that plaintiff was treated as an SHU inmate for five days, and then as a general population inmate for several days preceding his transfer to Attica. (Olmstead Decl. ¶¶ 4-5 and Ex. A)

**9** However, accepting plaintiff's version of the facts, as I must in the context of this motion, his eight-day confinement to SHU does not implicate a liberty interest. The Second Circuit recently observed that even a period of 101 days in "normal" SHU conditions is insufficient to constitute "atypical" treatment under Sandin: "To be sure, with respect to 'normal' SHU confinement, we have held that a 101-day confinement does not meet the Sandin standard of atypicality." Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir.2004) (citing Sealey v. Giltner, 197 F.3d 578, 589 (2d Cir.1999)), cert. denied, 125 S.Ct. 1398 (2005). Such "normal" SHU conditions include confinement to a cell for up to 23 hours daily, one hour of daily exercise and two showers per week. Ortiz, 380 F.3d at 655. Here, plaintiff admits that he was given his one hour of daily exercise while housed in the SHU. (AC ¶ 22) The only alleged difference between the "normal" SHU conditions described in Ortiz and plaintiff's SHU stay is his assertion that he was not permitted to shower at all during his stay

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

at Downstate. (*Id.*) While defendants dispute this assertion (*see* Olmstead Decl. ¶ 4 and Ex. A), I accept plaintiff's version as true on this motion; even so, that one fact would not render an eight-day stay in SHU "substantially more grave" than normal conditions of confinement. *Welch, 196 F.3d at 392; see also Frazier,* 81 F.3d at 317 (affirming dismissal of Due Process claims where plaintiff failed to show that conditions of 12-day SHU confinement were "dramatically different" from conditions in general population).

In any event, plaintiff's Due Process claims related to his brief stay in the SHU are appropriately disposed of on summary judgment because plaintiff cannot show that any of the named defendants were personally involved in the decision to confine him to SHU at Downstate. To succeed on a section 1983 claim against state officials in their personal capacities, a plaintiff must demonstrate "personal involvement of defendants in alleged constitutional deprivations...." *Colon,* 58 F.3d at 873 (citation omitted). Here, plaintiff alleges in his complaint that defendants Mazzuca and Ercole were responsible for his being placed in SHU upon his arrival at Downstate. (AC ¶ 15) However, both defendants have denied in their respective declarations that they directed or requested that he be so placed, and stated that they had no involvement whatsoever in determining the conditions of his confinement at Downstate. (Mazzuca Decl. ¶ 20; Ercole Decl. ¶ 20) Plaintiff has failed to come forth with any evidence to the contrary, and has failed to name as defendants any Downstate personnel. Defendants are entitled to summary judgment on plaintiff's Due Process claim related to his SHU status at Downstate.[FN5]

> FN5. To the extent plaintiff asserts a Due Process claim based on his SHU confinement at Fishkill, the four hours he spent in SHU prior to his departure from Fishkill is insufficient to implicate a liberty interest under the principles discussed above.

To the extent that plaintiff claims that his transfer out of Fishkill constituted a Due Process violation, defendants are entitled to summary judgment. Prison officials are vested with broad discretion to transfer inmates, and such transfers between facilities do not generally implicate Due

Process rights. *See Meacham v. Fano,* 427 U.S. 215, 225 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules."); *see also McKune v. Lile,* 536 U.S. 24, 39 (2002); *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.), *cert. denied,* 487 U.S. 1220 (1988). This is so even when a prisoner is transferred for disciplinary reasons, unless a state law imposes restrictions or conditions on transfers. *See Montayne v. Haymes,* 427 U.S. 236, 242 (1976). New York law does not place any such restrictions on transfers, and vests the DOCS Commissioner with discretion to order such transfers. *See id.;* N.Y. CORR. LAWW § 23.1; *see also Meriwether v. Coughlin,* 879 F.2d 1037, 1047 (2d Cir.1989). Thus, plaintiff's transfer out of Fishkill does not implicate a liberty interest upon which he may base a Due Process claim.

**\*10** To the extent plaintiff's Due Process claim is based on the change in his security classification from medium to maximum, defendants are also entitled to summary judgment. Plaintiff's contentions regarding his security classification do not differ in any relevant manner from his contentions regarding transfer. Security classifications, like transfer decisions, are committed to the discretion of the DOCS commissioner. *See* N.Y. CORR. LAWW § 137.1 ("The commissioner shall establish program and classification procedures...."). Plaintiff essentially complains that he has been transferred to a less favorable and more restrictive institution. As discussed above, plaintiff has no liberty interest in being housed in the facility of his choice. *See Meacham,* 427 U.S. at 225; *Montanye,* 427 U.S. at 242. Defendants are entitled to summary judgment on plaintiff's Due Process claim to the extent it is based on his change in security classification.

Defendants would be so entitled even if a liberty interest were somehow to be implicated. As discussed above, defendants Mazzuca and Ercole stated in their declarations that they played no role whatsoever in the change in security classification (*see* Mazzuca Decl. ¶¶ 20-21; Ercole Decl. ¶¶ 20-21), and plaintiff failed to name, and thus, failed to serve, the John Doe defendant he described in the AC as a "Classification and Movement

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

Analyst." Plaintiff also alleges that defendants Goord and Roy were informed of his allegedly improper change in security classification. Defendant Goord is entitled to summary judgment based on lack of personal involvement. "Personal involvement of a supervisory official may be established 'by evidence that: (1) the [official] participated directly in the alleged constitutional violation, (2) the [official], after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the [official] created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the [official] was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the [official] exhibited deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring." ' *Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 254 (2d Cir.2001) (quoting *Colon,* 58 F.3d at 873) (alterations in original). Liability may not be based on a theory of *respondeat superior. See Hayut v. State University of New York,* 352 F.3d 733, 753 (2d Cir.2003). Merely occupying a high position in the prison hierarchy does not render a defendant liable for a constitutional violation without a showing of personal involvement. *See Colon,* 58 F.3d at 874.

Goord's alleged liability is tied solely to his receipt of the three letters discussed earlier, two from plaintiff and one from plaintiff's wife. Goord states in his declaration that, with regard to the thousands of letters received by his office each year from or about inmates, they are opened by his secretaries, and referred to another DOCS staff member as appropriate. (Goord Decl. ¶ 4) Goord states that there is no indication in his office files that he was ever personally made aware of plaintiff's situation, and he does not recall being made aware. (*Id.* ¶ 6) That Goord's office received the letters and referred them for an appropriate response does not constitute the requisite personal involvement. *See, e .g., Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Johnson v. Wright,* 234 F.Supp.2d 352, 363-64 (S.D.N.Y.2002) (allegation that Goord received letters to which other defendants responded insufficient to show personal involvement).

**\*11** While defendant Roy did, in fact, respond to plaintiff's letters, his responses provide no evidence in support of plaintiff's claims. In response to plaintiff's August 7, 2000 letter (AC Ex. 12), Roy contacted the Office of Classification and Movement ("OCM"), which had also been forwarded a copy of the letter. Based on information provided by that office, Roy informed plaintiff in an August 29, 2000 letter (AC Ex. 13) that his request for reduced classification had been denied. This decision was made by the Office of the Inspector General and the Deputy Commissioner for Correctional Facilities, after review of a recommendation by OCM. (Roy Decl. ¶ 7) Roy informed plaintiff that the proper method for requesting transfers and changes in security classification was through his assigned corrections counselor. (AC Ex. 13) Similarly, in response to plaintiff's December 19, 2000 letter (AC Ex. 15), Roy contacted OCM to ensure that proper procedures had been followed with regard to plaintiff's requested transfer to a medium security facility, and again informed plaintiff, by letter dated January 16, 2001 (AC Ex. 16), that he should seek the assistance of his counselor in making future transfer requests. (Roy Decl. ¶ 12)

DOCS procedure for evaluating requests for reduced security classification dictates that inmates are subject to quarterly reviews. As part of the review process, an inmate's counselor may make a recommendation for change in classification to the OCM. (Roy Decl. ¶¶ 8-9) Requests that come directly from inmates are not considered. (*Id.* ¶ 10) Roy did not ignore plaintiff's letters. But neither did he act with indifference or disregard plaintiff's rights. Roy's responses to plaintiff's letters were proper and could not, in any event, be said to constitute personal involvement in a constitutional violation.

Viewed in a light most favorable to plaintiff, no reasonable jury could find in his favor on his Due Process claims. Defendants are entitled to summary judgment on these claims.

*Qualified Immunity*

Defendants have also raised the defense of qualified immunity. "[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609 (1999) (internal quotation marks and citation omitted). The doctrine applies to prison officials in civil rights actions brought by inmates. *See, e.g., Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). A right is clearly established if (1) the underlying law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit recognizes that right, and (3) a reasonable defendant would understand that his conduct was unlawful. *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003).

**\*12** "The first step is to determine whether the alleged conduct violates any constitutionally protected right at all. Conduct that does not violate any constitutional right certainly does not violate a constitutional right that was 'clearly established' at the time the conduct occurred." *Mozzochi v. Borden,* 959 F.2d 1174, 1179 (2d Cir.1992) (citing *Siegert v. Gilley,* 500 U.S. 226 (1991)). As discussed above, plaintiff has failed to raise a disputed issue of material fact as to the existence of a violation of any constitutional right. Thus, I need not reach the remainder of the qualified immunity inquiry as to, for example, whether the right was "clearly established" or whether reasonable prison officials could have disagreed about the lawfulness of the alleged violations. *See, e.g., Malley v. Briggs,* 475 U.S. 335, 341 (1986).

*Injunctive Relief*

In addition to damages, plaintiff has also requested injunctive relief. Specifically, plaintiff seeks a judicial order requiring removal from his prison records of references to "negative behavior," a "Code 04 transfer," or "involvement in any demonstration." (AC ¶ V.3) He also seeks a new parole hearing, "minus the false information that was in his prison folders, and the stigma of going before the parole board from a disciplinary maximum security prison, and involvement in a demonstration." (AC ¶ V.4) Finally, he seeks a reduction in his security classification back to medium security, and a transfer to a medium security facility. (AC ¶ V.5)

The Prison Litigation Reform Act ("PLRA") addresses an inmate's request for prospective injunctive relief:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.

*18 U.S.C. § 3626(a)(1)(A).* Under *§ 3626(g)(7),* "prospective relief" is defined to include "all relief other than compensatory money damages." Thus, the court may only grant injunctive relief to the extent necessary to correct a violation of plaintiff's First or Fourteenth Amendment rights. However, as discussed above, plaintiff has failed to demonstrate any constitutional violation based on the cell search, transfer, or change in security classification.

To the extent plaintiff claims his Due Process rights were violated by his denial of parole, they fail as well. Plaintiff has no liberty interest in an initial release to parole. *See Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001) ("The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release.... Accordingly, plaintiffs have no liberty interest in parole and the protections of the Due Process Clause are inapplicable."). Nor does the inclusion of allegedly false information in plaintiff's file implicate a liberty interest for Due Process purposes. *See Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988). "If there is no claim of retaliation or a constitutionally flawed disciplinary hearing, an 'inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Flemings v. Kinney,* No. 02 Civ. 9989(DC), 2004 WL 1672448 at *4 (S.D.N.Y. July 27, 2004) (quoting *Rideout,* 808 F.2d at 951) (additional citation omitted). Here, the Court has granted defendants summary judgment on plaintiff's retaliation claims. While plaintiff contends that the allegedly false information in his file resulted in the denial of parole, he does not allege that his June 2001 or June 2003 parole hearings were marked by any lack of procedural Due Process. (AC ¶ 38 (2001); Freeman Aff.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

Ex. B (2003)). In short, plaintiff has demonstrated no constitutional violation on which the Court could base an injunction.

*Alleged Failure to Provide Discovery*

**\*13** In opposition to defendants' motion, plaintiff contends-for the first time-that defendants failed to adequately respond to certain of his discovery requests. (*See* Freeman Aff. ¶ 21) Fed.R.Civ.P. 56(f) provides that, when a party opposing summary judgment makes a showing that he cannot present facts essential to justify his opposition, a court may order a continuance for the purpose of allowing further discovery. In support of his assertion, plaintiff attaches a copy of his undated request for the production of documents, and defendants' response, dated May 19, 2005. (Freeman Aff. Ex. C)

Defendants' responses, on their face, appear to be appropriate. Plaintiff asserts no basis for his belief that defendants have in their possession, custody or control documents responsive to Request No. 6 (requesting documents related to "[t]he Authority that approved the Transfer Order on Sunday January 2, 2000, and based on what available evidence") which were not, in fact, produced. While defendants objected in part to Request No. 12 (requesting documents related to "[t]he evidence that was ascertained to substantiate the extreme measures taken by Fishkill's Administration under the authority of the Department of Correctional Services (D.O.C.S.)"), they also referred plaintiff to the documents produced in response to Request No. 13 (requesting documents related to "[t]he unusual incident report"), defendants objected to the request as unclear in that it did not specify what "unusual incident report" was being referenced, but also stated that they were not in possession of "any unusual incident report related to plaintiff's movement to Downstate Correctional Facility in January, 2000." Request No. 14 read as follows: "What steps did the approving Authority take to be in compliance with NYCRR Title 7 procedures that regulate how actions are conducted in conjunction with State Law." The Court agrees with defendants that the request does not make clear what documents plaintiff sought.

This case was referred to Magistrate Judge James C.

Francis IV for general pretrial supervision, including all discovery matters, on February 20, 2003. Plaintiff included in his papers in opposition to summary judgment a letter to defendants' counsel dated June 20, 2005, in which he complains about defendants' responses to his document requests, which letter purports, on its face, to have been copied to Magistrate Judge Francis. (Freeman Aff. Ex. C) There is no indication in the record that plaintiff ever sought a ruling from Magistrate Judge Francis on any of the alleged shortcomings in defendants' discovery responses. Plaintiff has failed to make the showing required under Rule 56(f) that he cannot present facts essential to justify his opposition to summary judgment because of a lack of discovery. "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir.), *cert. denied,* 540 U.S. 823 (2003) (citations and internal quotation marks omitted). Plaintiff's argument provides no basis on which to deny summary judgment.

*Conclusion*

**\*14** For the reasons set forth above, defendants' motion for summary judgment is GRANTED.FN6 The Clerk is directed to enter a judgment in favor of defendants.

> FN6. Though the motion was nominally brought only on behalf of defendants Goord, Roy, Mazzuca, Ercole and Armstrong, summary judgment is granted to all named defendants. Defendant Conklin was never served with the AC. Defendant Zehr was served, and failed to answer or otherwise appear in this action. However, the sole allegation in the complaint relating to Zehr is that, on January 2, 2000, he "escort[ed] plaintiff from the law library area to the Messhall [sic] area." (AC ¶ 11) Plaintiff does not explain how this allegation is sufficient to implicate Zehr's involvement in any alleged

Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)

(Cite as: 2005 WL 3333465 (S.D.N.Y.))

      constitutional violation, and the Court cannot conceive of how it might.

    SO ORDERED.

S.D.N.Y.,2005.

Freeman v. Goord
Not Reported in F.Supp.2d, 2005 WL 3333465 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John CROSWELL, Plaintiff,
v.
Joseph E. MCCOY, Superintendent, Cayuga
Correctional Facility; Joseph Lippa, Correction Officer,
Cayuga Correctional Facility, Defendants.
No. Civ.9:01–CV–00547.

March 11, 2003.

Inmate sued superintendent of correctional facility and a correction officer under § 1983, asserting violations of his civil rights under the First and Eighth Amendments. On cross-motions for summary judgment, the District Court, Gary L. Sharpe, United States Magistrate Judge, held that: (1) genuine issues of material fact existed as to whether the inmate exhausted his administrative remedies; (2) inmate's allegations were insufficient to show that he suffered from a serious medical condition; (3) inmate failed to prove that he was retaliated against for filing a grievance requesting the use of a larger room to conduct meetings of a religious organization; and (4) defendants were entitled to qualified immunity.

Defendants' motion granted.

West Headnotes

**[1] Federal Civil Procedure 170A** 2491.5

170A Federal Civil Procedure

170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases
Genuine issues of material fact as to whether an inmate filled out the bottom of a grievance form so as to

appeal precluded summary judgment as to whether the inmate exhausted his administrative remedies, as required by the Prison Litigation Reform Act (PLRA). 42 U.S.C.A. § 1997e(a).

**[2] Prisons 310** 192

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
(Formerly 310k17(2))
**Sentencing and Punishment 350H** 1546

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
Inmate's allegations were insufficient to show that he suffered from a serious medical condition, thus defeating his claim that a correction officer was deliberately indifferent to his health and safety when the officer required him to clean pesticide residue from an exterminated beehive; the inmate simply had wheezing, which was not uncommon for persons with asthma, and a headache. U.S.C.A. Const. Amend. 8; 42 U.S.C.A. § 1983.

**[3] Constitutional Law 92** 1438

92 Constitutional Law

92XV Right to Petition for Redress of Grievances
92k1438 k. Prisoners. Most Cited Cases
(Formerly 92k91)
**Prisons 310** 152

310 Prisons

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

310II Prisoners and Inmates
310II(B) Care, Custody, Confinement, and Control
310k151 Religious Practices and Materials
310k152 k. In General. Most Cited Cases
(Formerly 310k4(14))

Inmate failed to prove that he was retaliated against for filing a grievance requesting the use of a larger room to conduct meetings of a religious organization, thus defeating the inmate's First Amendment claim; correction officer's requiring the inmate to clean pesticide residue was not an adverse action, and in any event was not shown to be causally related to the grievance, and the superintendent was not shown to have disregarded the request, would have moved the meetings to another location if necessary, and was not involved in a transfer of the inmate. U.S.C.A. Const. Amend. 1; 42 U.S.C.A. § 1983.

[4] Civil Rights 78 ☜ 1376(7)

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))

It was objectively reasonable for a correction officer to believe that requiring an inmate to clean pesticide residue did not violate the inmate's constitutional rights, and thus, the officer was entitled to qualified immunity in the inmate's § 1983 suit; the officer did not violate a clearly established right when he relied on the department of correctional services for the appropriate usage of toxic materials at the prison. 42 U.S.C.A. § 1983.

[5] Civil Rights 78 ☜ 1376(7)

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))

It was objectively reasonable for a superintendent of a correctional facility to deny an inmate's request for a larger room to conduct meetings of a religious organization and thus, the superintendent was entitled to qualified immunity in the inmate's section 1983 suit; the superintendent relied on a memorandum stating that the room provided for the meetings was "more than adequate." 42 U.S.C.A. § 1983.

[6] Civil Rights 78 ☜ 1376(7)

78 Civil Rights

78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases
(Formerly 78k214(7))

Transfer of an inmate would have been a lawful exercise of prison superintendent's authority had he been involved, in light of a prison policy mandating a transfer whenever a civilian employee was assaulted by an inmate, and thus, the superintendent was entitled to qualified immunity regarding the allegedly retaliatory transfer in the inmate's § 1983 suit. 42 U.S.C.A. § 1983.

John Croswell, Massapequa, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General State of New York, Department of Law, The Capitol, Litigation Bureau, Albany, New York, for the Defendants.

Sean M. Seely, Asst. Attorney General, of counsel.

*REPORT–RECOMMENDATION*

SHARPE, Magistrate J.
I. *INTRODUCTION* [FN1]
FN1. This matter has been referred to the undersigned for a Report–Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

**\*1** On June 3, 2002, plaintiff, *pro se* John Croswell filed a motion for summary judgment (*Dkt. No. 29* ). On June 10, 2002, defendants Joseph Lippa and Joseph McCoy filed a cross-motion for summary judgment (*Dkt. No. 34* ). On June 24, 2002, Croswell filed a response in opposition to the cross-motion (*Dkt. No. 42* ). After reviewing Croswell's claims and for the reasons set forth below, this court recommends denying Croswell's motion for summary judgment and granting the defendants' cross-motion for summary judgment for only the reasons stated.

## II. *Background*

Croswell brings this action under 42 U.S.C. § 1983 claiming that the defendants violated his civil rights under the First and Eighth Amendments. Specifically, Croswell moves for summary judgment claiming that: (1) Lippa was deliberately indifferent to his health and safety; (2) McCoy transferred him in retaliation for filing various grievances with the Inmate Grievance Review Committee ("IGRC"); (3) McCoy is liable for being grossly negligent in managing his subordinate; and, (4) unnamed defendants provided him with inadequate medical treatment while at the Upstate Correctional Facility.

The defendants filed a cross-motion for summary judgment based on the following: (1) Croswell failed to exhaust his administrative remedies concerning his pesticide exposure claim; (2) Croswell failed to state an Eighth Amendment claim; (3) Croswell failed to state a First Amendment claim; and, (4) they are entitled to qualified immunity. The court shall address each of these issues *seriatim*.

## III. *FACTS*

### A. *Pesticide Incident*

On September 5, 2000, as part of Croswell's inmate job assignment, he was ordered to clean pesticide residue from an exterminated beehive at the Cayuga Correctional Facility. He informed Lippa that he was asthmatic and requested a protective mask. Lippa refused to provide a mask and as a result, Croswell inhaled a considerable quantity of pesticide. Following the completion of his work assignment, Croswell requested permission to report to the infirmary because he was wheezing and had a severe headache.

### B. *Medical Treatment*

Croswell was treated by Nurse Timothy Burns. Burns detected some slight bi-lateral wheezing. Burns prescribed 4 tylenol tablets and offered a nebulizer treatment which Croswell refused. Croswell took two tylenol and went to use an inhaler that he had in his cell. He did not seek additional medical attention until three days later, and the issue was unrelated to any respiratory difficulty.

### C. *Grievances*

#### 1. *Nation Of Islam Grievance*

On September 5, 2000, the same day as the pesticide incident, Croswell filed a grievance on behalf of the Nation of Islam ("NOI") requesting a larger room to conduct meetings. The IGRC recommended granting his request to the extent that NOI meetings could be moved to a larger room when the number of inmates attending called for a larger venue. On September 8, 2000, Imam Saad Sahraoui submitted a memorandum indicating that there were only 23 inmates declared as NOI members at the time, and noted that the room used to conduct services was "more than adequate." (*Defs. ['] Cross-Mot. for Summ. J., Ex. D* ).

**\*2** Croswell appealed the recommendation and McCoy, in reviewing the IGRC's recommendation, stated in relevant part that:

[An][i]nvestigation reveals that there were only 25 registered members of the NOI at the time this griev[ance] was filed. The registered membership has risen to 46 since that time but with fewer than 30 inmates attending services on a regular basis. I find no reason to move the NOI services or classes to a larger room at this time. Should there be a need for such in the future, a suitable location will be selected.

(*Defs. ['] Cross–Mot. for Summ. J., Ex. F* ). Croswell appealed the decision to the Central Office Review Committee ("CORC") which subsequently denied his grievance. (*Defs. ['] Cross–Mot. for Summ. J., Ex. G* ).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

2. *Pesticide Exposure Grievance*

On September 18, 2000, Croswell filed a grievance concerning the pesticide exposure of September 5. In responding to the grievance, McCoy stated the following:
[T]he Material Safety Data Sheets for the product used indicated that inhalation is unlikely due to the large size of the particles. It also provides that no respiratory or eye protection is required for application nor gloves required. The product also carries a Health Risk Rating of 1(low).

(*Defs.* [*'*] *Cross–Mot. for Summ. J., Ex. I* ). McCoy determined that Croswell's health and safety were not placed in jeopardy by assigning him to clean up the residue.

D. *Misbehavior Report and Transfer*

On October 9, 2000, Croswell was charged with assaulting a civilian employee. Specifically, he was charged with grabbing a female civilian employee nurse's buttock in the prison infirmary. The hearing was conducted by McCoy's designee. Croswell was found guilty and he was sentenced to 270 days in the Special Housing Unit ("SHU"). He was also transferred to Upstate.

IV. *Discussion*

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999). "When a motion for summary judgment is made and supported ... an adverse party may not rest upon the mere allegations or denials of the ... pleading, but the adverse party's response, by affidavits or as otherwise

provided in [Federal Rule of Civil Procedure 56(e) ], must set forth specific facts showing that there is a genuine issue for trial." *St. Pierre v. Dyer,* 208 F.3d 394, 404 (2d Cir.2000). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Rexford Holdings, Inc. v. Biderman,* 21 F.3d 522, 525 (2d Cir.1994) (alternation in original) (citation omitted). However, it is well settled that on a motion for summary judgment, the court must construe the evidence in the light most favorable to the non-moving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999).

**\*3** Furthermore, in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *see Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)(a court is to read a *pro se* party's "supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest"). Indeed, the Second Circuit has stated that "[i]mplicit in the right to self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990); *see LaFond v. General Physics Serv. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

This liberal standard, however, does not excuse a *pro se* litigant from following the procedural formalities of summary judgment. *Showers v. Eastmond,* 00–CV–3725, 2001 WL 527484, at \*2 (S.D.N.Y, May 16, 2001). More specifically, Local Rule 7.1(a)(3) specifically provides that "any facts set forth in the [moving party's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." Local Rule 7.1(a)(3) further requires that the "non-movant shall file a Statement of Material Fact which mirrors the movant's statement in matching numbered paragraphs and which set forth a specific reference to the record where the material fact is alleged to arise." The courts of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

Northern District have adhered to a strict application of Local Rule 7.1(a)(3)'s requirement on summary judgment motions. *Giguere v. Racicot,* 00–CV–1178, 2002 WL 368534, at *2 (N.D.N.Y. March 1, 2002)(*interalia* citing *Bundy Am. Corp. v. K–Z Rental Leasing, Inc.,* 00–CV–260, 2001 WL 237218, at *1 (N.D.N.Y. March 9, 2001)).

Furthermore, this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute. *Amnesty America v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). As long as the local rules impose a requirement that parties provide specific record citations in support of their statement of material facts, the court may grant summary judgment on that basis. *Id.* at 470–71. With this standard in mind, the court now turns to the sufficiency of Croswell's claims.

B. *Exhaustion: Prison Litigation Reform Act*

[1] Before addressing the substance of Croswell's claims, the court must first consider whether he properly exhausted his administrative remedies. The Prison Litigation Reform Act ("PLRA") requires that suits brought by prisoners under 42 U.S.C. § 1983 must first exhaust their available administrative remedies.[FN2] Recently, the Supreme Court held that the PLRA exhaustion requirement applies to all inmate suits. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The Court has further held that the PLRA requires administrative exhaustion even where the grievance process does not permit award of money damages and the prisoner seeks only money damages, so long as the grievance tribunal has authority to take some responsive action. *See Booth v. Churner,* 531 U.S. 731, 741 (2001). However, "a dismissal of an action for failing to comply with the PLRA is without prejudice." *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002).

FN2. "No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

*4 The New York State Inmate Grievance Program involves three steps. First, an inmate must submit a grievance to the clerk of the I.G.R.C. within 14 days of the alleged occurrence. 7 NYCRR § 701.7[a]. The I .G.R.C. is a five-member body consisting of two voting inmates, two voting staff members, and a non-voting chair. 7 NYCRR § 701.4. Next, a party to the grievance may appeal to the superintendent within four working days after receipt of the I.G.R.C.'s written response. As a general rule, the superintendent or his designee must issue a decision within ten working days of receipt of the appeal. 7 NYCRR § 701.7[b]. Then, a party to a grievance may appeal the superintendent's action to the C.O.R.C. which consists of the deputy commissioners or their designees. 7 NYCRR § 701.6.

If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA. *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) (citation omitted). Furthermore, simply writing letters of complaint to the superintendent is insufficient to comply with the requirement that a plaintiff must exhaust his administrative remedies. *See Houze v. Segarra,* 217 F.Supp.2d 394, 396 (S.D.N.Y.2002)(citing *interalia Betty v. Goord,* 210 F.Supp.2d 250, 255–256 (S.D.N.Y.2000)); *see also,* Meehan v. Frazier, 2002 U.S. Dist LEXIS 20604, at *11–12; *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002).

However, an inmate may fulfill the PLRA's exhaustion requirement where he: (1) relies on a prison officials' representations that correct procedure was followed; or (2) makes a "reasonable attempt" to exhaust administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts; and, (3) the state's time to respond to the grievance has expired. *O'Connor v. Featherston,* 01–CV–3251, 2002 WL 818085, *2 (S.D.N.Y. Apr.29, 2002) (citations omitted).

Croswell indicates in his complaint that he did not present the facts to the prisoner grievance program. (*Compl., P. 2, ¶ 4* ). However, in Croswell's response papers, he asserts that he made every effort possible to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

exhaust all avenues of administrative relief before seeking redress through the court in his pesticide [FN3] grievance. Croswell provides the court with a copy of his pesticide grievance which shows that he filled out the bottom of the form to appeal to the CORC *(Croswell Aff., Exs. D & E; Dkt. No. 42)*. He also provides a letter from Thomas Eagen indicating that he did not receive Croswell's appeal concerning the pesticide exposure grievance. Croswell maintains that "once Eagen denied having ever received plaintiff's appeal ... plaintiff's avenues of administrative relief, with regard to said grievances, had been exhausted pursuant to time guidelines." *(Pl. ['s] Mem. Opp'n to Defs. ['] Cross-Mot. for Summ. J., P. 2; Dkt. No. 42 )*.

> FN3. It appears that Croswell did exhaust his administrative remedies concerning his NOI grievance.

**\*5** In contrast, the defendants provided a copy of Croswell's pesticide grievance which was not filled out at the bottom to indicate that he wanted to appeal to the CORC *(Seely Aff., Ex. I )*. The defendants contend that he failed to appeal McCoy's decision denying the pesticide grievance to the CORC. As such, the defendants urge the court to strike this claim since he has failed to exhaust his administrative remedies in regards to his pesticide grievance.

This court finds that it is unclear whether or not Croswell has exhausted his administrative remedies in his pesticide claim. Despite the defendants' claim that Croswell failed to fill out the bottom of his grievance form for his pesticide claim, Croswell insists that he did appeal and that the appeal never arrived. It is apparent that Croswell was familiar with the grievance process and the requirement to exhaust. Nonetheless, it may well be that Croswell has failed to exhaust his administrative remedies. However, without more information, the court cannot as a matter of law find that Croswell failed to exhaust his administrative remedies. Accordingly, this court recommends that the defendants' cross-motion for summary judgment based on Croswell's failure to exhaust his administrative remedies should be denied.

C. *Eighth Amendment*

[2] Croswell claims that Lippa was deliberately indifferent to his health and safety when he required him to clean pesticide residue from an exterminated beehive. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. at 102. Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id.* at 103 (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)).

A state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. See *Estelle,* 429 U.S. at 103. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical needs." *Id.* at 104. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104–105.

**\*6** The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (quoting *Farmer,* 511 U.S. at 837). " 'The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. *See Murphy v. Grabo,* 94–CV–1684, 1998 WL 166840, at *4 (N.D.N.Y. April 9, 1998) (citation omitted). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. *See Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. *See Murphy,* 1998 WL 166840, at *4 (citation omitted).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated some of the factors to be considered when determining if a serious medical condition exists, including " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Chance,* 143 F.3d at 702–703 (citation omitted).

In this case, Croswell asserts that he had wheezing and he suffered from a severe headache subsequent to cleaning the pesticide residue. He maintains that since the inhalation of the pesticide, he has had to undergo nebulizer treatments, was prescribed a steroid medication and has been treated for chronic bronchitis. He claims that he is currently suffering from gastrointestinal bleeding. Croswell maintains that even after Lippa admitted familiarity with the toxic substances directives, he still opted to order Croswell to remove the pesticide residue in

violation of his rights.

The defendants contend that Croswell has failed to allege that Lippa was deliberately indifferent to his serious medical needs. They maintain that Croswell did not suffer from a serious medical need. Furthermore, Croswell was permitted to report to the infirmary immediately after the incident occurred. Burns noted wheezing but no shortness of breath (*see Seely Aff.,* ¶ 5; *Dkt. No. 40* ). Burns attests that the detection of slight wheezing in an individual having a history of asthma is not uncommon or indicative of a health problem. *Id.* Burns noted that other than a headache, Croswell appeared to be in no acute distress. *Id.* at ¶ 5.

*7 In addition, the defendants argue that even if the court found that Croswell suffered from a serious medical condition, Lippa did not possess the requisite culpable intent. Moreover, Lippa relied on the Department of Corrections Services ("DOCS") to use only those materials that were appropriate and suitable for usage. Finally, the defendants claim that Croswell's claim accusing them of negligence is not actionable under § 1983.

This court finds that Croswell has failed to state an Eighth Amendment violation. It is evident that Croswell did not suffer from a serious injury or the presence of a medical condition that significantly affected his daily activities. Croswell admitted that he was provided with prompt medical attention, including pain medication. He also conceded that he deferred on the nebulizer treatment since he was reluctant to be away from this work detail for fear he would be given an inmate misbehavior report. Croswell also admitted that the nurse directed him to go to his cell and use his regular inhaler and then report back to his work detail.

As noted, a plaintiff may show deliberate indifference by corrections officers if they attempt to deny or delay an inmate's access to medical care or if they intentionally interfere with an inmate's treatment. Even if the court found that Croswell suffered from a serious medical condition, the record is clear that Lippa did not deny, delay or interfere with his treatment. In fact, Croswell was seen immediately and he was given medication to alleviate

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

the problem.

Furthermore, Lippa attests that it was not his function to determine the type of materials that were suitable for usage. Croswell asserts no fact which shows that Lippa intentionally attempted to cause him harm by exposing him to toxic substances. Despite his bald assertions to the contrary, he simply had wheezing which is not uncommon in persons with asthma and a headache. These allegations are insufficient to show that he suffered from a "serious" medical condition and that the defendants were deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendants' cross-motion for summary judgment should be granted in regards to Croswell's Eighth Amendment claim.

D. *First Amendment*

[3] Croswell accuses the defendants of retaliating against him for filing a grievance on behalf of the NOI. The Second Circuit has held that retaliation against a prisoner for pursuing a grievance is actionable under § 1983. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). Moreover, the Second Circuit has recognized both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated. Thus, prisoners' claims of retaliation are examined with skepticism and particular care. *See Flaherty v. Coughlin,* 713 F.2d 10 (2d Cir.1983).

In *Dawes v. Walker,*[FN4] 239 F.3d 489 (2001), the Second Circuit recited the factors that must be asserted in a retaliation complaint in order to survive summary dismissal. Thus, a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and, (3) that there was a causal connection between the protected speech and the adverse action. *Id .* at 492 (citation omitted). The court stated that "to adequately plead an adverse action, a plaintiff must allege that the defendants subjected him to 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Morales,* 278 F.3d at 131 (2d Cir.2002)(quoting *Dawes,* 239 F.3d at 492). "Prisoners may be required to tolerate

more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 492.

FN4. Dawes' complaint was dismissed pursuant to Fed.R.Civ.P. 12(b)(6).

**\*8** In this case, Croswell filed a grievance requesting the use of a larger room to conduct NOI meetings. He contends that Lippa asked him to clean the pesticide residue to punish him for filing that grievance. He also maintains that McCoy ordered the removal of names from the NOI class roster in an effort to neutralize the grievance that he filed. Lastly, Croswell claims that McCoy ordered him to be transferred in retaliation for filing complaints against him and his subordinates.

The defendants argue that Croswell's conclusory allegation that Lippa retaliated against him for filing a grievance is untrue. They contend that Lippa was unaware of the filed grievance when he ordered him to clean the pesticide residue. Moreover, the grievance did not involve Lippa. Lippa attests that even if the grievance would have been filed against him, he would not have been told the same day.

In addition, the defendants argue that there is nothing in the record which shows that McCoy retaliated against Croswell when he denied the NOI request for a larger room. Imam Sahraoui's statement that the room was adequate for the NOI members was used by McCoy to deny the request for a larger room. Furthermore, if the need arose, McCoy would move the NOI meetings to a more suitable location.

Lastly, the defendants contend that Croswell cannot demonstrate that McCoy transferred him in retaliation for filing his grievances. Kelly Huffman, a Corrections Counselor at Cayuga, attests that McCoy played no role in Croswell's administrative hearing or the decision to transfer him (*Huffman Aff.,* ¶¶ *6, 8–9* ). Moreover, Croswell's transfer occurred as a matter of course since he was found to have assaulted a civilian employee nurse (*Huffman Aff.,* ¶ 6). Furthermore, the defendants contend that even if McCoy was involved in Croswell's transfer, it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

was a result of being found guilty of violating a prison policy and not for filing grievances.

This court finds that Croswell asserts no set of facts which, if true, would show that Lippa and/or McCoy retaliated against him. It is undisputed that Croswell has a right to file a grievance and that this conduct is protected. However, Croswell fails to meet the second and third prong of a retaliation claim. Croswell has failed to show how the defendants took an adverse action against him. Lippa relied on DOCS to use materials which were appropriate for usage. As such, this court cannot find that Lippa took an adverse action.

However, even if the court found that requiring Croswell to clean the pesticide residue was an adverse action, he has failed to show that there was a causal connection between the protected speech and the adverse action. There is nothing in the record which shows that Lippa knew of the grievance filed the same day that he required Croswell to clean the pesticide residue. As previously mentioned, the grievance did not involve Lippa and even if it did, he attests that he would not have been informed of the grievance the same day. Moreover, there would not have been any reason to have informed Lippa about the grievance since he was not involved.

**\*9** Croswell's conclusory allegation that McCoy retaliated against him when he denied his request for a larger room for the NOI meetings is also without merit. Croswell fails to provide any proof which purports to show that McCoy erased records or that he somehow disregarded his request. Inman Sahraoui attests that the NOI did not need more space. McCoy noted that there was an increase of registered NOI inmates since the grievance was filed. However, it was also noted that fewer than 30 inmates attended the meetings. As previously mentioned, if the need arose, McCoy would move the NOI meetings to a more suitable location.

Thus, the court cannot find that McCoy took an adverse action against Croswell because he exercised his right to file a grievance. In addition, as the defendants correctly point out, there is nothing in the record which purports to show McCoy was involved in Croswell's transfer to Upstate. Moreover, even if McCoy would have

been involved in the transfer, Cayuga had a policy to transfer an inmate whenever an inmate assaulted a civilian employee as a matter of course (*Huffman Aff.,* ¶ 6).

Finally, Croswell has failed to allege facts that show how he was deterred from exercising his constitutional right to file grievances. Croswell continued to file numerous grievances subsequent to the incidents at issue in this case (*Seely Aff., Exs. N–T* )(He filed seven grievances from December 2000 to July 2001). This court notes that Croswell's right to file grievances was not affected by the defendants' conduct in this case. Accordingly, this court recommends that the defendant's cross-motion for summary judgment should be granted as to Croswell's retaliation claim.

E. *Qualified Immunity*

As an alternative basis to grant dismissal, the defendants argue that they are entitled to qualified immunity. Qualified immunity protects government officials who perform discretionary functions in the course of their employment. It shields them from liability for money damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). It also protects officials from "the burdens of costly, but insubstantial, lawsuits." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999)(quotation marks and internal citations omitted).

The question of whether qualified immunity will protect a public official depends upon " 'the objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted). Furthermore, the contours of the right violated must be sufficiently clear that a reasonable official might understand that his actions violate that right. *Id.* at 640; *Keane,* 196 F.3d at 332. The test for "evaluating whether a right was clearly established at the time a § 1983 defendant acted is: '(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." ' *African Trade & Information Center, Inc., v. Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002). *See also, Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000).

*10 Additionally, the Second Circuit has held that a court may dismiss a claim based upon qualified immunity without first deciding the substantive claims therein. *See Horne v. Coughlin,* 191 F.3d 244 (2d Cir.1999). Also within this decision, the Second Circuit suggested that the qualified immunity issue should be addressed before the substance of a claim. The court shall now consider the defendants' claim that they are entitled to qualified immunity.

[4] In this case, it has been clearly established that inmates have a right to file grievances. However, this court finds that it was objectively reasonable for the defendants to believe that their conduct did not violate Croswell's constitutional rights. Lippa, in relying upon DOCS for the appropriate usage of toxic materials at the prison, did not violate a clearly established right. As Lippa admitted, he did not possess any expertise with respect to pesticides or insecticides. In addition, this expertise was not required in his position as a corrections officer. As such, Lippa is entitled to qualified immunity since a reasonable corrections officer in Lippa's position could not have understood that his acts were unlawful.

[5] McCoy is entitled to qualified immunity concerning Croswell's request for a larger room since his decision was a lawful exercise of his authority. He relied on Imam Sahraoui's statement, dated September 8, 2000, that the room provided for the NOI meetings was "more than adequate." There is nothing in the record which shows that McCoy's decision was unlawful or in violation of a clearly established right. Moreover, the record is clear that McCoy was not involved in Croswell's transfer from Cayuga to Upstate in October of 2000.

[6] In addition, the prison's policy was clear that a transfer was mandated whenever a civilian employee was assaulted by an inmate. As such, even if McCoy would have been involved, the transfer would have been a lawful

exercise of his authority. Accordingly, as an additional basis to grant summary judgment, this court recommends that the defendants Lippa and McCoy should be dismissed from this suit because they are entitled to qualified immunity.

WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that Croswell's motion for summary judgment (*Dkt. No. 29* ) be DENIED; and it is further

RECOMMENDED, that the defendants' cross-motion for summary judgment (*Dkt. No. 34* ) based on Croswell's failure to exhaust his administrative remedies claim be DENIED; and it is further

RECOMMENDED, that the defendants' cross-motion for summary judgment (*Dkt. No. 34* ) be GRANTED in regards to Croswell's First Amendment claim; and it is further

RECOMMENDED, that the defendants' cross-motion for summary judgment (*Dkt. No. 34* ) be GRANTED in regards to Croswell's Eighth Amendment claim since he fails to state a claim for which relief can be granted; and it is further

RECOMMENDED, as an additional basis to grant summary judgment, that the defendants' cross-motion for summary judgment be GRANTED based on qualified immunity; and it is further

*11 ORDERED, that the Clerk of the Court serve a copy of this Report–Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2003.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)

(Cite as: 2003 WL 962534 (N.D.N.Y.))

Croswell v. McCoy
Not Reported in F.Supp.2d, 2003 WL 962534 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronald JOHNSON, Plaintiff,
v.
C.O. BROWN; Boulter; Kiernan; Guerin; and Eastern, Defendants.
Civ. Action No. 9:09-CV-0002 (GTS/DEP).

Sept. 3, 2010.
Ronald Johnson, Woodbourne, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Ronald Johnson, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by six corrections officers, including the named defendants, that following the assault defendants failed to provide medical treatment for his resulting injuries, and that in retaliation for filing grievances regarding the incident he was threatened and harassed.

Currently pending before the court is defendants' motion for summary judgment. In their motion, defendants assert that as to several of plaintiff's claims he has failed to state constitutionally cognizable causes of action, and as to others, based upon the record now before the court, no reasonable factfinder could find in plaintiff's favor. Additionally, defendants assert that they are immune from liability for damages in their official capacities, and are also protected from suit by the doctrine of qualified immunity.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's complaint be dismissed.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that most of plaintiff's allegations are sharply contested by the defendants.

The facts forming the basis for Johnson's claims are uncomplicated, although the parties vigorously dispute the relevant events, particularly the allegation that the plaintiff was beaten by corrections officers. Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Johnson was housed at the Watertown Correctional Facility ("Watertown"), located in Watertown, New York. *See generally* Complaint (Dkt. No. 1); *see also* Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶ 1. On September 29, 2009, plaintiff was returning to Watertown on a DOCS transport bus driven by Sergeant Guerin, after having been resentenced to post release supervision in Queens County Court. Defendants' Rule 7.1(a)(3) Statement ¶¶ 2-3; *see also* Transcript of Plaintiff's Deposition ("Tr.") (Dkt. No. 34-10) pp. 20-21. The Watertown bus arrived at the Oneida Correctional Facility at 12:00 p.m. to meet the incoming bus from the Ulster Correctional Facility and to exchange staff. Guerin Aff. (Dkt. No. 34-4) ¶ 4. At the staff exchange the Ulster bus, in which plaintiff was riding, became the bus bound for Watertown. *Id.* During the transport to Watertown, plaintiff claims to have asked a question regarding seating arrangements, precipitating the alleged beatings and harassment that followed. Complaint (Dkt. No. 1) § 6. This is where the parties' versions of the relevant events begin to diverge.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

According to Sergeant Guerin plaintiff did not merely ask a question, but rather demanded that the inmates in his group be permitted to "spread out" on the bus instead of being seated together; when Sergeant Guerin advised that this was not possible because more inmates would be boarding, Johnson verbally protested in a loud and angry manner. Guerin Aff. (Dkt. No. 34-4) ¶ 5. Consequently, Sergeant Guerin calmly instructed Johnson to quiet down. *Id.* at ¶ 6. Upon arrival at Watertown at 3:15 p.m., Sergeant Guerin exited the bus and went to his office to complete paperwork in connection with the transfers. Defendants' Rule 7.1(a) (3) Statement ¶¶ 14-15.

**\*2** Plaintiff's version of the verbal exchange on the bus significantly differs from that of Sergeant Guerin. Plaintiff alleges in his complaint that when he asked the sergeant about security arrangements on the bus, it was Sergeant Guerin who became agitated, loudly instructing Johnson not to tell him how to run his bus. Complaint (Dkt. No. 1) § 6. Though he admits that he did not hear what was said, plaintiff speculates that when the bus arrived at Watertown, Sergeant Guerin told the corrections officer meeting them that Johnson had been an "asshole" while on the bus.[FN2] Tr. (Dkt. No. 34-10) p. 30. As a result of Sergeant Guerin's comment, plaintiff believes, Corrections Officer Eastern immediately approached Johnson and said, "welcome home" and remarked to Johnson that he had been an "asshole" on the bus. Tr. (Dkt. No. 34-10) p. 26.

> FN2. Although never served, in the caption of his complaint plaintiff names "C.O. Easton" as a defendant and later identifies "CO Eastern", an officer who worked in the draft room, as a defendant. Plaintiff testified at his deposition that the corrections officer who met the bus and approached him was the defendant whom he believes is named "Easton" or "Eastern". Tr. (Dkt. No. 34-10) pp. 26-27. For the purposes of consistency and clarity in this report and recommendation, that defendant will be referred to throughout as "Eastern", the name listed on the court's records

In his complaint, plaintiff alleges further that after seeing the nurse in the draft room he was placed in a cell isolated from other prisoners, and six corrections officers, including certain of the named defendants, entered his cell and proceeded to beat him with their fists, as well as to kick and choke him, and that defendant Brown told him that now he knows that he is "nothing but a stupid nigger."[FN3] Complaint (Dkt. No. 1) § 6 and Attached Statement of Facts. Plaintiff's complaint also alleges that after the beating was over, Sergeant Kiernan entered the cell and asked Johnson if he was okay, to which plaintiff replied that he was afraid for his life; plaintiff was then escorted from draft processing to the housing unit at the facility without being offered any medical assistance. *Id.*

> FN3. In papers submitted in opposition to defendants' motion plaintiff clarifies his position regarding the participants in the beating, noting that defendant Kiernan witnessed the beating but did not intervene to protect him. Plaintiff's Memorandum (Dkt. No. 48) at pp. 11-12.

Plaintiff maintains that when he reported to emergency sick call the following day, despite notifying the nurse of the beating the day before and complaining of pain in the head, neck and ribs, he was only given pain medication and was not X-rayed until three weeks later. Complaint (Dkt. No. 1) § 6 and Attached Facts. The nurse at sick call on September 30, 2009, completed an injury report based upon plaintiff's statement that he had been jumped by corrections officers the day before and also examined plaintiff, finding no objective evidence of injury with the exception of a small bruise over his left eye, and gave plaintiff ibuprofen for his pain. *See* Plaintiff's Opposition (Dkt. No. 48) Attachments. When plaintiff returned to emergency sick call two days later voicing the same complaints, the nurse again examined plaintiff and found no objective evidence of injury, but again provided him with ibuprofen and ordered x-rays. *See id.*

Plaintiff claims to have filed grievances regarding the beating. Complaint (Dkt. No. 1) § 4 and Attached Facts. According to Johnson, in retaliation for filing those grievances he was threatened and bribed by the defendants, and his request for a transfer to another facility, which was motivated by his fear for his own safety, was denied.[FN4] *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

FN4. Plaintiff was later transferred out of Watertown in January of 2009. Tr. (Dkt. No. 34-10) p. 62.

**\*3** Defendants Guerin, Brown, and Kiernan dispute plaintiff's version of the events of September 29, 2008, and deny that any threats, assault, or retaliation occurred. *See generally* Guerin Aff. (Dkt. No. 34-4); Brown Aff. (Dkt. No. 34-3); and Kiernan Aff. (Dkt. No. 34-6). Plaintiff has not identified any other officers allegedly involved. According to Sergeant Guerin, who drove the transport bus, he proceeded directly to his office after arriving at Watertown, and did not ask or instruct staff to assault or in any way retaliate against Johnson. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 43-12) ¶¶ 15-16; *see also* Guerin Aff. (Dkt. No. 34-4) ¶¶ 7-8. Corrections Officer Boulter claims to have been on vacation on the day in question, and did not at any time enter the facility on that date. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 27-30; *see also* Boulter Aff. (Dkt. No. 34-1). Defendant Brown worked the "night shift", from 3:00 to 11:00 p.m., on the day of the alleged assault, and was assigned to Unit 16 as Roundsman; as such, he did not see or speak with Johnson at any time on September 29, 2008. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 32-33; *see also* Brown Aff. (Dkt. No. 34-3) ¶¶ 3-4. Similarly, Kiernan did not see or speak with Johnson at any time on that date, and never threatened the plaintiff in any manner. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 34-12) ¶¶ 22, 25; *see also* Kiernan Aff. (Dkt. No. 34-6) ¶¶ 5-8.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 1, 2009. Dkt. No. 1. As defendants, plaintiff's complaint names Corrections Officers Brown, Boulter, and Eastern; John Doe, the corrections sergeant who drove the Watertown bus; [FN5] and Sergeant Kiernan. Plaintiff's complaint references only the Eighth Amendment, and alleges that defendants subjected him to use of excessive force, indifference to his medical needs arising from the incident, and retaliation and harassment. *See generally* Complaint (Dkt. No. 1). Plaintiff seeks $1 million in damages to compensate for the physical and emotional pain that he has suffered.

FN5. The "John Doe" defendant has since been identified as Sergeant Guerin, who also has been served with the summons and complaint and has appeared in the action. *See* Dkt. Nos. 23, 24, and 27.

Following pretrial discovery, defendants filed a motion seeking the entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 34. In their motion, defendants argue that 1) the damage claims against them in their official capacities are barred by the Eleventh Amendment; 2) plaintiff's claims involving retaliation, verbal harassment and threats, and the failure to transfer him to another facility are not actionable; 3) the claims against defendants Boulter, Brown, and Kiernan are subject to dismissal based upon their lack of personal involvement in the alleged constitutional deprivations; 4) the evidence in the record fails to raise a triable issue of fact with respect to plaintiff's claim for excessive use of force; and, 5) in any event, defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 48, and defendants have submitted a reply to plaintiff's submission. Dkt. No. 50.

**\*4** Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

*Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").[FN6]

FN6. Although plaintiff has opposed defendants' motion, he has failed to submit a responding statement of material facts in dispute as required by the court's local rules. The consequences of this failure are potentially significant. By its terms, Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). Based upon plaintiff's failure to submit a proper response to Defendants' Rule 7.1(a)(3) Statement, I recommend that the court accept as true defendants' assertion of facts as set forth in their Local Rule 7.1(a)(3) Statement.

B. *Eleventh Amendment Immunity*

**\*5** At the outset, defendants' summary judgment motion seeks dismissal of plaintiff's claims against them in their official capacities, asserting their entitlement to Eleventh Amendment immunity.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978). This absolute immunity that states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN7] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29 (1982)). To the extent that a state official is sued for damages in his or her official capacity the official is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN8] *Kentucky v. Graham,* 473 U .S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985); *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991).

> FN7. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County,* 547 U.S. 189, 193, 126 S.Ct. 1689, 1693 (2006).

> FN8. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. See *Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

Although it appears from plaintiff's motion response that his claims against the defendants are brought against them solely in their individual capacities, to the extent his complaint can be interpreted otherwise, defendants are correct that since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and that plaintiff's damages claim against the defendants in their official capacities be dismissed.

C. *Verbal Harassment*

Included within plaintiff's complaint are allegations of threats and harassment on the part of prison officials which seem to form the basis, at least in part, for plaintiff's Eighth Amendment claim. Plaintiff alleges that defendants Guerin and Eastern, called him an "asshole", and Eastern is alleged to have said to plaintiff "welcome home", a statement that plaintiff interpreted as a threat. Brown is alleged to have called plaintiff a "stupid nigger", and plaintiff alleges that Kiernan threatened to set plaintiff up by planting drugs or weapons in his cell if he did not withdraw the grievance he filed regarding the alleged assault. Defendants assert that those allegations fail to give rise to a plausible Eighth Amendment claim.

As the defendants correctly note, 42 U.S.C. § 1983 is not designed to remedy harassment or verbal abuse. *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996) (citations omitted). As a general matter, verbal harassment, including profanity, without any associated physical injury, does not give rise to a claim cognizable under section 1983. See *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998). Nor do threats amount to a constitutional violation. *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995). Accordingly plaintiff's claims of verbal abuse, alleging conduct which, if true, is both unprofessional and reprehensible, do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. See *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3 (N.D.N .Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15, 1997) (Pooler, J. & DiBianco, M.J.) ("verbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").[FN9]

> FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*6** While implicitly acknowledging these well-established principles, plaintiff appears to claim that as a result of defendants' harassment he was emotionally and psychologically injured, making the defendants' conduct actionable under section 1983.[FN10] While under extreme circumstances the Eighth Amendment's prohibition against cruel and unusual punishment may encompass intentionally inflicted psychological injury,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

necessarily excluded from this protection is conduct causing only *de minimis* psychological harm. *St. Germain v. Goord,* No. 96-CV-1560, 1997 WL 627552, at *4 (N.D.N.Y. Oct. 8, 2007) (Pooler J. and Homer, M.J.); *Jermosen v. Coughlin,* No. 87 Civ. 6267,1993 WL 267357, at * 6 (S.D.N.Y. Jul. 9, 1993). Plaintiff's allegations in this case, even if true, would not rise to the level of malevolent conduct falling within the Eighth Amendment's protection. *Shabazz,* 994 F.Supp. at 475.

> FN10. To the extent the plaintiff contends that the name calling accompanied the alleged assault, plaintiff may have plausibly alleged an Eighth Amendment violation; as will be seen, however, plaintiff's excessive force claim fails on the merits. *See* pp. 20-33, *post.*

The comments allegedly made to the plaintiff amount to nothing more than name calling and an unrealized threat of retaliation, and plaintiff has failed to come forward with evidence to substantiate that he suffered anything more than minimal psychological consequences as a result of that conduct. Indeed, plaintiff admits that even though defendant Kiernan threatened to issue him a false misbehavior report, he never did. As to his alleged injuries, plaintiff contends that as a result of defendants' conduct he has had difficultly sleeping, but admits that it is a problem that he has always had when around corrections officers. Additionally, plaintiff claims that he saw a psychologist for treatment, but when questioned regarding the details of that alleged treatment, he was unable to identify the psychologist by name, and conceded that he consulted with her "maybe three times", and that he is not currently undergoing any psychological treatment or taking any medication. Tr. (Dkt. No. 34-10) pp. 14-16, 67.

Under these circumstances, I have concluded that no reasonable factfinder could find that plaintiff's allegations of verbal harassment and threats establish that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, and therefore recommend that the portion of defendants' motion challenging that component of plaintiff's Eighth Amendment claim be granted.

D. *Retaliation*

Plaintiff's claim of retaliation fares no better than his allegations of verbal harassment. In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. *Headley v. Fisher,* No. 06 Civ. 6331, 2010 WL 2595091, at *3 (S.D.N.Y. June 28, 2010). In the prison context, "adverse action" is objectively defined as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.), *superseded by* 320 F.3d 346 (2d Cir.2003)).

*7 Based on the record now before the court, plaintiff cannot satisfy the second prong of the retaliation test. Plaintiff's complaint alleges retaliation in only a conclusory manner, merely stating that after he filed a grievance complaining of the alleged assault defendants threatened to set him up with weapons or drugs in his cell and to subject him to further beatings. In response to defendants' motion, plaintiff claims that it was Sergeant Kiernan who threatened to set him up, and with future assaults.

Plaintiff's filing of a grievance clearly represented protected activity, as it was an exercise of his right to petition the government for redress of grievances under the First Amendment. *Scott v. Coughlin,* 344 F.3d 282, 288 (2d Cir.2003) (citation omitted). Kiernan's alleged verbal threats, however, which plaintiff admits never came to fruition, are patently insufficient to establish adverse action and support a plausible retaliation claim. *Bartley v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

Collins, No. 95 Civ. 10161(RJH), 2006 WL 1289256, at *6 (S.D.N.Y.2006) ( "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, Swierkiewicz v. Sorema N.A ., 534 U.S. 506, 122 S.Ct. 992 (2002)). Plaintiff's failure to allege any specific adverse action taken by the other defendants is similarly fatal to this cause of action. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).

Because plaintiff has failed to adduce any evidence of adverse action taken against him as a result of the grievances he claims to have filed, I have concluded that he has failed to come forward with sufficient facts to support a plausible claim for retaliation, and I therefore recommend that defendants' motion for summary judgment dismissing that cause of action be granted.

E. Excessive Force/ Failure To Intervene

At the heart of plaintiff's complaint is his claim that on September 29, 2008 he was subjected to an unprovoked attack by the defendants. Once again, in this regard plaintiff's complaint is conclusory, alleging only that six corrections officers, including those named in the complaint, beat him, and he has since alleged minimal additional facts to support this claim. Defendants argue for dismissal of this cause of action, relying on the Second Circuit's decision in Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir.2005), and asserting that based upon the record now before the court, no reasonable factfinder could credit plaintiff's version of the relevant events.

1. Excessive Force

Plaintiff's excessive force claim is alleged under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); see also Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, inter alia, Estelle ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of

an inmate's confinement are subject to Eighth Amendment scrutiny. Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing Rhodes v. Chapman, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

*8 A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." Whitley, 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); Griffen v. Crippen, 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Hudson v.. McMillian, 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999 (1992) (applying Whitley to all excessive force claims); Whitley, 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), cert. denied sub nom., John v. Johnson, 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. Wright v. Goord, 554 F.3d 255, 268 (2d Cir.2009) (citing Hudson, 503 U.S. at 7-8, 112 S.Ct. at 999 and Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in Wilkins v. Gaddy, however, after Hudson the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. ----, 130 S.Ct. 1175, 1178 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

*9 With regard to the objective prong of the Eighth Amendment analysis, Johnson has stated that he sustained a "busted lip", a black and blue eye, and blue and red spots all over his body. Tr. (Dkt. No. 34-10) p. 56. Plaintiff believes the bruise was over his left eye, and that it was about dime-sized. *Id.* at p. 57. Though admittedly minor, these injuries could potentially provide sufficient objective evidence to satisfy the first prong of the test.

Subjectively, if true, plaintiff's version of the events that transpired on the day in question would seem to establish that the actions of the corrections officers allegedly involved contravene contemporary standards of decency. Plaintiff alleges that the attack was prompted by the verbal exchange that took place between him and Sergeant Guerin during transport to Watertown and Guerin's purported statement to Eastern that plaintiff was an "asshole" and/or a problem on the bus. Thus, as a result of what appears to have been a relatively trivial outburst on the Watertown bus, plaintiff claims that he was brutally beaten by six corrections officers. In sum, the facts alleged by the plaintiff would appear to also satisfy the subjective prong of the governing Eighth Amendment test.

2. *Application of Jeffreys v. City of New York*

What sets this case apart from many other excessive force cases is that the dispute is not limited to specific facts surrounding the alleged incident, but instead defendants deny that any incident involving the use of force upon the plaintiff even occurred on the day in question. In light of plaintiff's claims and the defendants' denial of the use of any force against Johnson on September 29, 2008, it would appear that the court is squarely presented with an issue of credibility. It is well-established that credibility issues, which are questions of fact for resolution by a jury, are inappropriately decided by a court on motion for summary judgment. *Rule v. Brine, Inc.* 85 F.3d 1002, 1011 (2d Cir.1996) (citing, *inter alia, Anderson,* 477 U.S. at 255, 106 S.Ct. 2513).

However, in *Jeffreys,* 426 F.3d 549, a case now relied upon by defendants, the Second Circuit created a very narrow exception to this rule. *Slacks v. Gray,* No. 9:07-CV-510, 2009 WL 3164782, at *13 (N.D.N.Y. Sept. 29, 2009) (Mordue, C.J.). In that case, the Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

plaintiff, the court determines that "no reasonable person" could credit the plaintiff's testimony. *Jeffrey* s, 426 F.3d at 54-55. The *Jeffreys* court cited with approval the district court's opinion in *Shabazz,* 994 F.Supp. at 468-71, which granted summary judgment in an excessive force case based upon the absence of any evidence in the record to corroborate the plaintiff's version of the events, highlighting the "many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits." *Slacks,* 2009 WL 3164782, at *13 (citing *Jeffreys,* 426 F.3d at 555 and quoting *Shabazz,* 994 F.Supp. at 470).[FN11]

> [FN11.] The court in *Shabazz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Shabazz,* 994 F.Supp. at 470. While approving of the lower court's reasoning in *Shabazz,* the *Jeffreys* court was careful to distinguish *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997), another case it had previously decided, wherein it reversed the grant of summary judgment in an excessive force case. *Jeffreys,* 426 F.3d at 554-55. In doing so, the court emphasized that in *Fischl* the plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Id.*

**\*10** In this district, it appears that in order to qualify for application of the *Jeffreys* exception a defendant must meet the following three requirements: 1) the plaintiff must rely "almost exclusively on his own testimony"; 2) the plaintiff's testimony must be "contradictory or incomplete"; and 3) the plaintiff's testimony must be contradicted by evidence produced by the defense. *Benitez v. Ham,* No. 9:04-CV-1159, 2009 WL 3486379, at *20-21 (N .D.N.Y. Oct. 21, 2009) (Mordue, C.J. and Lowe, M.J.) (citing and quoting *Jeffreys* ). Based upon a careful review of the entire record before the court, I have concluded that this case presents one of those rare exceptions to the rule

that credibility determinations are inappropriately made when ruling on a summary judgment motion, given that the plaintiff's allegations are conclusory and inconsistent; there is an utter absence of medical evidence to corroborate plaintiff's version of the events; and a review of the record as a whole shows that no reasonable person could believe plaintiff's version.

The only evidence supporting plaintiff's claim that the defendants used excessive force is his own deposition testimony, during which he was decidedly vague, and at times inconsistent. When questioned at his deposition about the details of the assault, plaintiff could provide few. Plaintiff merely surmised that the motivation for the attack was the verbal exchange between him and Sergeant Guerin. Johnson admitted that he was not aware of what, if anything, Sergeant Guerin communicated to Corrections Officer Eastern when his bus arrived at Watertown, but instead just assumed that Guerin told Eastern what occurred on the bus. Tr. (Dkt. No. 34-10) pp. 26, 30. During his deposition, plaintiff asserted that even before he "got jumped", another inmate, named Earl, told him that the officers said they were going to do something to him. Tr. (Dkt. No. 34-10) p. 33. When asked to identify exactly what "Earl"-whose last name Johnson did not know-reported, the plaintiff testified, "[h]e just told me that the officers said that they were going to try to get me sent to the box and they're going to try to jump me, something like that." *Id.* According to plaintiff, Earl could not identify which officers made those statements. *Id.* Ultimately, plaintiff never received a misbehavior report relating to what ever occurred on September 29, 2009. *Id.* at pp. 60, 68.

Plaintiff further testified that after Eastern escorted him to the holding cell, "all of the officers came in"; he then identified the other corrections officers present as defendants Brown and Boulter, but was unable to name any others. *Id.* at p. 35. He apparently guessed at the number of corrections officers who participated in the alleged attack, stating that he was just "rounding it off to six. It could have been more." *Id.* Johnson could not state what role Eastern-who he claims escorted him into the cell-played, but testified that Eastern had to have been hitting him, and that Eastern later taunted him and withheld his personal property for over a week. *Id.* at pp.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

46-47.

**\*11** Plaintiff stated that the attack began with Brown inviting Johnson to hit him, stating, "you want to be a problem on the bus ... hit me." Tr. (Dkt. No. 34-10) p. 36. At the time, Johnson was sitting on a bench in the back of a cell; after he let Brown hit him a couple of times he got up, and the officers then took Johnson down to the floor, kicking him and calling him "stupid nigger." *Id.* at p. 37. When asked, plaintiff first said that he could not identify the corrections officers that took him down to the floor, but then said that they all helped. *Id.* at p. 48. Plaintiff testified that Brown kicked him in the ribs and hit him "probably in [the] head," swinging over the top of another corrections officer to reach Johnson; Boulter had his nose pushed up, and another corrections officer was choking him. Tr. (Dkt. No. 34-10) pp. 38-46. Although he alleges to have been kicked, punched, and slapped about the head and body by six corrections officers for five minutes, *see id.* at p. 37, plaintiff does not claim that immediately afterwards he was bleeding, exhibited signs of swelling, sustained any broken bones, or had any other obvious signs of injury, and he admits that he did not request medical attention at the time.

Johnson did go to emergency sick call on the day after the alleged incident; the record of the nurse's examination of plaintiff on that date, however, reveals that despite plaintiff's complaints of pain in the left rib and flank areas, nose, Adam's apple, and right lower lip, she only observed a dime-sized bruise over his left eye, *see* Plaintiff's Opposition (Dkt. No. 48) Attachments (Inmate Injury Report), and provided plaintiff with only ibuprofen for pain, a fact which plaintiff admits. Plaintiff returned to sick call on October 2, 2008 with the same complaints, and on that date the nurse similarly noted that a physical examination revealed no redness, swelling, or broken skin; nonetheless, the nurse ordered x-rays and provided plaintiff with more ibuprofen. *See id.* Johnson went to sick call again four days later, and while reiterating that he had been "jumped by officers" the week before, he stated that the pain in his ribs was improving, though they were still tender to touch; no other complaints were noted. Chest and rib X-rays performed sixteen days after the alleged beating were negative for any abnormality.[FN12] *See id.*

FN12. The photocopied incident photos attached to the injury report, which plaintiff has submitted as an attachment to his papers in opposition to defendants' motion, are of extremely poor quality such that it is impossible to determine what they purport to show. *See* Dkt. No. 48.

In their defense, each of the named defendants has submitted a sworn affidavit denying plaintiff's claim of excessive use of force. Indeed, defendant Boulter has testified, and submitted unrefuted documentary evidence confirming, that he took a vacation day and was not even at the facility on September 29, 2008, the day in question. Similarly, defendant Brown has sworn that he was not working the draft area that day, but was assigned to work as a roundsman in a housing unit. Defendant Kiernan states that he does not recall seeing or speaking with Johnson at any time on September 29, 2008, and that if he had the slightest suspicion that an altercation had occurred as alleged by Johnson, he would have followed standard operating procedure and would have immediately taken Johnson to Watertown's medical unit for medical attention and reported the incident for investigation. Notably, all of these statements are included within Defendants' Rule 7.1(a)(3) Statement, which plaintiff has failed to oppose, and are therefore deemed admitted.

**\*12** It should be noted that plaintiff made a complaint regarding the alleged incident to the DOCS Inspector General's office. After conducting an investigation, that agency concluded in a written report that Johnson's allegations were without merit, expressly noting that there were no witnesses to the alleged assault and that Johnson's lack of any significant injury is inconsistent with his statement that he was beaten by six corrections workers. *See* Plaintiff's Opposition (Dkt. No. 48) Attachment.

In sum, when considering the record as whole against plaintiff's vague and inconsistent assertions, it seems clear that no reasonable juror could credit plaintiff's testimony that he was brutally beaten for five minutes by six corrections officers in a draft holding cell at Watertown as a result of a seemingly insignificant exchange of words that he had on a transport bus with Sergeant Guerin. Accordingly, I recommend invoking the *Jeffreys* standard and granting defendants summary judgment dismissing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

plaintiff's excessive use of force claim.

3. *Failure to Intervene*

Although not alleged in plaintiff's complaint or addressed by the defendants in their motion, at various points in plaintiff's opposition papers he alleges that Sergeant Kiernan is liable for failure to intervene and protect him from the assault by other corrections personnel. A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted).

In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667 (1986)).

**\*13** In this instance, plaintiff testified at his deposition that Kiernan did not enter the draft holding cell

until after the beating was over and the corrections officers involved had left, Tr. (Dkt. No. 34-10) p. 51, and has come forward no evidence that the Kiernan was either aware that the assault would take place, or that while it was occurring, he had the opportunity to stop it. Moreover, since I have already concluded that plaintiff's excessive force claim is not supported by any credible evidence in the record and should be dismissed, it follows that Kiernan cannot be held responsible on this theory.

F. *Medical Indifference*

Defendants also seek dismissal of plaintiff's claims that following the beating defendants were deliberately indifferent to his medical needs by failing to provide treatment for his injuries. As will become evident, for essentially the same reasons, plaintiff's medical indifference claim is not viable.

Like the plaintiff's excessive use of force claim, his assertion that prison officials intentionally disregarded his medical needs must be analyzed within the framework of the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200 (1984)) (internal quotations omitted).

Claims of medical indifference are subject to analysis utilizing the Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279-81 (2d Cir.2006). Thus, plaintiff's medical indifference claim, like his excessive use of force claim, must satisfy both objective and subjective requirements. *Wright,* 554 F.3d at 268; *Price v. Reilly,* No. 07-CV-2634 (JFB/ARL), 2010 WL 889787, at *7-8 (E.D.N.Y. Mar. 8, 2010).

1. *Objective Requirement*

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

**\*14** Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136-37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'Dsignificantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr. 3, 2002) (Sharpe, M.J.) (citation omitted).

*2. Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M . J.) (same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S.Ct.1970).

Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition, on the other hand, does not implicate the Eighth Amendment and is not properly the subject of a section1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292. Thus, for example, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. If prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," however, such conduct is actionable as deliberate indifference. *Harrison,* 219 F.3d at 138; *Kearsey v. Williams,* No. 99 Civ 8646, 2005 WL 2125874, at *5 (S.D.N.Y. Sep. 1, 2005).

**\*15** The basis for plaintiff's medical indifference claim against the named defendants is unclear. Plaintiff seems to fault Sergeant Kiernan for failing to take action

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

after the alleged assault when plaintiff purportedly told Kiernan that he feared for his life. In any event, the record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a busted lip, a dime-sized bruise, and general complaints of pain. The record, including plaintiff's deposition testimony and his submission in opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at * 12 (S.D.N.Y. Mar. 27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

Moreover, plaintiff first indicated a need for medical attention when he attended sick call on the day after the alleged assault. At that time, the nurse conducted an examination, completed an injury report based upon plaintiff's account of the events of the previous day, and provided plaintiff with ibuprofen for the pain. Two days later when plaintiff went to sick call again, he was again examined and given ibuprofen, and x-rays were ordered, even though no objective sign of injury was observed. Contrary to plaintiff's assertions, he was not denied medical attention for his claimed injuries.

Finally, turning to the subjective element as it relates to plaintiff's claim against Sergeant Kiernan, plaintiff admits that he did not inform the sergeant that he had been beaten, was injured, or that he needed medical assistance, nor is there any evidence in the record suggesting that there were obvious signs of serious injury to plaintiff. There is no claim that at the time that Kiernan entered the holding cell the plaintiff was bleeding from any part of his body, suffered from obvious swelling on any part of his body, or was otherwise in such a dire physical condition that Kiernan should have known that plaintiff's health was seriously at risk. Succinctly stated, the record is devoid of any evidence upon which a reasonable factfinder could conclude that Kiernan acted with deliberate indifference

to Johnson's serious medical needs.

G. *Personal Involvement*

As an additional basis for dismissal of plaintiff's claims, including his allegation of medical indifference, defendants assert that they cannot be held responsible for alleged unconstitutional acts in which they did not participate.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*16** As defendants correctly contend, they cannot be held responsible for any alleged misconduct in which they were not personally involved. The only allegations against Brown and Boulter relate to the alleged assault. Accordingly, the only claim for which those defendants may be held responsible are those relating to the alleged use of force in violation of the Eighth Amendment, which I have already determined fails on the merits.

For the reasons stated above, there is no evidentiary support for the medical indifference claim against Kiernan. Plaintiff apparently seeks to additionally hold Sergeant Kiernan responsible for the alleged beating based upon his supervisory role. Notwithstanding that I have recommended a finding in favor of defendants on plaintiff's excessive force cause of action, defendant Kiernan could not be liable for damages under section 1983 solely by virtue of his position; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. In order for liability to attach in the case of Sergeant Kiernan, plaintiff must establish that he 1) directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal,

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* --- U.S. ----,129 S.Ct. 1937 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright,* 21 F.3d at 501.

Plaintiff has adduced no evidence supporting any of these showings. As a result, his attempt to hold Kiernan responsible for the alleged assault should be rejected.

H. *Request for Transfer*

The final allegation in plaintiff's complaint is that he was denied a transfer to another facility in retaliation for his grievances, a claim defendants correctly contend has no constitutional significance. It is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03-CV-01524, 2007 WL 2789499, at * 5 (N .D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) (citing *Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). While the denial of a transfer could ostensibly be actionable under section 1983 if based upon retaliatory animus, *see Van Gorder v. Workman,* No. 03-CV-6409, 2006 WL 3149360, at *2 (W.D.N.Y. Nov. 01, 2006), plaintiff has offered no evidence to establish the required nexus between his grievances and the denial, nor has he shown that as corrections sergeants and officers, the defendants held the power to make such a decision.[FN13]

> FN13. It should be noted that plaintiff conceded at his deposition he was ultimately transferred out of Watertown in January of 2009. Tr. (Dkt. No. 34-10) p. 62.

**\*17** In view of the foregoing, to the extent plaintiff asserts a violation of his constitutional rights based upon

any delay in his transfer, I recommend that defendants' motion in this regard be granted and the claim dismissed.

I. *Defendant Eastern*

Although defendants' motion does not explicitly request this relief, I have of my own initiative chosen to raise the question of whether plaintiff's claims should proceed as against the defendant Eastern, who was never served with the summons and complaint and who, if this report and recommendation is adopted, would be the sole remaining defendant in the case.

Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons and complaint be made within 120 days of issuance of the summons.[FN14] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v.. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the specified 120 day period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

> FN14. That rule provides that

> [i]f a defendant is not served within 120 days after the complaint is filed, the court-on motion or on its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of such a case on its merits, rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case here, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, "thereby relieving [the] plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint." *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996).

I am mindful of the Second Circuit's recent decision in *Murray v. Pataki,* in which the court cautioned that

[a] *pro se* prisoner proceeding *in forma pauperis* is only required to provide the information necessary to identify the defendant, *see, e.g. Sellers,* 902 F.2d at 602, and it is "unreasonable to expect incarcerated and unrepresented prisoner-litigants to provide the current business addresses of prison-guard defendants who no longer work at the prison," *Richardson v. Johnson,* 598 F.3d 734, 739-40 (11th Cir.2010).

**\*18** *Murray v. Pataki,* No. 09-1657, 2010 WL 2025613, at \*2 (2d Cir. May 24, 2010) (summary order) (cited in accordance with Fed. R.App. Proc. 32.1).

In this instance, however, plaintiff has failed to demonstrate the requisite vigilance in insuring service upon defendant Eastern and, to the extent necessary, eliciting the court's assistance. Plaintiff's original complaint in this action was filed on January 5, 2009. A summons was issued for defendant Eastern on January 13, 2009 and was returned as unexecuted on January 28, 2009. *See* Dkt. Nos. 5, 8. Thereafter, on February 13, 2009, plaintiff sought the court's assistance in identifying Eastern and was advised that this information could be obtained through discovery after one or more of the

defendants had answered the complaint. Dkt. No. 15. Despite the passage of nearly a year, completion of discovery, and the expiration of the discovery deadlines, plaintiff has failed to request any further assist assistance from the court in locating and this defendant, nor has he provided the clerk with the additional information regarding Eastern's identity so that additional attempts at service could be made. Because plaintiff has not diligently attempt to discern the identity and pursue service upon the defendant identified as "Eastern", I recommend dismissal of plaintiff's claims against him, without prejudice. [FN15]

FN15. Plaintiff's claim against this defendant seems to be that he participated in the use of excessive force. Since I have already determined, as to the other defendants, that plaintiff has failed to establish a violation of his constitutional rights, for the same reasons I could recommend dismissal of plaintiff's claim against Eastern on the merits as well.

IV. *SUMMARY AND RECOMMENDATION*

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendants on September 29, 2008 by an unprovoked attack, or that defendant Kiernan failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of the alleged incident or that any defendant was subjectively indifferent to his serious medical needs. Additionally, plaintiff's damage claims against the defendants in their official capacities should be dismissed as barred by the Eleventh Amendment, and those claims against defendants for which they had no personal involvement are subject to dismissal on this independent basis. [FN16]

FN16. In light of my determinations on the merits of plaintiff's claims, I have found it unnecessary to address the issue of qualified immunity.

Accordingly, it is hereby respectfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 6243352 (N.D.N.Y.)

(Cite as: 2010 WL 6243352 (N.D.N.Y.))

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 34) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety, with prejudice as to defendants Brown, Boulter, Kiernan and Guerin, and without prejudice as against defendant Eastern.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).*

**\*19** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Johnson v. Brown
Slip Copy, 2010 WL 6243352 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ronald JOHNSON, Plaintiff,
v.
Gary BROWN, Jr., Correctional Officer, Watertown Correctional Facility; Boulter, Correctional Officer; Kiernan, Sergeant; Guerin, Sergeant; and Eastern, Correctional Officer, Draft Room, Defendants.
No. 9:09–CV–0002 (GTS/DEP).

March 22, 2011.
Ronald Johnson, Woodbourne, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Krista A. Rock, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

### MEMORANDUM–DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

*1 Currently before the Court in this *pro se* prisoner civil rights action, filed by Ronald Johnson ("Plaintiff") against five employees of the New York State Department of Correctional Services ("Defendants"), are the following: (1) Defendants' motion for summary judgment (Dkt. No. 34); (2) United States Magistrate Judge David E. Peebles' Report–Recommendation, recommending that Defendants' motion be granted and that Plaintiff's Complaint be dismissed in its entirety (Dkt. No. 52); and (3) Plaintiff's Objections to the Report–Recommendation (Dkt. No. 55). For the reasons set forth below, the Report–Recommendation is accepted and adopted in its entirety; Defendants' motion is granted; and Plaintiff's Complaint is dismissed.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Plaintiff filed his Complaint on January 5, 2009. (Dkt.

No. 1.) Generally, in his Complaint, Plaintiff alleges that, on September 29, 2008, as he was returning by bus to Watertown Correctional Facility ("Watertown C.F.") from a hearing in Queens County Court, he asked a sergeant on the bus a question regarding security arrangements on the bus. (*Id.* at ¶ 6.) Plaintiff further alleges that, after the bus arrived back at Watertown C.F. and the sergeant reported to others that Plaintiff had been "an asshole on the bus," Plaintiff was seen by a nurse, then isolated in a cell, where he was physically assaulted and subjected to racial epithets by six corrections officers, including the named Defendants. (*Id.*) Finally, Plaintiff alleges that Defendants subsequently failed to provide him medical treatment for injuries sustained in the assault, threatened him with false disciplinary charges in retaliation for filing grievances regarding the assault, and wrongfully denied his request for a transfer to another correctional facility. (*Id.*) For a more detailed recitation of the factual allegations asserted in Plaintiff's Complaint, the Court refers the reader to that Complaint in its entirety. (*See generally* Dkt. No. 1.)

Construed with the utmost of special leniency, Plaintiff's Complaint attempts to assert the following claims against Defendants based on the above-described factual allegations: (1) some or all of the Defendants (including Brown) used excessive force against him in violation of the Eighth Amendment; (2) some or all of the Defendants (including Brown) verbally harassed him, in violation of the Eighth Amendment; (3) some or all of the Defendants (including Kiernan) were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment; (4) some or all of the Defendants retaliated against him in response to his filing of grievances, in violation of the First Amendment; and (5) some or all of the Defendants wrongfully denied him a prison transfer, in violation of the Fourteenth and/or First Amendments. (*Id.* at ¶¶ 6–7.)

### B. Undisputed Material Facts

For the sake of brevity, the Court will not repeat the undisputed material facts in this Decision and Order, which is intended primarily for the review of the parties.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

Instead, the Court will incorporate by reference Part I of Magistrate Judge Peebles' Report–Recommendation, which accurately recites those undisputed (and disputed) material facts. The Court would add merely that, generally, unlike Plaintiff's Complaint, the record on Defendants' motion reveals which Defendants allegedly committed which of the above-described acts against Plaintiff. For example, Plaintiff asserts that (1) the sergeant on the bus was Defendant Guerin, (2) the Defendants to whom Guerin reported that Plaintiff had been an "asshole" were Kiernan and Eastern, (3) the Defendant who shouted racial epithets at Plaintiff was Brown, (4) the Defendants who used excessive force against Plaintiff were Boulter, Brown, and Eastern, (5) in addition, Defendant Kiernan failed to intervene in that excessive use of force, (6) the Defendant who was deliberately indifferent to Plaintiff's serious medical needs was Defendant Kiernan, and (7) the individual who retaliated against Plaintiff for filing grievances was Defendant Kiernan.

## C. Parties' Briefing on Defendants' Motion

**\*2** On December 21, 2009, Defendants filed their motion for summary judgment. (Dkt. No. 34.) Generally, in their motion, Defendants argue as follows: (1) to the extent that Plaintiff asserts claims for damages against Defendants in their official capacity, those claims are barred as a matter of law by the doctrine of sovereign immunity under the Eleventh Amendment; (2) whether viewed thorough the factual allegations of Plaintiff's Compliant, or the facts established by the record on Defendants' motion, Plaintiff's claims of verbal harassment and verbal threats by Defendants Brown, Guerin and Kiernan are not actionable under 42 U.S.C. § 1983; (3) Plaintiff has failed to adduce record evidence establishing that Defendants Boulter, Brown or Kiernan (or any Defendants) were personally involved in the alleged constitutionally inadequate medical care that Plaintiff allegedly received on September 29, 2008, at Watertown C.F.; (4) Plaintiff has failed to adduce record evidence establishing that Defendants Boulter, Brown or Kiernan caused the physical injury that Plaintiff allegedly sustained through the assault on September 29, 2008, at Watertown C.F.; (5) whether viewed thorough the factual allegations of Plaintiff's Compliant, or the facts established by the record on Defendants' motion, Plaintiff's claim of a

wrongful denial of his request for a transfer to another correctional facility is not actionable under 42 U.S.C. § 1983; (6) Plaintiff has failed to allege facts plausibly suggesting, and/or adduce record evidence establishing, that he experienced adverse action sufficient to state or establish a retaliation claim against Defendant Kiernan; (7) Plaintiff has failed to adduce record evidence establishing that he was assaulted by any Defendant, because no reasonable factfinder could credit Plaintiff's self-contradictory, incomplete and totally uncorroborated deposition testimony, under *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005); and (8) based on the current record, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity. (Dkt. No. 34, Attach.7.)

On March 31, 2010, after being granted an extension of time in which to do so, Plaintiff filed a response to Defendants' motion. (Dkt. No. 48.) Generally, in his response, Plaintiff argues as follows: (1) while the Eleventh Amendment may bar his claims for damages against Defendants in their official capacity, it does not bar his claims for damages against Defendants in the individual capacity; (2) claims of verbal harassment and verbal threats are actionable under 42 U.S.C. § 1983 where, as here, the harassment and threats were preceded by the use of physical force; (3) Plaintiff has adduced record evidence establishing Defendants Boulter, Brown or Kiernan were personally involved in the alleged constitutionally inadequate medical care that Plaintiff allegedly received on September 29, 2008, at Watertown C.F., especially Kiernan, who asked Plaintiff how he was after the assault, and saw him bleeding, yet did not bring him to the prison's infirmary; (4) Plaintiff has adduced record evidence establishing that all five Defendants caused the physical injury that Plaintiff allegedly sustained through an assault on September 29, 2008, at Watertown C.F.—Boulter's, Brown's and Eastern's involvement being direct, Kiernan's involvement being as a supervisor who knew of the constitutional violation yet failed to stop it, and Guerin's involvement being the instigator of the assault; (5) contrary to Defendants' interpretation of Plaintiff's wrongful-transfer claim, that claim is based not on a request to be moved to a specific facility but a request simply to be removed from Watertown C.F., where he was in danger; (6) Plaintiff has adduced record evidence establishing that he experienced adverse action sufficient

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

to establish a retaliation claim against Defendant Kiernan, because he has adduced evidence that (a) Kiernan's threats dissuaded Plaintiff from "fil[ing] grievances on Lt. Ladue" regarding Kiernan's threats, and (b) Kiernan's threats, which were intended to inflict psychological harm, caused Plaintiff "to sink into a deep depression" and lose sleep; (7) grounds do not exist for the Court to make an exception to rule against making credibility determinations, under *Jeffreys,* because Plaintiff's deposition testimony is not self-contradictory, incomplete, or uncorroborated by the record (which includes medical records showing the use of force, and a memorandum from Defendant Guerin admitting that, before the assault, he told Defendant Kiernan and draft room officers that he had a problem with Plaintiff); and (8) based on the current record, Defendants are not protected from liability as a matter of law by the doctrine of qualified immunity. (Dkt. No. 48, at 1–23.)

**\*3** On April 21, 2010, Defendants filed a reply to Plaintiff's response. (Dkt. No. 50.) Generally, in their reply, Defendants argue as follows: (1) because Plaintiff willfully failed to comply with Local Rule 7.1(a)(3) of the Local Rules of Practice for this Court by not responding to Defendants' Statement of Material Facts, the Court must accept as true all facts asserted in Defendants' Statement of Material Facts; (2) Defendants Guerin and Boulter are entitled to summary judgment because (a) no admissible record evidence supports a causal connection between Defendant Guerin's report to the draft room officers and the assault that Plaintiff alleges he subsequently experienced, (b) the record evidence undisputably demonstrates that Defendant Boulter was not physically present at Watertown C.F. on September 29, 2008; (3) Plaintiff has failed to establish a claim for retaliation against Defendant Kiernan because (a) the record belies Plaintiff's claim that he was dissuaded from filing any grievances, and (b) the threat was *de minimis* under the circumstances; (4) Plaintiff's failure-to-intervene claim against Defendant Kiernan should be dismissed because (a) it was not asserted in Plaintiff's Complaint but was asserted for the first time in his response papers, (b) Defendants have adduced uncontroverted record evidence that there was no assault that any Defendant could have intervened, and (c) Plaintiff admitted in his deposition Defendant Kiernan first came onto the scene after the

assault was over; and (5) Plaintiff has failed to establish that Defendant Brown was personally involved in the alleged constitutional violations because Plaintiff's self-serving deposition testimony regarding Brown can be discredited as a matter of law under *Jeffreys.* (*Id.*)

**D. Magistrate Judge Peebles' Report–Recommendation**

On September 3, 2010, Magistrate Judge Peebles issued a Report–Recommendation recommending that Defendants' motion be granted and Plaintiff's Complaint be dismissed in its entirety. (Dkt. No. 52.) More specifically, Magistrate Judge Peebles recommends as follows: (1) to the extent that Plaintiff asserts claims for damages against Defendants in their official capacity, those claims should be dismissed as barred as a matter of law by the doctrine of sovereign immunity under the Eleventh Amendment; (2) Plaintiff's Eighth Amendment harassment claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendants' alleged verbal harassment caused him *severe* psychological harm sufficient to constitute cruel and unusual punishment; (3) Plaintiff's First Amendment retaliation claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that he suffered sufficiently serious adverse action as a result of filing any grievances; (4) Plaintiff's Eighth Amendment excessive force claim should be dismissed, because no reasonable factfinder could credit Plaintiff's self-contradictory, incomplete and totally uncorroborated deposition testimony, under *Jeffreys v. City of New York,* 426 F.3d 549 (2d Cir.2005); (5) Plaintiff's Eighth Amendment failure-to-intervene claim against Defendant Kiernan should be dismissed because Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that there occurred any excessive use of force or that Kiernan was physically present during it so as to enable him to intervene in it; (6) Plaintiff's Eighth Amendment medical indifference claim should be dismissed because he has failed to adduce admissible record evidence from which a rational factfinder could conclude that (a) he had a sufficiently serious medical need during the time in question, or (b) Defendant Kiernan knew, or had reason to know, of that need so as to confer on him a sufficiently

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

culpable state of mind; (7) Plaintiff has failed to allege facts plausibly suggesting that Defendants Brown and Boulter were personally involved in any violation other than the alleged assault; (8) Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that Defendant Kiernan was personally involved in the alleged excessive use of force as a supervisory official; (9) Plaintiff's wrongful-denial-of-transfer claim should be dismissed because (a) generally, prisoners do not have a constitutionally protected right to be granted a request for a prison transfer, and (b) while a denial of a request for a transfer could conceivably be actionable if it were retaliatory in nature, Plaintiff has failed to adduce admissible record evidence establishing that the denial of the transfer in question was retaliatory in nature; and (10) Plaintiff's claims against Defendant Eastern be dismissed, in the alternative, without prejudice for failure to serve pursuant to Fed.R.Civ.P. 4(m). (Id.)

*4 Familiarity with the grounds of Magistrate Judge Peebles' Report–Recommendation is assumed in this Decision and Order, which is intended primarily for review by the parties. (Id.)

**E. Plaintiff's Objections to the Report–Recommendation**

On October 18, 2010, Plaintiff submitted his Objections to the Report–Recommendation. (Dkt. No. 55.) Generally, in his Objections, Plaintiff argues as follows: (1) Magistrate Judge Peebles failed to consider Plaintiff's medical reports and the photographs of his injuries, which demonstrate a dime-sized bruise over his left eye and redness to certain areas of his face, and constitutes sufficient evidence to support his excessive force claim; (2) because Plaintiff has asserted claims against Defendants in their individual capacities, the doctrine of sovereign immunity is inapplicable; (3) Plaintiff has adduced admissible adduced record evidence in the form of his deposition testimony that establishes that Defendant Kiernan retaliated against him for filing grievances; (4) Magistrate Judge Peebles erred in making a credibility determination regarding his excessive force claim under *Jeffreys* because (a) Plaintiff adduced admissible record evidence (including photographs of his injuries) that corroborates his deposition testimony regarding his excessive force claim, and (b) Plaintiff's deposition

testimony was not self-contradictory and incomplete; (5) Magistrate Judge Peebles erred in dismissing Plaintiff's failure-to-intervene claim because Plaintiff adduced record evidence establishing that Defendant Kiernan (a) had an opportunity to prevent the assault before it happened in that he was notified by Guerin of a "problem" with Plaintiff before the assault, (b) had a reasonable opportunity to intervene in the assault while it was occurring in that he was just outside the room while the assault was occurring, and (c) failed to remedy the assault after it occurred in that he did not take action against the bad actors or bring Plaintiff to the infirmary; (7) Plaintiff has adduced record evidence establishing that each Defendant was personally involved in the alleged constitutional violations, especially Kiernan who (at the very least) was grossly negligent in managing his subordinates; and (8) the Court should not dismiss Defendant Eastern from this action for failure to serve because Defendants' motion did not request that relief, but instead should allow Plaintiff a further opportunity to identify and serve him. (Id.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard Governing Review of a Report–Recommendation**

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).FN1 When only general objections are made to a magistrate judge's report-recommendation, or where the objecting party merely reiterates the same arguments taken in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999). FN2 Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]. *Fed.R.Civ.P.* 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducting the appropriate

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

> FN1. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN2. *See also Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

**B. Standard Governing a Motion for Summary Judgment**

*5 Magistrate Judge Peebles correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 52, at 10–12.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS**

**A. Plaintiff's Claims of Deliberate Indifference to His Serious Medical Needs and Failure to Transfer**

As an initial matter, Plaintiff does not object to the portions of Magistrate Judge Peebles' Report–Recommendation recommending dismissal of his Eighth Amendment medical indifference claim, and his Fourteenth Amendment claim that he was improperly denied a facility transfer. As a result, and for the reasons explained above in Part II.A. of this Decision and Order, the Court need review these portions of the Report–Recommendation only for clear error. After doing so, the Court concludes that the portions of the Report–Recommendation recommending dismissal of Plaintiff's medical indifference claim, and his claim that he was improperly denied a facility transfer are well-reasoned and not clearly erroneous. Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts theses portions of the Report–Recommendation for the reasons stated therein.

The Court would add only three points regarding these claims. First, the portions of the Report–Recommendation recommending dismissal of these claims would survive even a *de novo* review.

Second, at best, the record reflects that, when Defendant Kiernan saw him on September 29, 2008, Plaintiff had a cut on his lip, a bruise over his eye, and "[b]lue and red spots all over his body." (Dkt. No. 34, Attach. 10, at 56.) Such injuries do not constitute a serious medical need as a matter of law. FN3

> FN3. *See Benitez v. Straley,* 01–CV–0181, 2006 WL 5400078, at *3, 4, 12 (S.D.N.Y. Feb. 16, 2006) (finding that cut on plaintiff's lips, cut on plaintiff's head, and "severe cuts" to plaintiff's wrists-none of which required stitches-did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment, even if plaintiff's allegations were assumed to be true); *Hickey v. City of New York,* 01–CV–6506, 2004 WL 2724079, at *16

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

(S.D.N.Y. Nov. 29, 2004) (finding that cuts and bruises do not constitute sufficiently serious medical needs), *accord, Decayette v. Goord,* 06–CV–0783, 2009 WL 1606753, at *1, 2009 WL 1606753 (N.D .N.Y. June 8, 2009) (McAvoy, J.); *Rodriguez v. Mercado,* 00–CV–8588, 2002 WL 1997885, at *3, 8 (S.D.N.Y. Aug. 28, 2002) (finding that bruises to plaintiff's head, back and wrists, accompanied by back pain and migraines but no loss of consciousness, did not constitute a medical condition that was sufficiently serious for purposes of Eighth Amendment); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) ( "[C]ut finger, even where skin is 'ripped off,' ... does not, as a matter of law, qualify as an injury severe enough to justify civil rights relief."); *Henderson v. Doe,* 98–CV–5011, 1999 WL 378333, at *2 (S.D.N.Y. June 10, 1999) (concluding that broken finger does not rise to sufficient level of urgency); *Montavon v. Town of Southington,* 95–CV–1141, 1997 WL 835053, at *4 (D.Conn. Sept. 29, 1997) (finding that plaintiff's cuts and scrapes, unaccompanied by profuse bleeding or other conditions, did not constitute a medical condition that was sufficiently serious for purposes of Fourteenth Amendment).

Third, while a denial of a request for a transfer could conceivably be actionable if it were retaliatory in nature, Plaintiff has failed to adduce admissible record evidence from which a rational factfinder could conclude that the denial of the transfer in question was retaliatory in nature. In particular, Plaintiff has failed to adduce record evidence establishing that any named Defendant was either aware of his transfer request, or was personally involved in preventing his transfer. Indeed, Plaintiff has adduced record evidence establishing that his transfer request was submitted merely as part of one of his grievances. (Dkt. No. 34, Attach. 10, at 62.) Moreover, the record reflects that Plaintiff was in fact transferred within four months of the alleged assault. (*Id.*)

**B. Plaintiff's Claims of Retaliation and Harassment**

Even when construed with the utmost of liberality, Plaintiff's Objections regarding the portions of Magistrate Judge Peebles' Report–Recommendation recommending dismissal of his First Amendment retaliation claim and his Eighth Amendment harassment claim fail to specifically address Magistrate Judge Peebles' recommendations. Instead, the Objections simply reiterate the arguments Plaintiff previously presented to the Court in his response memorandum of law. As a result, and for the reasons explained above in Part II.A. of this Decision and Order, the Court need review these portions of the Report–Recommendation only for clear error. After doing so, the Court concludes that the portions of the Report–Recommendation recommending dismissal of Plaintiff's First Amendment retaliation claim and his Eighth Amendment harassment claim are well-reasoned and not clearly erroneous. Magistrate Judge Peebles employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts theses portions of the Report–Recommendation for the reasons stated therein.

**\*6** The Court would add only four points. First, the portions of the Report–Recommendation recommending dismissal of these claims would survive even a *de novo* review.

Second, even assuming that, after Plaintiff filed a grievance, one of the named Defendants threatened him with the planting of contraband in his cell if he filed additional grievances, as Magistrate Judge Peebles noted in his Report–Recommendation, this alleged verbal threat, which Plaintiff admits never came to fruition, is insufficient to establish adverse action for purposes of a retaliation claim. *Bartley v. Collins,* 95–CV–10161, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action.").[FN4]

FN4. *See also Gill v. Smith,* 283 F.Supp.2d 763, 765, 770 (N.D.N . Y.2003) (Scullin, J. adopting DiBianco, M.J.) (finding that inmate did not establish a First Amendment retaliation claim based on correctional officer's threat to retaliate against all prison library workers unless inmate dropped his grievance regarding officer's smoking in law library because, even assuming

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

inmate suffered "great stress and depression," inmate did not withdraw his grievance, which was thoroughly investigated and appealed to the highest level).

Third, to the extent that Plaintiff is attempting to characterize his denied transfer as the "adverse action" he experienced for purposes of his retaliation claim, Plaintiff has failed to allege facts plausibly suggesting, and/or adduce admissible record evidence establishing, that (1) any named Defendant was either aware of his transfer request, or was personally involved in preventing his transfer, and (2) his transfer was even denied (rather than being merely delayed).

Fourth, as Magistrate Judge Peebles noted in his Report–Recommendation, although Plaintiff testified that, as a result of the threats to plant contraband in his cell, he had difficulty sleeping and was stressed (*see* Dkt. No. 34, Attach. 10, at 67), based on the admissible record evidence, no rational factfinder could conclude that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment.[FN5]

FN5. As Magistrate Judge Peebles noted, although Plaintiff testified that he lost sleep and was stressed as a result of the threats, Plaintiff also testified that he *"always"* ha[s] trouble sleeping or trouble around other officers ... [because] he does not trust them." (Dkt. No. 34, Attach. 10, at 67 [emphasis added].) In addition, at best, such evidence establishes only *de minimis* psychological pain. *See Cusamano v. Sobek,* 604 F.Supp.2d 416, 492–93 (N.D.N.Y.2009) (Suddaby, J. adopting Lowe, M.J.) (finding allegations that correction officer's threats and abusive language caused plaintiff to experience "humiliation[,] ... [and] extreme feelings of marginality and 'nobodiness' " insufficient to "elevate Plaintiff's alleged psychological injuries above a *de minimis* level"); *Duamutef v. Leonardo,* 91–CV–1100, 1993 WL 428509, at *13 (N.D.N.Y. Oct. 22, 1993) (Hurd, M.J.) (finding that plaintiff's allegation that strip searches caused him to "suffer constant humiliation, unnecessary psychological pain and distress" did not rise to level of Eighth Amendment violation), *adopted by* 1994 WL 86700 (N.D.N.Y. March 7, 1994) (McCurn, J.), *appeal dismissed,* 47 F.3d 1158 (2d Cir.1995); *Jermosen v. Coughlin,* 87–CV–6267, 1993 WL 267357, at *6 (S.D.N.Y. July 9, 1993) (finding that plaintiff suffered only *de minimis* psychological harm when the record reflected that, before conducting a strip frisk of plaintiff, correctional officers "approached his cell with their nightsticks raised in a threatening position" in order to "deliberately inflict[ ] [on him] mental pain, anguish, embarrassment and humiliation").

**C. Plaintiff's Claims of Excessive Force and Failure to Intervene**

Turning to Plaintiff's Objections regarding his excessive force and failure-to-intervene claims, the Court concludes that those Objections are sufficiently specific in nature. As a result, the Court reviews the portion of the Report–Recommendation recommending dismissal of these claims de novo. After doing so, the Court concludes, for the reasons stated by Magistrate Judge Peebles in his thorough Report–Recommendation, that Plaintiff's testimony was self-contradictory, incomplete and totally uncorroborated deposition testimony. The Court would add only two points.

First, in addition to the internal contradictions and omissions in Plaintiff's deposition testimony noted by Magistrate Judge Peebles in his Report–Recommendation, the Court notes some additional such internal contradictions regarding what happened to Plaintiff immediately before the alleged assault. Specifically, Plaintiff testified that, after he was seen by a nurse and before he was allegedly assaulted, he was "brought back to the cell with everybody else.... *Then* the[ officers] took everybody else out and put me in a cage by myself that's off to the side[.]" (Dkt. No. 34, Attach. 10, at 29, 30, 32 [emphasis added].) However, moments later he testified that "[t]hey put me in by myself and they *then* took everybody ...." (*Id.* at 32 [emphasis added].) Immediately after this testimony Plaintiff again changed his testimony: "first they took everybody back." (*Id.*) Finally, Plaintiff admitted his lack of knowledge on the subject: "I don't know if they took everybody back first or after, but I know

Slip Copy, 2011 WL 1097864 (N.D.N.Y.)

(Cite as: 2011 WL 1097864 (N.D.N.Y.))

they put me in a cage by myself and they got everybody back to the dorm[.]" (*Id.*) When asked to confirm the simple fact that he was by himself when he was transported to the "cage," he confirmed that he was "completely alone" at that time. (*Id.* at 32, 34.) However, he also testified that, as he was being transported to the "cage," he was not in fact completely alone but was in the company of an inmate named Earl (who told him that "the officers were going to do something to [him]"). (*Id.* at 33.) Moreover, moments later he changed that piece of testimony, testifying that no one told him what was going to happen to him because "nobody knew." (*Id.* at 34.)

**\*7** Second, as Magistrate Judge Peebles correctly found, the main (if not exclusive) evidence on which Plaintiff relies (i.e., his internally contradictory and incomplete deposition testimony) is squarely contradicted by evidence produced by the defense. For example, in his deposition, Plaintiff testified that, while he was lying on the ground during the assault, he looked up and clearly saw (1) Defendant Brown kick him, and (2) Defendant Boulter, who smelled like liquor and was drunk, push up his nose. (Dkt. No. 34, Attach. 10, at 41–42, 44.) However, Defendant Brown has adduced admissible record evidence, in the form of an affidavit, establishing that, on the date of the alleged incident, he worked the 3:00 p.m. to 11:00 p .m. shift at Unit 16 (i.e., a different part of the facility), never seeing or speaking to Plaintiff during that time. (Dkt. No. 34, Attach.3.) Furthermore, Defendant Boulter has adduced admissible record evidence, in the form of a time sheet and an affidavit, establishing that, on the date of the alleged incident, he was away from Watertown C.F., on vacation. (Dkt. No. 34, Attach.1, 2.)

### D. Defendant Eastern

In his thorough Report–Recommendation, Magistrate Judge Peebles recommended that Plaintiff's claims against the Defendant identified as "Eastern" be dismissed for the alternative reason that Plaintiff failed to take reasonable steps to identify this Defendant, in order for him to be served, in violation of Fed.R.Civ.P. 4(m). Ordinarily, out of an extension of special solicitude to Plaintiff as a *pro se* civil rights litigant, the Court would be inclined to permit Plaintiff one final opportunity to take the appropriate steps

necessary to identify this Defendant and notify the Clerk of his identity so that he may be served. However, because the Court has already concluded that Plaintiff's only evidence establishing the occurrence of the assault on September 29, 2008, is his self-contradictory, incomplete deposition testimony that is wholly unsupported by the record, the Court concludes that it would be futile to permit Plaintiff leave to identify the Defendant referred to as "Eastern."

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Peebles' Report–Recommendation (Dkt. No. 52) is *ACCEPTED* and *ADOPTED;* and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 34) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is *DISMISSED.*

N.D.N.Y.,2011.

Johnson v. Brown
Slip Copy, 2011 WL 1097864 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

(Cite as: 1997 WL 614285 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

DONALD L. CURTIS, Plaintiff,
v.
GEORGE PATAKI, Governor, New York State; and
Philip Coombe, Jr., Defendants.
No. 96–CV–425 RSP–GJD.

Oct. 1, 1997.
Donald L. Curtis, Plaintiff, Pro Se.

Dennis C. Vacco, Attorney General of the State of New York, for Defendants, Albany, New York, Deborah A. Ferro, Assistant Attorney General, of Counsel.

### ORDER

POOLER, J.

**\*1** In a report-recommendation filed September 4, 1997, Magistrate Judge Gustave J. Di Bianco recommended that I deny plaintiff Donald L. Curtis' request for a default judgment and grant defendants' requests to vacate entry of default against them and dismiss this civil rights action. Curtis filed timely objections to each of the magistrate judge's recommendations.

### BACKGROUND

Curtis, a New York prison inmate, is serving concurrent sentences of twelve and one-half to twenty-five years for robbery and twenty-five years to life for murder. Pl.'s Reply to Defs.' Mot. Dismiss, Dkt. No. 18 ¶ 2; Defs.' Mem. Sup. Mot. Dismiss, Dkt. No. 15, at 2. On January 12, 1996, Curtis filed a complaint pursuant to 42 U.S.C. § 1983 in the United States District Court for the Western District of New York. Curtis claimed that N.Y.Correct.L. §§ 803 and 804 and N.Y.COMP.CODES R. & REGS., tit. 7 § 260.1(c) are unconstitutional insofar as they deny inmates serving a maximum life sentence of the opportunity to earn good time credits. Curtis claims that

(1) he has a liberty interest in good time credits and (2) granting inmates not serving a life sentence good time credits while denying them to inmates serving a life sentence is a denial of equal protection. Compl., Dkt. No. 1, ¶¶ 3,5,10.

By order dated February 26, 1996, Chief Judge Larimer of the Western District of New York transferred Curtis's lawsuit to this district. *See* Dkt. No. 3.

By letter dated July 3, 1996, defendant Philip Coombe, then commissioner of the New York State Department of Corrections ("DOCS"), requested an extension until August 15, 1996, to answer the complaint. Dkt. No. 9. Coombe's request was granted. *Id.*

On September 24, 1996, Curtis moved for a default judgment. Dkt. No. 11. Because Curtis had not yet obtained entry of default, the Clerk treated Curtis' request as one for entry of default and entered default on September 27, 1996. Dkt. No. 11.

By letter dated December 2, 1996, both defendants requested an extension of time to January 6, 1997, to answer or move to dismiss the complaint. Dkt. No. 12. This request was granted. *Id.* Curtis then filed a motion for a default judgment on January 17, 1997. Dkt. No. 13. On February 18, 1997, defendants cross-moved to vacate entry of default and to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 14. Curtis opposed defendants' motion to dismiss. Dkt. No. 18.

In his report-recommendation issued September 4, 1997, the magistrate judge recommended that I vacate entry of default and deny plaintiff's request for a default judgment because (1) defense counsel's default was not wilful because she had been seriously ill during some of the period in which she delayed responding to the complaint and she had requested extensions of time, (2) defendant failed to demonstrate prejudice, and (3) defendants demonstrated meritorious defenses. The magistrate judge also recommended that I dismiss plaintiff's complaint because it fails to state a claim.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

(Cite as: 1997 WL 614285 (N.D.N.Y.))

**\*2** Curtis filed his objections on September 14, 1997. Curtis made the following specific objections: (1) entry of default should not have been vacated because the Attorney General has ample resources and could have assigned another attorney to handle plaintiff's law suit during Assistant Attorney General Deborah Ferro's illness and Ms. Ferro was able to work despite her illness; (2) the Magistrate Judge erred factually by (a) stating that Curtis would receive good time against his twelve and one-half to twenty-five year sentence and (b) stating that Curtis had not requested new legislation; and (3) N.Y.Correct.L. § 803(1)(a) denies Curtis equal protection because he is similarly situated to inmates who do receive good time and the statute's distinction between inmates serving life sentences and inmates who are not serving life sentences is not rationally related to a government interest.

### DISCUSSION

**I. Standard**

I review the report-recommendation *de novo* because both plaintiff's motion for a default judgment and defendants' motion to dismiss are dispositive motions. *See* 28 U.S.C. § 636(b)(1)(C).

**II. Default**

Plaintiff moved for a default judgment. Defendants opposed plaintiff's and moved to vacate entry of default.

A party may move pursuant to Rule 55(c) to set aside entry of default for "good cause." Whether or not to vacate entry of default is left to the sound discretion of the district court judge; however, there is a strong preference in favor of adjudicating controversies on their merits. *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993). The criteria employed in determining whether good cause exists are "(1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." *Id.* In all instances, the criteria for setting aside entry of default should be construed generously. *Id.*

The magistrate judge correctly determined that defendants' default was not willful. Although defense counsel did not meet deadlines, she did request two extensions of time and she suffered from walking pneumonia from July through September 1996. Ferro Aff'n, Dkt. No. 16, ¶¶ 4,6,7. Plaintiff did not make any specific allegations to support a finding of prejudice. Finally, for reasons I explain below, defendants' motion to dismiss for failure to state a claim is meritorious. Therefore, I will vacate entry of default and deny plaintiff's motion for a default judgment.

### III. Motion to Dismiss

Plaintiff initially claimed that both Sections 803 and 804 of the Corrections Law were unconstitutional. However, the magistrate judge correctly found that Section 804 does not apply to plaintiff because he is not serving a definite sentence. Plaintiff does not contest this finding. Therefore, I need consider only Section 803(1)(a), which provides:

> Every person confined in an institution of the department or a facility in the department of mental hygiene serving an indeterminate or determinate sentence of imprisonment, *except a person serving a sentence with a maximum term of life imprisonment,* may receive time allowance against the term or maximum term of his sentence imposed by the court. Such allowances may be granted for good behavior and efficient and willing performance of duties assigned or progress and achievement in an assigned treatment program, and may be withheld, forfeited or canceled in whole or in part for bad behavior, violation of institutional rules or failure to perform properly in the duties or program assigned.

**\*3** N.Y.Correct.L. § 803(1)(a) (McKinney Suppl.1996) (emphasis added).

The Equal Protection Clause does not forbid all classifications. *Nicholas v. Tucker,* 114 F.3d 17, 20 (2d Cir.1997). Unless Section 803(1)(a) either (1) burdens a fundamental right or (2) creates a distinction that burdens a suspect class, defendants need only demonstrate that the statutory scheme is rationally related to a legitimate government interest. *Id.* (citing *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976)). Inmates serving sentences that have a maximum term of life are not a suspect classification. *Cf. Id.* (holding that inmates are not a suspect classification). Moreover, the legislature's decision to grant certain inmates good time credits "is a matter of legislative grace" and does not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

(Cite as: 1997 WL 614285 (N.D.N.Y.))

create a fundamental right. *People ex rel. McNeil v. New York State Bd. of Parole,* 57 A.D.2d 876, 394 N.Y.S.2d 230, 232 (2d Dep't 1977). Therefore, the magistrate judge correctly determined that Section 803(1)(a) survives equal protection scrutiny if it is rationally related to a legitimate government interest. The magistrate judge identified two such legitimate governmental interests: denying early release to inmates who—in the view of the sentencing judge—have committed crimes deserving a life sentence and administrative convenience. Because deducting good time from a life sentence is obviously impracticable, not granting good time to inmates with maximum life sentences clearly is rationally related to administrative convenience. Moreover, the legislature was entitled to assume that judges would give maximum life sentences to those felons that the judges believed had committed the most heinous crimes and were least deserving of early release. Therefore, denying good time to inmates with life sentences is rationally related to ensuring that inmates convicted of the most serious crimes are not released early.

Plaintiff argues that the magistrate judge erred by finding that (1) plaintiff would receive good time against his shorter sentence and (2) he had not asked for new legislation. Even if plaintiff is correct on these points, the asserted factual errors do not affect the equal protection analysis set forth above.

Plaintiff also argues that he has a liberty interest in good time. However, the very statute that arguably creates a right to good time for certain inmates specifically excludes inmates who, like plaintiff, are serving sentences that have a maximum term of life. Therefore, the statute does not give Curtis a liberty interest in good time. Curtis' claim that is it unfair to subject him to a loss of good time through due process hearings while not allowing him good time is nonsensical. Curtis will incur no actual loss of good time unless his maximum life sentence is vacated and he is awarded good time against his lesser sentence.

### CONCLUSION

Therefore, the report-recommendation is approved; plaintiff's request for a default judgment is denied; entry of default is vacated; and the complaint is dismissed in its entirety.

**\*4** IT IS SO ORDERED.

GUSTAVE J. DI BIANCO, Magistrate J.

REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rules N.D.N.Y. 72.3(c).

In the instant civil rights complaint, plaintiff alleges that New York Corrections Law sections 803 and 804 violate equal protection because they deny inmates with life sentences the right to receive good time credits.

Plaintiff requests that the court abolish the existing good time credit laws, rules, regulations, policy and practices. Plaintiff requests that the laws be restructured to include plaintiff, who is serving a life sentence.

Presently before the court are two motions. The plaintiff has moved for a default judgment pursuant to FED.R.CIV.P. 55 (Docket # 13), and the defendants have cross-moved to vacate the entry of default and to dismiss the complaint for failure to state a claim pursuant to FED.R.CIV.P. 12(b)(6) (Docket # 14). For the following reasons, the undersigned agrees with defendants and will recommend that the entry of default be vacated and the complaint be dismissed.

DISCUSSION

**1.** *Default Judgment:*

The plaintiff moves for a default judgment, based upon the entry of default dated September 27, 1996.[FN1] At that time, defendants had not responded to the complaint. Defendants now request that the entry of default be vacated and that they be allowed to cross-move for dismissal of the complaint.

> FN1. The plaintiff filed a document labeled motion for default judgment". (Docket # 11). However, the Clerk interpreted this document as a request for entry of default pursuant to FED.R.CIV.P . 55(a).

The court notes that under FED.R.CIV.P. 55(a), the Clerk of the Court may enter default against a party when

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

(Cite as: 1997 WL 614285 (N.D.N.Y.))

the Clerk learns through affidavit or otherwise, that the party against whom a judgment for affirmative relief has been sought has failed to plead or otherwise defend as required by the rules. *Dow Chemical Pacific, Ltd. v. Rascator Maritime S.A., Intra–Span, Inc.,* 782 F.2d 329, 335 (2d Cir.1986). Entry of default is not a default judgment, which requires a hearing and final judgment pursuant to FED.R.CIV.P. 55(b). *Id.*

In the instant case, plaintiff initially submitted a motion for a default judgment, however, such a motion is improper until the Clerk enters default against a party. Thus, plaintiff's "motion" (Docket # 11) was considered by the Clerk as merely a request for entry of default. The Clerk made a written notation on the document submitted by the plaintiff that default was "noted and entered" on September 27, 1996. (Docket # 11). This notation is signed by Patricia L. McGuire, Deputy Clerk. Thus, entry of default was made on September 27, 1996.

In December of 1996, defendants requested and were granted an extension of time within which to move to answer or dismiss the complaint. (Docket # 12). This request was granted by the Pro Se Staff Attorney at my direction. The extension to serve the motion was granted until January 6, 1997. However, on January 17, 1997, the plaintiff moved for a default judgment. (Docket # 13). No motion had yet been filed or served by the defendants. On February 18, 1997, the defendants filed their cross-motion with the court.

**\*5** In defendants' memorandum of law in support of vacating the entry of default, defense counsel states various extenuating circumstances which caused the delay in this case and which caused the defendants' failure to timely file either their answer or their motion to vacate default and to dismiss the complaint.

The court may vacate an entry of default for good cause. FED.R.CIV.P. 55(C). There are strong policies in favor of resolving issues on their merits. *In re Martin Trigona,* 763 F.2d 503, 505 (2d Cir.1985). A finding of good cause is based on whether the default was willful, whether there will be prejudice to the other party if the court sets aside the default, and whether a meritorious defense is presented. *Id.* (citations omitted).

In the instant case, it is clear that the default was not willful, and that defense counsel was attempting to comply with deadlines for filing her motion. Additionally, a review of the documents shows that a meritorious defense is submitted, and there will be no prejudice to the plaintiff to allow the case to go forward and be decided on its merits. Thus, the court recommends vacating the entry of default and will continue to consider defendants' motion to dismiss.

**2.** *Motion to Dismiss:*

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The court must accept the material facts alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964)(per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

**3.** *Facts and Contentions:*

Plaintiff is an inmate serving two concurrent sentences of confinement. He is serving a 25 year to life sentence for Murder, Second Degree, and a concurrent sentence of 12 1/2 to 25 years for Robbery, First Degree. Plaintiff alleges that New York Corrections Law sections 803 and 804 are unconstitutional because they specifically except inmates who are serving life sentences from accumulating statutory good time to reduce their sentences. Plaintiff claims that he "loses" good time credits after disciplinary hearings, so he should be entitled to accumulate them. Plaintiff alleges that defendants are violating his right to equal protection of the law.

**4.** *Proper Defendants:*

Defendants first allege that neither of them has the power or authority to comply with the mandatory injunctive relief sought by the plaintiff.

When a plaintiff seeks a declaration that a particular statute is unconstitutional, the proper defendants are the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

(Cite as: 1997 WL 614285 (N.D.N.Y.))

government officials charged with the administration and enforcement of the statute. *New Hampshire Right to Life Committee v. Gardner,* 99 F.3d 8, 13 (1st Cir.1996) (citations omitted). In the instant case, it is true that the Governor appears to have no responsibility for administering or enforcing the statute that affords inmates of correctional institutions good time. Thus, he is not an appropriate defendant in the instant case.

**\*6** However, New York Corrections Law section 803(3) specifically provides that the Commissioner of Correctional Services shall promulgate rules and regulations for the administration of the time allowances authorized by the statute. N.Y.Correct.Law § 803(3). It is the ultimate responsibility of the Commissioner of Correctional Services to administer and enforce the statute. Thus, defendant Coombe is a proper defendant for prospective injunctive relief in this case. Although it is true that neither of the defendants is authorized to enact legislation, the plaintiff seeks a declaration that a statute is unconstitutional. If the statute is found unconstitutional to the extent that inmates serving a life sentence could not be excepted from the provisions of the statute, it does not appear that the plaintiff is requesting that new legislation be enacted, he is requesting that he simply be allowed to participate in the existing legislation. Thus, plaintiff is not requesting new legislation. It must be remembered that plaintiff is *pro se* and may not be aware how to request appropriate relief.

In any event, regardless of whether defendant Coombe is a proper defendant, plaintiff's claim has no ultimate merit as discussed in the sections below.

**5. *Equal Protection:***

Before the court considers the substance of plaintiff's equal protection claim, the court notes that although plaintiff challenges sections 803 and 804 of the New York Corrections Law, section 804 has no application to plaintiff's case since it is a good time statute for inmates with **definite** sentences. An inmate who is serving a sentence with a minimum and a maximum term is serving an **indeterminate,** not a definite sentence. *See* N.Y.Penal Law § 70.00. Section 804, thus, does not apply to plaintiff, and he cannot challenge the application of that section.

Section 803 is the appropriate section for plaintiff to challenge.

Section 803 of the New York Corrections Law provides that:

1. (a) Every person confined in an institution of the department ... serving an indeterminate or determinate sentence of imprisonment, *except a person serving a sentence with a maximum term of life imprisonment,* may receive time allowance against the term or *maximum* term imposed by the court.

N.Y.Corr.Law § 803(1)(a)(emphasis added). On its face, the law is quite clear that it does not apply to inmates whose maximum term of imprisonment is life. Without any complicated analysis, it is logical that since good time is deducted from the maximum term of an inmate's sentence, it would be impossible to calculate good time for an individual with a maximum of life term. Thus, aside from the legislature's desire to clearly exclude inmates with life sentences, perhaps because a sentence of life is usually reserved for those who commit the most serious of crimes, good time is impossible to calculate on such a term. There would be no starting number from which to subtract accumulated good time.

**\*7** The Equal Protection Clause insures that governmental decision makers do not treat people differently who are alike in all relevant respects. *Nicholas v. Tucker,* 114 F.3d 17, 210 (2d Cir.1997) (citing *inter alia Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). The Equal Protection Clause does not forbid all classifications, and unless the classification burdens a fundamental right or draws distinctions based on suspect classifications, the statute will be upheld if it is rationally related to a legitimate governmental interest. *Id.*

Inmates are not a suspect class such that a more exacting scrutiny is required. *Id.* Additionally, even assuming that the good time statute creates a right to obtain a reduction of one's sentence, this right would not be "fundamental" such that strict scrutiny would be required for the statute's classification to survive an equal protection challenge. *See Washington v. Glucksberg,* 521 U.S. 702, ——, 117 S.Ct. 2258, 2271, 138 L.Ed.2d 772 (1997) (discussing fundamental rights protected by the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)

(Cite as: 1997 WL 614285 (N.D.N.Y.))

Fourteenth Amendment). *See also People ex rel. McNeil v. New York State Board of Parole,* 57 A.D.2d 876, 877, 394 N.Y.S.2d 230, 232 (2d Dep't 1977) (no fundamental right to good time). Since this statute affects neither a suspect class nor a fundamental right, its differing treatment of those who are serving life sentences needs only to be rationally related to a legitimate governmental interest to survive an equal protection challenge. Aside from the obvious problem in calculating good time for an individual with a life sentence, it is certainly rational to deny a privilege to those who have committed more serious crimes and thus, excepting individuals with life sentences from the good time statute is certainly related to this interest.[FN2]

> [FN2]. It is also arguable that an inmate serving a life sentence is not even similarly situated to one who is not serving a life sentence. If so, there would be no need to justify the differing treatment.

Plaintiff points out that he loses good time when he is found guilty of a disciplinary violation. However, the court points out, as stated by defendants, that plaintiff has two sentences, one of which has a maximum of twenty-five years. The plaintiff can accumulate and lose good time on this less-than-life sentence in case the life sentence is somehow vacated or changed in any way. The fact that plaintiff can accumulate good time on his sentence for robbery does not mean he can accumulate good time on his life sentence. Thus, plaintiff's equal protection challenge must fail.

WHEREFORE, based on the above, it is hereby

RECOMMENDED, that plaintiff's motion for default judgment pursuant to FED.R.CIV.P. 55 (Docket # 13) be **DENIED,** and it is further

RECOMMENDED, that the defendants' motion to vacate the entry of default and to dismiss the complaint (Docket # 14) be **GRANTED,** the default be vacated, and the complaint be dismissed.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R .Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1997.

Curtis v. Pataki
Not Reported in F.Supp., 1997 WL 614285 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1133074 (N.D.N.Y.)

(Cite as: 2010 WL 1133074 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Frederick DIAZ, Plaintiff,
v.
Brian FISCHER, Commissioner, Department of
Corrections; Harold D. Graham, Superintendent,
Auburn Correctional Facility; Steven Byrne, Lieutenant;
Timothy Quinn, Lieutenant; Gregory Redmond,
Lieutenant, Auburn Correctional Facility; James Cady,
Correctional Officer, Auburn Correctional Facility;
Robert Burdick, Correctional Officer, Auburn
Correctional Facility; and Joseph Merville, Correctional
Officer, Auburn Correctional Facility, Defendants.
No. 9:08-CV-1208 (LEK/DRH).

March 23, 2010.
Frederick Diaz, Comstock, NY, pro se.

Roger W. Kinsey, Office of Attorney General, Albany,
NY, for Defendants.

**DECISION AND ORDER**

LAWRENCE E. KAHN, District Judge.

*\*1* This matter comes before the Court following a
Report-Recommendation filed on February 23, 2010 by
the Honorable David R. Homer, United States Magistrate
Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the
Northern District of New York. Report-Rec. (Dkt. No.
42). After ten days from the service thereof, the Clerk has
sent the entire file to the undersigned, including Plaintiff
Frederick Diaz' Objections, (Dkt. No. 43) ("Objections"),
which were filed on March 8, 2010.

It is the duty of this Court to "make a de novo
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b). "A [district] judge ... may
accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge." Id.

This Court has considered the Objections, undertaken
a *de novo* review of the record, and determined that,
except as specifically noted and for the reasons discussed
below, the findings of the Report-Recommendation are
adopted. As detailed below, Defendants' Motion to dismiss
(Dkt. No. 25) is partially granted; Plaintiff may pursue his
retaliation and due process claims against Defendant
Quinn; and Plaintiff's Complaint (Dkt. No. 1) is dismissed
in its entirety as to Defendants Fischer; Graham;
Redmond; Burdick; and Merville. The Court does not
reach any conclusions with regard to Plaintiff's claims
against Defendants Byrne and Cady,[FN1] who are not party
to the instant Motion. *See* Mem. of Law in supp. of Defs.'
Mot. to Dismiss (Dkt. No. 25-1) ("Defs.' Mem.").

> FN1. Plaintiff appears to make an Eighth
> Amendment claim against Defendants Byrne and
> Cady for their alleged assault against him.
> Compl. ¶¶ 63-69. Plaintiff also appears to
> alleged that Defendant Byrne violated his
> Fourteenth Amendment right to due process. *Id.*
> 60-73.

**I. STANDARD OF REVIEW**

The Report-Recommendation correctly noted the
standard of review applicable to motions to dismiss under
Rule 12(b)(6) of the Federal Rules of Civil Procedure. In
short, when considering a motion to dismiss under
12(b)(6), a district court must accept the factual
allegations made by the non-moving party as true and
"draw all inferences in the light most favorable" to the
non-moving party. *In re NYSE Specialists Sec. Litig.,* 503
*F.3d 89, 95 (2d Cir.2007).* In order to survive a motion to
dismiss, "a complaint must contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.' " *Ashcroft v. Iqbal, --- U.S. ----, 129
S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)* (quoting *Bell
Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct.
1955, 167 L.Ed.2d 929 (2007)). A court should "begin by
identifying pleadings that, because they are no more than
conclusions, are not entitled to the assumption of truth."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1133074 (N.D.N.Y.)

(Cite as: 2010 WL 1133074 (N.D.N.Y.))

*Id.* at 1950. If a plaintiff provides well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

## II. DISCUSSION

### A. Loss of Property and Conditions of Confinement

The Report Recommendation, noting Plaintiff's *pro se* status, entitled Plaintiff to special solicitude and construed his pleadings liberally. Report-Rec. at 12 (citing *Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir.2006).* The Magistrate thus considered the pleadings to include a due process claim for lost property and an Eighth Amendment claim based on the conditions of Plaintiff's keeplock cell. While Plaintiff objects to certain findings associated with the Magistrate's analysis of these issues, his Objections make clear that he is not asserting these claims. Objections at 4. Moreover, the Court finds no error in the Report-Recommendation's treatment of these claims. They are dismissed.

### B. Personal Involvement of Defendants Fischer, Quinn, and Graham

**\*2** Defendants claim that Plaintiff has failed to allege facts showing the personal involvement of Defendants Fischer, Quinn, and Graham in the constitutional violations he alleges. See Defs.' Mem. at 4-7. Upon *de novo* review of the record and consideration of Plaintiff's Objections, the Court has determined that the Report-Recommendation's findings on this issue should be approved for the reasons stated therein. Thus, Defendants' Motion to dismiss is granted with regard to Defendant Fischer for lack of personal involvement, but denied on this ground as to Defendants Quinn and Graham.

### C. Plaintiff's Retaliation Claims

To state a claim of unconstitutional retaliation, a plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dawes v. Walker, 239 F.3d 489, 492 (2d Cir.2001) overruled on other grounds; Gill v. Pidlypchak, 389 F.3d 379, 381-83 (2d Cir.2004).* Given the relative ease with which claims of retaliation can be alleged,

however, courts have scrutinized such retaliation claims with particular care. See *Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983).*

The Report-Recommendation correctly noted that even where a plaintiff alleges retaliation for a constitutionally protected activity, any " 'adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.' " Report-Rec. at 17 (quoting *Jackson v. Onondaga County, 549 F.Supp.2d 204, 215 (N.D.N.Y.2008)* (citing *Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996)*). Thus, where a plaintiff shows that he was engaged in a constitutionally protected activity and that protected conduct was a "substantial or motivating factor in the prison officials' decision to discipline the plaintiff," the state action may still be upheld if defendants "show by a preponderance of the evidence that they would have disciplined the plaintiff 'even in the absence of the protected conduct.' " *Graham, 89 F.3d at 79* (quoting *Mount Healthy Sch. Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)*). This showing may be properly made upon a motion for summary judgment, as the cases cited in the Report-Recommendation indicate. *See also Sher v. Coughlin, 739 F.2d 77, 81-82 (2d Cir.1984)* (summary judgment appropriate where "there can be no doubt that the administrative reasons relied on by the defendants would have caused them to" undertake the conduct at issue); *Lowrance v. Achtyl, 20 F.3d 529, 535 (2d Cir.1994)* (same); *Scott v. Coughlin, 344 F.3d 282 (2d Cir.2003)* (reversing a grant of summary judgment where, after defendants' showing, factual issues still remained on issues including whether the severity of punishment would have been the same without the retaliatory motive). Where retaliation is alleged in "wholly conclusory terms" it may be dismissed on the pleadings; where factual support exists linking the alleged retaliatory conduct to the protected activity, some and perhaps full discovery should be allowed. *Flaherty, 713 F.2d at 13* ("a retaliation claim supported by specific and detailed factual allegations which amount to a persuasive case ought usually be pursued with full discovery. However, a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone.").

### 1. Defendants Merville and Burdick

Slip Copy, 2010 WL 1133074 (N.D.N.Y.)

(Cite as: 2010 WL 1133074 (N.D.N.Y.))

**\*3** In his Report-Recommendation, the Magistrate found that Plaintiff's retaliation claim against Defendants Merville and Burdick fails because the alleged retaliation, misbehavior reports authored by Burdick and endorsed by Melville, which cited Plaintiff for not appearing to work as scheduled were: 1) were written for a proper purpose; 2) related to Plaintiff's employment status and not to a constitutionally protected activity; or 3) related to Plaintiff's filing grievances, which is a protected activity, but one which occurred subsequent to the alleged retaliation, and could not therefore be the basis of alleged conduct. Report-Rec. at 18. The Report-Recommendation did not specifically address Plaintiff's claim of retaliation by these Defendants based on Plaintiff's membership on the Inmate Grievance Resolution Committee ("IGRC") and Inmate Liaison Committee ("ILC"). Objections at 6; Compl. ¶ 26. Plaintiff's activities taken on behalf of the ILC (complaining about defective typewriters) constitutes protected activity. *See Shaheen v. Filion,* No. 9:04-CV-625, 2006 WL 2792739 (N.D.N.Y. Sept.17, 2006); *Alnutt v. Cleary,* 913 F.Supp. 160, 169 (W.D.N.Y.1996). The Court nevertheless upholds the conclusion of the Magistrate, as Plaintiff fails to state a plausible retaliation claim against Merville and Burdick.

Plaintiff admits that the work schedule indicated that he was required to be at work and he was not. Report-Rec. at 21; Compl. ¶ 24. However, Plaintiff alleges that the Defendants purposefully changed the work schedule in order to catch him in violation, that being written up for such trivial violations is unheard of, and that the real motivation was retaliation against Plaintiff for, amongst other things, membership in the IGRC and ILC. Compl. ¶ 24-26. Plaintiff alleges that Merville and Burdick "did not like the fact that plaintiff was a member of the Inmate Liaison Committee [and] ... became even more hostile to plaintiff over" the ILC's recommendation that the Law Library's typewriters were defective and needed replacement. Compl. ¶ 26. After this incident, Plaintiff alleges that "Merville made it clear to plaintiff that he should never go behind his back again with any issue to the ILC." *Id.*

The Court, taking Plaintiff's factual allegations as true, finds that Plaintiff's claim against Burdick must be dismissed. The mere allegation that Burdick "did not like"

that Plaintiff was a member of the ILC and became hostile to him after finding out about such membership, does not causally link the alleged unconstitutional retaliation by Burdick to Plaintiff's ILC membership. Plaintiff's claim to the contrary is a mere conclusion and "not entitled to the assumption of truth." Iqbal, 129 S.Ct. at 1950.

Plaintiff's allegations against Merville similarly fail to state a plausible retaliation claim. Assuming Merville told Plaintiff not to make complaints about prison conditions behind his back via the ILC, Plaintiff's assertion that Merville's subsequent endorsement of the misbehavior report filed against Plaintiff was caused by Plaintiff's ILC membership is wholly conclusory.

**\*4** Because no factual allegations support a linkage between the alleged retaliation and Plaintiff's ILC membership, his claims against Burdick and Merville are properly dismissed. *Flaherty,* 713 F.2d at 13 ("a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone.").

**2. *Defendant Quinn***

The Court finds that Plaintiff has alleged a plausible claim of retaliation against Defendant Quinn. Plaintiff alleges that Defendant Quinn issued a falsified misbehavior violation once he discovered Plaintiff was the ILC Secretary. Compl. ¶ 42. According to Plaintiff's Complaint, Quinn's issued Plaintiff a false misbehavior report because of the content of Plaintiff's earlier filed grievances against Sergeant Cox [FN2] and because of Plaintiff's membership in the ILC. Compl. 35-45; *see also* Pl.'s Opp'n to Defs.' Mot. to Dismiss (Dkt. No 27) at 2-3; Objections (Dkt. No 43) at 6. The Report-Recommendation appears to have read Plaintiff's retaliation claim against Quinn as largely stemming from the grievance Plaintiff filed subsequent to the issuance of the misbehavior report, rather than those filed against Cox prior to its issuance.[FN3] Report-Rec. at 19. The Report-Recommendation did not address Plaintiff's assertion that his ILC membership was a motivating factor in Quinn's allegedly unconstitutional conduct. *Id.*

FN2. Not a party to the present action.

FN3. The filing of grievances is clearly a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1133074 (N.D.N.Y.)

(Cite as: 2010 WL 1133074 (N.D.N.Y.))

constitutionally protected activity. *See Davis v. Goord,* 320 F.3d 346, 352-53 (2d Cir.2003) (citing *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)); *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988).

Plaintiff provides several facts in support of his claim. For example, Plaintiff's contact with Defendant Quinn sprang from the latter's investigation of grievances pertaining to the IGRC's handling of grievances filed by Plaintiff; during their interview Quinn allegedly berated Plaintiff specifically about the latter's filing grievances; Quinn issued Plaintiff a misbehavior report following a pat-down leading to the discovery of an ILC card in Plaintiff's wallet; upon finding this card Quinn allegedly said, "Now I'm definitely having you moved out of E-Block;" and the penalty of being sent to the Special Housing Unit ("SHU") that Plaintiff received as a result of the violation issued by Quinn was allegedly extraordinarily harsh [FN4] but also required in order to remove Plaintiff from his ILC position. Compl. ¶¶ 35-48. Given the stage of litigation and the allegations contained in Plaintiff's Complaint, dismissal of Plaintiff's retaliation claim against Quinn is, at present, inappropriate. *Flaherty,* 713 F.2d at 13; *Davis v. Goord,* 320 F.3d 346, 352-53 (2d Cir.2003); *Gill v. Pidlypchak,* 389 F.3d 379 (2d Cir.2004).

FN4. The original penalty of 120 days in the Special Housing Unit was significantly lessened on appeal to 14 days with 46 days in keeplock. Compl. ¶ 48.

### 3. *Defendant Graham*

The Court has undertaken a *de novo* review of the record and has determined that the Report-Recommendation's findings on this issue should be approved for the reasons stated therein. Plaintiff's allegations of retaliation by Defendant Graham are entirely conclusory and this claim is properly dismissed.

### D. Plaintiff's Due Process Claims

### 1. Preclusion under the "Favorable Termination" Rule

**\*5** The Court finds that the Report-Recommendation's conclusion that Plaintiff's claim is precluded under the "favorable termination" rule announced in *Heck v.*

*Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), and extended under *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997) is incorrect. The Heck rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. 512 U .S. at 486-87. *Edwards* extended this rule to challenges to prison disciplinary proceedings. 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906.

That rule, however, does not apply where, as here, Plaintiff is challenging the conditions of prison life rather than the validity of his sentence and the complained of disciplinary violation does not affect the duration of his confinement. *See Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999) ("a § 1983 suit by a prisoner ... challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards"* ).

### 2. *Due Process Claims*

The fact that Plaintiff's claim is not precluded under *Heck* and *Edwards* does not end the inquiry. An inmate asserting a violation of his Fourteenth Amendment right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). Plaintiff's Complaint asserts a denial of his Fourteenth Amendment right to due process as a result of his confinement in SHU after being issued a false misbehavior report allegedly issued in retaliation for his exercising his constitutional rights, and as a result of allegedly unfair disciplinary hearings.

To state a due process violation, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *Sandin* requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *see also Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1133074 (N.D.N.Y.)

(Cite as: 2010 WL 1133074 (N.D.N.Y.))

deprivation. *Sandin,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418.

Further, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). However, where a plaintiff has alleges that he was falsely accused in retaliation for engaging in a protected activity and that false accusation led to a deprivation of a liberty interest, his right to due process is implicated. *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). As discussed above, Plaintiff has alleged a plausible retaliation claim against Defendant Quinn. The alleged retaliation involved the issuance of a disciplinary violation that led to Plaintiff's confinement in SHU. Thus, Plaintiff has alleged a plausible claim that Quinn violated his right to due process. *Id.*

**\*6** An inmate also "ha[s] a due process right to a hearing before he may be deprived of a liberty interest on the basis of a misbehavior report." *Boddie,* 105 F.3d at 862 (citing *Freeman v. Rideout,* 808 F.2d at 951). In this case, after Quinn issued Plaintiff's misbehavior report, Plaintiff received a hearing, adjudicated by Defendant Redmond. Compl. ¶ 46. Plaintiff alleges that this hearing was a "farce" and alleges a due process claim against Redmond for his participation in it. Plaintiff asserts that Redmond's determination, a sentence of 120 days in SHU, was an excessive punishment imposed on Plaintiff only because Redmond was friends with Quinn. *Id.* at 47. Plaintiff claims that the sentence was retaliatory and supports this by referring to the fact that the disposition was lessened on appeal to only 14 days in SHU followed by 46 days in keeplock.

In this Circuit, "[f]or a prison disciplinary proceeding to provide due process there must be, among other things, 'some evidence' to support the sanction imposed." *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004) (quoting *Gaston v. Coughlin,* 249 F.3d 156, 163 (2d Cir.2001)), *cert. denied* 543 U.S. 1187 (2005). Accordingly, "judicial review of the written findings required by due process is limited to determining whether the disposition is supported by 'some evidence.'" *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (quoting *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)). "This standard is extremely tolerant and is satisfied if there is any evidence in the record that supports the disciplinary ruling." *Id.* (quoting *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000)). Thus, the simple fact that Plaintiff's disposition was reduced on appeal is inadequate to support Plaintiff's claim against Redmond for violation of due process. On the other hand, there is "some evidence" to support Redmond's findings, namely Quinn's testimony regarding the underlying events leading to Plaintiff's being issued a violation. Finally, Plaintiff's claim that Redmond acted out of retaliation is entirely conclusory. Therefore, his claim against Redmond is dismissed.

Plaintiff makes an additional due process claim against Defendant Graham for upholding a disposition against Plaintiff following an alleged assault against Plaintiff by Defendants Byrne and Cady during a separate grievance hearing over which they were presiding. Compl. ¶¶ 59-78. Plaintiff claims Graham upheld the disposition in retaliation for Plaintiff's filing of grievances, which he alleges also to have been the cause of Byrne and Cady's assault against him. Graham upheld Byrne's disposition despite the fact that he listened to the audiotape that was recording the session and found that the recording was stopped at the time of the alleged assault. Nevertheless, there is no factual support that Graham's actions were made in retaliation for Plaintiff's filing grievances. There is, however, "some evidence" to support Graham's disposition, including the findings in Byrne's disposition and the testimony by Byrne regarding the reason that the audio tape was paused. Plaintiff's claim against Graham is dismissed.

**E. Plaintiff's Equal Protection Claim**

**\*7** The Court has undertaken a *de novo* review of the record and has determined that the Report-Recommendation's findings on this issue should be approved for the reasons stated therein. Accordingly, Plaintiff's equal protection claim is dismissed.

**F. Qualified Immunity**

Defendants claim that they are entitled to qualified immunity. The doctrine of qualified immunity shields government officials "from liability for civil damages

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1133074 (N.D.N.Y.)

(Cite as: 2010 WL 1133074 (N.D.N.Y.))

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted); *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To determine whether a defendant is entitled to qualified immunity, a court must first determine whether, based upon the facts alleged, the plaintiff has facially established a constitutional violation. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). If so, the court must then determine whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled on other grounds by *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)); *Poe v. Leonard,* 282 F.3d 123, 133 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998)).

Given the above discussion, the qualified immunity defense is relevant only to Defendant Quinn. Taking the Plaintiff's factual allegations as true, Defendant Quinn issued Plaintiff a false misbehavior report in retaliation for Plaintiff's exercising of his First Amendment rights to file grievances and participate in the ILC. These are well established rights. It is not objectively reasonable for Defendant Quinn to believe that issuing a misbehavior report because of such conduct and for the purpose of disqualifying Plaintiff from the ILC was lawful. Thus, at this stage in the litigation, Defendant Quinn is not entitled to qualified immunity.

## III. CONCLUSION

Accordingly, it is hereby
**ORDERED,** that the Report-Recommendation (Dkt. No. 42) is **APPROVED** and **ADOPTED in PART;** and it is further

**ORDERED,** that Defendant's Motion to dismiss (Dkt.

No. 25) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED,** that Plaintiff's Complaint is **DISMISSED in its ENTIRETY** as to Defendants Fischer, Graham, Redmond, Burdick, and Merville; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Diaz v. Fischer
Slip Copy, 2010 WL 1133074 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Frederick DIAZ, Plaintiff,
v.
Brian FISCHER, Commissioner, Department of
Corrections; Harold D. Graham, Superintendent,
Auburn Correctional Facility; Steven Byrne, Lieutenant;
Timothy Quinn, Lieutenant; Gregory Redmond,
Lieutenant, Auburn Correctional Facility; James Cady,
Correctional Officer, Auburn Correctional Facility;
Robert Burdick, Correctional Officer, Auburn
Correctional Facility; and Joseph Merville, Correctional
Officer, Auburn Correctional Facility, Defendants.
No. 08-CV-1208 (LEK/DRH).

Feb. 23, 2010.
Frederick Diaz, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Roger W. Kinsey, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER**[FN1]

FN1. This matter was referred to the undersigned
for report and recommendation pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

*1 Plaintiff pro se Frederick Diaz ("Diaz"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants, the
DOCS Commissioner and seven DOCS employees,
violated his constitutional rights under the First, Eighth,
and Fourteenth Amendments. Compl. (Dkt. No. 1).
Presently pending is defendants' motion to dismiss
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 25.[FN2] Diaz

opposes the motion. Dkt. No. 27. For the following
reasons, it is recommended that defendants' motion be
granted.

FN2. The motion is filed on behalf of all
defendants except Byrne and Cady. Dkt. No. 25
at 2. Byrne and Cady have both filed answers.
Dkt. Nos. 26, 39.

**I. Background**

The facts are related herein in the light most favorable
to Diaz as the non-moving party. *See* subsection II(A)
*infra.*

**A. Work Placement**

On April 3, 2006, Diaz was transferred to Auburn
Correctional Facility ("Auburn"). Compl. ¶ 14. Upon
arrival at Auburn, Diaz was immediately verbally harassed
by defendant Redmond, a Lieutenant. *Id.* ¶ 15.[FN3] Shortly
after his arrival, Diaz sought an employment placement.
*Id.* ¶ 16. Diaz claims that he was not offered an
appointment "commensurate with his education and skills,
despite the fact that all the other inmates were being given
programs of [their] choosing." *Id.* When Diaz protested,
his privileges were limited. *Id.*

FN3. Allegations of verbal harassment alone are
not actionable under § 1983. *See Purcell v.
Coughlin,* 790 F.2d 263, 265 (2d Cir.1996) (
"The claim that a prison guard called Purcell
names also did not allege any appreciable injury
and was properly d ism issed.").Therefore, even
when the allegations of the complaint are
liberally construed, the allegations here afford no
basis for a claim under § 1983 and will not be
further addressed.

While on limited privileges, Diaz was repeatedly
denied access to recreation, showers, and the law library,
ordered to double bunk with another inmate, and placed in
keeplock [FN4] when he refused the double bunking order.
Compl. ¶ 17. During this time, Diaz continued to attempt
to secure an employment position in the Shop Gate. *Id.* ¶
21. Diaz was told that he was not permitted to join such a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

program, which he later learned was untrue, so he wrote multiple letters and grievances to defendant Graham, the Auburn Superintendent. *Id.* Graham responded that Diaz would still not be assigned to the Shop Gate program, regardless of whether it was permitted pursuant to internal policies and regulations. *Id.* As Diaz was continually offered nothing more than a porter position, he decided to run for a membership spot in the Inmate Grievance Resolution Committee (IGRC).[FN5] *Id.* ¶ 20.

> FN4. "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6.

> FN5. "DOCS maintains an Inmate Grievance Program (IGP)at all facilities. The first step requires an inmate to file a grievance with the IGRC. If such informal resolution fails, the inmate may then appeal to the facility superintendent and thereafter to the Central Office Review Committee. *See Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004).

The day after Diaz won the IGRC election, Graham approached him and offered a deal. Compl. ¶ 22. If Diaz resigned from his position on the IGRC, he would be given an employment placement in the law library and could join the Inmate Liason Committee. *Id.* Diaz accepted the offer and resigned. *Id.*[FN6]

> FN6. To the extent that, liberally reading the complaint, Diaz contends that he should have received, or continued to occupy, a specific employment placement, such contentions are without merit. Prisoners do not have a constitutionally protected property interest in a certain employment or in continued employment. *See Johnson v. Rowley,* 569 F.3d 40, 43-44 (2d Cir.2009); *see also Bulger v. United States Bureau of Prisons,* 65 F.3d 48, 50 (5th Cir.1995) (finding that termination and reassignment to a different job within the prison setting is neither atypical nor significant in relation to ordinary

prison life); *Newsom v. Norris,* 888 F.2d 371, 374 (6th Cir.1989) (holding that "the Constitution does not create a property or liberty interest in prison employment and that any such interest must be created by state law by language of an unmistakably mandatory character.") (citations and quotation marks omitted); *Karacsonyi v. Radloff,* 885 F.Supp. 368, 370 (N.D.N.Y.1995) ("Prison officials, however, have broad discretion in denying federal inmates the opportunity to [work].") (citations omitted). Additionally, the Second Circuit has held that a "New York [state] ... prisoner has no protected liberty interest in a particular job assignment." *Frazier v. Coughlin,* 81 F.3d 313, 318 (2d Cir.1996); *Hodges v. Jones,* 873 F.Supp. 737, 745 (N.D.N.Y.1995) (citations omitted) (holding that inmates "ha[ve] no constitutional right to any particular position of employment."). Accordingly, as a matter of law, Diaz has no liberty interest in his initial, or continued, employment, or any choice in which employment he should be assigned.

Diaz commenced working in the law library under the supervision of defendants Burdick and Merville, both corrections officers. Compl. ¶ 23. Burdick and Merville attempted to incite the other inmate library clerks into an altercation with Diaz, telling the other inmates that Diaz was a "snitch," and promoting Diaz to a coveted position over other inmate clerks who had been employed longer. *Id.* Shortly after Diaz refused the promotion, on December 27, 2006, Burdick issued a retaliatory misbehavior report against Diaz for his failure to report to work. *Id.* ¶ 24. According to Diaz, the schedule was changed without his knowledge and he was not scheduled to work that shift. *Id.*

**\*2** At the subsequent disciplinary hearing, Diaz was found guilty for failing to attend work, sentenced to ten days keeplock [FN7], and referred back to the Program Committee for a new job assignment. Compl. ¶ 25. Diaz claims that Burdick and Merville tolerated known homosexual activity and drug use among the other inmate clerks, allowing them to retain their employment in the law library despite being adjudged guilty of more serious disciplinary infractions which led to longer disciplinary

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

sentence dispositions. *Id.* ¶ 28. However, due to Diaz's propensity to file grievances, he was terminated from his position in the law library despite his minor disciplinary infraction. *Id.* ¶¶ 28, 30. Diaz was again offered the porter position by the Program Committee, which he accepted, despite the fact that it was given to him with "absolutely no consideration of [his] education and skills ...." *Id.* ¶ 30.

> **FN7.** "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (2007).

**B. Misbehavior Report for May 21, 2007 and Subsequent Disciplinary Hearing**

On May 21, 2007, defendant Quinn, a Lieutenant, was sent to interview Diaz and investigate the claims alleged in Diaz's grievance against Sgt. Cox, a non-party here.[FN8] Compl. ¶ 37. Quinn called Diaz into an interview room, but was not concerned with investigating Diaz's concerns, as instead he "began to berate [Diaz] about his grievances." *Id.* ¶ 38. During the interview, Quinn asked to see Diaz's identification ("ID") card. *Id.* ¶ 39. Diaz produced the ID card, which did not have a program sticker on it. *Id.* Quinn threatened to place Diaz in keeplock for having improper documentation, but Diaz stated that his card had recently been lost during transport and the replacement did not have a sticker. *Id.* Quinn then asked Diaz why he had not reported to his assigned work program as a porter, and Diaz responded that he was not called out to work that day. *Id.* ¶ 40. At this point, Quinn exited the interview room and ordered Diaz to report to work. *Id.* Upon exiting the room, Diaz told Quinn not to contact him again. *Id.* ¶ 41. Quinn ordered Diaz onto the wall, Diaz was "roughly" pat frisked, and threatened again by Quinn who stated that the policies and procedures of Auburn did not apply to the corrections officers there. *Id.* Before being returned to his cell, Diaz was informed that he was being sent to the Special Housing Unit ("SHU")[FN9] for not reporting to work that day. *Id.* ¶ 43.

> **FN8.** On May 15, 2007, Sgt. Cox presided over one of Diaz's disciplinary hearings. Compl. ¶ 35. During the hearing, Cox threatened Diaz, insisting that unless Diaz stopped filing

grievances he would be subjected to "man law" by having fabricated charges brought against him, being assaulted by staff, and being sent to solitary confinement. *Id.*

> **FN9.** SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

Quinn charged Diaz with "refusing a direct order and refusing to accept a program assignment by the Program Committee." Compl. ¶ 45. On May 26, 2007, defendant Redmond. a Lieutenant, presided over the disciplinary hearing for the aforementioned misbehavior report. *Id.* ¶ 46. Diaz contends that the misbehavior report was false because (1) he never told Quinn he removed his program sticker, (2) Diaz did accept the porter assignment from the Program Committee or else he would have been on limited privileges, and (3) he did not fail to refuse a direct order as he had never been called for his employment on May 21. *Id.* Diaz could not develop his defense during the hearing because Redmond failed to let him ask Quinn any questions. *Id.* While Diaz was waiting for the verdict of the hearing, he was placed in a holding room. Compl. ¶ 47. While in that room, Diaz observed Quinn and Redmond conversing. *Id.* Then, Quinn came over to the door of the holding room and began to curse at and berate Diaz. *Id.* Ultimately Redmond found Diaz guilty and sentenced him to 120 days in SHU. *Id.* ¶ 47.

**\*3** Diaz wrote letters of complaint and grievances about Quinn and Redmond during the disciplinary hearing. Compl. ¶¶ 47, 49. Diaz also requested to see the videotape of the hearing,[FN10] as well as asking Graham and Fischer to view the tape. *Id.* ¶¶ 48-49, 51-52. On June 1, 2007, Graham modified Diaz's disciplinary disposition to fourteen days in SHU and forty-six days in keeplock, as well as 120 days loss of privileges. *Id.* ¶ 48. Graham's modification was affirmed on administrative appeal on July 18, 2007, and the grievances Diaz lodged in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

connection with this misbehavior report and disciplinary hearing were denied. *Id.* ¶ 51.

> FN10. Diaz viewed the tape on June 27 It allegedly showed Diaz in the holding room, Quinn entering the room and conversing with Redmond, Quinn moving to the door of Diaz's room and exchanging words, and then Quinn returning to speak with Redmond. Compl. ¶ 50.

### C. Conditions of Confinement

For the forty-six days in which Diaz was housed in keeplock, he was deliberately placed in a filthy cell in retaliation for the grievances which he had previously filed against defendants. Compl. ¶ 56. Diaz's cell (1) contained a urine-stained mattress; (2) had filthy walls and a dirty sink; (3) had a sink in need of repair; (4) required a new mattress and light bulbs; and (5) lacked a desk and foot locker. *Id.* ¶¶ 56-57. Additionally, while in keeplock, guards placed a note on Diaz's cell labeling him "total whiner", until it was subsequently removed by "a decent guard." *Id.* ¶ 57. Diaz was also denied showers for two days. *Id.* ¶ 58. In response, Diaz submitted a grievance against the staff. *Id.*

### D. Disciplinary Hearing on June 26, 2007 and Subsequent Misbehavior Report and Disciplinary Hearing

On June 26, 2007, Byrne presided over one of Diaz's disciplinary hearings. Compl. ¶ 60.[FN11] During the hearing, Diaz interrupted Byrne when he began to read the misbehavior report out of context. *Id.* ¶ 62. Byrne strenuously advised Diaz not to interrupt him further. *Id.* This escalated into a verbal altercation, whereupon Diaz got up to leave the hearing and Byrne ordered him to stop. *Id.* ¶¶ 62-63. Defendant Cady, a corrections officer who was also present at the disciplinary hearing, prevented Diaz from leaving the room. *Id.* ¶ 63. Diaz was then assaulted by both Byrne and Cady. *Id.* ¶¶ 63-64. Additional officers responded to the altercation and also began to batter Diaz alongside Byrne and Cady. *Id.* ¶ 64. Throughout the entire assault, an audiotape was running, which was supposed to be recording the disciplinary hearing. *Id.* ¶¶ 62-64. Byrne ultimately found Diaz guilty of the disciplinary infraction, sentenced him to thirty days keeplock, and also issued Diaz a misbehavior report for

assaulting an officer. *Id.* ¶¶ 69-70. Diaz's disciplinary disposition was upheld by Graham, despite the fact that he listened to the audiotape of the disciplinary hearing. *Id.* ¶ 68. However, on August 1, 2007, the misbehavior report was "expunged from [Diaz's] record per Supt. Graham," overturning the thirty day disciplinary disposition. *Id.* ¶ 69.

> FN11. It is unclear what the disciplinary infraction was for which Diaz was being tried. However, Diaz and Byrne had previously met as Byrne interviewed Diaz about previous grievances he had submitted. Compl. ¶ 61. Prior to the hearing, Diaz inquired about the status of his grievance investigation and Byrne was very agitated by Diaz's questions. *Id.*

*4 On July 2, 2007, a disciplinary hearing was held for the misbehavior report for the altercation on June 26. Compl. ¶ 71. During the hearing, the audiotape from June 26 was played, which was allegedly altered. *Id.* ¶ 72. When Byrne was questioned about the tape's authenticity, he explained he paused the tape player during the hearing in order to converse privately with Diaz. *Id.* ¶ 73. On July 9, 2007, Diaz was found guilty of assaulting Byrne and Cady and sentenced to eight months in SHU. *Id.* ¶ 74. Graham affirmed the disciplinary disposition. *Id.* On September 13, 2007, the conviction and sentence were report was reversed on administrative appeal due to the altered audiotape. *Id.* ¶ 75.

### E. Destroyed Property

Diaz also claims that when he was sent to SHU or keeplock, the retaliation against him was exacerbated and perpetuated by defendants throwing away and damaging his personal property. Compl. ¶¶ 53, 77. Diaz wrote letters to Graham complaining about the destruction of his property, but no investigation was ever commenced. *Id.* ¶ 53.

### II. Discussion

In his complaint, Diaz alleges that his First Amendment rights were violated when defendants continually authored false misbehavior reports against him for filing grievances. Additionally, liberally reading the complaint, Diaz contends that his Eighth Amendment rights were violated when he was subjected to (1)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

unconstitutional conditions of confinement during his forty-six days in keeplock and (2) excessive force by defendants Bryne and Cady during his disciplinary hearing. Lastly, Diaz asserts that his Fourteenth Amendment rights were violated when he was subjected to (1) multiple false misbehavior reports, (2) faulty procedural due process during disciplinary hearings, (3) damaged personal property,[FN12] and (4) an Equal Protection violation as Diaz was terminated from his job position in the library when other similarly situated inmates were allowed to continue with their employment placement. Defendants assert that (1) Diaz has failed to demonstrate the personal involvement of defendants Fischer, Quinn, and Graham; (2) there is no merit to Diaz's due process, retaliation, or equal protection claims; (3) the Eleventh Amendment bars suit of defendants in their official capacities;[FN13] and (4) defendants are entitled to qualified immunity.

> FN12. An inmate has a right not to be deprived of property without due process. However, federal courts do not provide redress for the deprivation of property if there is an adequate state court remedy which the plaintiff can pursue. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "New York courts provide such a remedy ... [through the] initiat[ion of] an Article 78 proceeding in New York Supreme Court ...." *Gabis v. New York City Taxi & Limousine Comm'n,* No. 05-CV-8083 (HB), 2005 WL 2560384, at *3 (S.D.N.Y. Oct.12, 2005); *see also* N.Y. C.P.L.R. §§ 7803, 7804; *Locurto v. Safir,* 264 F.3d 154, 174 (2d Cir.2001) ("An Article 78 proceeding permits a petitioner to submit affidavits and other written evidence, and where a material issue of fact is raised, have a trial of the disputed issue, including constitutional claims.") (citations omitted); *Campo v. New York City Employees' Ret. Sys.,* 843 F.2d 96, 101 (2d Cir.1988) ("Article 78 ... provides a summary proceeding which can be used to review administrative decisions."). State law also provides that "[a]ny claim for damages arising out of any act done ... within the scope of ... employment and in the discharge of the duties of any officer or employee of the department [of corrections] shall

be brought and maintained in the court of claims as a claim against the state." N.Y. Corr. Law § 24(2). In this case, Diaz contends that there were unconstitutional deprivations when his property was destroyed by corrections officers. Compl. ¶¶ 53, 77. First, the Article 78 procedure exists. Second, because Diaz is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24. Thus, the correct venue to litigate these claims is state court. Accordingly, defendants' motion should be granted as to this claim.

> FN13. Diaz has clarified, in his opposition papers, that he "is suing the defendants in their individual capacities [and] ... refer[ed] to the official title .. for reference purposes only ...." Dkt. No. 27. Accordingly, since Diaz clearly sues the defendants only in their individual capacities, the Eleventh Amendment bar to suits against state officials in their official capacities is inapplicable.

**A. Legal Standard**

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). However, this "tenet ... is inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555 (2007) (holding that "entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action ... [as] courts are not bound to accept as true a legal conclusion couched as a factual allegation.")).

**\*5** Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility ... that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

(citing *Twombly,* 550 U.S. at 556 (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct].")); *see also Arar v. Ashcroft,* 585 F.3d 559, 569 (2d Cir.2009) (holding that, "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible ....") (citations omitted). Determining whether plausibility exists is "a content specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 129 S.Ct. at 1950-51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. *See Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," ... that a *pro se* litigant's submissions must be construed "liberally,"... and that such submissions must be read to raise the strongest arguments that they 'suggest .... At the same time, our cases have also indicated that we cannot read into *pro se* submissions claims that are not "consistent" with the *pro se* litigant's allegations,... or arguments that the submissions themselves do not "suggest, ..." that we should not "excuse frivolous or vexatious filings by *pro se* litigants" ... and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law ...."

*Id.* (citations and footnote omitted); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)).

**B. Conditions of Confinement**

To the extent that, liberally reading Diaz's complaint, such a claim is raised, it is without merit. First, Diaz fails to identify the individuals responsible for his placement and care in keeplock. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Second, "[t]he Constitution does not

mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1970). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective ... and subjective test." *Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (citations omitted). Thus, "[c]onditions of confinement only constitute an Eighth Amendment violation if they involve the deprivation of a single identifiable human need or denial of the minimum civilized measure of life's necessities, and the defendants' state of mind was one of deliberate indifference to that deprivation." *Johnson v. Smith,* No. 9:03CV1050 (FJS/DEP), 2006 WL 1843292, at *9 (N.D.N.Y. June 29, 2006) (Scullin, J.) (citations omitted).

**\*6** The objective prong can be satisfied by conditions of confinement ... [which] in combination [constitute an Eighth Amendment violation] when each would not do so alone ... [such as] when the conditions have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise-for example, a low cell temperature at night combined with a failure to issue blankets.

*Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005) (citations omitted). However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304-05, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). The subjective prong requires "a prison official [to] have a sufficiently culpable state of mind ..., of deliberate indifference to inmate health or safety" *Farmer,* 511 U.S. at 834 (citations omitted).

Diaz claims that while in keeplock, he had a stained mattress, dirty walls and sink, and lacked a desk and foot locker. However, Diaz has failed to show how these conditions rose to the level of substantial risk of serious harm or denial of an identifiable human need. *See Davidson,* 371 F.Supp.2d at 370. Diaz makes no contention of how a dirty wall and sink and stained

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

mattress inhibited his ability to eat, sleep, or remain at an adequate temperature. Additionally, there are no claims for illness or injury. At best, these are conclusory allegations that are wholly insufficient to state an Eighth Amendment violation. Moreover, Diaz's claims that he was not offered a shower for two days are also insufficient to state an Eighth Amendment violation. *See Beckford v. Portuondo, 151 F.Supp.2d 204, 211 (N.D.N.Y.2001)* (citations omitted) ("Nowhere has it been held that prisoners are entitled to complete and unfettered access to water or showers."); *see also Cosby v. Purkett, 782 F.Supp. 1324, 1329 (E.D.Mo.1992)* (holding that access to showers every seventy-two hours is not a violation under the Eighth Amendment). Accordingly, Diaz has failed to establish the objective element of the analysis.

Lastly, as discussed *supra,* verbal harassment alone is insufficient to allege a constitutional violation. Accordingly, defendants' motion as to any such claim should be granted.

**C. Personal Involvement**

Defendants contend that Diaz has failed to allege the personal involvement of Fisher, Quinn, and Graham. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994)* (quoting *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir.1991)*). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir.1996).* However, supervisory personnel may be considered "personally involved" if:

*7 (1)[T]he defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)* (citing *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir.1986)*).

**1. Fischer**

A position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *Wright, 21 F.3d at 501.* Thus, Fisher cannot be held liable solely because he, as Commissioner, held a supervisory position. The gravamen of Diaz's Complaints against Fischer is that he was continually written to, and failed to respond. Compl. ¶¶ 29, 3, 52, 76. However, failure to respond to a grievance is insufficient to allege personal involvement. *Smart v. Goord, 441 F.Supp.2d 631, 643 (S.D.N.Y.2006)* ( "Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] ...."). Additionally, there were no allegations, nor does the record support any contentions, that Fischer was directly involved in any of the alleged violations, that Fischer failed to remedy a wrong of which he was informed, that he was grossly negligent in supervising subordinates, or that he was deliberately indifferent to the health and safety of Diaz.

Accordingly, defendants' motion should be granted and Fischer should be dismissed from the present action.

**2. Quinn**

Diaz has unequivocally alleged that Quinn was directly responsible for writing a false misbehavior report on May 21, 2007, and also influenced Redmond's decision at his subsequent disciplinary hearing on May 26, 2007. Compl. ¶¶ 45, 47. As such, Diaz has plausibly contended that Quinn was responsible for his alleged constitutional violations. Whether there is any substantive merit to said violations is a separate issue and discussed *infra.* Accordingly, defendants' motion on this ground as to Quinn should be denied.

**3. Graham**

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

As previously discussed, holding a supervisory position, without more, is insufficient to allege personal involvement. *Wright,* 21 F.3d at 501. Additionally, receipt of a letter, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. *See, e.g., Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009) (citing cases); *Boddie v. Morgenthau,* 342 F.Supp.2d 193, 203 ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability ... [p]ersonal involvement will be found ... where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint."). Defendants argue that Diaz's contentions center around Graham's lack of response to his complaints. However, Diaz alleges that Graham personally investigated and acted on Diaz's complaints. For example, Graham allegedly listened to the audiotape of the June 26, 2007 disciplinary hearing before affirming both disciplinary dispositions. Compl. ¶ 74.

*8 Additionally, Diaz contends that after the May 26, 2007 disciplinary hearing, he asked Graham to review the videotape of the hearing, thus providing Graham with notice of a constitutional violation which was allegedly ongoing with his continued segregation. Graham refused to review the tape prior to affirming the disciplinary disposition.

It has been held that "an appropriate guiding principle" for determining personal responsibility is where a grievance alleges an "ongoing" constitutional violation, the supervisory official who reviews the grievance is "personally involved" if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to "remedy" a violation.

*Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) (internal citations omitted). Thus, Graham's knowledge was not that of a "violation ... that has already occurred and is not ongoing," it was continuous and his failure to remedy the situation is sufficient to allege personal involvement. *Id.*

Accordingly, defendants' motion on this ground as to

Graham should be denied.

**D. Retaliation**

To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). "Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 215 (N.D.N.Y.2008) (citing *Graham,* 89 F.3d at 79). Additionally, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient. *Id.* (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).)).

First, as discussed *infra* section II(E)(2), Diaz's misbehavior reports were written for a proper purpose. Additionally, Diaz has failed to allege or prove facts to support a retaliation claim against Merville and Burdick. The misbehavior report which Burdick authored, and Merville endorsed, occurred shortly after Diaz refused to accept a promotion. Compl. ¶¶ 23-24. Diaz's employment status does not represent a constitutionally protected activity. *See supra* note 4. Thus, this cannot provide a basis by which to assert a retaliation claim. Instead, Diaz appears to rely upon his grievances as his constitutionally protected conduct. Compl. ¶¶ 28, 30. While filing grievances is an activity protected by the First Amendment, Diaz fails to identify a time when he filed grievances against Merville and Burdick prior to the issuance of the allegedly false misbehavior report. Thus, defendants' adverse actions of filing the misbehavior report could not be a substantial factor in the alleged retaliation because the grievances against them were filed *after* the misbehavior report, not before. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

*9 Similarly, Diaz has failed to allege or prove facts to support a retaliation claim against Quinn. Quinn

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

investigated a grievance which Diaz filed against an unnamed corrections officer. Throughout the interview, Diaz and Quinn exchanged words, Quinn ordered Diaz to report to work, Diaz left the interview and failed to report to work, and was given a misbehavior report for failing to follow a direct order and participate in his programming. Compl. ¶¶ 38-45. Diaz filed a grievance against Quinn after the disciplinary hearing took place. *Id.* ¶¶ 47, 49. As previously discussed, this constitutionally protected activity occurred *after* the adverse action of the misbehavior report, and not before. Thus, the grievances could not serve as a substantial cause for the report. Furthermore, conclusory and general allegations that Diaz was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain the present claim. *Jackson,* 549 F.Supp.2d at 215.

The same is true, with regard to the misbehavior reports and disciplinary hearing occurring prior to June 2007, for Graham. Graham's actions in affirming the hearing decisions were allegedly in retaliation for Diaz's filing of grievances against the other defendants. These conclusory allegations are insufficient to plausibly state a retaliation claim.

Accordingly, defendants' motion on this ground should be granted.

### E. Due Process

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Id.* at 484; *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a SHU confinement alone is insufficient to establish an atypical and significant deprivation. The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in SHU as well as "the conditions of the prisoner's

confinement in SHU relative to the conditions of the general prison population" are to be considered. *Vasquez v. Coughlin,* 2 F.Supp.2d 255, 259 (N.D.N.Y.1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997)).

### 1. Preclusion

Diaz alleges due process violations occurring during his disciplinary hearing in connection with the December 27 misbehavior report and the hearing on May 26, 2007 in connection with the May 21 disciplinary report. However, such claims run afoul of the "favorable termination" rule of *Heck v. Humphrey,* 512 U.S. 477, 487-87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983. This rule apples to challenges to procedures used in prison disciplinary proceedings. *Edwards. v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997).

**\*10** There is no evidence that Diaz's disciplinary determinations were ever vacated with regard to these two proceedings.[FN14] While Diaz's sentence was modified with respect to the May 26 hearing, it was never overturned or expunged. Thus, the *Heck* rule still applies and any procedural challenges are barred. Therefore, because Diaz's recovery of damages here for a false misbehavior report would necessarily imply the invalidity of his conviction, the based on that hearing is barred.

> FN14. Diaz's claims concerning the June 26, and July 2, 2007 disciplinary hearings are not raised in the present motion.

Accordingly, defendants' motion should be granted as to these claims.

### 2. False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as retaliation against the prisoner for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

exercising a constitutional right." *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997)* (citing *Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir.1988)*).

As discussed *supra,* Diaz has failed to establish facts sufficient to allege a retaliation claim. Thus, the present claim must also fail. Moreover, as discussed *supra,* such a finding of a false misbehavior report runs afoul of *Heck* and its progeny. Finally, as established by the record, Diaz's misbehavior reports were supported by sufficient evidence.

In the first case, Diaz does not dispute that the schedule indicated that he needed to be at work and he was not there. Compl. ¶ 24. The factual issues of when the schedule was changed and what it actually indicated were determined at the hearing, which concluded with a finding of guilt and has not been overturned. Similarly, the second misbehavior report cited Diaz's failure to follow a direct order and participate in his employment. Quinn's order to Diaz to report to work, whether or not he was previously called out, was a direct order with which Diaz failed to comply. *Id.* ¶¶ 40, 43, 45. Any other factual issues were necessarily addressed during the disciplinary hearing which resulted in a finding of guilt which was never expunged or overturned. Accordingly, in both cases, Diaz was found guilty of the offense charged. Such findings were also consistent with the allegations in the complaint. While there are some disputed facts as to why the schedule was incorrect or whether Diaz was actually called for work, those facts were determined in the disciplinary hearings.

Accordingly, defendants' motion should be granted as to these claims.

### 3. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir.2005)* ("To prove a violation of the Equal Protection Clause ... a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

*11 [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*Vegas v. Artus, 610 F.Supp.2d 185, 209 (N.D.N.Y.2009)* (internal quotation marks and citations omitted). In the prison setting, inmate treatment is evaluated pursuant to a rational basis standard. *Phillips, 408 F.3d at 129* (citing *Shaw v. Murphy, 532 U.S. 223, 229-230, 121 S.Ct. 1475, 149 L.Ed.2d 420 (2001)*). Thus, in order to establish an equal protection violation, the plaintiff must show that "the disparity in treatment cannot survive the appropriate level of scrutiny which ... means that he must demonstrate that his treatment was not reasonably related to any legitimate penological interests." *Id.*

If an inmate cannot "allege membership in [a protected] class, he or she can still prevail in ... a class of one equal protection claim." *Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir.2005)* (internal quotations and citations omitted). Similarly, to succeed, plaintiffs must show "that they were intentionally treated differently from other similarly-situated individuals without any rational basis." *Clubside, Inc. v. Valentin, 468 F.3d 144, 158-59 (2d Cir.2006)*. Additionally, to be successful, plaintiff must establish an extremely high "level of similarity between plaintiffs and the persons with whom they compare themselves ...." *Neilson, 409 F.3d at 104.*

Here, Diaz contends first that he was not given the preferential employment treatment he deserved when he made a deal with Graham. Compl. ¶ 22. As the Equal Protection Clause bars deprivations and unequal treatment, such claims for preferential treatment are not within its bounds. Moreover, Diaz fails to allege facts sufficient to conclude that others who made similar deals with Graham were treated differently.

Additionally, Diaz claims that the sanction of losing his employment was more severe than that received by other inmates who had been adjudged guilty of more

Slip Copy, 2010 WL 1132772 (N.D.N.Y.)

(Cite as: 2010 WL 1132772 (N.D.N.Y.))

serious disciplinary infractions and sentenced to more severe dispositions. Such general claims fail to identify which individuals intentionally treated him differently. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) ( "To prove an equal protection violation, claimants must prove purposeful discrimination, directed at an identifiable ... class."). The named defendants did not appear to have any involvement in Diaz's employment placement. At Diaz's hearing, he was referred back to the Inmate Program Committee for assignment. Compl. ¶ 25. This committee, the members of which are not named in the present action, appears to have the authority to place inmates in a job assignment. The moving defendants are neither on the Program Committee nor vested with the authority to provide Diaz with employment options. Reliance on Fischer or Graham for such power is neither alleged nor inferable from the record. Additionally, none of the other moving defendants acted as hearing officers or imposed Diaz's sentences. Thus, no evidence has been proffered that any moving defendant purposefully discriminated against Diaz.

*\*12* Accordingly, defendants' motion should be granted as to the equal protection claim.

**F. Qualified Immunity**

Defendants claim that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229-30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)) (internal citations omitted)).

A court must first determine whether, if plaintiff's

allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached concerning Diaz's claims because, as discussed *supra,* accepting all of Diaz's allegations as true, he has not shown that defendants violated his constitutional rights.

Accordingly, in the alternative, defendants' motion should be granted on this ground.

**III. Conclusion**

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion to dismiss (Dkt. No. 25) be **GRANTED** in all respects and that the complaint be **DISMISSED** as to defendants Fischer, Graham, Quinn, Redmond, Burdick, and Merville as to all claims against them.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2010.

Diaz v. Fischer
Slip Copy, 2010 WL 1132772 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
No. 97-CV-1385 LEK DRH.

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.[FN2] In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. Id. at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. Id. at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. Id. at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. Id. at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Id. at ¶¶ 22, 27-28.

II. Motion to Dismiss

*2 When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir.1995) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir.), cert. denied, 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); Rhodes v. Chapman, 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. Farmer, 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes*, 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord*, 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn*, 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio*, 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie*, 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray*, 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer*, 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer*, 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,* 524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

### B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware that there is a significant risk of serious injury to that prisoner." Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at \*3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at \*3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rufus GIBSON, Plaintiff,
v.
The City of New York; Warden Ortiz; Deputy Warden
Edwin Knight; Deputy Warden Clyton Eastmond; John
Doe Area Captains (of assigned posts at times of
violations of Block 5 South in Otis Bantum Correctional
Center CPSU); John Doe Captain (Badge # 878); and
John Doe Official, Defendants.
No. 96 CIV. 3409(DLC).

March 25, 1998.
Rufus Gibson, Pro Se, Fishkill Correctional Facility,
Beacon.

Jeffrey Friedlander, Esq., Acting Corporation Counsel for
the City of New York, New York, By Renee Nebens, Esq.,
Assistant Corporation Counsel.

OPINION AND ORDER

COTE, District J.

**\*1** On May 9, 1996, Rufus Gibson ("Gibson") filed
this action pursuant to Section 1983 claiming that the
defendants had violated his Fourteenth Amendment rights
while he was a pretrial detainee, by subjecting him to
unconstitutional conditions of confinement and by
depriving him of due process prior to a disciplinary
confinement.[FN1] On May 9, 1996, Chief Judge Griesa, to
whom this case was then assigned, ordered Gibson to file
an amended complaint within sixty days with more
specific information to show why he is entitled to relief.
On May 23, 1996, the plaintiff filed a slightly more
detailed complaint (the "First Amended Complaint"),
which was accepted by the Court as meeting the
requirements of the May 9, 1996 Order. On March 4,
1997, the defendants filed a motion to dismiss the First
Amended Complaint for failure to state a claim.[FN2] At a
March 7, 1997, pretrial conference held on the record, the
Court allowed the plaintiff to either oppose that motion or
further amend his complaint. On April 7, 1997, the
plaintiff filed a Second Amended Complaint which
contained more detail and which changed the named
defendants to those listed in the caption of this Opinion
and Order. The defendants now move to dismiss the
Second Amended Complaint for failure to state a claim
and the plaintiff moves for the entry of a default judgment
against defendant Robert Ortiz ("Ortiz").[FN3] For the
reasons stated below, the motion to dismiss is granted in
part and denied in part and the motion for entry of a
default judgment is denied.

> FN1. Gibson has since been convicted and
> transferred to the custody of the New York State
> Department of Corrections.

> FN2. The motion to dismiss the First Amended
> Complaint was made on behalf of defendants
> named in that pleading: the New York City
> Department of Correction Otis Bantum
> Correctional Facility, Warden Ortiz, and Deputy
> Warden Edwin Knight.

> FN3. The instant motion was originally made
> solely on behalf of the City of New York. After
> having been served with the Second Amended
> Complaint in July 1997, defendants Clyton
> Eastmond and Edwin Knight joined in the
> motion. On September 23, 1997, the plaintiff
> moved to have a default judgment entered
> against Robert Ortiz, who had also been served
> in July 1997, but who had not filed an answer.
> On October 7, 1997, Assistant Corporation
> Counsel Renee Nebens filed a declaration
> seeking to have Robert Ortiz join in the instant
> motion. For the reasons described elsewhere in
> this Opinion, the October 7 request is granted.

Background

The Court takes as true the facts as alleged in the
Second Amended Complaint. Beginning on or about
February 10, 1996, Gibson was confined in the Central

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

Punitive Segregation Unit ("CPSU")[FN4] at Rikers Island for a period of ninety days after a disciplinary hearing.[FN5] For the first thirty days of Gibson's CPSU confinement, he was housed at the James A. Thomas Center ("JATC") even though JATC "was ordered closed due to high levels of asbestos, insect infestation and possibly lead paint" and "the general population inmates were moved to other buildings." On March 10, 1996, the CPSU was moved to the Otis Bantum Correctional Center ("OBCC"). While Gibson was housed in OBCC CPSU between March 10 and May 16, 1996, he was denied access to recreation on eight occasions (March 10, 11, and 14, April 3, 13, 20, and 22, and May 4), denied access to the law library on four occasions (March 27, 28, and 29, and April 10), denied access to a religious service on March 15, and required to choose between access to recreation and the law library on April 18 and between access to recreation and the barber shop on April 19. Gibson states that he reported each deprivation to defendants Deputy Warden Edwin Knight ("Knight") and Deputy Warden Clyton Eastmond ("Eastmond"), both of whom failed to intervene or prevent the recurrence of these deprivations. In addition, the plaintiff alleges that Ortiz was aware of the problems because Knight and Eastmond reported to him.

> FN4. The defendants explain that the CPSU is the housing area at Rikers Island where inmates who have been disciplined for rules' infractions are housed.

> FN5. The plaintiff does not say when his confinement in CPSU began or for what offense he was confined. The Court has inferred the date on which Gibson's confinement began from the other events for which the plaintiff provides dates.

*2 Gibson also states that the defendants were deliberately indifferent to his condition as an asthmatic. During a slashing incident in the law library, a John Doe Captain and a corrections officer used a chemical agent (mace) in an attempt to subdue another inmate. While Gibson was not involved in the fight, he was present in the law library at the time and the exposure to the chemical agent triggered an asthma attack. Gibson returned to his cell and used his inhaler to stop the attack. Gibson complains that he was not asked by prison officials if he

wanted to see a doctor and was not taken to the prison infirmary.

Finally, Gibson claims that his due process rights were violated during the procedure which had led to his confinement in CPSU. On May 1, 1996, after an Article 78 proceeding, the infraction for which Gibson was confined in CPSU was dismissed due to "a late warden signature." Gibson, however, was not released from CPSU for another fifteen days, that is, until May 16, 1996, his regularly scheduled release date. Gibson daily asked John Doe Area Captains and Knight why he was being held beyond his confinement date. These individuals told Gibson that they had checked and had not received an order for his release.

### Standard for Motion to Dismiss

A court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." ' Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir.1994) (quoting Conley v. Koenig, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." Jackson Nat. Life Ins. v. Merrill Lynch & Co. 32 F.3d 697, 699–700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action.

When a plaintiff is proceeding pro se, the court must liberally construe the complaint. See, e.g., Boddie v. Schneider, 105 F.3d 857, 860 (2d Cir.1997). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." Baker v. Cuomo, 58 F.3d 814, 818 (2d Cir.1995).

### Discussion

The plaintiff's allegations form the basis for claims (1) that the defendants subjected him to conditions of confinement which violated his constitutional rights, (2) that the defendants interfered with his constitutional right for access to the courts, and (3) that the defendants violated his due process rights in connection with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

procedures leading to his confinement in CPSU. The Court considers each of these claims in turn.

I. *Conditions of Confinement*

Since the plaintiff was a pretrial detainee at the time of the alleged deprivations, his claims regarding the conditions of his confinement are governed by the Due Process Clause of the Fourteenth Amendment. See *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Under the Due Process Clause, the state may subject a pretrial detainee to restrictions that are inherent to confinement in a detention facility so long as those conditions do not amount to punishment. See *Bell,* 441 U.S. at 536–7. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense ...." *Id.* at 537. The Supreme Court has stated that the issue is whether " 'the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." ' *Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (quoting *Bell,* 441 U.S. at 538).

**\*3** While the Supreme Court has not provided specific guidance for determining when a pretrial detainee's rights have been violated, it has held that a person's Due Process rights regarding the conditions of confinement under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (citations omitted). *See Bryant,* 923 F.2d at 983; *Hayes v. New York City Dept. of Corrections,* 91 Civ. 4333, 1995 WL 495633 at \*5 (S.D.N.Y. Aug.21, 1995). The Supreme Court has articulated a two part test for determining whether an inmate has suffered an injury of a violation of his Eighth Amendment rights. See *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, there is an objective component which,

[f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm.*

*Id.* (emphasis supplied). Second, there is a subjective component requiring that the prison official have a "sufficiently culpable state of mind," to wit, be deliberately indifferent to the harmful conditions. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In *Farmer,* the Court rejected an objective test for a defendant's deliberate indifference, and held instead

that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837 (emphasis supplied).

1. *Denial of Access to Recreation*

Gibson states that he was denied access to recreation on eight occasions and forced to choose between recreation and the law library or the barber shop on two other occasions. When the dates are compared, it appears that he was deprived on only one occasion of the opportunity for recreation on consecutive days—March 10 and 11.[FN6] While it is well-established that inmates have a right to exercise, see *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), the deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment. *See, e.g., Anderson v. Coughlin,* 757 F.2d 35, 36 (2d Cir.1985) (an occasional day without exercise during inclement weather is not cruel and unusual punishment); *Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997) (collecting cases under Eighth Amendment).

> FN6. Gibson does not specify which option he chose when he was forced to choose between recreation and the law library or the barber shop. If he chose to forgo recreation on both of these occasions, it is possible that there were also three consecutive days when he did not have recreation—April 18, 19 and 20. This three day

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

deprivation, however, would have been partially the result of a choice made by the plaintiff rather than solely the result of the defendants' actions.

2. *Denial of Religious Service*

Gibson alleges that he was denied access to a religious service on one occasion. This single deprivation is insufficient to state a deprivation that amounts to punishment. *See, e.g., Giglieri v. New York City Dep't of Corrections,* 95 Civ. 6853, 1997 WL 419250 at *3 (S.D.N.Y. July 25, 1997) (duration is one factor to consider in determining whether a deprivation or condition violates a pretrial detainee's Fourteenth Amendment rights). *But see Cruz v. Jackson,* 94 Civ. 2400, 1997 WL 45348 at *7 (S.D.N.Y. Feb.5, 1997) (denial of access to religious services for fifteen day period sufficient to state a claim).

3. *Medical Claim*

**\*4** Gibson further claims that he was denied adequate medical care when a corrections officer used mace to subdue another inmate while Gibson was in the vicinity. Specifically, Gibson complains that no officer asked him if he wanted to go to the infirmary after Gibson suffered an asthma attack. Gibson's allegations fail to meet either component of the test for a violation of his constitutional rights. While asthma may in some circumstances constitute a serious condition, Gibson promptly controlled his asthma attack with his inhaler and does not state that he suffered any further harm. Moreover, since the asthma was promptly controlled, corrections officers were not deliberately indifferent to his medical needs by failing to ask him if he wanted to go to the infirmary.

4. *Conditions at JATC*

Gibson alleges that during the thirty days he was confined at JATC before the CPSU was transferred to OBCC he was exposed to asbestos, insect infestation and perhaps lead paint. Further, he alleges that the CPSU remained at JATC for thirty days after a court order had closed the facility and after general population inmates had been transferred to different facilities. Gibson's allegations are sufficient to state a claim. First, Gibson's allegations regarding the conditions at JATC, coupled with the duration of his confinement there and the alleged

existence of a court order closing the facility, are sufficient to describe a substantial risk of serious harm. Second, liberally construing the complaint, Gibson implies that the defendants were deliberately indifferent to that substantial risk because it took thirty days for the defendants to move the CPSU after a court order had closed JATC and after the general population inmates had been transferred.

II. *Denial of Access to the Law Library*

The plaintiff alleges that on four occasions he was denied access to the law library and on another occasion he was forced to choose between the law library and recreation.[FN7] The Court understands the plaintiff to be complaining of interference with his constitutionally protected right of access to the courts. In order to state a claim for denial of access to the courts, "a plaintiff must demonstrate that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim." ' *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, ——, 116 S.Ct. 2174, 2179, 2180, 135 L.Ed.2d 606 (1996)). The actual injury requirement derives from the doctrine of standing. *Id.* Here, Gibson has not alleged that he was hindered in his efforts to pursue a legal claim. Given that the plaintiff has amended his complaint twice—once after the defendants' first motion to dismiss specifically raised this issue—and that the denial of access occurred at most five times in a sixty day period, the Court finds that granting the plaintiff further leave to amend regarding this allegation would be futile.

> FN7. The plaintiff does not state which option he chose on this occasion.

III. *Due Process Violation*

**\*5** Gibson claims that his due process rights were violated in two ways. First, there were procedural irregularities in the process by which he was first confined in the CPSU.[FN8] Second, he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The Second Circuit has stated that

> FN8. Gibson identifies the procedural irregularity as a "late warden signature," but indicates that he requires discovery to determine

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

the exact irregularity which caused the disciplinary decision to be revoked through the Article 78 proceeding.

[d]etermining whether an inmate has received due process involves "a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law."

*Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (quoting *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996) (ellipses in original)). To show a protected liberty interest arising from state law, an inmate must show that the restraint imposes an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The relevant factors which a court must consider to determine if a hardship is "atypical and significant" include:

(1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement.

*Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). *See also Sealey,* 116 F.3d at 52; *Brooks v. Di Fasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997).

The Court will address the third factor—the duration of Gibson's confinement—first. The defendants, citing *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992), argue that Gibson's first due process claim fails since his state challenge cured any procedural defect. Thus, they argue, Gibson was improperly confined for at most fifteen days. The Second Circuit has held, however, that

[t]he rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the

prison officials responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense.

*Walker v. Bates,* 23 F.3d 652, 658–59 (2d Cir.1994).[FN9] Thus, the Court properly considers the full ninety days in determining whether Gibson was deprived of a liberty interest.

FN9. While the Second Circuit has not discussed the issue resolved in *Walker* since the Supreme Court's decision in *Sandin,* the Circuit has been faced with fact patterns which indicate that it adheres to the analysis in *Walker. See, e.g., Wright,* 132 F.3d at 135 (plaintiff's 288 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action for damages); *Brooks,* 112 F.3d at 48 (plaintiff's 180 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action).

While ninety days may not always be a significant deprivation, the Court is unable to determine based on the record now presented whether the duration of Gibson's disciplinary segregation—for either the full ninety day or the shorter fifteen day period—is similar to discretionary confinement of pretrial detainees. Similarly, the Court has no basis to make a determination of whether the conditions of disciplinary confinement differ from routine prison conditions—the second factor for consideration. At present, the record is clear as to only one factor, that is, the first factor. Gibson has not claimed that his confinement in CPSU in any way altered the term of his prison confinement.

**\*6** Assuming that Gibson's confinement in the CPSU implicated a protected liberty interest, he has stated a claim for a violation of his due process rights on only one of his two theories. As articulated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Due Process Clause requires that prisoners be provided with written notice at least 24 hours prior to the hearing of the alleged violation of the disciplinary rules, a written statement indicating what evidence the fact-finder at the hearing relied upon and the reason for the disciplinary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

action taken, and, if institutional safety requires the omission of certain evidence, a statement indicating the fact of such omission. *Id.* at 564–65. Gibson has not alleged that he was deprived of any of the procedures required under *Wolff* at the proceeding for which he was initially confined in the CPSU. Moreover, if the defendants had failed to follow any of these procedures, Gibson would be aware of the deficiency and would not require discovery to state a claim. Thus, Gibson has failed to state a claim on his first theory. As to Gibson's second theory—that he was confined to the CPSU for fifteen days after the Article 78 proceeding vacated his disciplinary sentence—further factual development of the factors described above is required to determine whether fifteen days of disciplinary confinement for a pretrial detainee imposes an "atypical and significant hardship."

IV. *Motion for a Default Judgment*

Default judgments are governed by Rule 55, Fed.R.Civ.P. Rule 55(a) provides for entry of a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Rule 55(a), Fed.R.Civ.P. A court "[f]or good cause shown may set aside an entry of default." Rule 55(c), Fed.R.Civ.P. Although Rule 55(c) applies on its face to setting aside defaults already entered, the same analysis should be employed in evaluating opposition to entry of a default. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 243 (2d Cir.1994). The Second Circuit has stated that

[g]ood cause depends upon such factors as the willfulness of the default, the prejudice the adversary would incur were the default set aside [or should the Court decline to enter it], and the merits of the defense proffered.

*In re Chalasani,* 92 F.3d 1300, 1307 (2d Cir.1996). In addition, the Court must keep in mind the "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993).

Here, Gibson asks the Court to enter a default judgment against Ortiz. Gibson has not shown that the default by Ortiz was willful. Ortiz joined the other defendants in moving to dismiss the *First* Amended

Complaint. Only after the plaintiff filed and served a Second Amended Complaint did Ortiz neglect initially to join the motion to dismiss the Second Amended Complaint. Additionally, Gibson has not shown that he would suffer any prejudice from the Court declining to enter the default judgment against Ortiz. Finally, Ortiz may be able to interpose a successful defense; Gibson has not alleged that Ortiz was personally involved in the claims that survive the motion to dismiss. *See Sealey,* 116 F.3d at 51.[FN10]

> FN10. While the defendants included in their motion to dismiss the First Amended Complaint an argument based on the plaintiff's failure to allege personal involvement, they have not included such an argument in the instant motion.

Conclusion

**\*7** The defendants' motion to dismiss is granted on all claims, except the plaintiff's claims that he was subjected to unconstitutional conditions of confinement while housed in the JATC CPSU for thirty days and that he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The plaintiff's motion for the entry of a default judgment against defendant Ortiz is denied.

SO ORDERED:

S.D.N.Y.,1998.

Gibson v. City of New York
Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
Charles SCULLY, Thomas A. Coughlin, C. Artuz,
Donald Selsky, Defendants.
Jerry Young a/k/a Ramadan, Plaintiff,
v.
Thomas A. COUGHLIN, III, Bobby Joe Laboy,
Battista, Defendants.
Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
C. ARTUZ, Donald Selsky, R. Sanford, Jochnewicz,
Sgt. Defendants.
Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner of Dept of
Correctional Services, J. Soto, B. Laboy, A. Kimelman,
Battista, Defendants.
Nos. 91 Civ. 4332(JSM), 91 Civ. 4801(JSM), 91 Civ.
6768(JSM), and 91 Civ. 6769(JSM)

March 22, 1993.
MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

**\*1** In these consolidated actions, Plaintiff Jerry Young
("Young"), a state prisoner, is suing several correction
officials for damages under 42 U.S.C. § 1983 for alleged
due process violations in (i) the conduct of his disciplinary
hearings at Green Haven Correctional facility; and (ii) his
confinement in a plexiglass cell and the issuance of a
deprivation order. The Plaintiff further alleges that the
denial of privileges during his confinement violated both
his first and eighth amendment rights. The parties now
cross move for summary judgment.

FACTUAL BACKGROUND

Plaintiff first challenges the constitutionality of six
disciplinary hearings, claiming that he was denied his
constitutional right to call witnesses of his choosing.

During these hearings, Young requested one or more of
the following as witnesses: Commissioner Coughlin,
Department of Correctional Facilities ("DOCS") Special
Housing Director Selsky, DOCS Inspector General Brian
Malone, Green Haven Superintendent Scully, First Deputy
Superintendent Artuz, Deputy Superintendent for Security
Demski, United States District Judge Kram, Inmate
Aramas, and Inmate Codrington. Plaintiff also alleges that
he was denied his right to effective employee assistance.

Plaintiff next contends that his denial of privileges
from January 6, 1991 through January 10, 1991 and his
confinement in a plexiglass cell from January 10, 1991
through January 14, 1991 and again from February 22,
1991 to March 2, 1991 were without notice of charges or
hearing, and thus violated his due process rights.

Lastly, Plaintiff challenges his denial of privileges
during confinement on the ground that the deprivation
amounted to cruel and inhuman punishment in violation of
his eighth amendment rights. He also asserts that certain
deprivations violated his first amendment rights.

DISCUSSION

*1. The Conduct of the Disciplinary Hearings*

The Supreme Court has recognized an inmate's right
to call witnesses at prison disciplinary hearings. *Wolff v.
McDonnell,* 418 U.S. 539, 94 S.Ct. 2963 (1974).
However, this right is "necessarily circumscribed by the
penological need to provide swift discipline in individual
cases." *Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192,
2195 (1985). Specifically, the right to call witnesses is
subject to the "mutual accommodation between
institutional needs and objectives and the provisions of the
Constitution." *Baxter v. Palmigiano,* 425 U.S. 308, 321,
96 S.Ct. 1551, 1559 (1976). The Supreme Court has held
that a hearing officer may refuse to call a witness (i) if
granting the request would be "unduly hazardous to
institutional safety or correctional goals"; (ii) if necessary
"to keep the hearing within reasonable limits"; or (iii) for
reasons of "irrelevance" or "lack of necessity." *Wolff,* 418
U.S. at 566, 94 S.Ct. at 2980; *see also Ponte,* 471 U.S. at
496–977, 105 S.Ct. at 2195–96.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

In the case at hand, the hearing officer denied Plaintiff's request to call the following witnesses: DOCS Commissioner Coughlin, Special Housing Director Selsky, Inspector General Brian Malone, Green Haven Superintendent for Security Demskie, and U.S. District Judge Kram. None of these requested witnesses had any personal knowledge of the incidents that gave rise to the disciplinary charges. As such, the hearing officer's refusal to call these witnesses on the ground of relevance did not violate Plaintiff's qualified right to call witnesses since, consistent with due process, the hearing officer could refuse to call the witnesses for that very reason.[FN1]

*2 The hearing officer was also correct in refusing to require the testimony of two inmate witnesses, Aramas and Codrington. One hearing concerned an altercation which occurred in the showers of the cell block. The hearing officer refused to call Aramas and Codrington on the ground that their testimony would be irrelevant. The hearing officer found that at the time of the incident the two inmates "were locked in their cell, they were not in the shower with Young, did not see what happened, and could not hear what was ordered by staff." Mindful of the Supreme Court's admonition in *Wolff* that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators," *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979, we refuse to disturb the hearing officer's finding.

Plaintiff Young further asserts that his due process rights were violated in that he was not allowed to call inmate Codrington in connection with two other hearings. Young misapprehends the facts. Contrary to Young's assertion, Codrington was not prohibited from testifying. Rather, the record indicates that Codrington of his own volition refused to testify. As there is no right to compel an inmate to testify, *see, e.g., Smith v. Coughlin,* No. 89–0321, slip op. (N.D.N.Y. April 8, 1992), Young's claim based on inmate Codrington's refusal to testify must fail.[FN2]

Lastly, while an inmate is entitled to effective employee assistance, *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988), such assistance is qualified. Here, Young contends that Defendant Jochnewicz, Young's employee assistant in one hearing, is liable for failing to

interview various prison officials and inmate Codrington. However, as mentioned earlier, these officials had no personal knowledge of the incident. Interviewing these Defendants would have been fruitless and as such was not required. As for Codrington, Young once again misapprehends the facts. Codrington, the only one of the four Defendants with knowledge relevant to Young's hearing, was in fact interviewed. As such, Young received effective employee assistance.

*2. The Plexiglass Confinement and Deprivation Order*

Plaintiff alleges that he was confined to a plexiglass cell and deprived of certain privileges without notice or hearing in violation of his due process rights. In evaluating his claim, we must first determine whether a protected liberty interest was infringed and, if so, whether the procedures employed by the state afforded the Plaintiff adequate due process.

State regulations create a constitutionally protected liberty interest when they establish substantive limitations on official discretion and contain "explicitly mandatory language, i.e., specific directives to the decision maker that if the regulations' substantive predicates are not present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462–64, 109 S.Ct. 1904, 1910 (1989); *see also Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990).

*3 Turning to Young's claim that he was confined to a plexiglass cell without due process, we note that regulation 7 N.Y.C.C.R. § 305.6, while containing substantive predicates to guide official decision making concerning the use of plexiglass shields, "stop short of requiring that a particular result is to be reached," *Thompson,* 490 U.S. at 462, 109 S.Ct. at 1910. Specifically, § 305.6(b) provides that "[c]ell shields *may* be applied for good cause including, but *not limited to,* the reasons listed below." 7 N.Y.C.C.R. § 305.6(b) (emphasis added). The words "may" and "not limited to" make it clear that the official's decision is discretionary and is not limited to enumerated substantive predicates. The failure of the regulation to provide mandatory language or criteria defeats Young's claim that the regulation creates a liberty

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

interest.

By contrast, the language in Regulation 7 N.Y.C.C.R. § 305.2(a), by requiring specific substantive predicates for issuance of deprivation orders, creates a liberty interest which may not be deprived without due process.[FN3] Section 305.2(a) provides that "[a]n order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or state property exists." 7 N.Y.C.C.R. § 305.2(a). As such, the issuance of deprivation orders is limited to situations in which a threat is present. In so limiting the issuance of deprivation orders, New York State has created a liberty interest and must accordingly provide procedural safeguards. However, an inmate is not necessarily entitled to a full panoply of procedural safeguards. The process required is determined by balancing the private interest affected against the interests and concerns of the government. Here, in an administrative confinement, the balancing test tips in favor of the government's compelling interest in maintaining prison safety, and "an informal, nonadversary review" is sufficient to satisfy the due process requirement. *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873; *Patterson v. Coughlin,* 761 F.2d 886, 980–81 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879 (1986). Accordingly, due process is satisfied if the inmate is provided with "notice of the charge against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873; *see also Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989).

Here, the record is unclear as to whether Young received sufficient due process. The record indicates that Young did pose a threat to safety, that the deprivation order was reviewed and approved by a second correction official before being issued, and that the deprivation order was reviewed daily to determine if it was necessary to be continued. However, the record is silent as to whether Young was given an opportunity to voice his objections " 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965)); *Giglio v. Dunn,* 732

F.2d 1133, 1135 (2d Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328 (1984).

**\*4** While a more complete record would be helpful, we need not pass on this issue today. This is because we conclude that summary judgment should be awarded to the Defendants on the ground that the officials are shielded under the doctrine of qualified immunity. Specifically, state officials are shielded "from personal liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 112 S.Ct. 3032 (1992) (citations omitted); *see also Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987); *Krause v. Bennett,* 887 F.2d 362, 368 (2d Cir.1989). An official will enjoy immunity when his actions were objectively reasonable when assessed in the light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2739 (1982).

Here, the regulation at issue, while containing mandatory language, also contained permissive language, and as such ambiguity existed. Nor could it be said that case law on the subject was sufficiently clear to preclude immunity. We are aware of no decisions issued prior to the incidents in this case recognizing a liberty interest in remaining free from the restraints imposed through deprivation orders. Indeed, such deprivations had been found not violative of due process in at least two state court decisions. *See Bogle v. Coughlin,* 569 N.Y.S.2d 831 (3d Dep't 1991); *Malik v. Coughlin,* 550 N.Y.S.2d 219 (3d Dep't 1990). Because we find that case law is not clearly established in this area, it cannot be said that the actions taken by the Defendants were unreasonable and contrary to clearly established law. Accordingly, the Defendants are entitled to good faith immunity as a matter of law.

*3. The Denial of Cell Privileges and Property*

In Plaintiff's brief in support of his cross-motion for summary judgment, he asserts that his confinement and the

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

accompanying deprivations amounted to cruel and unusual punishment. Specifically, Plaintiff alleges that he was denied exercise, shower and hot water, cell cleaning equipment, wardrobe and hygiene articles, and religious and legal books "without penological justification."

It is well settled that the eighth amendment, which applies to states through the due process clause of the fourteenth amendment, *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420 (1962), prohibits "cruel and unusual" punishment suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976).

However, to establish an eighth amendment claim based on a post-sentencing deprivation, a plaintiff must go beyond showing that the deprivation constitutes an "unnecessary and wanton infliction of pain." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2400 (1981). The plaintiff must also establish that the defendants acted with the requisite intent. *Wilson v. Seiter,* 111 S.Ct. 2321, 2324 (1991). Stated differently,

**\*5** After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citations omitted; internal quotations omitted).

Turning to the facts at hand, we must conclude that the Plaintiff's allegations, except for one, fail to satisfy the objective requirement of serious deprivation articulated in *Rhodes. Rhodes* holds that the objective element is satisfied where punishment results "in unquestioned and serious deprivations of basic human needs" or "deprive[s] inmates of the minimal civilized measure of life's

necessities." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399 (1981). Here, no such egregious deprivation occurred.

The record shows, and Plaintiff does not dispute, that for the most part the deprivations complained of were imposed to safeguard institutional security and specifically the safety of other correctional staff. The record also shows that the deprivations complained of were *de minimis* in nature and lasted only for a period of several days. None of the deprivations, the curtailing of exercise and shower privileges, or the surrender of toiletries and books, rose to the level of extreme deprivation. Furthermore, as we "do not sit to supervise state prisons," *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532 (1976), we defer to the experience of the Defendants in concluding that these deprivations were both necessary and justified. Because Young has failed to establish the elements of an eighth amendment claim, these claims fail as a matter of law and summary judgment is properly awarded to the Defendants.

Our decision today is not without support. Courts have routinely held that claims such as Young's fail to amount to cruel and unusual punishment. *See, e.g., Green v. Ferrell,* 801 F.2d 765, 771–72 (5th Cir.1986) (denial of exercise for limited duration); *Leonard v. Norris,* 797 F.2d 683, 685 (8th Cir.1986) (denial of exercise privileges for fifteen days); *Johnson v. Williams,* 768 F.Supp. 1161, 1167 (E.D.Va.1991) (limitations on exercise upheld); *Scher v. Purkett,* 758 F.Supp. 1316 (E.D.Mo.1991) (denial of shampoo and deodorant); *Jackson v. Ward,* 458 F.Supp. 546 (W.D.N.Y.1978) (upholding limitations on access to written materials); *Jordan v. Arnold,* 408 F.Supp. 869 (M.D.Pa.1976) (two showers and two hours of exercise per week sufficient); *Spain v. Procunier,* 408 F.Supp. 534 (N.D.Cal.1976) (short term denial of shower privileges), *aff'd in part on other grounds, rev'd in part on other grounds,* 600 F.2d 189 (9th Cir.1979).

**\*6** Young also asserts that, as part of the deprivation order, he was essentially "stripped"; i.e., deprived of "soap, toothpaste, toothbrush, showers, mattress, blanket, sheets, pillow, pillowcase, toilet paper, pants, shirt, undershirt, socks, shoes, slippers." However, evidence submitted by the government has shown that, contrary to Plaintiff's allegations that he was confined naked in a bare

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

cell, *see* Wright v. McMann, 460 F.2d 126, 129 (2d Cir.) (strip cell confinement cruel and unusual), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115 (1972); LaReau v. MacDougall, 473 F.2d 974, 978 (2d Cir.1972) (same), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49 (1973), Plaintiff was at all times provided with at least a "tee shirt, undershorts, paper slippers or socks, a mattress, and a blanket at nighttime." Affidavit of Bobbie Jo LaBoy ("LaBoy Aff."). Such treatment does not rise to the level of extreme deprivation required of an eight amendment violation, for the reasons stated above.

*4. Access to Religious and Legal Materials*

The Second Circuit has stated:
In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment. Accordingly, courts have jealously protected the inmate in his exercise of first amendment prerogatives.

Wolfish v. Levi, 573 F.2d 118, 129 (2d Cir.1978), *rev'd,* 441 U.S. 520, 99. S.Ct. 1861 (1979).

A prisoner's first amendment rights, however, are not unlimited: "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049 (1948). Thus a prisoner's first amendment rights must yield when "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," Pell v. Procunier, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974), although these restrictions must be "reasonably adapted to achieving a penological objective," O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 2404 (1987); *see also* Young v. Coughlin, 866 F.2d 567 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989).

Here, Young alleges that he was denied access to

religious books for a period of several days, thus depriving him of his first amendment right to freedom of religion. Defendants have not denied this allegation. Evidence presented by the government shows that the removal of Plaintiff's religious books was the result of an incident in which Plaintiff threw coffee at a prison employee. LaBoy Aff. p. 3 & Exhibit B. Plaintiff was deprived of all items, except those listed above, "to protect the safety of Green Haven corrections staff from assault by plaintiff, particularly with any objects in plaintiff's possession." *Id.* If these were the only facts relevant to Plaintiff's claim, the Court would have little trouble determining that such actions were reasonably adopted to penological objectives.

*7 But the ostensible safety objective cited by the Government, that of "maintaining the security of the facility and specifically the safety of correction staff from being assaulted with any objects in plaintiff's possession," Government's Sur–Reply Memorandum at 6, is called into question by evidence that Plaintiff would have been allowed *other* books even during this period of deprivation: "The inmate, however, continues to have access to the law library; he must fill out a request form, and the requested books or other materials are delivered to his cell, usually within 24 hours." LaBoy Aff. at 4. While this Court has no desire to condemn a prison administration's admirable attempts to allow inmates access to legal materials, it is difficult to see how religious books can be a threat to the safety of the officers of a facility while legal books are not. However, there is no need to rule on this issue, because it is plain that Plaintiff has not demonstrated culpability.

There is no evidence in the record that the alleged deprivation of Plaintiff's first amendment rights involved any degree of fault by defendants. Nothing indicates that the books were removed with awareness that any of them were integral to Plaintiff's practice of his religion, or that the authorities later received notice of this fact. In short, there is no evidence that the defendants knew or should have known that they were depriving Plaintiff of his first amendment rights, if in fact they were. "Negligence alone will not carry a § 1983 action," Paulsen v. Gotbaum, 1992 WL 8361, *8 (S.D.N.Y.), *aff'd,* 982 F.2d 825 (2d Cir.1992); here there was not even proof of negligence. Furthermore, even if a *prima facie* case under § 1983 were

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

made out, defendants would still be entitled to qualified immunity for their actions taken in good faith; once this defense is raised, it is Plaintiff's burden to defeat it. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Thus, because there is no genuine issue of material fact as to whether defendants acted culpably or are entitled to good faith immunity, summary judgment for defendants is appropriate.

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED; all claims are DISMISSED in their entirety. Plaintiff's motion for summary judgment is DISMISSED as moot.

SO ORDERED.

FN1. Plaintiff counters that "he wrote several complaints to [these officials] about [other] officials harassing him into violating prison rules and since mitigating [sic] is a factor which the hearing officer must consider in determining his sentences their testimony was relevant at least to the issue of punishment." This argument is tenuous at best. Accordingly, we decline to disturb the hearing officer's determination.

FN2. Citing *Silva v. Scully,* 526 N.Y.S.2d 532 (2d Dep't 1988), Young notes that before a hearing officer may refuse to call a witness, the hearing officer must "explore their reasons for not testifying" and communicate these reasons to the inmate. *Silva,* 526 N.Y.S.2d at 534. *See also Barnes v. LeFevre,* 511 N.Y.S.2d 591 (1986); *Briggs v. Lord,* 524 N.Y.S.2d 335 (Sup.Ct.1988). No such explanation is required under federal law. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196 (1985). It is well settled that violations of state procedural rules do not of their own accord implicate federal law. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229 (1987); *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985); *Smallwood–El v. Coughlin,* 589 F.Supp. 692, 699 (S.D.N.Y.1984). As such, we decline to hold today that the officer's failure to

demand an explanation amounts to a constitutional violation redressable under § 1983.

FN3. Young contends that separate liberty interests were created in the right to shower, exercise, and maintain personal property. We need not address this contention, however, since privileges cited by Young may be denied upon issuance of a deprivation order. As such, we confine our discussion to whether a liberty interest has been created in remaining free from the restraints imposed by a deprivation order.

S.D.N.Y.,1993.

Young v. Scully
Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

C

United States District Court,
E.D. New York.
Anthony PRICE, Plaintiff,
v.
Sheriff Edward REILLY, Kim Edwards, RN III, Perry
Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, MD,
and Nassau University Medical Center, Defendants.
**No. 07-CV-2634 (JFB)(ARL).**

March 8, 2010.

**Background:** Pro se inmate, who suffered from end stage
renal disease requiring dialysis, filed § 1983 action against
sheriff, nurse practitioner, physician, and medical center,
alleging violations of the Eighth Amendment for
defendants' failure to provide adequate medical care.
Defendants moved for summary judgment.

**Holdings:** The District Court, Joseph F. Bianco, J., held
that:

(1) there was no evidence that administrative remedy was
available to inmate;

(2) prison medical staff's modification of inmate's
medication dosage did not constitute deliberate
indifference to his medical needs;

(3) prison's failure to provide food with inmate's
medication was not sufficiently serious to satisfy objective
prong of test for deliberate indifference to serious medical
needs;

(4) medical staff did not act with culpable intent to
consciously disregard inmate's serious medical needs;

(5) genuine issue of material fact as to whether prison
medical staff was aware of, and consciously disregarded
inmate's request for a kidney transplant test precluded
summary judgment;

(6) genuine issue of material fact as to whether inmate's
shoulder pain was a serious medical condition precluded
summary judgment;

(7) sheriff was not liable under § 1983; but

(8) genuine issues of material fact precluded summary

judgment on § 1983 liability of registered nurse and
doctor.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** &#9758;     **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited
Cases
Generally, plaintiffs' failure to respond or contest facts set
forth by defendants in their statement of facts, submitted
in support of summary judgment, constitutes admission of
those facts, and facts are accepted as undisputed under
local rule. U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

**[2] Federal Civil Procedure 170A** &#9758;     **25**

170A Federal Civil Procedure
    170AI In General
        170AI(B) Rules of Court in General
            170AI(B)1 In General
                170Ak25 k. Local rules of District Courts.
Most Cited Cases
District court has broad discretion to determine whether to
overlook a party's failure to comply with local court rules.

**[3] Federal Civil Procedure 170A** &#9758;     **2547.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2547 Hearing and Determination
                    170Ak2547.1 k. In general. Most Cited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Cases
District court, when analyzing motion for summary judgment by sheriff and medical personnel in inmate's pro se action alleging cruel and unusual punishment, would treat as admitted only those facts in defendants' statement of facts that were supported by admissible evidence and not controverted by other admissible evidence in the record, given that inmate was acting pro se, he failed to file and serve a response to defendant's statement, but he had identified arguments and factual assertions in statement with which he disagreed. U.S.C.A. Const.Amend. 8; U.S.Dist.Ct.Rules S.D.N.Y., Civil Rule 56.1.

[4] Federal Civil Procedure 170A ⌐⌐    657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases
Court must construe pro se complaint broadly, and interpret it to raise the strongest arguments that it suggests.

[5] Attorney and Client 45 ⌐⌐    62

45 Attorney and Client
    45II Retainer and Authority
        45k62 k. Rights of litigants to act in person or by attorney. Most Cited Cases

Federal Civil Procedure 170A ⌐⌐    657.5(1)

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak654 Construction
                170Ak657.5 Pro Se or Lay Pleadings
                    170Ak657.5(1) k. In general. Most Cited Cases

Federal Civil Procedure 170A ⌐⌐    2546

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)3 Proceedings
                170Ak2542 Evidence
                    170Ak2546 k. Weight and sufficiency.
Most Cited Cases
Though pro se litigant's pleadings and other submissions are afforded wide latitude, pro se party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat motion for summary judgment.

[6] Civil Rights 78 ⌐⌐    1304

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and elements of civil actions.
Most Cited Cases
To prevail on a claim under § 1983, a plaintiff must show: (1) deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, (2) by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[7] Prisons 310 ⌐⌐    317

310 Prisons
    310II Prisoners and Inmates
        310II(H) Proceedings
            310k316 Exhaustion of Other Remedies
                310k317 k. In general. Most Cited Cases
In order to determine if prisoner exhausted his administrative remedies prior to commencement of lawsuit, as required by PLRA, court must first establish from a legally sufficient source that an administrative remedy is applicable, and that the particular complaint does not fall within an exception. Prison Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).

[8] Prisons 310 ⌐⌐    313

310 Prisons

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

310II Prisoners and Inmates
    310II(H) Proceedings
        310k307 Actions and Litigation
            310k313 k. Trial. Most Cited Cases
Whether administrative remedy was available to prisoner
in a particular prison or prison system, and whether such
remedy was applicable to grievance underlying prisoner's
suit, for purpose of PLRA's exhaustion requirement, are
not questions of fact; rather, such issues either are, or
inevitably contain, questions of law. Prison Litigation
Reform Act of 1995, § 101(a), 42 U.S.C.A. § 1997e(a).


[9] Civil Rights 78 ☞    1319


78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal law enforcement; prisons.
Most Cited Cases
Sheriff and prison medical staff provided no evidence that
an administrative remedy was available to inmate who
suffered from end state renal disease, and who sought, but
did not receive, medical testing to determine if he was a
candidate for kidney transplant, and thus inmate's § 1983
action alleging violations of Eighth Amendment would not
be dismissed for his failure to exhaust administrative
remedies under PLRA; defendants failed to establish
procedural framework for grievance resolution at the
prison or the availability of any administrative remedies
for prisoner's situation. U.S.C.A. Const.Amend. 8; Prison
Litigation Reform Act of 1995, § 101(a), 42 U.S.C.A. §
1997e(a).


[10] Sentencing and Punishment 350H ☞    1533


350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in
general. Most Cited Cases
Test for determining whether prison official's actions or
omissions rise to level of "deliberate indifference" in
violation of the Eighth Amendment, as will allow recovery
by prisoner in federal civil rights action, is twofold: first,
prisoner must demonstrate that he is incarcerated under

conditions posing substantial risk of serious harm, and
second, prisoner must demonstrate that defendant prison
officials possessed sufficient culpable intent. U.S.C.A.
Const.Amend. 8; 42 U.S.C.A. § 1983.


[11] Sentencing and Punishment 350H ☞    1533


350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1533 k. Deliberate indifference in
general. Most Cited Cases
Second prong of test for determining whether prison
officials acted with deliberate indifference to rights of
prisoners in violation of the Eighth Amendment, that of
"culpable intent," in turn involves two-tier inquiry;
specifically, prison official has sufficient culpable intent
if he has knowledge that inmate faces substantial risk of
serious harm and he disregards that risk by failing to take
reasonable measures to abate harm. U.S.C.A.
Const.Amend. 8.


[12] Sentencing and Punishment 350H ☞    1546


350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
        350HVII(H) Conditions of Confinement
            350Hk1546 k. Medical care and treatment. Most
Cited Cases
Mere fact that an inmate's underlying disease is a "serious
medical condition" does not mean that prison staff's
allegedly incorrect treatment of that condition
automatically poses an "objectively serious health risk," in
violation of Eighth Amendment. U.S.C.A. Const.Amend.
8.


[13] Prisons 310 ☞    192


310 Prisons
    310II Prisoners and Inmates
        310II(D) Health and Medical Care
            310k191 Particular Conditions and Treatments
                310k192 k. In general. Most Cited Cases

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**Sentencing and Punishment 350H** ⚷   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's end stage renal disease requiring dialysis was serious medical condition, prison medical staff did not act with deliberate indifference to inmate's medical needs in violation of his Eighth Amendment rights by modifying his medication dosage, since reduction in medication levels posed no objectively serious health risk to inmate; only injury inmate suffered was an increase in phosphorous levels, which was correctable, and a slight rash. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[14] Prisons 310** ⚷   **192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ⚷   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate's prescriptions indicated that his medications for renal disease were to be taken with meals, prison officials' failure to provide food with the medication was not sufficiently serious to satisfy objective prong of test for deliberate indifference to inmate's serious medical needs, in violation of Eighth Amendment; inmate did not suffer any harm from taking medicine without food. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[15] Sentencing and Punishment 350H** ⚷   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

An inmate's mere disagreement with prison officials' prescribed medication dosage is insufficient as a matter of law to establish officials' "deliberate indifference" to his medical needs, in violation of the Eighth Amendment. U.S.C.A. Const.Amend. 8.

**[16] Prisons 310** ⚷   **192**

310 Prisons
    310II Prisoners and Inmates
      310II(D) Health and Medical Care
        310k191 Particular Conditions and Treatments
          310k192 k. In general. Most Cited Cases

**Sentencing and Punishment 350H** ⚷   **1546**

350H Sentencing and Punishment
    350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
        350Hk1546 k. Medical care and treatment. Most Cited Cases

Even though inmate disagreed with medical treatment he received at prison, medical staff did not act with culpable intent to consciously disregard inmate's serious medical needs, in violation of his Eighth Amendment rights, by adjusting the dosage levels of his prescription medication for renal disease; dosage inmate received adequately treated his condition, he suffered no injury from modification of dosage other than increased phosphorous levels, and officials changed dosage to correct those levels. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[17] Federal Civil Procedure 170A** ⚷   **2491.5**

170A Federal Civil Procedure
    170AXVII Judgment
      170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
          170Ak2491.5 k. Civil rights cases in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

general. Most Cited Cases
Genuine issue of material fact as to whether prison medical staff was aware of, and consciously disregarded inmate's request for a kidney transplant test, precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[18]** Sentencing and Punishment 350H &#128273;   1546

350H Sentencing and Punishment
   350HVII Cruel and Unusual Punishment in General
      350HVII(H) Conditions of Confinement
         350Hk1546 k. Medical care and treatment. Most Cited Cases
An inmate's chronic pain can constitute a "serious medical condition" for purposes of claim of deliberate indifference to a serious medical need under the Eighth Amendment. U.S.C.A. Const.Amend. 8;.

**[19]** Federal Civil Procedure 170A &#128273;   2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether inmate's shoulder pain was a serious medical condition, and whether prison medical staff acted with deliberate indifference by failing to prescribe pain medication or take x-rays, despite inmate's ongoing complaints, precluded summary judgment, in inmate's § 1983 Eighth Amendment claims against medical staff. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[20]** Civil Rights 78 &#128273;   1355

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1355 k. Vicarious liability and respondeat

superior in general; supervisory liability in general. Most Cited Cases
Supervisor liability in § 1983 action can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring. 42 U.S.C.A. § 1983.

**[21]** Civil Rights 78 &#128273;   1358

78 Civil Rights
   78III Federal Remedies in General
      78k1353 Liability of Public Officials
         78k1358 k. Criminal law enforcement; prisons. Most Cited Cases
Sheriff was not liable under § 1983 for alleged deliberate indifference to medical needs of inmate related to inmate's end stage renal disease or chronic shoulder pain; there was no showing that sheriff was personally involved in denying medical treatment to inmate, or that there was a custom or policy at prison of allowing alleged constitutional violations. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[22]** Federal Civil Procedure 170A &#128273;   2491.5

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether registered nurse on prison medical staff was personally involved in prison's alleged failure to arrange for inmate's kidney transplant test precluded summary judgment in inmate's § 1983 action alleging officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

**[23]** Civil Rights 78 🗝    1358

78 Civil Rights
    78III Federal Remedies in General
        78k1353 Liability of Public Officials
            78k1358 k. Criminal law enforcement; prisons.
Most Cited Cases
If prison doctor denies medical treatment to an inmate, that doctor is "personally involved" in alleged constitutional violation for purposes of § 1983 liability. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

**[24]** Federal Civil Procedure 170A 🗝    2491.5

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2491.5 k. Civil rights cases in general. Most Cited Cases
Genuine issue of material fact as to whether doctor denied medical treatment to inmate suffering from end stage renal disease, precluded summary judgment in inmate's § 1983 action alleging prison officials' deliberate indifference to his medical needs, in violation of Eighth Amendment. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.
*347 Anthony Price, pro se.

Edward J. Troy, Law Office of Edward J. Troy, Greenlawn, NY, for the Defendants.

**\*348 MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Anthony Price (hereinafter "Price" or "plaintiff") alleges, pursuant to 42 U.S.C. § 1983, that Sheriff Edward Reilly, Kim Edwards, RN, Perry Intal, Mary Sullivan, RN, Dr. Benjamin Okonta, and Nassau University Medical Center (hereinafter "defendants") violated his Eighth Amendment rights by acting with deliberate indifference to his serious medical needs while plaintiff was incarcerated at the Nassau County Correctional Center (hereinafter "NCCC"). Specifically, plaintiff alleges that defendants: (1) prescribed an incorrect dosage of medication for his renal disease; (2) failed to get him tested for a kidney transplant list; and (3) failed to adequately treat him for shoulder pain. Defendants have moved for summary judgment on all of plaintiffs' claims. For the reasons set forth below, defendants' motion is granted in part and denied in part. Specifically, defendants' motion is granted with respect to plaintiff's claim regarding the dosage of his prescription medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

### I. FACTS

**[1][2][3]** The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the defendants' Rule 56.1 statement of facts.[FN1] They are not findings of fact by the Court, but rather are assumed to be true for the purposes of deciding this motion. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party-here, the plaintiff. *See Capobianco v. City of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2005). Unless otherwise noted, where a party's 56.1 statement or deposition is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.

FN1. The Court notes that plaintiff failed to file and serve a response to defendants' Local Rule 56.1 Statement of Facts in violation of Local Civil Rule 56.1. Generally, a "plaintiff['s] failure to respond or contest the facts set forth by the defendants in their Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." *Jessamy v. City of New Rochelle,* 292 F.Supp.2d 498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs., Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d 134, 139 (S.D.N.Y.2003)). However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

*also Giliani v. GNOC Corp.,* No. 04 Civ. 2935(ILG), 2006 WL 1120602, at *2 (E.D.N.Y. Apr. 26, 2006)* (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In his opposition papers, plaintiff identifies defendants' arguments and factual assertions with which he disagrees. In the exercise of its broad discretion, and given plaintiff's *pro se* status, the Court will deem admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05. Furthermore, the Court has carefully reviewed all of the parties' submissions, including plaintiff's deposition, to determine if plaintiff has any evidence to support his claims.

### A. Arrival at NCCC and Medication

Plaintiff was incarcerated in the Nassau County Correctional Center from January 7, 2007 to December 11, 2007. (Price Dep. at 6, 35.) Plaintiff has end stage renal disease and has been on dialysis since 2004 related to kidney failure. (*Id.* at 10; Defs.' 56.1 ¶ 2.) Plaintiff takes two daily medications, Renagel and PhosLo, for this condition. (Price Dep. at 10.) Before arriving**349 at the NCCC,[FN2] plaintiff was taking two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 12-13.)

> FN2. Plaintiff was incarcerated at the Elmira correctional facility in 2005 and 2006. (Price Dep. at 7-8.)

When plaintiff arrived at the NCCC, he was interviewed by Perry Intal, a nurse practitioner in the medical intake department. (*Id.* at 21-22.) Plaintiff told Intal about his medical history, including that he was a dialysis patient and that he took medications. (*Id.* at 22.) Plaintiff was given a prescription for one 800 milligram pill of Renagel two times a day and one 667 milligram pill of PhosLo two times a day. (*Id.* at 23-24.) Two or three weeks later, plaintiff went to dialysis treatment and a blood test revealed high phosphorous levels. (*Id.* at 25-26.) As a

result, plaintiff was given an increased dosage of medication. (*Id.* at 25-27.) Thereafter, plaintiff's phosphorous levels decreased and about one month later (*id.* at 30-31), his dosage was decreased to one 800 milligram pill of Renagel three times a day and two 667 milligram pills of PhosLo three times a day. (*Id.* at 31-33.) This was the dosage plaintiff received for the rest of his incarceration at the NCCC.[FN3] (*Id.* at 32-33.) Plaintiff believed that the dosage he was receiving was "wrong" and that it was "hurting" him. (*Id.* at 59-60.) However, the more plaintiff complained about the dosage hurting him, "the more it seemed like the people got aggravated." (*Id.* at 60.) In addition, plaintiff's prescriptions for Renagel and PhosLo indicate that the medications were to be taken with meals. (*See* Defs.' Ex. E.) Plaintiff alleges, however, that the medications were sometimes given to him without food or at times that interfered with his meals. (Price Dep. at 23, 60.)

> FN3. Plaintiff testified that, at the time of his deposition, he was receiving two 800 milligram pills of Renagel three times a day and two 667 milligram pills of PhosLo three times a day at the Fishkill correctional facility. (Price Dep. at 11-12.)

Besides receiving medication, plaintiff also received dialysis treatment three times a week at the Nassau University Medical Center. (*Id.* at 30.) On some occasions, plaintiff refused dialysis treatment because he "was feeling good" and "wanted to take a break" from treatment. (*Id.* at 56.) Plaintiff's regular medical treatment at the hospital also included a blood test every 30 days. (*Id.* at 27-28, 30.)

### B. Kidney Transplant Request

In February or March 2007, plaintiff spoke with a social worker named "Susan" about getting tested for a kidney transplant. (*Id.* at 76.) A test was required before an inmate could be placed on a waiting list for kidney transplants. (*Id.* at 80-81.) Only two hospitals in the area dealt with such matters: Stony Brook and a hospital in Westchester County. (*Id.* at 75-76.) Susan tried to contact Dr. Benjamin Okonta (hereinafter "Okonta") at Nassau University Medical Center in or about February or March

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

2007 (*id.* at 76-77), but Susan told plaintiff that Okonta did not get back to her.[FN4] (*Id.* at 65-66, 74-78.) Susan also submitted a letter to Okonta in July 2007, stating: "As per our conversation on 7/27/07, I am re-submitting for your review my request [for] your medical services on behalf of our renal dialysis pt., Anthony Price." (*Id.* at 77-78; Defs.' Ex. K.) Plaintiff never received a response from Okonta. (Price Dep. at 82.)

> FN4. Plaintiff never interacted with Okonta except through Susan, the social worker. (Price Dep. at 73-74.)

Susan also submitted a letter to Nurse Mary Sullivan (hereinafter "Sullivan"), the **\*350** day supervisor at the NCCC medical center, stating: "As per our telephone conversation, I am submitting in writing Anthony Price's request for referral and evaluation to a kidney transplant center ... Stonybrook Univ. Medical Ctr." (Def.'s Ex. K.) At some point in time, plaintiff was called down to the NCCC medical center and was told by Sullivan that defendants knew about plaintiff's request to get on the kidney transplant list but that they had "other priorities right now." (Price Dep. at 70.) Plaintiff believed Sullivan was referring to his other health issues. (*Id.* at 70.) Plaintiff did not ask when he would be tested for the kidney transplant list. (*Id.* at 71.)

On September 25, 2007, plaintiff filed a formal grievance regarding his request to be tested for the kidney transplant list.[FN5] (*Id.* at 85.) Plaintiff stated on his grievance form that he had "been waiting to take the test I need to take to get on the kidney transplant list" and that his social worker had told him that she had forwarded the paperwork to the jail, but could not get a response. (Defs.' Ex. F.) Plaintiff requested that he be "given the test to see if I'm a candidate for possibly a kidney transplant." (*Id.*) By interdepartmental memorandum dated September 27, 2007, the Inmate Grievance Coordinator informed plaintiff that the medical grievance "is being discussed with and turned over to the Health Services Administrator. The medical unit will evaluate you. A Grievance Unit Investigator will contact you at a later date to conduct an evaluation of your status and to closeout the paperwork." (*Id.*) In another memo dated October 5, 2007, defendant Kim Edwards,[FN6] informed plaintiff:

> FN5. This was the only formal medical grievance filed by plaintiff. (Price Dep. at 85.)

> FN6. Edwards never wrote medical orders for plaintiff or examined plaintiff. (Price Dep. at 61.) Plaintiff had no interaction with Edwards except her written response to plaintiff's grievance. (*Id.* at 67.)

The social worker can only inform you of treatment options that are available for your medical problem. If you are in need of a "test", documentation must be provided by the attending physician that is responsible for your renal treatment.

(*Id.*) Plaintiff interpreted this response from Edwards to mean that the matter was now in the hands of the medical department, and so he did not further proceed with the grievance and "did not feel it was necessary." (Pl.'s Opp. at 3.)[FN7] Therefore, plaintiff "signed off on the grievance," saying that he had "read it and accepted it." (Price Dep. at 88.)

> FN7. Although plaintiff does not offer this explanation in his deposition, the Court construes the *pro se* plaintiff's sworn "verified rebuttal" to defendants' motion for summary judgment as an evidentiary submission. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also Hailey v. N.Y. City Transit Auth.,* 136 Fed.Appx. 406, 407-08 (2d Cir.2005) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

Plaintiff did not get the requested test during the remainder of his incarceration at the NCCC. (*Id.* at 90.) Defendants have submitted evidence that they made efforts to get plaintiff tested and, in fact, scheduled plaintiff for a test at Stony Brook University Hospital on November 29, 2007, but that the test had to be cancelled due to "unforeseen circumstances"; the test was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

re-scheduled for January 10, 2008. (Defs.' Ex. G, Reschke Aff. ¶¶ 6-7.) Plaintiff was not informed about any scheduled test (Pl.'s Opp. at 2), and he was **351 transferred to a different facility in December 2007. (Price Dep. at 35; Reschke Aff. ¶ 7.)

### C. Shoulder Pain

Plaintiff began complaining about shoulder pain to the medical department at the NCCC on January 17, 2007, stating that his right shoulder was "extremely hurting." (Price Dep. at 36; Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Plaintiff had received treatment for shoulder pain in the past, including a shot of Cortisone while at the Elmira facility (Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.) After the January 17 complaint, plaintiff was seen a couple of days later and given medication to rub on his shoulder. (Price Dep. at 41.) The medication did not help with the discomfort, and so plaintiff complained again later in January. (*Id.* at 42-43.) Although defendants gave plaintiff Motrin and Naprosyn for the pain, no x-rays were taken for several months. (*Id.* at 44, 55; Defs.' Ex. H, Edwards Aff. ¶ 4.) The pain medication continued to be ineffective, and plaintiff continued to complain. (*See, e.g., id.* at 45, 51.) For instance, in June 2007, plaintiff complained that his right shoulder "hurts really bad." (Def.'s Ex. E, Sick Call Request, June 12, 2007.) Plaintiff never refused medication for his shoulder. (Price Dep. at 56.) When plaintiff eventually was given x-rays, in April and November 2007 (Edwards Aff. ¶ 4), plaintiff was told that nothing was wrong with his shoulder.[FN8] (Price Dep. at 44; *see also* Defs.' Ex. J, Discharge Summary, November 2007 ("Although no definite evidence of venous thrombosis is seen with Rt. upper extremity, short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information....").) Plaintiff states that, with respect to his right shoulder, he currently wears a brace for carpal tunnel syndrome, has a separated shoulder, and takes shots for the pain. (Pl.'s Opp. at 4.)

FN8. Plaintiff testified that he stopped complaining about his shoulder at some point because he was frustrated that defendants were not helping. (Price Dep. at 54-55.) There is evidence that plaintiff complained about his shoulder at least as late as June 2007, and again

complained in November 2007, which resulted in the taking of additional x-rays. (*See* Def.'s Ex. E, Sick Call Request, June 21, 2007; Defs.' Ex. J.)

### II. PROCEDURAL HISTORY

On June 28, 2007, plaintiff filed the initial complaint in this action. Plaintiff filed an amended complaint on August 20, 2007 alleging, pursuant to Section 1983, that defendants Sheriff Edward Reilly, Kim Edwards, Perry Intal, and Nassau University Medical Center violated his Eighth Amendment rights with respect to his medication dosage, kidney transplant request, and shoulder pain. On November 14, 2007, plaintiff filed another complaint in a separate action (No. 07-CV-4841) making substantially the same allegations and expanding on his allegations regarding the kidney transplant request. This complaint named Mary Sullivan and Dr. Benjamin Okonta, as well as the Nassau University Medical Center, as defendants. By Order dated July 11, 2008, the Court consolidated both actions (Nos. 07-CV2634 and 07-CV-4841) because the allegations in the two actions were "factually intertwined."

Defendants moved for summary judgment on May 29, 2009.[FN9] Plaintiff submitted **352 an opposition to the motion on August 3 and August 11, 2009.[FN10] Defendants replied on August 20, 2009. Plaintiff submitted a surreply on October 6, 2009. This matter is fully submitted.

FN9. Pursuant to Local Rule 56.1, defendants also served plaintiff with the requisite notice for *pro se* litigants opposing summary judgment motions. *See Irby v. N.Y. City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001) ("And we remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.").

FN10. Plaintiff submitted his two identical oppositions and a sur-reply to the instant motion not only in this action, but also in the now-consolidated action (No. 07-CV-4841). The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Court has considered all of plaintiff's submissions in both actions in deciding the instant motion.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Reiseck v. Universal Commc'ns of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir.2010). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir.2004); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts .... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). Indeed, the "mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S.Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed.

*R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

[4][5] Where the plaintiff is proceeding *pro se*, the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported **\*353** by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.*, 653 F.Supp.2d 499, 502 (S.D.N.Y.2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.*, 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

[6] To prevail on a claim under Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993).

There is no dispute for purposes of this motion that defendants were acting under color of state law. The question presented, therefore, is whether defendants' alleged conduct deprived plaintiff of his Eighth Amendment rights. Plaintiff alleges that his Eighth Amendment rights were violated when defendants: (1) prescribed him an incorrect dosage of medication for his renal disease; (2) failed to get him tested for the kidney

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

transplant list; and (3) failed to adequately treat him for his shoulder pain. For the reasons set forth below, after drawing all reasonable inferences from the facts in favor of plaintiff, the Court concludes that defendants are entitled to summary judgment on plaintiff's claim regarding the dosage of his medication and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion for summary judgment is denied in all other respects.

### A. Exhaustion

As a threshold matter, defendants argue that plaintiff is barred from raising any Eighth Amendment claim with respect to his kidney transplant request because plaintiff has not exhausted his administrative remedies.[FN11] For the reasons set forth below, the Court disagrees and cannot conclude from this record that plaintiff failed to exhaust his administrative remedies.

> FN11. Defendants raise exhaustion only with respect to plaintiff's kidney transplant request, and so the Court does not consider exhaustion with respect to plaintiff's other claims.

### 1. Legal Standard

The Prison Litigation Reform Act of 1995 ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA exhaustion requirement 'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' Prisoners must utilize the state's grievance procedures, regardless of whether the relief sought is offered through those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir.2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368

(2006). Therefore, the exhaustion inquiry requires a court to "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *354 Espinal, 558 F.3d at 124 (citing Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) and Woodford, 548 U.S. at 88-90, 126 S.Ct. 2378).

Prior to Woodford, 548 U.S. 81, 126 S.Ct. 2378 (2006), the Second Circuit "recognized some nuances in the exhaustion requirement: (1) administrative remedies that are ostensibly 'available' may be unavailable as a practical matter, for instance, if the inmate has already obtained a favorable result in administrative proceedings but has no means of enforcing that result; (2) similarly, if prison officials inhibit the inmate's ability to seek administrative review, that behavior may equitably estop them from raising an exhaustion defense; (3) imperfect exhaustion may be justified in special circumstances, for instance if the inmate complied with his reasonable interpretation of unclear administrative regulations, or if the inmate reasonably believed he could raise a grievance in disciplinary proceedings and gave prison officials sufficient information to investigate the grievance." Reynoso v. Swezey, 238 Fed.Appx. 660, 662 (2d Cir.2007) (internal citations omitted); see also Davis v. New York, 311 Fed.Appx. 397, 399 (2d Cir.2009) (citing Hemphill v. New York, 380 F.3d 680, 686, 691 (2d Cir.2004)). However, the Second Circuit has not decided whether the above-discussed considerations apply post- Woodford. See, e.g., Reynoso, 238 Fed.Appx. at 662 ("Because we agree with the district court that [plaintiff] cannot prevail on any of these grounds, we have no occasion to decide whether Woodford has bearing on them."); Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir.2006) ("We need not determine what effect Woodford has on our case law in this area, however, because [plaintiff] could not have prevailed even under our pre- Woodford case law.").

As the Supreme Court has held, exhaustion is an affirmative defense: "We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); see also Key v. Toussaint, 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) ("Failure to exhaust remedies under the PLRA is an affirmative defense, and thus the defendants have the

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

burden of proving that [plaintiff's] retaliation claim has not been exhausted." (citations omitted)).

### 2. Application

Defendants argue that plaintiff did not appeal the resolution of his grievance request, i.e., the memo from Edwards dated October 5, 2007, stating that: "If you are in need of a 'test', documentation must be provided by the attending physician that is responsible for your renal treatment." (Defs.' Ex. F.) Therefore, defendants argue, plaintiff has failed to exhaust his administrative remedies under the PLRA. (Defs.' Br. at 25.) Plaintiff argues in response that he did not believe any further action on his grievance was "necessary" because the matter was put into the hands of the medical department. (Pl.'s Opp. at 3.) For the reasons discussed below, the Court concludes that, on this record, defendants have not met their burden of proving that plaintiff failed to exhaust his administrative remedies.

[7][8][9] As discussed above, the PLRA requires exhaustion only with respect to "such administrative remedies as are available." See 42 U.S.C. § 1997e(a). Therefore, in order to determine whether plaintiff exhausted his administrative remedies, the Court "must first establish from a legally sufficient source that an administrative remedy is applicable and that the particular complaint does not fall within an exception." Courts should be careful to look at the applicable set of grievance procedures,*355 whether city, state or federal." Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir.2003); see also Espinal, 558 F.3d at 124 (holding that, when considering exhaustion, courts must "look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures" (citations omitted)). "Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They are, or inevitably contain, questions of law." See Snider v. Melindez, 199 F.3d 108, 113-14 (2d Cir.1999). However, "the existence of the procedure may be a matter of fact." Id. at 114.

On the record before the Court on this motion, the Court

is unable to establish from any legally sufficient source that an administrative remedy was available to plaintiff. Defendants have made no submissions to the Court regarding the applicable grievance procedures at the NCCC. See, e.g., Abney v. County of Nassau, 237 F.Supp.2d 278, 281 (E.D.N.Y.2002) (noting that the "Inmate Handbook" for the Nassau County Correctional Facility procedure was "annexed to Defendants' moving papers"). Specifically, defendants have not submitted any evidence, by affidavit or otherwise, that NCCC procedures offer a remedy to address the particular situation in this case.[FN12] Therefore, the Court cannot conclude from this record that plaintiff had an available administrative remedy that he failed to exhaust.

FN12. The Court notes that the October 5, 2007 memo from Edwards is unclear as to which party bore the responsibility of obtaining plaintiff's medical records. (Defs.' Ex. F.) Edwards explains in an affidavit that she advised plaintiff that "it would be necessary for his doctors to provide the selected facility with his records before a request for testing would be considered." (Edwards Aff. ¶ 2.) It is unclear whether plaintiff had access to these records or whether the prison would need to obtain them. Thus, there appears to be a factual question as to the implementation of this grievance resolution. A similar situation arose in Abney v. McGinnis, 380 F.3d 663 (2d Cir.2004), in which the Second Circuit held that where a prisoner achieved favorable results in several grievance proceedings but alleged that prison officials failed to implement those decisions, that prisoner was without an administrative remedy and therefore had exhausted his claim for purposes of the PLRA. See id. at 667-68, 669 ("Where, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [plaintiff's] situation have fully exhausted their available remedies."). The Court recognizes that Abney, 380 F.3d 663, was decided before Woodford v. Ngo, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), and that, as discussed above, the Second Circuit has not decided whether the various nuances to the exhaustion requirement apply post- Woodford. However, the Court need not decide the applicability of any such nuances to the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

exhaustion requirement because, as discussed above, defendants have failed to establish the procedural framework for grievance resolution at the NCCC and the availability of *any* administrative remedies.

Although there may be administrative remedies for such a situation under the New York Department of Corrections regulations, *see* 7 N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5(c)(4) ("If a decision is not implemented within 45 days, the grievant may appeal to CORC citing lack of implementation as a mitigating circumstance."), it does not follow that the same procedure applies at the NCCC. *See, e.g., Abney v. County of Nassau,* 237 F.Supp.2d at 283 ("The flaw in Defendants' argument, however, is that the cases relied upon were all decided under the New York State administrative procedure-none were decided in the context of the procedure relied upon-the Nassau County Inmate Handbook procedure.").

B. Plaintiff's Claims of Deliberate Indifference

1. Legal Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the **\*356** 'unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment" and therefore "states a cause of action under § 1983." *Estelle v. Gamble,* 429 U.S. 97, 104-05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As the Second Circuit has explained,

[t]he Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. Moreover, under 42 U.S.C. § 1983, prison officials are liable for harm incurred by an inmate if the officials acted with "deliberate indifference" to the safety of the inmate. However, to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice.

*Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citations omitted). Within this framework, "[d]eliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment." *Bellotto v. County of Orange,* 248 Fed.Appx. 232, 236 (2d Cir.2007). Thus, according to the Second Circuit,

[d]efendants may be held liable under § 1983 if they ... exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution. Deliberate indifference is found in the Eighth Amendment context when a prison supervisor knows of and disregards an excessive risk to inmate health or safety .... Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Ortiz v. Goord,* 276 Fed.Appx. 97, 98 (2d Cir.2008) (citations and quotation marks omitted); *see also Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) ("Deliberate indifference will exist when an official 'knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.' ") (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Curry v. Kerik,* 163 F.Supp.2d 232, 237 (S.D.N.Y.2001) (" '[A]n official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' ") (quoting *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks omitted)).

[10][11] In particular, the Second Circuit has set forth a two-part test for determining whether a prison official's actions or omissions rise to the level of deliberate indifference:

The test for deliberate indifference is twofold. First, the plaintiff must demonstrate that he is incarcerated under conditions posing a substantial risk of serious harm.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

Second, the plaintiff must demonstrate that the defendant prison officials possessed sufficient culpable intent. The second prong of the deliberate indifference test, culpable intent, in turn, involves a two-tier inquiry. Specifically, a prison official has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.

**\*357** _Hayes,_ 84 F.3d at 620 (internal citation omitted); _see also_ _Phelps v. Kapnolas,_ 308 F.3d 180, 185-86 (2d Cir.2002) (setting forth two-part deliberate indifference test).

In _Salahuddin v. Goord,_ the Second Circuit set forth in detail the objective and subjective elements of a medical indifference claim. 467 F.3d 263 (2d Cir.2006). In particular, with respect to the first, objective element, the Second Circuit explained:

The first requirement is objective: the alleged deprivation of adequate medical care must be sufficiently serious. Only deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. Determining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable care. Thus, prison officials who act reasonably [in response to an inmate-health risk] cannot be found liable under the Cruel and Unusual Punishments Clause, and, conversely, failing to take reasonable measures in response to a medical condition can lead to liability.

Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner. For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an inmate's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a serious medical condition as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

467 F.3d at 279-80 (citations and quotation marks omitted); _see also_ _Jones v. Westchester County Dep't of Corr. Medical Dep't,_ 557 F.Supp.2d 408, 413-14 (S.D.N.Y.2008).

With respect to the second, subjective component, the Second Circuit further explained:

The second requirement for an Eighth Amendment violation is subjective: the charged official must act with a sufficiently culpable state of mind. In medical-treatment cases not arising from emergency situations, the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health. Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law. This mental state requires that the charged official act or fail to act while actually aware **\*358** of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable. The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices. But recklessness

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent.

*Salahuddin,* 467 F.3d at 280 (citations and quotation marks omitted); *see also Jones,* 557 F.Supp.2d at 414. The Supreme Court has stressed that

in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle v. Gamble,* 429 U.S. 97, 105-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citations omitted); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations omitted)); *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a medical practitioner who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not evince the culpability necessary for deliberate indifference).

**2. Application**

Plaintiff alleges that defendants violated his Eighth Amendment rights by: (1) prescribing an incorrect dosage of his renal disease medication; (2) failing to have him tested for the kidney transplant list; and (3) failing to properly treat his shoulder pain. The Court considers each claim in turn and, for the reasons discussed below, concludes that defendants are entitled to summary

judgment on plaintiff's claim regarding his medication dosage and on all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects.

**a. Medication Dosage**

Defendants concede that plaintiff's kidney condition is serious (Defs.' Br. at 21), but argue that the dosage of Renagel and PhosLo prescribed for plaintiff did not result in any injury. Defendants also argue that, even if the dosage was incorrect, it was at most "an error in medical judgment." Finally, defendants argue that plaintiff cannot show deliberate indifference because defendants continually tested plaintiff and twice changed the dosage of his medication depending on his phosphorous levels. (Defs.' Br. at 22.) For the reasons set forth below, the Court agrees and concludes that no rational jury could find that defendants acted with deliberate indifference with respect to the prescription**359** of medication for plaintiff's renal disease.

**i. Objective Prong**

[12][13][14] Plaintiff has failed to present any evidence that the allegedly incorrect medication dosage posed an objectively serious risk to plaintiff's health. As a threshold matter, the mere fact that plaintiff's underlying renal disease is a serious medical condition does not mean that the allegedly incorrect treatment for that condition poses an objectively serious health risk. *See Smith v. Carpenter,* 316 F.3d 178, 186-87 (2d Cir.2003) ("As we noted in *Chance* [*v. Armstrong,* 143 F.3d 698 (2d Cir.1998) ], it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes."). Furthermore, plaintiff has failed to produce any evidence that his medication dosage at the NCCC caused him any objectively serious harm. Instead, plaintiff testified merely that the prescribed dosage was "wrong" and was "hurting" him.[FN13] (Price Dep. at 60.) Plaintiff's belief that the medication dosage was incorrect is insufficient to establish the objective prong of the deliberate indifference test.[FN14] *See Fox v. Fischer,* 242 Fed.Appx. 759, 760 (2d Cir.2007) ("[T]he fact that [plaintiff] was provided Claritin as a substitute for Allegra

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

fails to establish deliberate indifference to a serious medical need, because there is no allegation that the change in medication caused harm, if any, sufficiently serious to establish the objective prong of a deliberate indifference claim...."); *Reyes v. Gardner,* 93 Fed.Appx. 283, 285 (2d Cir.2004) ( "[Plaintiff] has offered no evidence ... showing that the prescribed medication regimen deviated from reasonable medical practice for the treatment of his condition."). Although there is evidence that plaintiff's phosphorous levels increased when he was prescribed a lesser dosage of medication upon arriving at the NCCC (*see* Price Dep. **\*360** at 23-26), that is not by itself enough to support a finding of an objectively serious condition.[FN15] *See Smith,* 316 F.3d at 188-89 ("Although [plaintiff] suffered from an admittedly serious underlying condition, he presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health, nor did he present any evidence explaining why the absence of actual physical injury was not a relevant factor in assessing the severity of his medical need.") (affirming denial of motion for new trial). Thus, plaintiff's medication dosage claim must fail because he cannot show that the complained-of dosage posed an objectively serious health risk.[FN16]

FN13. Plaintiff does not distinguish between the initial dosage he received at the NCCC and the later dosages he received, instead arguing generally that all of the dosages he received at the NCCC were incorrect.

FN14. Plaintiff's conclusory testimony that the dosage was "hurting" him also is insufficient to establish the objective prong of the deliberate indifference test. To the extent plaintiff claims that the medication caused him pain, there is no evidence in the record that plaintiff suffered from chronic pain or, indeed, any other objectively serious symptoms in connection with the medication dosage. Although not mentioned in plaintiff's deposition or in his opposition to the instant motion, plaintiff alleges in his amended complaint that the lesser dosage put him at risk of "itching" and "breaking of bones." (Amended Complaint, No. 07-CV-2634, at 4.) There is evidence that plaintiff suffered from a rash and/or itching while at the NCCC and that plaintiff was told at one point that he had

eczema. (*See* Price Dep. at 45-51.) However, there is no evidence to connect those symptoms with the medication dosage for his renal disease. (*See, e.g., id.* at 46 ("Q. Did anyone ever tell you what was causing a rash? A. I kept going to the-I had went to the dermatologist at Bellevue. To me, the doctor had an attitude like it ain't nothing wrong; like it was acne or something.").) Furthermore, there is no evidence that the rash and/or itching was an objectively serious condition. *See Lewal v. Wiley,* 29 Fed.Appx. 26, 29 (2d Cir.2002) (affirming summary judgment and holding that plaintiff's alleged "persistent rash" was not a "serious medical condition"); *see also Benitez v. Ham,* No. 04-CV-1159, 2009 WL 3486379, at \*11 (N.D.N.Y. Oct. 21, 2009) ("[T]he evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation."). In any event, even if plaintiff did suffer from an objectively serious condition because of the medication dosage, he cannot prove that defendants acted with a subjectively culpable state of mind, as discussed *infra.*

FN15. In any event, as discussed *infra,* defendants adjusted plaintiff's dosage in response to the increase in phosphorous levels, and there is no evidence from which a rational jury could conclude that defendants acted with deliberate indifference in prescribing plaintiff's medication.

FN16. Although he does not raise it in any of his pleadings or in his opposition to the instant motion, plaintiff testified at his deposition that he had to take the medication with meals but that sometimes he was given the medication without food or at times that interfered with his meals. (Price Dep. at 23, 60; Defs.' Ex. E.) The record is unclear as to how often this occurred. The Court assumes, as it must on this motion for summary judgment, that on some occasions plaintiff was given his medications not at meal times or at times that interfered with meals. However, plaintiff points to no evidence whatsoever of any harm caused by defendants' alleged conduct in this regard, and, therefore, no

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

rational jury could find that the provision of medication without food on some occasions was objectively serious. *See Gillard v. Kuykendall, 295 Fed.Appx. 102, 103 (8th Cir.2008)* (affirming summary judgment for defendants where defendants, on some occasions, "were late in giving [plaintiff] his medications and did not always administer them with meals as [plaintiff] apparently desired" where there was no evidence of any adverse consequences). Thus, any deliberate indifference claim based on these allegations would fail as well.

### ii. Subjective Prong

[15][16] Plaintiff's claim with respect to his medication dosage also fails because plaintiff cannot show that defendants acted with subjectively culpable intent, i.e., that they were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff's claim is based on his assertion that the prescribed dosage was "wrong." However, mere disagreement with a prescribed medication dosage is insufficient as a matter of law to establish the subjective prong of deliberate indifference. *See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir.1998)* ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs., 151 F.Supp.2d 303, 312 (S.D.N.Y.2001)* ("[D]isagreements over medications ... are not adequate grounds for a Section 1983 claim. Those issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment." (citing *Estelle, 429 U.S. at 107, 97 S.Ct. 285)*); *see also, e.g., Fuller v. Ranney, No. 06-CV-0033, 2010 WL 597952, at *11 (W.D.N.Y. Feb. 17, 2010)* ("Plaintiff's claim amounts to nothing more than a disagreement with the prescribed treatment he received and his insistence that he be prescribed certain medications. Without more, plaintiff's disagreement with the treatment he received does not rise to the level of a constitutional violation of his Eighth Amendment rights."); *Covington v. Westchester County Dep't of Corr., No. 06 Civ. 5369, 2010 WL 572125, at *6 (S.D.N.Y. Jan. 25, 2010)* ("[Plaintiff's] claims that Defendants failed **361 to change or increase his medication and counseling

sessions amount to negligence claims at most, which is insufficient."); *Hamm v. Hatcher, No. 05-CV-503, 2009 WL 1322357, at *8 (S.D.N.Y. May 5, 2009)* ("Plaintiff's unfulfilled demand for a larger dosage of [the medication] represents a mere disagreement over the course of Plaintiff's treatment and is inconsistent with deliberate indifference ....").

The fact that defendants adjusted the dosage of plaintiff's medication in response to plaintiff's phosphorous levels (*see* Price Dep. at 25-27) is also inconsistent with deliberate indifference. *See Bellotto v. County of Orange, 248 Fed.Appx. 232, 237 (2d Cir.2007)* ("The record also shows that mental health professionals responded to [plaintiff's] concerns about his medications and adjusted his prescription as they believed necessary.") (affirming summary judgment for defendants); *see also Jolly v. Knudsen, 205 F.3d 1094, 1097 (8th Cir.2000)* ("[Defendant's] actions in this case cannot reasonably be said to reflect deliberate indifference. The only relevant evidence in the record indicates that [defendant's] actions were aimed at correcting perceived difficulties in [plaintiff's] dosage levels [in response to blood tests]."); *Fuller, 2010 WL 597952, at *11* ("Moreover, a subsequent decision to prescribe plaintiff a certain medication does not indicate that the medication should have been prescribed earlier.").[FN17] Thus, there is no evidence in the record sufficient for a rational jury to find that defendants acted with deliberate indifference regarding the prescription dosage of plaintiff's renal disease medication.

FN17. To the extent plaintiff also argues that that defendants acted with deliberate indifference because he has received different prescriptions at different facilities, the Court rejects that argument as well. *See, e.g., Cole v. Goord, No. 04 Civ. 8906, 2009 WL 1181295, at *8 n. 9 (S.D.N.Y. Apr. 30, 2009)* ("[Plaintiff's] reliance upon the fact that subsequent medical providers have provided him with a different course of medication or treatment ... does nothing to establish that [defendant] violated [plaintiff's] Eighth Amendment rights. Physicians can and do differ as to their determination of the appropriate treatment for a particular patient; that difference in opinion does not satisfy the requirements for a constitutional claim of deliberate indifference."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

(citing *Estelle,* 429 U.S. at 97, 97 S.Ct. 285)).

In sum, based on the undisputed facts and drawing all reasonable inferences in plaintiff's favor, no rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's objectively serious health needs regarding his medication dosage. Accordingly, defendants' motion for summary judgment is granted with respect to this claim.

b. Kidney Transplant

[17] Defendants also argue that plaintiff cannot proceed with his deliberate indifference claim regarding his request to be tested for a kidney transplant. Defendants do not dispute the objective seriousness of plaintiff's underlying condition or the requested transplant, and instead argue only that defendants lacked subjective culpability. Specifically, defendants argue that they made reasonable efforts to get plaintiff tested. (Defs.' Br. at 23.) However, construing the facts in the light most favorable to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs.

Plaintiff began requesting a kidney transplant test as early as February or March 2007 and still had not received one by the time he left the NCCC in December 2007. (*See* Price Dep. at 76-77, 90.) Requests were sent on plaintiff's behalf to Dr. Okonta at the Nassau University Medical Center and to Nurse Mary Sullivan at the NCCC medical department. (*See* Defs.' Ex. K.) The record indicates that plaintiff received no response from Okonta. (*See* Price Dep. at 82.) When plaintiff asked Sullivan about the test, Sullivan told him that defendants had "other priorities right now." (Price Dep. at 70.) Even after plaintiff filed a formal grievance in September 2007, he still did not receive the requested test. (*See* Defs.' Ex. F.) On these facts, where there was a delay of at least nine months in arranging a kidney transplant test for plaintiff despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that defendants acted with deliberate indifference to plaintiff's serious medical needs. *See Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000) (holding summary judgment inappropriate where there

was evidence that, *inter alia,* plaintiff was delayed dental treatment for a cavity for one year); *Hathaway v. Coughlin,* 841 F.2d 48, 50-51 (2d Cir.1988) ("[Plaintiff's] affidavit in opposition to [defendants'] motion for summary judgment alleged that a delay of over two years in arranging surgery ... amounted to deliberate indifference to his serious medical needs. We believe this is a sufficient allegation to survive a motion for summary judgment under *Archer* [*v. Dutcher,* 733 F.2d 14 (2d Cir.1984) ] because it raises a factual dispute ...."); *see also Lloyd v. Lee,* 570 F.Supp.2d 556, 569 (S.D.N.Y.2008) ("A reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that [plaintiff] was given an MRI. The argument that the doctors here did not take [plaintiff's] condition seriously is plausible, given the length of the delays. Nine months went by after the MRI was first requested before the MRI was actually taken.").

Defendants point to evidence in the record that they were, in fact, attempting to get plaintiff tested throughout the time in question, but were unsuccessful in their efforts. (*See* Defs.' Br. at 23; Reschke Aff. ¶ 3.) However, defendants' proffered explanation for the delay, i.e., the difficulty of finding a hospital because of transportation and security concerns, raises questions of fact and does not, as a matter of law, absolve them of liability. *See Johnson v. Bowers,* 884 F.2d 1053, 1056 (8th Cir.1989) ("It is no excuse for [defendants] to urge that the responsibility for delay in surgery rests with [the hospital]."); *Williams v. Scully,* 552 F.Supp. 431, 432 (S.D.N.Y.1982) (denying summary judgment where plaintiff "was unable to obtain treatment ... for five and one half months, during which time he suffered considerable pain" despite defendants' "explanations for the inadequacy of [the prison's] dental program"), *cited approvingly in Harrison v. Barkley,* 219 F.3d 132, 138 (2d Cir.2000). Thus, whether defendants' efforts were reasonable over the nine month period at issue is a question of fact for the jury.

In sum, on this record, drawing all reasonable inferences in plaintiff's favor, the Court concludes that a rational jury could find that defendants acted with deliberate indifference regarding plaintiff's request for a kidney transplant test. Accordingly, defendants' motion for summary judgment on this claim is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

c. Shoulder

Defendants argue that summary judgment is warranted on the claim relating to the alleged shoulder injury because plaintiff's complained-of shoulder pain was not objectively serious and plaintiff has failed to show subjectively culpable intent by defendants. For the reasons set forth below, the Court disagrees and concludes that a rational jury could find that defendants acted with deliberate indifference **363 regarding plaintiff's shoulder pain. Thus, summary judgment on this claim is denied.

i. Objective Prong

[18][19] Defendants argue that plaintiff cannot satisfy the objective element of the deliberate indifference test regarding his shoulder because plaintiff alleges only that he had pain in his shoulder and not that he had "a condition of urgency, one that might produce death, deterioration or extreme pain." (Defs.' Br. at 22.) However, plaintiff did complain to the medical department that his right shoulder was "extremely hurting." (Defs.' Ex. E, Sick Call Request, Jan. 17, 2007.) Furthermore, plaintiff states that he now has a separated shoulder and wears a brace for carpal tunnel syndrome. (Pl.'s Opp. at 4.) In any event, chronic pain can be a serious medical condition. See Brock v. Wright, 315 F.3d 158, 163 (2d Cir.2003) ("We will no more tolerate prison officials' deliberate indifference to the chronic pain of an inmate than we would a sentence that required the inmate to submit to such pain. We do not, therefore, require an inmate to demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do we require a showing that his or her condition will degenerate into a life-threatening one."); Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir.1994); see also Sereika v. Patel, 411 F.Supp.2d 397, 406 (S.D.N.Y.2006) ( "[Plaintiff's] allegation that he experienced severe pain as a result of the alleged delay in treatment, together with his allegation that the alleged delay in treatment resulted in reduced mobility in his arm and shoulder, raise issues of fact as to whether his shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate indifference standard.") (denying summary judgment). Thus, the Court cannot conclude at the summary judgment stage that plaintiff did not suffer from a serious medical condition.

ii. Subjective Prong

Defendants also argue that plaintiff cannot meet the subjective prong of the deliberate indifference test because plaintiff was seen repeatedly by the medical department and was given pain medication. (Defs.' Br. at 22.) Defendants also point to the fact that when x-rays were ultimately taken, they were negative.[FN18] However, construing the facts most favorably to plaintiff, a rational jury could find that defendants were aware of, and consciously disregarded, plaintiff's serious medical needs. Plaintiff repeatedly complained to defendants over a period of several months, beginning in January 2007, about the pain in his shoulder (see Defs.' Ex. E), and further complained that the pain medication he was being given was ineffective.[FN19] (See, e.g., Price Dep. at 45, 51.) In June 2007, for instance, plaintiff was still complaining that his right shoulder "hurts really bad," and that he had been "complaining of that for months." (Def.'s Ex. E, Sick Call Requests, June 12 and June 17, 2007.) Thus, it is uncontroverted that defendants were aware of plaintiff's alleged chronic shoulder pain.

FN18. The November 2007 x-ray records indicate that "short segment acute thrombosis cannot be reliably excluded, Ultrasound might provide additional information ...." (See Defs.' Ex. J, Discharge Summary, November 2007.) Defendants point to no evidence in the record that they followed up on that x-ray report.

FN19. Plaintiff also informed defendants that he had been given a Cortisone shot for his shoulder at his previous place of incarceration. (See Price Dep. at 38, 53-54; Defs.' Ex. E, Sick Call Request, Apr. 14, 2007.)

Despite plaintiff's complaints, however, plaintiff was not given an x-ray exam for several months (Price Dep. at 44; Def.'s *364 Ex. J), and was not given any pain medication besides Motrin and Naprosyn. (Price Dep. at 55.) Although defendants argue that the treatment for plaintiff's shoulder pain was reasonable under the circumstances, there are factual questions in this case that preclude

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

summary judgment. *See Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case.") (reversing grant of motion to dismiss). Drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow-up on a November 2007 x-ray report indicating that further tests might be needed (*see* Defs.' Ex. J, Discharge Summary, November 2007). *See Brock,* 315 F.3d at 167 ("It is not controverted that [defendant] was aware that [plaintiff] was suffering some pain from his scar. The defendants sought to cast doubt on the truthfulness of [plaintiff's] claims about the extent of the pain he was suffering and, also, to put into question DOCS' awareness of [plaintiff's] condition. But at most, defendants' arguments and evidence to these effects raise issues for a jury and do not justify summary judgment for them."); *Hathaway,* 37 F.3d at 68-69 (holding that, *inter alia,* two-year delay in surgery despite plaintiff's repeated complaints of pain could support finding of deliberate indifference). The fact that defendants offered some treatment in response to plaintiff's complaints does not as a matter of law establish that they had no subjectively culpable intent. *See Archer v. Dutcher,* 733 F.2d 14, 16 (2d Cir.1984) ("[Plaintiff] received extensive medical attention, and the records maintained by the prison officials and hospital do substantiate the conclusion that [defendants] provided [plaintiff] with comprehensive, if not doting, health care. Nonetheless, [plaintiff's] affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution.... [Plaintiff's] assertions] do raise material factual issues. After all, if defendants did decide to delay emergency medical-aid-even for 'only' five-hours in order to make [plaintiff] suffer, surely a claim would be stated under *Estelle.*"). Specifically, given the factual disputes in this case, the Court cannot conclude as a matter of law that defendants did not act with deliberate indifference when they allegedly declined to change their treatment for plaintiff's shoulder pain despite repeated complaints over several months that the pain persisted. *See, e.g., Lloyd,* 570 F.Supp.2d at 569 ("[T]he amended complaint plausibly alleges that doctors knew that [plaintiff] was experiencing extreme pain and loss of mobility, knew that the course of treatment they prescribed was ineffective, and declined to do anything to attempt to improve

[plaintiff's] situation besides re-submitting MRI request forms.... Had the doctors followed up on numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that [plaintiff] experienced for more than a year could have been averted."). Thus, there are factual disputes that prevent summary judgment on defendants' subjective intent.

In sum, on this record, drawing all reasonable inferences from the facts in favor of plaintiff, a rational jury could find that defendants acted with deliberate indifference to plaintiff's shoulder pain. Accordingly, defendants' motion for summary judgment on this claim is denied.

**\*365** C. Individual Defendants

Defendants also move for summary judgment specifically with respect to plaintiff's claims against three of the individual defendants: Sheriff Edward Reilly (hereinafter "Reilly"), Edwards, and Okonta. For the reasons set forth below, the Court grants defendants' motion with respect to Reilly, and denies it with respect to Edwards and Okonta.

1. Legal Standard

[20] "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citation and quotation marks omitted). In other words, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Id.* Supervisor liability can be shown in one or more of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Id.* at 145 (citation omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### 2. Application

[21] Although plaintiff alleges in the complaint that Reilly was aware of plaintiff's condition and failed to assist,[FN20] there is no mention whatsoever of Reilly in plaintiff's deposition or in any of the parties' evidentiary submissions. Because there is no evidence in the record that Reilly was personally involved in any of the alleged constitutional violations or that there was a custom or policy of allowing such constitutional violations (and that Reilly allowed such custom or policy to continue), no rational jury could find Reilly liable for any of plaintiff's deliberate indifference claims. *See Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim."); *see also Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438-39 (E.D.N.Y.2009) ("[T]he plaintiff cannot establish that Sheriff Reilly was grossly negligent in failing to supervise subordinates because the medical care of inmates at the NCCC was delegated to the Nassau Health Care Corporation and plaintiff provides no evidence that Reilly was otherwise personally involved in his treatment."). Therefore, defendants' motion for summary judgment with respect to plaintiff's claims against Sheriff Reilly is granted.

> FN20. Plaintiff actually refers in the complaint to "Sheriff Edwards," but the Court determines, liberally construing the complaint, that this allegation refers to Sheriff Reilly.

[22] With respect to plaintiff's claims against Edwards and Okonta, however, there are disputed issues of fact that preclude summary judgment. Defendants argue that Edwards was not personally involved in the alleged constitutional violations because she did not treat plaintiff and merely responded to his grievance request. (Defs.' Br. at 24-25.) However, plaintiff testified that, although Edwards never physically treated him, she "takes care of appointments and makes sure you get to certain specialists" and that "she was in a position to make sure that I get the adequate care that I needed." (Price Dep. at 61-62.) Plaintiff also testified that he submitted a grievance request to *366 Edwards in order to be tested for the kidney transplant list, but that Edwards failed to get him on the list. (Price Dep. at 62-63.) Drawing all reasonable inferences in favor of plaintiff, a rational jury could find that Edwards was personally involved in the alleged constitutional violations because she was in a position to get plaintiff tested for the kidney transplant list and failed to do so. *See McKenna v. Wright,* 386 F.3d 432, 437-38 (2d Cir.2004) ("Although it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of, [defendant] was properly retained in the lawsuit at this stage, not simply because he rejected the grievance, but because he is alleged, as Deputy Superintendent for Administration at [the prison], to have been responsible for the prison's medical program." (citation omitted)). Thus, plaintiff has presented sufficient evidence of Edwards's personal involvement in the alleged constitutional violations to raise a genuine issue of material fact as to whether Edwards is liable for the alleged Eighth Amendment violations.

[23][24] Defendants also argue that Okonta was not personally involved in the alleged constitutional violations because he did not actually treat plaintiff. (Defs.' Br. at 24-25.) This argument misses the mark. It is plaintiff's allegation that Okonta violated plaintiff's constitutional rights precisely by not treating him. Plaintiff has presented evidence that he received no response from Okonta regarding his requests to be tested for the kidney transplant list. Where a prison doctor denies medical treatment to an inmate, that doctor is personally involved in the alleged constitutional violation. *See McKenna,* 386 F.3d at 437 (finding "personal involvement" where medical defendants were alleged to have participated in the denial of treatment); *see also Chambers v. Wright,* No. 05 Civ. 9915, 2007 WL 4462181, at *3 (S.D.N.Y. Dec. 19, 2007) ("Prison doctors who have denied medical treatment to an inmate are 'personally involved' for the purposes of jurisdiction under § 1983." (citing *McKenna,* 386 F.3d at 437)). Although defendants argue that they were in fact making efforts to get plaintiff tested (Defs.' Br. at 25), the reasonableness of those efforts, as discussed above, is a factual question inappropriate for resolution on summary judgment.

In sum, defendants' motion for summary judgment on plaintiff's claims against Reilly is granted. Defendants' motion with respect to Edwards and Okonta is denied.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

697 F.Supp.2d 344
(Cite as: 697 F.Supp.2d 344)

### V. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment. Specifically, the Court grants defendants' motion with respect to plaintiff's claim regarding the dosage of his renal disease medication and with respect to all of plaintiff's claims against Sheriff Reilly. Defendants' motion is denied in all other respects. The parties to this action shall participate in a telephone conference on Monday, April 5, 2010 at 3:30 p.m. At that time, counsel for defendants shall initiate the call and, with all parties on the line, contact Chambers at (631) 712-5670.

SO ORDERED.

E.D.N.Y.,2010.
Price v. Reilly
697 F.Supp.2d 344

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Karus LAFAVE, Plaintiff,
v.
CLINTON COUNTY, Defendants.
**No. CIV.9:00CV0744DNHGLS.**

April 3, 2002.

Karus Lafave, Plaintiff, Pro Se, Plattsburgh, for the Plaintiff.

Maynard, O'Connor Law Firm, Albany, Edwin J. Tobin, Jr., Esq., for the Defendants.

REPORT-RECOMMENDATION [FN1]

FN1. This matter was referred to the undersigned for Report-Recommendation by the Hon. David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B) and L.R. 72.3(c).

SHARPE, Magistrate J.

I. INTRODUCTION

*1 Plaintiff, *pro se,* Karus LaFave ("LaFave") originally filed this action in Clinton County Supreme Court. The defendant filed a Notice of Removal because the complaint presented a federal question concerning a violation of LaFave's Eighth Amendment rights (Dkt. No. 1). Currently before the court is the defendant's motion to dismiss made pursuant to Rule 12(b)(6) and in the alternative, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure (Dkt. No. 5). LaFave, in response, is requesting that the court deny the motion, excuse his inability to timely file several motions, and to permit the

matter to be bought before a jury [FN2]. After reviewing LaFave's claims and for the reasons set forth below, the defendant's converted motion for summary judgment should be granted.

FN2. It should be noted that the date for dispositive motions was February 16, 2001. The defendant's motion to dismiss was filed on September 29, 2000. On January 9, 2001, this court converted the defendant's motion to dismiss to a motion for summary judgment, and gave LaFave a month to respond. On April 16, 2001, after three months and four extensions, LaFave finally responded.

II. BACKGROUND

LaFave brings this action under 42 U.S.C. § 1983 claiming that the defendant violated his civil rights under the Eighth Amendment [FN3]. He alleges that the defendant failed to provide adequate medical and dental care causing three different teeth to be extracted.

FN3. LaFave does not specifically state that the defendant violated his Eighth Amendment rights but this conclusion is appropriate after reviewing the complaint.

III. FACTS [FN4]

FN4. While the defendant provided the court with a "statement of material facts not in issue" and LaFave provided the court with "statement of material facts genuine in issue," neither provided the court with the exact nature of the facts.

Between January and July of 1999, LaFave, on several occasions, requested dental treatment because he was experiencing severe pain with three of his teeth. After being seen on several occasions by a Clinton County

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

Correctional Facility ("Clinton") doctor, he was referred to a dentist. Initially, LaFave's mother had made an appointment for him to see a dentist, but he alleges that Nurse LaBarge ("LaBarge") did not permit him to be released to the dentist's office [FN5]. Subsequently, he was seen by Dr. Boule, D.D.S ., on two occasions for dental examinations and tooth extractions.

> FN5. This appears to be in dispute because the medical records show that LaFave at first stated that his mother was going to make arrangements, but later requested that the facility provide a dentist.

### IV. DISCUSSION

A. *Legal Standard*

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc ., 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); accord F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994). The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).* Once this burden is met, it shifts to the opposing party who, through affidavits or otherwise, must show that there is a material factual issue for trial. *Fed.R.Civ.P. 56(e)*; *see Smythe v. American Red Cross Blood Services Northeastern New York Region,* 797 F.Supp. 147, 151 (N.D.N.Y.1992).

Finally, when considering summary judgment motions, *pro se* parties are held to a less stringent standard than attorneys. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972). Any ambiguities and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). With this standard in mind, the court

now turns to the sufficiency of LaFave's claims.

B. *Eighth Amendment Claims*

**\*2** LaFave alleges that his Eighth Amendment rights were violated when the defendant failed to provide adequate medical care for his dental condition. The Eighth Amendment does not mandate comfortable prisons, yet it does not tolerate inhumane prisons either, and the conditions of an inmate's confinement are subject to examination under the Eighth Amendment. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1975, 128 L.Ed.2d 811 (1994). Nevertheless, deprivations suffered by inmates as a result of their incarceration only become reprehensible to the Eighth Amendment when they deny the minimal civilized measure of life's necessities. *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991) (*quoting Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

Moreover, the Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency ..." against which penal measures must be evaluated. See *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). Repugnant to the Amendment are punishments hostile to the standards of decency that " 'mark the progress of a maturing society." ' *Id.* (*quoting Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). Also repugnant to the Amendment, are punishments that involve " 'unnecessary and wanton inflictions of pain." ' *Id. at 103,97 S.Ct. at 290* (*quoting Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976)).

In light of these elementary principles, a state has a constitutional obligation to provide inmates adequate medical care. See *West v. Atkins,* 487 U.S. 42, 54, 108 S.Ct. 2250, 2258, 101 L.Ed.2d 40 (1988). By virtue of their incarceration, inmates are utterly dependant upon prison authorities to treat their medical ills and are wholly powerless to help themselves if the state languishes in its obligation. *See Estelle,* 429 U.S. at 103, 97 S.Ct. at 290. The essence of an improper medical treatment claim lies in proof of "deliberate indifference to serious medical

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

needs." *Id.* at 104, 97 S.Ct. at 291. Deliberate indifference may be manifested by a prison doctor's response to an inmate's needs. *Id.* It may also be shown by a corrections officer denying or delaying an inmate's access to medical care or by intentionally interfering with an inmate's treatment. *Id.* at 104-105, 97 S.Ct. at 291.

The standard of deliberate indifference includes both subjective and objective components. The objective component requires the alleged deprivation to be sufficiently serious, while the subjective component requires the defendant to act with a sufficiently culpable state of mind. See *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A prison official acts with deliberate indifference when he " 'knows of and disregards an excessive risk to inmate health or safety.' " *Id.* (*quoting Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979). However, " 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.*

**\*3** However, an Eighth Amendment claim may be dismissed if there is no evidence that a defendant acted with deliberate indifference to a serious medical need. An inmate does not have a right to the treatment of his choice. See *Murphy v. Grabo,* 1998 WL 166840, at \*4 (N.D.N.Y. April 9, 1998) (*citation omitted* ). Also, mere disagreement with the prescribed course of treatment does not always rise to the level of a constitutional claim. See *Chance,* 143 F.3d at 703. Moreover, prison officials have broad discretion to determine the nature and character of medical treatment which is provided to inmates. See *Murphy,* 1998 WL 166840, at \*4 (*citation omitted* ).

While there is no exact definition of a "serious medical condition" in this circuit, the Second Circuit has indicated what injuries and medical conditions are serious enough to implicate the Eighth Amendment. See *Chance,* 143 F.3d at 702-703. In *Chance,* the Second Circuit held that an inmate complaining of a dental condition stated a serious medical need by showing that he suffered from great pain for six months. The inmate was also unable to chew food and lost several teeth. The Circuit also recognized that dental conditions, along with medical conditions, can vary in severity and may not all be severe. *Id.* at 702. The court acknowledged that while some injuries are not serious enough to violate a constitutional right, other very similar

injuries can violate a constitutional right under different factual circumstances. *Id.*

The Second Circuit provided some of the factors to be considered when determining if a serious medical condition exists. *Id.* at 702-703. The court stated that " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain' ' are highly relevant. *Id.* at 702-703 (*citation omitted* ). Moreover, when seeking to impose liability on a municipality, as LaFave does in this case, he must show that a municipal "policy" or "custom caused the deprivation." *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999).

In this case, the defendant maintains that the medical staff was not deliberately indifferent to his serious medical needs. As a basis for their assertion, they provide LaFave's medical records and an affidavit from Dr. Viqar Qudsi [FN6], M.D, who treated LaFave while he was incarcerated at Clinton. The medical records show that he was repeatedly seen, and prescribed medication for his pain. In addition, the record shows that on various occasions, LaFave refused medication because "he was too lazy" to get out of bed when the nurse with the medication came to his cell (*Def. ['s] Ex. A, P. 4*) .

    FN6. Dr. Qudsi is not a party to this action.

According to the documents provided, Dr. Qudsi, examined LaFave on January 13, 1999, after LaFave reported to LaBarge that he had a headache and discomfort in his bottom left molar (*Qudsi Aff., P. 2*). Dr. Qudsi noted that a cavity was present in his left lower molar. *Id.* He prescribed Tylenol as needed for the pain and 500 milligrams ("mg") of erythromycin twice daily to prevent bacteria and infection. *Id.* On January 18, 19, and 20, 1999, the medical records show that LaFave refused his erythromycin medication (*Def. ['s] Ex. B, P. 1).*

**\*4** Between January 20, and April 12, 1999, LaFave made no complaints concerning his alleged mouth pain. On

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

April 12, 1999, LaFave was examined by LaBarge due to a complaint of pain in his lower left molar (*Def. ['s] Ex. A, P. 4* ). Dr. Qudsi examined him again on April 14, 1999. *Id.* He noted a cavity with pulp decay and slight swelling with no discharge. *Id.* He noted an abscess in his left lower molar and again prescribed 500 mg erythromycin tablets twice daily and 600 mg of Motrin three times daily for ten days with instructions to see the dentist. *Id.* On the same day, LaBarge made an appointment for LaFave to see an outside dentist that provides dental service to facility inmates, Dr. Boule *(Qudsi Aff., P. 3).*

On May 3, 1999, LaBarge was informed by LaFave that his mother would be making a dental appointment with their own dentist and that the family would pay for the treatment (*Def. ['s] Ex. A, P. 4* ). On that same day, Superintendent Major Smith authorized an outside dental visit. *Id.* On May 12, 1999, he was seen by LaBarge for an unrelated injury and he complained about his lower left molar (*Def .['s] Ex. A, P. 5* ). At that time, LaFave requested that LaBarge schedule a new appointment with Dr. Boule because the family had changed their mind about paying an outside dentist. *Id.* LaBarge noted that he was eating candy and informed him of the deleterious effects of candy on his dental condition. *Id.* Thereafter, LaBarge scheduled him for the next available date which was June 24, 1999, at noon. *Id.*

On June 2, 1999, LaFave again requested sick call complaining for the first time about tooth pain in his upper right molar and his other lower left molar (*Def. ['s] Ex. A, P. 6* ). He claimed that both molars caused him discomfort and bothered him most at night. *Id.* LaFave confirmed that he had received treatment from Dr. Boule for his first lower left molar one week before. *Id.* The area of his prior extraction was clean and dry. *Id.* There was no abscess, infection, swelling, drainage or foul odor noted. *Id.* LaBarge recommended Tylenol as needed for any further tooth discomfort. *Id.*

On June 21, 1999, LaFave again requested a sick call and was seen by LaBarge (*Def. ['s] Ex. A, P. 6* ). No swelling, drainage or infection was observed. *Id.* However, LaBarge noted cavities in LaFave's lower left molar and right lower molars. *Id.* LaBarge made arrangements for Dr. Qudsi to further assess LaFave. *Id.* On June 23, 1999, Dr. Qudsi examined his right lower molar and noted cavitation with

decay in that area (*Def. ['s] Ex. A, P. 7* ). In addition, he noted that LaFave had a cavity in his second left lower molar. *Id.* He prescribed 500 mg of erythromycin twice daily for 10 days and 600 mg of Motrin three times daily for 10 days, with instructions to see a dentist. *Id.*

On June 30, 1999, Officer Carroll reported that LaFave was again non-compliant with his medication regimen as he refused to get up to receive his medication (*Def. ['s] Ex. A, P. 8* ). On July 7, 1999, he again requested sick call complaining of a toothache in his lower right molar (*Def. ['s] Ex. A, P. 9* ). Again, LaFave was non-compliant as he had only taken his erythromycin for five days instead of the ten days prescribed. *Id.* During the examination, Dr. Qudsi informed LaFave that extraction of these teeth could be necessary if he did not respond to conservative treatment. *Id.* At that time, LaFave informed Dr. Qudsi that he was going to be transferred to another facility. *Id.* Dr. Qudsi advised LaFave to follow-up with a dentist when he arrived at the new facility. *Id.* Dr. Qudsi prescribed 500 mg Naproxin twice daily for thirty days with instructions to follow-up with him in two weeks if the pain increased. *Id.* The following day, LaFave requested sick call complaining to LaBarge that he had taken one dose of Naproxin and it was not relieving the pain. *Id.* He was advised that he needed to take more than one dose to allow the Naproxin to take effect. *Id.*

**\*5** On July 17, 1999, LaFave was again seen by Dr. Qudsi and he indicated that he did not believe he was benefitting from the prescribed course of conservative treatment with medication (*Def. ['s] Ex. A, P. 10* ). Subsequently, LaBarge made a dental appointment for him on July 23 [FN7], 1999, at 3:15 p.m. *Id.* On July 23, 1999, a second extraction was conducted. *Id.* On July 28, 1999, he was again seen by Dr. Qudsi, for an ulceration at the left angle of his mouth for which he prescribed bacitracin ointment. *Id.* At this time, LaFave continued to complain of tooth pain so he was prescribed 600 mg of Motrin three times daily. *Id.*

FN7. The medical records contain an error on the July 17, 1999, note which indicted that an appointment was set for June 23, 1999, however, it should have been recorded as July 23, 1999.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)
(Cite as: 2002 WL 31309244 (N.D.N.Y.))

On August 4, 1999, he was seen for feeling a sharp piece of bone residing in the area of his lower left molar (*Def. ['s] Ex. A, P. 11* ). Dr. Qudsi recommended observation and to follow-up with dental care if his condition continued. *Id.* The defendant maintains that given all of the documentation that he was seen when he requested to be seen and prescribed numerous medications, the medical staff was not deliberately indifferent to his serious medical needs. The defendant contends that at all times, professional and contentious dental and medical treatment were provided in regards to his various complaints.

In his response, LaFave disagrees alleging that the county had a custom or policy not to provide medical treatment to prisoners. However, LaFave does not allege in his complaint that the county had a "custom or policy" which deprived him of a right to adequate medical or dental care. In his response to the motion for summary judgment, for the first time, LaFave alleges that the county had a policy which deprived him of his rights. He maintains that his continued complaints of pain were ignored and although he was prescribed medication, it simply did not relieve his severe pain.

This court finds that the defendant was not deliberately indifferent to his serious dental and medical needs. Moreover, even if this court construed his complaint to state a viable claim against the county, LaFave has failed to show that the county provided inadequate medical and dental treatment. As previously stated, an inmate does not have the right to the treatment of his choice. The record shows that he was seen numerous times, and referred to a dentist on two occasions over a six month period. While LaFave argues that the dental appointments were untimely, the record shows that the initial delay occurred because he claimed that his mother was going to make the appointment but later changed her mind. In addition, the record demonstrates that he did not adhere to the prescribed medication regime. On various occasions, LaFave failed to get out of bed to obtain his medication in order to prevent infection in his mouth. Although it is apparent that LaFave disagreed with the treatment provided by Clinton, the record does not show that the defendant was deliberately indifferent to his serious medical needs. Accordingly, this court recommends that the defendant's motion for summary judgment should be granted.

**\*6** WHEREFORE, for the foregoing reasons, it is hereby

RECOMMENDED, that the defendant's motion for summary judgment (Dkt. No. 5) be GRANTED in favor of the defendant in all respects; and it is further

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation upon the parties by regular mail.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2002.
Lafave v. Clinton County
Not Reported in F.Supp.2d, 2002 WL 31309244 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
Anthony ROSS, 94–A–6742, Plaintiff,
v.
Michael MCGINNIS, Superintendent; Dr. Shah, M.D.;
John V. Hagn, RN; Paul Daugherty, NP; Victor Herbert,
Superintendent; Robert Takos, MD; Stephen Laskowski,
MD; B. Higley, RN; C. Yohe, RN; Susan Nolder, RN;
and Sherley Stewart, RN Defendants.
No. 00–CV–0275E(SR).

March 29, 2004.
Anthony Ross, Comstock, NY, pro se.

Michael A. Siragusa, New York State Attorney General's
Office, Buffalo, NY, for Defendants.

*DECISION AND ORDER*

SCHROEDER, Magistrate J.

  **\*1** Pursuant to 28 U.S.C. § 636(c), the parties have
consented to the assignment of this case to the undersigned
to conduct all proceedings in this case, including the entry
of final judgment. Dkt. # 29.

  Plaintiff's third amended *pro se* complaint, pursuant
to 42 U.S.C. § 1983, alleges that defendants denied him
adequate medical treatment during his incarceration at
Southport Correctional Facility ("Southport"), and Attica
Correctional Facility ("Attica"), in violation of his
constitutional rights under the Eighth and Fourteenth
Amendments to the United States Constitution. Dkt. # 83.
Specifically, plaintiff claims that officials at these facilities
were deliberately indifferent to his complaints of
abdominal pain, vomiting, heartburn, constipation, body
odor, and extreme body heat. Dkt. # 83.

  Currently before me is plaintiff's motion to compel
production of documents (Dkt.# 92), and defendants'
motion for summary judgment. Dkt. # 103. For the

following reasons, plaintiff's motion is denied and
defendants' motion is granted.

*BACKGROUND*

  Upon plaintiff's transfer to Southport on August 24,
1998, plaintiff indicated no chronic medical problems or
current medical complaints. Dkt. # 114, Exh. A.

  On October 10, 1998, Registered Nurse John
VonHagn ("RN VonHagn"), examined plaintiff for
complaints of stomach upset, bubbling and gas. Dkt. #
106, ¶ 9. RN VonHagn dispensed one bottle of Maalox to
plaintiff. Dkt. # 106, ¶ 9. Plaintiff was given another bottle
of Maalox on October 14, 1998. Dkt. # 106, ¶ 10. When
plaintiff requested a third bottle of Maalox on October 16,
1998, RN VonHagn instead gave plaintiff Alamay, a
heartburn medication. Dkt. # 106, ¶ 11. Plaintiff was
prescribed Zantac on October 18, 1998. Dkt. # 107, ¶ 8.

  On November 3, 1998, RN VonHagn ordered
Simethecone for plaintiff after he complained of gas and
belching after eating and indicated concern that he had an
infection in his stomach. Dkt. # 106, ¶ 14.

  On November 17, 1998, plaintiff informed RN
VonHagn that he was not experiencing any relief from the
medication prescribed and complained that his body was
hot and that he thought he had an infection in his stomach.
Dkt. # 106, ¶ 15. RN VonHagn scheduled an appointment
for plaintiff with NP Dougherty. Dkt. # 106, ¶ 15.

  On November 20, 1998, NP Dougherty examined
plaintiff for complaints of gastric distress and prescribed
a blood test to rule our Heliobactor Pylori. Dkt. # 107, ¶
6. NP Dougherty avers that the results were negative. Dkt.
# 107, ¶ 6. Because plaintiff's gastric acidity was higher
than normal, plaintiff was "continued on Zantac, which is
used to treat acid reflux, and which is the medication of
choice for hyperacidity." Dkt. # 107, ¶ 6.

  Plaintiff was transferred to Attica on or about
December 13, 1998.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

On December 14, 1998, plaintiff complained to Registered Nurse Barbara Higley ("RN Higley"), that he was experiencing increased burping and gas and that the Zantac was not helping his stomach problems. Dkt. # 109, ¶ 6. RN Higley placed plaintiff on the weekend sick-call list as he requested. Dkt. # 109, ¶ 6.

**\*2** On December 17, 1998, while distributing medications, plaintiff complained of abdominal discomfort to Registered Nurse Stewart ("RN Stewart"), but refused his Zantac until he saw the doctor. Dkt. # 108, ¶ 6. RN Stewart placed the plaintiff on the "Physician's Assistant call-out" list. Dkt. # 108, ¶ 6. Plaintiff again refused to take his Zantac on December 22, 1998, stating that it was not working. Dkt. # 108, ¶ 8.

On December 23, 1998, plaintiff continued to complain of stomach problems to RN Higley, but refused to take his Zantac. Dkt. # 109, ¶ 7. RN Higley again placed plaintiff on the weekend sick-call list. Dkt. # 109, ¶ 7. Plaintiff again refused his Zantac on December 27, 1998. Dkt. # 114, ¶ 6.

At plaintiff's request, Dr. Laskowski discontinued the Zantac prescription on December 27, 1998. Dkt. # 114, ¶ 7. However, the Zantac prescription was renewed by Dr. Laskowski and provided to plaintiff during the evening of December 29, 1998 after plaintiff requested Zantac during sick-call that morning. Dkt. # 114, ¶ 8. RN Higley noticed no change in plaintiff's weight on that date. Dkt. # 109, ¶ 8.

Dr. Laskowski examined plaintiff for complaints of epigastric distress on January 1, 1999. Dkt. # 109, ¶ 8. Plaintiff reported that Zantac was partially helpful. Dkt. # 114, ¶ 9. Dr. Laskowski prescribed blood work for plaintiff. Dkt. # 114, ¶ 9.

On January 3, 1999, plaintiff complained of a stomach ache to RN Stewart, who provided him with Amalay. Dkt. # 108, ¶ 9.

On January 17, 1999, Dr. Laskowski received the results of plaintiff's blood work, which was positive for H–Pylori, a bacteria which causes gastritis. Dkt. # 114, ¶ 12. Plaintiff's H–Pylori reference range was 32. Dr.

Laskowski prescribed antibiotics and anti-acids to treat this condition. Dkt. # 114, ¶ 12.

On January 25, 1999, plaintiff refused his monthly weight check by RN Higley. Dkt. # 109, ¶ 9.

On February 8, 1999, plaintiff asked to have x-rays taken of his abdomen. Dkt. # 109, ¶ 10. RN Higley placed plaintiff on the weekend call-out list. Dkt. # 109, ¶ 10.

On February 13, 1999, plaintiff reported substantial improvement in his symptoms following treatment for H–Pylori. Dkt. # 114, ¶ 13. Dr. Laskowski planned to "continue a full course of H2 blockers after the antibiotoc thearpy is completed." Dkt. # 114, ¶ 13.

On February 27, 1999, plaintiff complained of abdominal problems to RN Higley and was placed on the weekend call-out list. Dkt. # 109, ¶ 11. On February 28, 1999, Dr. Laskowski examined plaintiff and diagnosed him with residual gastritis and possible urinary tract infection. Dkt. # 114, ¶ 14. Dr. Laskowski ordered a urine test and prescribed Avid for plaintiff. Dkt. # 114, ¶ 14.

On March 4, 1999, plaintiff informed Dr. Laskowski that he continued to experience gastric burning and pain despite the prescription of Avid. Dkt. # 114, ¶ 15. Dr. Laskowski prescribed Prilosec and determined that he would request a gastric consult if the symptoms continued. Dkt. # 114, ¶ 16.

**\*3** On March 5, 1999, plaintiff complained of abdominal pain and informed RN Higley that the antibiotics were not helping. Dkt. # 109, ¶ 12. RN Higley placed plaintiff on the weekend sick-call list. Dkt. # 109, ¶ 12.

On March 7, 1999, Dr. Laskowski encouraged plaintiff to continue taking Prilosec despite his report of no improvement, as Dr. Lakowski felt that plaintiff had not been taking the medication for a sufficient period of time to be able to assess its efficacy. Dkt. # 114, ¶ 17.

On April 8, 1999, Dr. Laskowski referred plaintiff to a GI specialist for an upper endoscopy after plaintiff reported that the Prilosec and anti-acids were not relieving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

his symptoms. Dkt. # 114, ¶ 19.

On April 29, 1999, Dr. Laskowski advised plaintiff to discontinue Prilosec and wait the results of the GI consult. Dkt. # 114, ¶ 21.

Plaintiff was examined by Dr. Chaudhry, a Gastroenterologist, on April 30, 1999. Dkt. # 114, ¶ 22. Dr. Chaudhry observed no acute distress and diagnosed plaintiff with chronic dyspepsia. Dkt. # 114, ¶ 22. Dr. Chaudhry recommended an upper endoscopy and ordered blood work to test whether the H–Pylori had cleared up. Dkt. # 114, ¶ 22. Dr. Takos ordered a complete blood work-up for plaintiff on May 27, 1999. Dkt. # 114, ¶ 24.

On May 29, 1999, plaintiff requested anti-acid tablets to relieve his complaints of stomach pain which was creating "heat that comes up to my head." Dkt. # 112, ¶ 6. Registered Nurse Cathie Yohe Turton ("RN Turton"), noted that plaintiff was scheduled to meet with Dr. Takos and provided plaintiff with the anti-acid tablets he requested. Dkt. # 112, ¶ 6.

On June 2, 1999, plaintiff was examined by Dr. Takos, who ordered lab work to rule out ulcers. Dkt. # 111, ¶ 6. The lab work reported a H–Pylori level of 15, which is an equivocal range. Dkt. # 114, Exh. A, p. 76. Plaintiff also received an x-ray of his abdomen, which revealed "a normal gas pattern." Dkt. # 114, Exh. A, p. 84.

On June 7, 1999, plaintiff complained that he smelled, but Dr. Takos "was unable to appreciate any odor or smell about the patient while in the examination room." Dkt. # 111, ¶ 6.

On June 11, 1999, plaintiff again complained of gas to RN Turton, but refused her recommendation of Simethecone. Dkt. # 112, ¶ 6. RN Turton provided plaintiff with the medication plaintiff requested. Dkt. # 112, ¶ 6.

On June 18, 1999, Dr. Laskowski examined plaintiff and reassured him that no additional treatment was necessary at that time. Dkt. # 114, ¶ 28.

On June 29, 1999, plaintiff requested Simthecone but

complained that he was still experiencing gas even with this medication. Dkt. # 112, ¶ 6. RN Turton noted that plaintiff was scheduled for medical call-out with Dr. Takos the next day, so she advised him to wait until his appointment before taking any additional medication. Dkt. # 112, ¶ 6. RN Turton reviewed plaintiff's medical records, including his complaints of "bad odor" "made by my body" which "comes out of my head," and, unable to detect any odor when plaintiff was in her presence, referred plaintiff for a mental health evaluation. Dkt. # 112, ¶ 6.

**\*4** On June 30, 1999, Dr. Takos found no masses or tenderness upon examination of plaintiff's abdomen. Dkt. # 111, ¶ 9. Dr. Takos continued plaintiff's prescription for Simethecone for gas relief. Dkt. # 111, ¶ 9.

On July 10, 1999, plaintiff again complained to RN Turton that "there is something eating me up inside," that he was experiencing "constant bubbling" from his groin up to his head, and that there was a bad odor coming from his body. Dkt. # 112, ¶ 10. RN Turton could not detect any odor and advised plaintiff to continue taking Simthecone pending his GI referral. Dkt. # 112, ¶ 10.

On July 12, 1999, plaintiff complained to RN Turton that his head was sore under the skin and that he had vomited the day before. Dkt. # 112, ¶ 11. RN Turton determined that plaintiff was in no acute distress and noted that he was scheduled for the GI Clinic and a doctor call-out. Dkt. # 112, ¶ 11.

On July 15, 1999, plaintiff was examined by Dr. Laskowski for complaints of urinary problems which were treated with a urine test and antibiotic. Dkt. # 114, ¶ 33.

On July 21, 1999, plaintiff complained of stomach pain and soreness between his toes. Dkt. # 112, ¶ 12. RN Turton noted that plaintiff had already been prescribed medication to take for relief of his gastritis and provided plaintiff with antifungal powder for his feet. Dkt. # 112, ¶ 12.

On July 23, 1999, Registered Nurse Susan Nolder ("RN Nolder"), provided plaintiff with Maalox in response to his complaints of GI upset. Dkt. # 113, ¶ 6. On

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

July 26, 1999, plaintiff complained of stomach problems and body odor, but refused RN Nolder's offer of Simthecone. Dkt. # 113, ¶ 7.

On August 9, 1999, plaintiff complained that he was vomiting and could not keep food down. Dkt. # 113, ¶ 9. RN Nolder weighed plaintiff and determined that there had been no significant change in plaintiff's weight and noted that plaintiff was scheduled to be seen for a GI consult that month. Dkt. # 113, ¶ 9.

August 20, 1999, Dr. Chaudhry examined plaintiff in follow-up for his diagnosis of chronic dyspepsia. Dkt. # 114, Exh. A, p. 93. Dr. Chaudhry noted that plaintiff had previously cancelled an upper endoscopy because he didn't want to be sedated, but was experiencing increasingly worse symptoms. Dkt. # 114, Exh. A, p. 93. Accordingly, Dr. Chaudhry recommended that the upper endoscopy under IV sedation be rescheduled. Dkt. # 114, Exh. A, p. 93.

On August 29, 1999, RN Turton examined plaintiff with respect to stomach complaints, determined he was not in acute distress, noted he was scheduled for an endoscopy, and provided him with Maalox. Dkt. # 112, ¶ 13.

On August 31, 1999, plaintiff was seen by Dr. DePerio with complaints of a stomach virus. Dkt. # 114, ¶ 39. Plaintiff requested to be seen by Dr. Laskowski instead. Dkt. # 114, ¶ 39. Dr. Laskowski examined plaintiff and noted that an upper endoscopy was being rescheduled. Dkt. # 114, ¶ 40.

**\*5** Dr. Chaudhry performed an upper endoscopy on plaintiff on September 14, 1999, revealing a "small hiatal hernia" and "mild reflux esophagitis." Dkt. # 114, ¶¶ 41–42. Dr. Chaudhry recommended anti-reflux measures and Prilosec, which was prescribed by Dr. Laskowski. Dkt. # 114, ¶ 42.

On September 23, 1999, RN Nolder scheduled plaintiff to see the physician's assistant to rule out a urinary tract infection in response to plaintiff's complaints of straining and smell with urination and sweat. Dkt. # 113, ¶ 11.

On October 8, 1999, plaintiff complained to RN Turton that Prilosec was not helping his symptoms and was given additional medication as requested. Dkt. # 112, ¶ 14. On October 14, 1999, RN Nolder renewed plaintiff's prescription for Prilosec. Dkt. # 113, ¶ 12. Plaintiff complained that Prilosec was ineffective and claimed that his armpit smelled like feces, causing RN Nolder to schedule plaintiff for a call-out with Dr. Laskowski. Dkt. # 113, ¶ 12.

On October 20, 1999, plaintiff complained of pains in his chest and gas "running all around the body." Dkt. # 113, ¶ 12. RN Nolder took plaintiff's blood pressure, which was normal, noted that he was scheduled to see Dr. Laskowski, and provided him with Simethecone. Dkt. # 113, ¶ 13.

On October 27, 1999, plaintiff complained of "shitty smelling armpits." Dkt. # 113, ¶ 14. RN Nolder noted no odor and advised plaintiff to speak to Dr. Laskowski about his concerns. Dkt. # 113, ¶ 14.

On November 5, 1999, plaintiff complained of pain in his armpit, which moved down into his lower chest and abdomen, and of strained bowel movements. Dkt. # 113, ¶ 15. RN Nolder provided plaintiff with fiber. Dkt. # 113, ¶ 15.

On November 30, 1999, Dr. Laskowski referred plaintiff back to Dr. Chaudhry in response to plaintiff's complaints that the Prilosec was not helping and that he had body odor. Dkt. # 114, ¶ 46.

On December 13, 1999, plaintiff requested Maalox and Advil. Dkt. # 113, ¶ 16. RN Nolder provided him with Maalox, but substituted Tylenol for Advil because of plaintiff's history of GI distress. Dkt. # 113, ¶ 16.

Dr. Chaudhry examined plaintiff on December 17, 1999 and noted no weight loss and no acute distress. Dkt. # 114, ¶ 47. Dr. Chaudhry recommended a barium enema and upper GI to rule out irritable bowel syndrome. Dkt. # 114, ¶ 47. If the findings were normal, Dr. Chaudhry recommended treatment with a mild-antidepressant. Dkt. # 114, ¶ 47. Dr, Chaudhry also recommended indefinite

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

continuation of Prilosec or Prevacid for the hiatal hernia and reflux. Dkt. # 114, ¶ 47.

Plaintiff continued to complain of stomach problems on January 3, 2000 and was seen by Dr. Laskowski in response to those complaints on January 6, 2000. Dkt. # 113, ¶ 17.

The upper Gl series was completed on January 19, 2000, revealing normal esophagus, stomach, duodenum and bowel motility. Dkt. # 114, ¶ 49.

On February 10, 2000, RN Nolder provided plaintiff with a stool softener as requested. Dkt. # 113, ¶ 17.

**\*6** Plaintiff again requested Advil on February 18, 2000, but was provided with Tylenol by RN Nolder because of the contraindication of Advil for individuals with gastric issues. Dkt. # 113, ¶ 19.

Dr. Laskowski prescribed Prozac for plaintiff, but was informed that this medication could only be ordered by a psychiatrist. Dkt. # 114, ¶ 51. After consultation with psychiatry, plaintiff was prescribed Elavil, "a similar medication used for Gl pathology." Dkt. # 114, ¶ 51. "After a lengthy discussion with the plaintiff regarding the use of Elavil, and the rational for the treatment, the plaintiff refused the same." Dkt. # 114, ¶ 51. Plaintiff states that he refused the Elavil because of fears that Dr. Laskowski "was experimenting on him" and because "he has no mental problem and ... won't take any mental health medication for stomach pain." Dkt. # 118, ¶¶ 68–69.

Plaintiff was transferred to Shawangunk Correctional Facility on April 6, 2000. Dkt. # 118, ¶ 74.

In support of this motion for summary judgment, Dr. Laskowski and Dr. Takos opine that

The plaintiff, at all times, was given appropriate and proper treatment, outside diagnostic consults (i.e., Gl specialist), numerous blood tests, numerous x-rays, including EGD's, an upper Gl and a barium enema. Plaintiff was eventually diagnosed as having a hiatal hernia and mild reflux esophagitis. The treatment he had been receiving all along was the same treatment

recommended by the Gl specialist. All recommendations given by the Gl specialist were followed by the medical staff at [Attica]. The plaintiff was diagnosed and treated appropriately, however, he often was noncompliant with medication protocol which would help his condition. The plaintiff was either unable or unwilling to understand that this is a chronic condition that will have to [be] dealt with on a symptomatic basis through diet, medication and lifestyle changes.

Dkt. # 111, ¶ 12; Dkt. # 114, ¶ 55.

In opposition to defendants' motion for summary judgment, plaintiff submitted affidavits from two inmates who noticed "a pungent odor" and "smells of feces" coming from plaintiff's body. Dkt. # 119. Plaintiff also submitted a letter from one cell mate complaining that plaintiff "be gasing all the time and he also be smelling like urine everyday, even after he takes a shower" and another cell mate complaining that he was "really in a difficult situation by being in a double bunk cell with someone who has the cell that smell like shit." Dkt. # 118, Exh. A–B.

*ANALYSIS*

Motion to Compel

Plaintiff moves to compel production of the following documents:

(1) Produce the amount of prisoner[s] Dr. Shah ever examined at Southport on or about August of 1998 to [M]ay of 2001.

(2) Any logs, list, or other document reflecting grievance[s] filed by Southport Correctional Facility inmates from August of 1998 to May of 2001.

(3) Produce any and all written statements logged in any logbook[s] concerning Plaintiff's transfer from B–West to C–West behind plexi-glass from on or about January 1, 1999 to January 20, 1999 the day of plaintiff [sic] transfer.

**\*7** (4) Produce any and all documents created by any Attica staff member concerning plaintiff's transfer from

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

B–West to C–West behind plexi-glass without a misbehavior report from on or about January 1, 1999 to January 20, 1999.

Dkt. # 94, Exh. 1.

With respect to the first demand, defendants argue that it would be impossible for them to determine the number of inmates Dr. Shah examined during this period without reviewing the medical records of every inmate housed at Attica during that time period and, in any event, this information is not relevant to the question of whether plaintiff was denied adequate medical treatment at Attica. Dkt. # 100, ¶¶ 12–13. Plaintiff responds that this information is "relevant to show a pattern of mistreatment and neglect of how care free Dr. Shah is towards inmates." The Court agrees with defendants that the medical care provided by Dr. Shah to other inmates is irrelevant to a determination of the quality of care afforded plaintiff.

With respect to the second demand, defendants argue that plaintiff's demand is over broad and oppressive inasmuch as it seeks grievances relating to issues other than medical care and, to the extent it seeks grievances with respect to medical care, seeks information of a confidential nature with respect to other inmates. Dkt. # 100, ¶¶ 15–16. Plaintiff argues that this is necessary to establish that inmates are forced to file grievances to get the medical care they need. Dkt. # 93. This request is not relevant to the question of whether plaintiff received adequate medical care at Attica, which is the question before the Court on defendants' motion for summary judgment. Accordingly, plaintiff does not require access to this information prior to consideration of defendants' motion for summary judgment.

Defendants object to the third and fourth requests on the ground that plaintiff's transfer from one cell to a cell with a plexiglass shield has nothing to do with plaintiff's allegations of inadequate medical care. Dkt. # 100, ¶¶ 17–18. Plaintiff alleges that he was placed in a cell with a plexiglass shield because the corrections officers could no longer stand the odor coming from plaintiff's cell. Dkt. # 93. Even if that were true, defendants argue that it would not demonstrate deliberate indifference on the part of defendants. Dkt. # 100, ¶ 18. In any event, defendants note

that they provided plaintiff with copies of the log book entries concerning this transfer. Dkt. # 19. Inasmuch as the Court will credit plaintiff's allegation of body odor for purposes of defendant's motion for summary judgment, there is no need to compel any additional information regarding the reason for plaintiff's transfer prior to deciding the motion for summary judgment. Accordingly, plaintiff's motion to compel discovery is denied.

Motion for Summary Judgment

Defendants argue that plaintiff's allegations fail to rise to the level of a serious medical need or to demonstrate deliberate indifference by any of the defendants. Dkt. # 104.

**\*8** Plaintiff responds that there is a question of fact whether defendants' delay of "approximately two and a half months to begin any diagnostic test on plaintiff" despite his complaints that defendants "continuous offerings of maalox, simethecone and zantac" were not relieving his symptoms, constitutes deliberate indifference to his serious medical needs. Dkt. # 124. Following receipt of the blood test indicating positive H–Pylori in November of 1998, plaintiff argues that defendants concealed the results from plaintiff and "did not treat the infection at all." Dkt. # 124. "In total," plaintiff claims that he "was allowed to suffer for four and a half months and sustain needless pain and organ damage to the pancreas" as a result of the defendants' deliberate indifference. Dkt. # 124. Plaintiff argues that "H–Pylori causes various types of ulcers and, if left untreated, perforations develop in the stomach wall. It is in this manner that the bacteria (as well as stomach acids and other toxins) escape out of the stomach and infiltrate other areas of the body." Dkt. # 124.

*Summary Judgment*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment

must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

**\*9** Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H.Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified

to at trial may not properly be set forth in an affidavit).

_____

*Deliberate Indifference to Serious Medical Needs*

In *Estelle v. Gamble,* the Supreme Court of the United States determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution. 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish such a claim, the prisoner must demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

In assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and the severity and persistence of pain. *See Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Id.*

"When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003), *quoting Chance,* 143 F.3d at 702. Moreover, although an Eighth Amendment violation may be based upon exposure to an unreasonable risk of future harm, "the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith,* 316 F.3d at 188. "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Id.* at 187.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

**\*10** With respect to the defendant's state of mind, it is clear that "a prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Hathway,* 37 F.3d at 66, *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathway,* 37 F.3d at 66, *citing Farmer,* 511 U.S. at 835. Accordingly,

It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation. Moreover, negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim.

*Chance,* 143 F.3d at 703.

At the outset, the Court notes that there is a question of fact as to when the presence of H–Pylori bacteria should have initially been detected. Although NP Dougherty avers that the results of plaintiff's November 20, 1998 blood test were negative, the blood test report indicates a reference range of 68.8, with anything greater than 25 constituting a positive result. Dkt. # 114, Exh. A, p. 126. However, even assuming that plaintiff should have been treated for the presence of H–Pylori bacteria following his blood test on November 20, 1998, the two month delay in providing such treatment until January 17, 1999 may constitute negligence, but it does not rise to the level of a constitutional violation.

Plaintiff's complaints of abdominal pain, vomiting, heartburn, constipation, body odor and extreme body heat did not constitute a serious medical need. Even if they did, defendants were not deliberately indifferent to these complaints. Plaintiff was examined frequently and found to be in no acute distress. He underwent blood tests and was given a variety of medications to relieve his complaints. When these medications failed to provide relief, plaintiff was referred to a gastroenterologist and underwent additional blood tests, x-rays, and a lower and upper endoscopy, a barium enema and upper GI series.

As a result, plaintiff was diagnosed with chronic dyspepsia, a small hiatal hernia, and mild reflux esophagitis. The recommended treatment for these diagnoses was indefinite continuation of Prilosec or Prevacid and a mild antidepressant, which plaintiff refused to take. Nothing in the record before the Court suggests that plaintiff's chronic medical needs rose to the level of a serious medical need or that defendants exhibited deliberate indifference to those chronic medical needs. *See Obispo v. Alves,* 1999 WL 1390248 (W.D.N.Y. Aug.23, 1999); *Demata v. Greifinger,* 1999 WL 47241, at \*3 (S.D.N.Y. Feb.3, 1999); *Felipe v. New York State Dep't of Correctional Servs.,* 1998 WL 178802 (N.D.N.Y. April 10, 1998). Accordingly, defendants' motion for summary judgment is granted.[FN1]

> FN1. In light of this determination, defendants' alternative arguments need not be addressed. *See* Dkt. # 104.

### CONCLUSION

**\*11** For the foregoing reasons, plaintiff's motion to compel production of documents (Dkt.# 92), is DENIED, and defendants' motion for summary judgment (Dkt.# 103), is GRANTED. The Clerk of the Court is directed to enter judgment in favor of defendants.
_____

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

W.D.N.Y.,2004.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 1125177 (W.D.N.Y.)

(Cite as: 2004 WL 1125177 (W.D.N.Y.))

Ross v. McGinnis
Not Reported in F.Supp.2d, 2004 WL 1125177
(W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Richard BLACK, Plaintiff,
v.
Brian FISCHER, Commissioner; Kenneth Perlman, Superintendent, Mid-State Correctional Facility; R. Calidonna, Administrator II, Mid-State Correctional Facility; M.D. Lester Wright, MD, Deputy Commissioner, Defendants.
Civil Action No. 9:08-CV-0232 (FJS/DEP).

July 1, 2010.
Richard Black, Bronx, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Christopher W. Hall, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

*\*1* Plaintiff Richard Black, a former New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 claiming deprivation of his civil rights. Alleging claims under the Eighth Amendment, plaintiff's complaint asserts that the food he was served at the facility in which he was housed at the relevant times, as well as the medical treatment he received there for a hemorrhoid, subjected him to cruel and unusual punishment. As relief, plaintiff seeks to recover compensatory and punitive damages.

Currently pending before the court is defendants' motion for summary judgment dismissing plaintiff's complaint in its entirety, in part based upon plaintiff's failure to exhaust his administrative remedies, and

substantively in light of the fact that he cannot prove that his Eighth Amendment rights were abridged. Having carefully considered the record now before the court in light of the defendants' motion and the plaintiff's arguments in opposition, I find that defendants have established that no reasonable fact finder could conclude plaintiff's Eighth Amendment rights were violated, and therefore recommend that their motion be granted.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

Plaintiff is a former prison inmate who at all times relevant to the complaint was entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 26). From on or about March 14 until July 3, 2007, plaintiff was confined to the Mid-State Correctional Facility ("Mid-State"), located in Marcy, New York. Defendants' Rule 7.1(a)(3) Statement of Material Facts (Dkt. No. 37-1) ¶ 3.

While at Mid-State the plaintiff became constipated and, on or about April 6, 2007, observed a hemorrhoid "hanging down" and noticed bleeding. Plaintiff's Deposition Transcript ("Tr.") (Dkt. No. 37-3) 34, 36-37. Plaintiff is a "very sensitive eater", and attributes his condition to the cold, overcooked, unhealthy, and sometimes spoiled food served to him while at Mid-State, although no medical person employed at the facility has ever told him that the hemorrhoid was caused by his diet. In fact, to the contrary, he was advised by a nurse at the facility that hemorrhoids are caused by straining or inappropriate sitting. *Id.* at 32-33, 60. At the time he began complaining of his hemorrhoid, plaintiff was housed in a

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

special housing unit ("SHU") [FN2] and was confined to his cell for twenty-three hours each day; while confined to SHU, Black was taking what he described as "mental medication", each dose consisting of 300 milligrams of Seroquel, and was visited twice daily by a nurse who administered the medication.[FN3] *Id.* at 37-38, 44, 58.

> FN2. Prisoners may be placed in SHU for a variety of reasons, including for disciplinary purposes. *Lee v. Coughlin,* 26 F.Supp.2d 615, 618 (S.D.N.Y.1998) (quoting, *inter alia,* 7 N.Y.C.R .R. § 301.6); 7 N.Y.C.R.R. § 301.7. Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one of hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

> FN3. Seroquel is the trade name for a preparation of quetiapine fumarate, a dibenzothiazepine derivative that is an antagonist to multiple neurotransmitter receptors in the brain and is used as an antipsychotic in the treatment of schizophrenia and other psychotic disorders. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1591, 1723 (31st ed.2007). Plaintiff testified that the medication put him to sleep, helped him get through the day, made him hungry, and gave him dry mouth. Tr. 38-39, 558-59.

On April 7, 2007, the day after he first noticed the hemorrhoid, plaintiff discussed his condition with a nurse, who advised that it was not serious and that if he wanted to see a doctor, it would take two or three weeks to be seen. Tr. 56. The nurse instructed Black to drink water and provided him with a stool softener, Pepto Bismol, and Preparation H-an over-the-counter medication that reduces the swelling, inflammation, and discomfort associated with hemorrhoids-and advised the plaintiff to apply the ointment with his finger. Tr. 44, 56-57; Felker Aff. (Dkt. No. 37-2) ¶¶ 15-17. Following the nurse's instructions, plaintiff applied the Preparation H to his rectum area approximately eight times daily. Tr. 45. Plaintiff described the pain he experienced from the hemorrhoid as "harsh ... like a tingling sensation." *Id.*

**\*2** On April 8, 2007, as a result of his continued complaints, plaintiff was given another three-day supply of Preparation H. Felker Aff. (Dkt. No. 37-2) ¶ 18. Approximately a week and a half after first reporting the hemorrhoid to a nurse, Black was visited by a doctor who told plaintiff that his condition was not life threatening and should resolve itself within a week or two. Tr. 46-47. According to plaintiff, the hemorrhoid continued to bleed, which he reported to the nurse, and having discovered that there is an "instrument" to apply the ointment, he requested that he be provided that tool. *Id.* at 47-48. The nurse responded that she was not permitted to dispense the applicator for security reasons. *Id.* Plaintiff understood that in denying plaintiff the applicator for applying the Preparation H the nurses were not being malicious, but instead simply following prison policy. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 28; Tr. 53. In response to his complaints of blood loss, the nurses monitored Black's blood pressure, as well as whether he was dehydrated, and questioned him regarding the amount of water that he was drinking. Plaintiff claims that the water at the facility contained excessive chemicals, and that as a result he could not drink much water because after ingesting eight cups he would experience a headache. Tr. 33; Plaintiff's Decl. (Dkt. No. 38-2) ¶ 13.

While in SHU confinement at Mid-State plaintiff experienced headaches, heavy gas, and stomach cramps, causing him to stop eating, lose about six pounds, and become weak and "distressful"; he also alleges that he was unable to take his prescribed psychiatric medication twice daily as required because the medication made him hungry. *Id.* at 58, 61; Plaintiff's Decl. (Dkt. No. 38-2) ¶¶ 1, 9, 12.[FN4] According to Black, he therefore stopped taking the medication as prescribed and was "harboring" the pills, and, as a result, the medication was discontinued, which caused him to become verbally and physically violent. *Id.* at ¶ 12.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

FN4. In opposition to defendants' motion, plaintiff has submitted an affidavit and a declaration, both sworn to October 20, 2009.

Plaintiff's ambulatory health records ("AHR") reveal that while housed at Mid-State he was seen by medical personnel approximately forty times over a 104-day period, or an average of every two and one-half days. Felker Aff. (Dkt. No. 37-2) ¶ 14. Plaintiff's last complaint regarding hemorrhoids occurred on May 3, 2007, at which time he again was advised to use Preparation H. *Id.* ¶¶ 22-23.

While at Mid-State, plaintiff filed a single grievance, in it complaining of uncooked rice. Tr. 78-80. That grievance was informally resolved to plaintiff's satisfaction, having received an explanatory letter from defendant R. Calidonna, the food administrator at the facility. *Id.* Additionally, although he does not claim to have complained himself, plaintiff alleges that "many prisoners" informally advised defendant K. Perlman of the "food conditions" at the facility while he a was making daily rounds through the S-Block at Mid-State. Plaintiff's Decl. (Dkt. No. 38-2) ¶ 7.

**\*3** Plaintiff was transferred to out of Mid-state and into the Southport Correctional Facility ("Southport") on July 3, 2007. Felker Aff. (Dkt. No. 37-2) ¶ 26. Upon arrival at Southport, plaintiff refused to submit to the incoming draft physical, and the nurse noted that Black had no physical conditions preventing him from being placed on a disciplinary diet.[FN5] *Id.* While at Southport, on December 28, 2007, plaintiff filed a grievance complaining of the food, having suffered from gas pains, constipation, and blood loss, and of not being placed on a special diet while housed at Mid-State. *Id.* at ¶ 28 and Exh. B. Plaintiff admitted that he filed the grievance at Southport in effort to exhaust his administrative remedies before commencing this lawsuit. Tr. 84-85.

FN5. A disciplinary diet is high in fiber and consists of a loaf of bread made with vegetables and wheat flour that is nutritionally adequate. Felker Aff. (Dkt. No. 27) ¶ 27.

The nurse administrator at Southport, Ms. Catherine

Felker, investigated Black's grievance and found it to be without merit. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 67; Felker Aff. (Dkt. No. 37-2) ¶¶ 29-30 and Exh. C. Nurse Felker concluded that the results of laboratory testing showed no evidence of significant blood loss; and that plaintiff's upset stomach was appropriately treated with antacids, as needed, adding that "[c]onstipation is a common complaint for inmates in SHU due to lack of normal activity and failure to drink adequate amounts of fluid. A special diet is not indicated for his complaints. Food temperature is checked and the food is given immediately upon arrival to the housing unit. At no time is spoiled, undercooked or overcooked food served to the inmate population."[FN6] *Id.* at Exh. C.

FN6. Nurse Felker's comments regarding the food are addressed to the food service provided to the plaintiff at Southport, and not Mid-State. Defendants' Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 75.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2008.[FN7] Dkt. No. 1. Plaintiff's complaint, as amended, names as defendants Brian Fischer, Commissioner of the DOCS; Kenneth Perlman, the Superintendent at Mid-State; R. Calidonna, an administrator at Upstate; and Dr. Lester Wright, Deputy Commissioner and Chief Medical Officer of the DOCS. Dkt. No. 26. Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment, in that defendants were deliberately indifferent to both his basic human needs and his serious medical needs. *Id.* As relief, plaintiff's complaint seeks recovery of compensatory damages of $1,000,000, and an additional award of punitive damages in an unspecified amount. *Id.*

FN7. Plaintiff's complaint was accompanied by an application to proceed *in forma pauperis.* Dkt. Nos. 1 and 2. After routine review of the complaint, by order of March 12, 2008, plaintiff was granted leave to proceed *in forma pauperis* and directed to file an amended complaint. Dkt. No. 5. In compliance with that order, Black filed an amended complaint on March 27, 2008. Dkt. No. 6. He was subsequently granted permission

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

to file a second amended complaint, Dkt. No. 20, which is now the operative pleading in this lawsuit.

On October 1, 2009, following the close of discovery, defendants moved pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing plaintiff's complaint. Dkt. No. 37. In support of their motion defendants assert that those portions of plaintiff's claims in the action that are based upon the failure of prison officials to provide an applicator for use in administering his hemorrhoid medication are barred due to his failure to exhaust available administrative remedies before commencing suit, and that substantively plaintiff cannot establish a violation of the Eighth Amendment. *See id.* Plaintiff has since responded in opposition to defendants' motion through the submission of an affidavit with attached exhibits, along with a statement of material facts in dispute, and a memorandum of law.[FN8] Dkt. No. 17.

> FN8. With his opposition papers plaintiff also filed a notice of motion seeking "an order dismissing the named defendants [sic] motion pursuant to Rule 56 ...". Dkt. No. 38.

**\*4** Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v.*

*Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to File a Proper Local Rule 7.1(a)(3)*

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

*Statement*

**\*5** This court's rules provide that a party opposing a motion for summary judgment

shall file a response to the [moving party's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs.

N.D.N.Y.L.R. 7.1(a)(3). This rule, which is typical of similar rules from many other courts, serves to assist the court in identifying material issues in a case and determining whether they are genuinely disputed. *See Monahan,* 214 F.3d at 292. While in opposing defendants' motion plaintiff has filed a document entitled "Statement of Material Facts In Opposition to the Defendants [sic] Motion For Summary Judgment", plaintiff's filing fails to comport with the requirements of Local Rule 7.1(a)(3). The consequences of this failure are potentially significant.

By its terms, Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y.L.R. 7.1(a)(3) (Emphasis in original). Courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts admitted upon an opposing party's failure to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at \*1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases)[FN9]; *see also Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN10]

FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

FN10. As to those facts not contained in the defendants' Local Rule 7.1(a)(3) statements, I assume for purposes of this motion that plaintiff's version of those facts is true, as plaintiff is entitled to the benefit of all inferences at this stage. *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998).

Although plaintiff's statement includes seven separately numbered paragraphs, those paragraphs do not directly respond or correspond to the eighty-one separately numbered paragraphs contained in the Defendants' Local Rule 7.1(a)(3) Statement. Additionally, plaintiff has neglected to include any citations to the record in his Local Rule 7.1(a)(3) Statement. More importantly, plaintiff expressly acknowledges that the defendants' "document numbered from 1/81 in paragraphs are true statements looking back at the deposition transcripts ..." but argues that "the format in which they are said to challenge the plaintiff [sic] is completely swindling the genuine issue of facts." Plf.'s Local Rule 7.1(a) (3) Stmt. (Dkt. No. 38-1) As this excerpt suggests, for the most part, plaintiff's Local Rule 7.1(a)(3) Statement improperly consists of argument, rather than statements of fact.

Because plaintiff has failed to comply with the requirements of Local Rule 7.1(a)(3) and submit a proper statement of material facts responding to that filed by defendants, I recommend that the court deem those facts set forth in defendants' Local Rule 7.1(a) (3) Statement to have been admitted.

C. *Exhaustion of Remedies*

**\*6** In support of their motion for summary judgment, the defendants argue that plaintiff's complaint must be dismissed because he failed to exhaust his administrative remedies. This prong of defendants' motion is based upon Black's alleged failure to raise any complaint in the grievances he filed while in prison regarding treatment of his hemorrhoid or the refusal of prison medical personnel to supply him with an applicator.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see* Woodford v. Ngo, 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted). Plaintiff's claims, which relate to the his medical treatment, qualify under the PLRA as the type of claims requiring exhaustion as a prerequisite to asserting them in the context of a civil rights action. *Kendall v. Kittles,* No. CO Civ. 628(GEL), 2004 WL 1752818, at *3 (S.D.N.Y. Aug. 4, 2004).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See* Mingues v. Nelson, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN11] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206

F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia,* Sulton v. Greiner, No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN11. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

**\*7** In this case, plaintiff filed only two relevant grievances. The first, complaining of uncooked rice, was filed while Black was confined to Mid-State and was informally resolved, apparently to his satisfaction. The second grievance was filed on December 7, 2007, several months after he Black was transported to Southport.

Defendants' position regarding exhaustion is somewhat schizophrenic. In their memorandum, defendants assert that the grievance filed by plaintiff at Southport did not reference the hemorrhoid medication applicator issue. *See* Defendants' Memorandum (Dkt. No. 37-6) at p. 9. It seems clear that this is the case since in that grievance, in which plaintiff complained that he suffered constipation, blood loss, and an upset stomach, was deprived of adequate medical treatment and a special diet, and served cold, spoiled, uncooked, and overcooked meals while at Mid-State, does not reference the applicator issue. *See* Felker Aff. (Dkt. No. 37-2) Exh. B.

In their local rule 7.1(a)(3) Statement, however, defendants offer conflicting accounts regarding that grievance, at one point asserting that the Southport Grievance did in fact reference the hemorrhoid ointment applicator issue. *Compare* Defendants Local Rule 7.1(a)(3) Statement (Dkt. No. 37-1) ¶ 50 ("Five months after plaintiff left Mid-State, while at Southport Correctional Facility, plaintiff finally filed a grievance related to his claims in this lawsuit: i.e., bad food and being denied an applicator for hemorrhoid at Mid-State"); *with id.* ¶ 78 ("in his grievance plaintiff fails [sic] that he was denied an applicator to apply ointment to his hemorrhoid." (citing to December 7, 2007 grievance).

The record is therefore at least slightly equivocal as to whether plaintiff's Southport grievance was construed by prison officials as dealing with the applicator issue.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

This confusion is furthered by plaintiff's deposition testimony, in which he stated that the applicator issue was intended by him to be included within the December 7, 2007 grievance. *See* Tr. 81-90. There is no indication of whether the result of the December 7, 2007 grievance, which was apparently a denial, was pursued by the plaintiff through to the CORC-a requirement for complete exhaustion. Given these various unresolved issues, notwithstanding my recommendation with regard to the merits, I have opted not to recommend dismissal of the applicator claim on this procedural ground.

D. *Plaintiff's Eighth Amendment Claims*

As an additional basis for granting summary judgment, defendants argue that plaintiff has failed to state a cognizable Eighth Amendment claim. The essence of plaintiff's complaint appears to be that he was denied the basic human right to adequate food, and that the defendants failed to properly treat his hemorrhoid.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

**\*8** A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No.

97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

1. *Plaintiff's Claim That He Was Denied Adequate Food*

To satisfy the objective prong of an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar.30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar.18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2). The Second Circuit has recognized that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Couglin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *Brown v. Eagen,* No. 9:08-CV-0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar.26, 2009) (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass,* No. 9:03-CV-1128, 2006 WL 2795332, at * 11 (N.D.N.Y. Sept.26 2006) (Mordue, C.J.) (citations omitted).

In this instance, plaintiff has failed to present evidence demonstrating that the food at Mid-State was prepared and served in a manner that endangered his health. Instead, plaintiff's food complaints consist entirely of broad and conclusory allegations which, while at first blush troublesome, are devoid of the specifics necessary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

to prove such a claim. Plaintiff states, for example, that after entering Mid-State he "became aware of the mostly uncooked and cold foods serviced [sic] in which immediately caused stomach cramps and heavy gas." Plaintiff's Decl. (Dkt. No. 38-2) ¶ 1. Black further asserts that the food was "unacceptable, unhealthy, and ... apparently unnutritionally inadequate both quantity and quality ... there was spoiled vegetables, over cooked and uncooked rice and meats serviced ... the bread regularly be air filters stale ... the food service was un-consumable and none-chewable ... period." *Id.* ¶ 11. Plaintiff does not, however, identify any specific occasions, or number of occasions, or meals he claims were spoiled or uncooked. Although he claims to have lost six pounds while at Mid-State, admittedly as a result of his own refusal to eat, he does not produce any evidence that meals or food that he consumed caused him to become ill on any specific instance, or otherwise immediately threatened his physical well being. Indeed, there is no evidence in Black's AHR that he suffered any dire physical consequences as a direct result of food consumed by him, or his refusal to eat the allegedly unhealthy food. Simply stated, plaintiff's allegations are no more than generalized allegations which are troublesome at first blush, but lack the specifics necessary to substantiate an Eighth Amendment claim while housed at Mid-State. *Brown,* 2009 815724, at *10.

**\*9** In further support of his position plaintiff submits the declaration of Michael Perkins, also an inmate at Mid-State in 2007, who alleges that while housed there he filed grievances complaining about the rations of food, and the facts that it was cold and, at times, spoiled. *See* Black Decl. (Dkt. No. 38-2) Exh. A at ¶ 4. Unfortunately, the Perkins declaration is similarly conclusory and does not provide any factual support for plaintiff's claim. Perkins does not provide any detail regarding the date of and the specific complaint included in any grievance that he filed, or any specific instances that he was served spoiled food while at Mid-State. At best, the Black affidavit and Perkins declaration establish only that the food at Mid-State was not to their liking, and, on occasion meals may have been cold and/or included some spoiled food. "Insofar as [the plaintiff] alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a cause of action." *Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005).

Even if plaintiff were able to over come the objective prong of the Eighth Amendment analysis, he still fails with respect to the subjective component. To show deliberate indifference, a plaintiff must demonstrate that the prison official sued was aware of and disregarded an excessive risk to the inmate's health or safety. *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978. Plaintiff does not claim that defendants Fischer or Wright had actual knowledge of the alleged unhealthy food condition; instead, plaintiff alleges in his complaint that these defendants had "constructive knowledge". Complaint (Dkt. No. 26) ¶ 17.

With regard to defendant Perlman, the plaintiff alleges only that through daily rounds he would be advised of the food conditions by many prisoners. While plaintiff claims that he made defendant Calidonna aware through his grievance, the record is undisputed that Black filed only one grievance during the time he was housed at Mid-State, and in that grievance he complained only of uncooked rice. Plaintiff has otherwise failed to adduce any evidence that any of the named defendants were made aware of a pervasive problem of uncooked or spoiled food being served at Mid-State. Nor has he produced any evidence that any of them had noticed that problems with food service endangered prisoners' health; there is no evidence that anyone, including plaintiff, suffered a serious illness as a direct result of ingesting the prison food. For these reasons, the evidence in the record is insufficient to establish a triable issue of fact concerning whether defendants were aware of and disregarded a serious problem with the food. *Newman v. Zenk,* No. 05-CV-259, 2007 6888112, at *6 (E.D.N.Y. Mar. 29, 2007) (citing *Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006)), *aff'd,* 309 Fed. App'x 535 (2d Cir. Feb.17, 2009). Accordingly, I find that defendants' motion as to plaintiff's food-related claim should be granted.

2. *Plaintiff's Claims Regarding Inadequate Medical Treatment*

**\*10** Plaintiff's medical indifference claim appears to have two components, one in which he complains of the denial of an applicator for use with Preparation H, and the other contending that the treatment he received for his

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

hemorrhoid was inadequate. Like plaintiff's food-related claim, claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection afforded by the Eighth Amendment, *Estelle,* 429 U.S. at 102, 104, 97 S.Ct. at 291, and are subject to the two-prong analysis requiring that a plaintiff establish both the objective and subjective elements, *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

a) *Objective Requirement*

Analysis of the objective, "sufficiently serious" requirement of a Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and focuses on whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. The second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185-86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.,* at 280 (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, the critical question is the seriousness of the medical need, or whether the temporary deprivation was objectively harmful enough to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment,' but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

Addressing the seriousness of the plaintiff's condition

first, plaintiff's AHR establishes that he complained of constipation and an external hemorrhoid for a period of less than one month, during which he experienced typical symptoms, including discomfort and minor bleeding. These conditions, without more, are not sufficiently serious to establish an Eighth Amendment claim. *Lowman v. Perlman,* No. 9:06-CV-0422, 2008 WL 4104554, at *5 (N.D.N.Y. Aug.29, 2008) (Kahn, D.J. and Treece, M.J.); *Cabassa v. Gummerson,* No. 01-CV-1039, 2006 WL 1559215, at *9-10 (N.D.N.Y. Mar.30, 2006) (Lowe, M.J.), report and recommendation adopted by, 2006 WL 1555656 (N.D.N.Y. Jun.1, 2006) (Hurd, D.J.); *Kendall v. Kittles,* 2004 WL 1752818, at *6 ("Hemorrhoids, albeit uncomfortable, are a minor issue, far removed from the category of medical conditions that have been deemed 'sufficiently serious' by other courts.").

*11 Additionally, I note that it cannot seriously be argued that Black did not receive medical attention while incarcerated. In fact, plaintiff's AHR shows that in response to various minor physical complaints including constipation, upset stomach, hemorrhoids, and bleeding, he was seen by medical personnel approximately forty times during the four months that he was confined to Mid-State. When plaintiff first noticed the hemorrhoid, he was visited by a nurse, who provided him with ointment and a stool softener and instructions regarding avoiding hemorrhoids, including that he drink water and exercise. Plaintiff apparently failed to follow these instructions. Each time he complained of the hemorrhoid, plaintiff was provided with more Preparation H. Plaintiff was reassured by a physician that, despite some bleeding, his condition was not serious or life threatening and that the hemorrhoid would disappear in time. Because plaintiff admittedly suffered an external hemorrhoid, an applicator was not necessary for treatment with Preparation H.[FN12] Felker Aff. (Dkt. No. 37-2) ¶¶ 35, 39.

FN12. Even if plaintiff's hemorrhoid required the use of an applicator, it appears that he likely would have been denied access to such a tool based on security concerns, and not out of malice. *See* Felker Aff. (Dkt. No. 37-2) ¶¶ 40-41. Under these circumstances, the deliberate indifference standard cannot be established as the record demonstrates that the withholding of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))

applicator was reasonably calculated to maintain prison security. *See Trammel v. Keane,* 338 F.3d 155, 163 (2d Cir.2003) ( "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security") (quoting *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

The record now before the court clearly establishes that prison officials were attentive and acted reasonably in treating plaintiff's hemorrhoid. Plaintiff's obvious dissatisfaction or disagreement with treatment that he received for his hemorrhoid is patently insufficient to establish an Eighth Amendment violation. *Tafari v. McCarthy,* No. 9:07-CV-654, 2010 WL 2044705, at *32 (N.D.N.Y. May 24, 2010) (Hurd, J. and Lowe, M.J.) (citation omitted); *McQueen v. County of Albany,* No. 9:08-CV-799, 2010 WL 338081, at * (N.D.N.Y. Jan.28, 2010) (Hurd, J. and Peebles, M.J.) (citations omitted).

b) *Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson,* 501 U.S. at 300, 111 S.Ct. 2321, 115 L.Ed.2d 271). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839-40, 114 S.Ct. 1970, 128 L.Ed.2d 811). As previously discussed, to establish deliberate indifference a plaintiff must show that the official was aware of facts from which it could be concluded that a substantial risk of serious harm existed and must also draw that conclusion. *See Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979. Mere negligence on the part of a physician or other prison medical official in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a § 1983 action. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 292; *Chance,* 143 F.3d at 703.

For the same reasons that plaintiff cannot prove the objective element of a medical indifference claim, he fails with respect to the subjective element. Plaintiff's hemorrhoid did not expose him to substantial risk of harm if left untreated, and the condition, in fact, was not ignored by prison personnel. In sum, the record is devoid of any evidence suggesting that any defendant, or any prison official for that matter, was deliberately indifferent to plaintiff's medical needs.

**\*12** After carefully reviewing the record before the court, I find that there are no material issues of fact with respect to plaintiff's Eighth Amendment medical indifference claim and that defendants' motion for summary judgment dismissing this claim should therefore be granted.

IV. *SUMMARY AND CONCLUSION*

Plaintiff complains regarding the conditions of confinement while housed at Mid-State, alleging the food he was served and the medical treatment that he was provided with regard to a hemorrhoid subjected him to cruel and unusual punishment. These complaints, however, amount to nothing more than dissatisfaction with the harsh realities of prison life. The record fails to show that the food that plaintiff was served was not nutritionally adequate, or posed an immediate danger to plaintiff's health, and that defendants were aware of that fact. Turning to plaintiff's hemorrhoid, no reasonable factfinder could conclude that it satisfies the threshold constitutional requirement of a serious medical condition, and in any event, the record establishes that plaintiff was rendered reasonable medical treatment for his hemorrhoid.

Unfortunately for plaintiff, while the Eighth Amendment ensures that inmates are provided the minimal civilized measures of life's necessities, it does not create a right to comfortable prisons. For this reason, though I have concluded that issues of fact remain as to whether plaintiff exhausted his administrative remedies, I have found that substantively plaintiff has failed to state a constitutional claim and that defendants' motion for summary judgment therefore should be granted.

Accordingly, it is hereby respectfully

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2985081 (N.D.N.Y.)

(Cite as: 2010 WL 2985081 (N.D.N.Y.))


RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 37) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, with prejudice.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ordered that the clerk is also serve a copy of the report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Black v. Fischer
Slip Copy, 2010 WL 2985081 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Mark W. GANTT, Plaintiff,
v.
William LAPE and Gary Mielenz, Defendants.
No. 9:10-CV-0083 (GTS/GHL).

Jan. 18, 2011.

Mark W. Gantt, Five Points Correctional Facility Romulus, NY.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Justin C. Levin, Esq., of Counsel, Albany, NY, for Defendants.

***REPORT-RECOMMENDATION and ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Mark W. Gantt alleges that he was wrongfully charged for commissary purchases and punished for lying. Currently pending before the Court is Defendant William Lape's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 12.) Also pending is Plaintiff's request to amend the complaint to add an additional defendant. (Dkt. No. 15.) For the reasons that follow, I recommend that Defendant's motion be granted and order that Plaintiff's request is denied without prejudice.

**I. BACKGROUND**

The complaint alleges that on September 8, 2009, Plaintiff filed a grievance because the commissary charged him $10.49 for an item he had not purchased. (Dkt. No. 1 at 4.[FN1])

FN1. The page reference is to the page number assigned by the Court's electronic filing system.

Thereafter, Defendant Gary Mielenz, a commissary clerk, came to Plaintiff's cell and screamed at Plaintiff that Plaintiff "did make [t]he purch[ase] and [t]hat [h]e was [g]oing [t]o [t]ake the $10.49 and [Plaintiff] would never [g]o [t]o [the] commissary" again. *Id.* at 4-5.

Defendant Mielenz wrote a misbehavior report charging Plaintiff with lying. *Id.* at 5. A hearing was conducted on the misbehavior report. *Id.* The hearing officer "[r]ead [t]he [g]rievance at [t]he [t]ime of [t]he hear[ ]ing" and found Plaintiff guilty. *Id.* Plaintiff states that the grievance he filed was the only evidence the hearing officer considered. *Id.* The hearing officer imposed a penalty of thirty days' loss of commissary privileges and a $5.00 fine. *Id.*

Plaintiff filed the complaint in this action on January 22, 2010. (Dkt. No. 1.) The complaint names William Lape (the superintendent of Coxsackie Correctional Facility) and Mielenz as defendants. *Id* . at 1-2. The complaint does not name the hearing officer as a defendant. Plaintiff requests $120,015.49. *Id.* at 7.

Defendants answered on July 6, 2010. (Dkt. No. 11.) On that same date, Defendant Lape filed the pending motion for judgment on the pleadings. (Dkt. No. 12.) Plaintiff opposes the motion for judgment on the pleadings. (Dkt. No. 14.) In addition, Plaintiff requests leave to amend his complaint to add the hearing officer as a defendant. (Dkt. No. 15.) Defendants oppose that request. (Dkt. No. 16.)

**II. LEGAL STANDARD GOVERNING MOTIONS FOR JUDGMENT ON THE PLEADINGS**

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). In order to state a claim upon which relief can

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

**\*2** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

### III. ANALYSIS

### A. Defendant Lape's Motion for Judgment on the Pleadings

Defendant Lape moves for judgment on the pleadings. (Dkt. No. 12 .) Defendant Lape argues that (1) the complaint does not sufficiently allege that he was personally involved in any constitutional violation; and (2) he is entitled to qualified immunity. (Dkt. No. 12-1.)

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d

880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN2]

> **FN2.** Although the Second Circuit has not yet addressed the issue, several district courts in this Circuit have found that the Supreme Court's decision in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949 (2009) nullified some or all of the *Colon* categories of personal involvement. *See Sash v. United States,* 674 F.Supp.2d 531, 543-44 (S.D.N.Y.2009) (collecting cases).

Here, the complaint does not allege any facts about Defendant Lape at all. He is mentioned only in the list of parties. (Dkt. No. 1 at 1.) Therefore, the face of the complaint does not plausibly suggest that Defendant Lape was personally involved in any constitutional violation. Accordingly, I recommend that the Court dismiss Plaintiff's claims against Defendant Lape.

**\*3** Where a *pro se* complaint fails to state a cause of action, the court *generally* "should not dismiss without

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted). However, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (citation omitted).

Here, the problem with Plaintiff's claim against Defendant Lape is substantive and could not be cured by better pleading. Plaintiff argues in opposition to the motion that Defendant Lape "did know of his [e]mployee's [a]ction[ ]s [because] he is or was [a]t t[h]e t[i]me t[h]e [s]uperintendent of Coxsackie C.F. and is t[h]e one who [g]et[ ]s [ ][t]he Tier 2 appeal[ ]s." (Dkt. No. 14 at 1.) Attached to Plaintiff's opposition is a copy of Plaintiff's appeal of the disciplinary determination. (Dkt. No. 14 at 4.) This appeal form shows that on October 20, 2009, the "superintendent or designee" affirmed the results of Plaintiff's disciplinary hearing. *Id.* The signature of the "superintendent or designee" is not entirely legible, but the first name appears to begin with an "R" and the last name with a "W." *Id.*

There are two reasons that Plaintiff's allegation and exhibit are insufficient to plausibly suggest that Defendant Lape was personally involved in any alleged constitutional violation. First, as a factual matter, it does not appear that Defendant Lape was the individual who affirmed the results of Plaintiff's disciplinary hearing. Defendant Lape's first name begins with a "W" and his last name begins with an "L", which does not correspond to the signature of the "superintendent or designee" on the exhibit.

Second, as a legal matter, even if Defendant Lape had signed the form, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08-CV-463A, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009).[FN3] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN4], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official

"proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2-3. Here, Plaintiff has not alleged, either in his complaint or in his opposition to the motion for judgment on the pleadings, that Defendant Lape was "proactively involved" in reviewing Plaintiff's administrative appeal.

FN3. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN4. *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Further, the second *Colon* category-that a supervisor is personally involved if he or she failed to remedy a violation after learning of it through a report or appeal-applies only to situations where an alleged violation is ongoing, not to situations involving a one-time violation. *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) ("It has been held that an appropriate guiding principle for determining personal responsibility is where a grievance alleges an ongoing constitutional violation, the supervisory official who reviews the grievance is personally involved if he is confronted with a situation that he can remedy directly. If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to remedy a violation.") (internal quotation marks and citations omitted); *Rahman v. Fisher,* 607 F.Supp.2d 580, 585 (S.D.N.Y.2009) ("Receiving post hoc notice does not constitute personal involvement in the unconstitutional activity and cannot be said to have proximately caused the damage suffered by the inmate. Therefore, a supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it. Similarly, liability may attach when a supervisor fails to act on reports of a staff member's previous assaults on the plaintiff and the plaintiff is assaulted again by that same staff member.") (citation omitted). Here, Plaintiff does not allege that he was the victim of any ongoing constitutional violation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

**\*4** Accordingly, I find that Plaintiff will be unable to cure the defect in his complaint and I therefore recommend that the Court dismiss the claims against Defendant Lape without leave to amend. Because I find that Defendant Lape is entitled to judgment on this ground, I decline to address his argument that he is entitled to qualified immunity.

**B. Plaintiff's Request to Amend the Complaint to Add a Defendant**

Plaintiff has filed a request to amend his complaint to add the hearing officer as a defendant. (Dkt. No. 15.) In full, this request states that:

I would like to put this motion before the court to add another de[ ]fendant to this [action]. The de[ ]fendant in question is the hearing [officer] Lt. McDermont who read the grievances into the hearing of the Tier II of the Plaintiff's gr[ie]vance that the Plaintiff filed that was all the evidence [ ] that the hearing L.T. relied on.

*Id.* Defendants oppose Plaintiff's request, arguing that (1) the request is defective because Plaintiff did not file a proposed amended complaint; and (2) "because Plaintiff has failed to submit a proposed amended complaint, he cannot demonstrate that any such pleading would be viable and not futile." (Dkt. No. 16 at 1.) Defendants' first argument is correct.[FN5]

> [FN5.] Regarding Defendants' second argument, I note that the burden of proving the futility of an amendment lies with the party opposing the amendment. *Garcia v. Pancho Villa's of Huntington Vill.,* 268 F.R.D. 160, 166 (E.D.N.Y.2010). Therefore, Plaintiff is not required to "demonstrate that any such pleading would be viable and not futile" unless and until Defendants present an argument that the amended pleading *would* be futile. (Dkt. No. 16 at 1.)

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. Proc. 15(a)(2); *Foman v. Davis,* 371 U .S. 178, 182 (1962); *Manson v. Stacescu,* 11 F.3d 1127, 1133 (2d Cir.1993).

Elaborating on this standard, the Supreme Court has explained:

> In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should ... be 'freely given.'

*Foman,* 371 U.S. at 182, *accord, Milanese v. Rust-Oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001) ("[Leave to amend] should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility.").

Under Local Rule 7.1(a)(4), a "party moving to amend a pleading ... must attach an unsigned copy of the proposed amended pleading to its motion papers." Here, Plaintiff has not provided the Court with a proposed amended pleading. Although Plaintiff, as a *pro se* civil rights litigant, is entitled to special solicitude and leniency regarding the substance of his pleadings and papers, even *pro se* plaintiffs must obey the Court's procedural rules.[FN6] The requirement that a motion to amend be accompanied by a proposed amended complaint promotes clarity. Here, for instance, without such a document, it is not clear either to the Court or Defendants what claims Plaintiff intends to pursue against the hearing officer. Defendants thus cannot adequately oppose Plaintiff's attempt to amend and the Court cannot adequately weigh the parties' arguments. Therefore, I deny Plaintiff's request to amend without prejudice to Plaintiff filing a renewed motion to amend that complies with this Court's local rules.

> [FN6.] *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to

Slip Copy, 2011 WL 673783 (N.D.N.Y.)

(Cite as: 2011 WL 673783 (N.D.N.Y.))

comply with relevant rules of procedural and substantive law."); *Edwards v. I.N.S.,* 59 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") (citations omitted).

**\*5 ACCORDINGLY,** it is

**RECOMMENDED** that Defendant Lape's motion for judgment on the pleadings (Dkt. No. 12) be ***GRANTED.*** It is recommended that the Court dismiss the action as to Defendant Lape without leave to amend; and it is further

**ORDERED** that Plaintiff's request to amend the complaint (Dkt. No. 15) is **DENIED** without prejudice to the filing of a procedurally proper motion; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08-CV-463A, 2009 WL 4730309 (W.D.N.Y. Dec. 7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Gantt v. Lape
Slip Copy, 2011 WL 673783 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2011 WL 673782 (N.D.N.Y.)

(Cite as: 2011 WL 673782 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Mark W. GANTT, Plaintiff,
v.
William LAPE, Superintendent, Coxsackie Correctional
Facility; and Gary Mielenz, Commissary Clerk IV,
Coxsackie Correctional Facility, Defendants.
No. 9:10-CV-0083 (GTS/GHL).

Feb. 17, 2011.
Mark W. Gantt, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Justin C. Levin, Esq., Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

### DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se* prisoner
civil rights action filed by Mark W. Gantt ("Plaintiff")
against William Lape and Gary Mielenz ("Defendants")
are the following: (1) Defendant Lape's motion for a
judgment on the pleadings (Dkt. No. 12); (2) Plaintiff's
letter-motion requesting leave to amend his Complaint to
add a Defendant (Dkt. No. 15); and (3) United States
Magistrate Judge George H. Lowe's
Report-Recommendation recommending that Defendant
Lape's motion be granted, Defendant Lape be dismissed
from this action, and Plaintiff's motion be denied without
prejudice (Dkt. No. 25). Plaintiff has not filed an
Objection to the Report-Recommendation. For the reasons
set forth below, the Report-Recommendation is accepted
and adopted in its entirety; Defendant Lape's motion is
granted; Defendant Lape is dismissed from this action; and
Plaintiff's motion to amend is denied without prejudice.

### I. RELEVANT BACKGROUND

Plaintiff filed his Complaint on January 22, 2010.

(Dkt. No. 1.) Construed with the utmost of liberality,
Plaintiff's Complaint alleges that, in September 2009,
while he was incarcerated at Coxsackie Correctional
Facility, Defendant Mielenz issued him a misbehavior
report in retaliation for him filing a grievance regarding
commissary purchases for which he was charged, but did
not make or receive. (*Id.*) Plaintiff further alleges that he
was found guilty at his Tier II disciplinary hearing of
making false statements, which resulted in the imposition
of a five dollar ($5.00) fine and the loss of commissary
privileges for 30 days. (*Id.* at 4-5.) For a more detailed
recitation of the factual allegations asserted in Plaintiff's
Complaint, the Court refers the reader to that Complaint in
its entirety. (*See generally* Dkt. No. 1.)

Construed with the utmost of special leniency,
Plaintiff's Complaint attempts to assert the following
claims against Defendants based on the above-described
factual allegations: (1) a claim of retaliation against
Defendant Mielenz, in violation of the First Amendment;
and (2) a claim of denial of due process against the
hearing officer who presided over his disciplinary hearing,
in violation of the Fourteenth Amendment. (*Id.*)

On July 6, 2010, Defendant Lape filed a motion for
judgment on the pleadings. (Dkt. No. 12.) In his motion,
Defendant Lape argues as follows: (1) Plaintiff has failed
to allege facts plausibly suggesting that Defendant Lape
was personally involved in the events alleged; (2) he is
shielded from liability as a matter of law by the doctrine of
qualified immunity; and (3) he is entitled to a protective
order barring discovery until this motion is resolved. (Dkt.
No. 12.)

On July 8, 2010, Plaintiff filed a response in
opposition to Defendant Lape's motion. (Dkt. No. 14.) In
his response, Plaintiff argues that Defendant Lape should
not be dismissed from this action because, as
Superintendent of Coxsackie Correctional Facility, he
receives Tier II appeals, and he was therefore aware of
Defendant Mielenz's actions. (Dkt. No. 14, at 1.) As an
attachment to that response, Plaintiff submitted, for the
first time, a copy of a disciplinary appeal determination
bearing a barely legible signature of the "superintendent or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673782 (N.D.N.Y.)

(Cite as: 2011 WL 673782 (N.D.N.Y.))

[his] designee." (*Id.* at 4.)

**\*2** On August 11, 2010, Plaintiff submitted a letter-motion requesting that the Court permit him leave to amend his Complaint to add a Defendant. (Dkt. No. 15.) Specifically, Plaintiff sought to add as a Defendant Lieutenant McDermont, the officer who presided over his Tier II disciplinary hearing. (*Id.*)

On January 18, 2011, Magistrate Judge Lowe issued a Report-Recommendation recommending that Defendant Lape's motion be granted, that Plaintiff's claims against Defendant Lape be dismissed, and that Plaintiff's letter-motion to amend his Complaint to add a Defendant be denied without prejudice. (Dkt. No. 25.) In support of his recommendation, Magistrate Judge Lowe found as follows, *inter alia:* (1) Plaintiff failed to allege any facts about Defendant Lape in his Compliant (let alone facts plausibly suggesting a claim upon which relief can be granted against him); (2) the disciplinary appeal determination, which Plaintiff provides for the first time in his opposition papers, does not clearly show it was signed by Defendant Lape, nor would any such signature even render Defendant Lape personally involved in the constitutional violations alleged; (3) because the problem with Plaintiff's claim against Defendant Lape is substantive, and could not be cured by better pleading, granting Plaintiff leave to amend would be futile; and (4) Plaintiff's failed to file a proposed amended complaint with his letter-motion seeking leave to amend, and therefore his motion is procedurally defective. (*See generally* Dkt. No. 25.) Familiarity with the grounds of Magistrate Judge Lowe's Report-Recommendation is assumed in this Decision and Order, which is intended primarily for review by the parties.

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Review of a Report-Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN1] When only general objections are made to a magistrate

judge's report-recommendation, or where the objecting party merely reiterates the same arguments taken in its original papers submitted to the magistrate judge, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN2] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducting the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

> FN1. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

> FN2. *See also Camardo v. Gen. Motors Hourly-Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 673782 (N.D.N.Y.)

(Cite as: 2011 WL 673782 (N.D.N.Y.))

to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09-CV-0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07-CV-1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04-CV-0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006) (Sharpe, J.).

**B. Legal Standard Governing a Motion to Dismiss**

**\*3** Magistrate Judge Lowe correctly recited the legal standard governing a motion for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c), as well as the legal standard governing a motion for leave to amend a complaint, pursuant to Fed.R.Civ.P. 15(a). (Dkt. No. 25.) As a result, these standards are incorporated by reference in this Decision and Order.

**III. ANALYSIS**

Plaintiff has not filed an Objection to the Report-Recommendation. As a result, the Court need review the Report-Recommendation only for clear error. After carefully reviewing all of the papers in this action, including Magistrate Judge Lowe's thorough Report-Recommendation, the Court concludes that the Report-Recommendation is well-reasoned and not clearly erroneous. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein.

The Court would add only two points. First, Magistrate Judge Lowe's thorough Report-Recommendation would survive even a *de novo* review. Second, Magistrate Judge Lowe's finding of futility (i.e., his finding that it would be futile to afford Plaintiff a further chance to amend his claim against Defendant Lape because better pleading could not cure the referenced defect in that claim) is further supported by the fact that Plaintiff's motion to amend his Complaint-which was filed after he had notice of Defendants' challenge to his claim against Defendant Lape-is conspicuously absent of a request for leave to add any factual allegations regarding Defendant Lape. (*See generally* Dkt. No. 15.)

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 25) is *ACCEPTED* and *ADOPTED* in its entirety; and it is further

**ORDERED** that Defendant Lape's motion for judgment on the pleadings (Dkt. No. 12) is *GRANTED;* and it is further

**ORDERED** that Defendant Lape is *DISMISSED* from this action; and it is further

**ORDERED** that Plaintiff's letter-motion to amend his Complaint (Dkt. No. 15) is *DENIED* without prejudice.

N.D.N.Y.,2011.

Gantt v. Lape
Slip Copy, 2011 WL 673782 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.

Benjamin **BRAXTON**, Plaintiff,
v.
James **NICHOLS**, John Nuttall, Licien J. Leclaire, Jr.,
Gayle Haponik, Anthony J. Annucci and Lester Wright,
Defendants.
No. 08 Civ. 08568(PGG).

March 18, 2010.

*MEMORANDUM OPINION AND ORDER*

PAUL G. GARDEPHE, District Judge.

**\*1** *Pro se* Plaintiff Benjamin Braxton alleges that his rights under the Eighth Amendment to the United States Constitution were violated by his exposure to a dangerous level of environmental tobacco smoke ("ETS"), commonly known as secondhand smoke, caused by the Defendants' deliberate indifference. The Complaint seeks compensatory and punitive damages. (Cmplt. at 16) Defendants have moved to dismiss Plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion (Docket No. 9) will be granted as to Count II but otherwise denied.

*DISCUSSION*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To meet this standard, a complaint's factual allegations must permit the Court, "draw[ing] on its judicial experience and common sense," "to infer more than the mere possibility of misconduct." *Id.* at 1950. "In considering a motion to dismiss ... the court is to accept as true all facts alleged in the complaint," *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007)

(citing *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 87 (2d Cir.2002)), and must "draw all reasonable inferences in favor of the plaintiff." *Id.* (citing *Fernandez v. Chertoff,* 471 F.3d 45, 51 (2d Cir.2006)).

Because Plaintiff is proceeding *pro se,* the Court construes the complaint liberally, *Harris v. Mills,* 22 A.D. 379, 572 F.3d 66, 72 (2d Cir.2009), "interpret[ing] it to raise the strongest arguments that it suggests." *Harris v. Westchester County Department of Corrections,* No. 06 Civ.2011(RJS), 2008 WL 953616, at \*2 (S.D.N.Y. Apr.3, 2008) (internal quotation omitted). Moreover, allegations made in a *pro se* plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss. *See Coakley v. 42nd PCT. Case 458,* No. 08 Civ. 6202(JSR), 2009 WL 3095529, at \*3 (S.D.N.Y. Sept.28, 2009); *Donahue v. U.S. Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990).[FN1] As in any other case, however, the Court accepts as true only factual allegations, and does not accept as true allegations stating only legal conclusions. *Harris,* 572 F.3d at 72 ("[T]hreadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." (quoting *Iqbal,* 129 S.Ct. at 1949)).

> FN1. *See also Oliver v. Haddock,* No. 08 Civ. 4608(DAB)(GWG), 2009 WL 4281446, at \*2 (S.D.N.Y. Dec. 1, 2009) (citing *Woods v. Goord,* No. 01 Civ.. 3255(SAS), 2002 WL 731691, at \*1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering pro se prisoner's factual allegations in briefs as supplementing the complaint); *Burgess v. Goord,* No. 98 Civ.2077(SAS), 1999 WL 33458, at \*1 n. 1 (S.D.N.Y. Jan.26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.' " (quoting *Gadson v. Goord,* No. 96 Civ. 7544(SS), 1997 WL 714878, at \*1 n. 2 (S.D.N.Y. Nov.17, 1997)

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

(citations omitted))).

## I. *FACTS*

For purposes of deciding Defendants' motion to dismiss, the Court assumes that the following factual allegations in the Complaint, and in documents that the Complaint incorporates by reference,[FN2] are true: On July 31, 1996, Braxton was convicted in state court, and on September 6, 1996, he was incarcerated at Gowanda Correctional Facility, where he was housed with a substantial number of frequent or chain smokers.[FN3] (*Id.* ¶ 14) On February 7, 2000, Plaintiff was transferred to Fishkill Correctional Facility, where he was again housed with numerous frequent or chain smokers. (*Id.* ¶ 15) On November 8, 2000, Defendant Annucci, Deputy Commissioner and Counsel, and Defendant Leclaire, Jr., Deputy Commissioner for Correctional Services, forwarded a memorandum to all facility superintendents announcing the Department of Correctional Services' ("DOCS") indoor smoking ban. (*Id.* ¶ 16)

> FN2. The Court may consider documents incorporated by reference in the Complaint without converting Defendants' motion to dismiss to a motion for summary judgment. *See Kamholtz v. Yates County,* No. 09-0026-cv, 2009 WL 3463481 (2d Cir. Oct 29, 2009); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

> FN3. While Plaintiff also complains about being exposed to secondhand smoke as a pretrial detainee at Rikers Island (Cmplt.¶ 13), such a claim is not cognizable under the Eighth Amendment. Accordingly, in ruling on Defendants' motion to dismiss, the Court considers only the events occurring after Plaintiff's state court conviction. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (because prisoner was a pre-trial detainee, she had no Eighth Amendment claim).

**\*2** Plaintiff was transferred on March 12, 2001, to Mid-Orange Correctional Facility, where he was once more housed with inmates who were frequent or chain smokers. (*Id.* ¶ 17) Between April 2, 2001, and October 12, 2003, Plaintiff served as a porter in the bathrooms, laundry rooms, shower areas and single rooms of the D1-Block where he was housed. In performing his porter duties, Plaintiff "was constantly bombarded with Secondhand smoke which compromised Plaintiff's health and safety." (*Id.* ¶ 19) After serving time in the Segregated Housing Unit as the result of a disciplinary infraction, Plaintiff was moved to the D2-Block at Mid-Orange on September 10, 2004, where he continued working as a porter. (*Id.* ¶ 21) During his porter duties in the D2-Block, Plaintiff was again exposed to regular smoking by inmates in the bathroom stalls, shower areas, dayrooms, and single rooms throughout the day. (*Id.* ¶ 22)

On April 25, 2007, former Mid-Orange Superintendent D.L. Van Buren forwarded a memorandum to prison personnel about the facility's new "Indoor Smoke Free Policy," (*Id.* ¶ 23) On October 15, 2007, Plaintiff submitted his first grievance that relates to this action. Plaintiff complained that secondhand smoke was causing irritation to his lungs.[FN4] (Cmplt. ¶ 24; Schulman Dec. Ex. A) The facility inmate grievance committee reviewed Plaintiff's grievance and determined that his medical concerns should be addressed through "sick call." (Schulman Dec. E. A at 3) Plaintiff appealed to the Superintendent on November 6, 2007, and on November 13, 2007, the Superintendent issued a decision advising Plaintiff "to address his medical concerns through sick call." (*Id.* at 2) Plaintiff met with a doctor on November 21, 2007, but claims that his concerns about lung irritation from secondhand smoke were not addressed. (Cmplt.¶ 27) Prior to this doctor's visit, Plaintiff appealed the Superintendent's decision to the Central Office Review Committee ("CORC") on November 17, 2007, on the basis that his "medical concerns were not being addressed." (*Id.* ¶ 26; Schulman Dec. Ex. A at 2) CORC sustained the Superintendent's decision on December 17, 2007, noting that Plaintiff had already been seen by a doctor and that he could address any additional medical concerns through the regular sick call procedures. (Cmplt. ¶ 28; Schulman Dec. Ex A at 1)

> FN4. Plaintiff also wrote to the Department of Health on October 29, 2007, complaining about the facility's inadequate ventilation, (Cmplt.¶ 24)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

Plaintiff's complaints about secondhand smoke continued. On December 15, 2007, he wrote to Defendant Nichols, then Mid-Orange Superintendent, to report that inmates were smoking in the upper and lower gymnasiums and in other common areas. (Cmplt. ¶ 30; Pltf. Ex. 16) Plaintiff stated that he was experiencing headaches, nausea, congestion, and respiratory complications because of exposure to the secondhand smoke. (*Id.*) Acting Superintendent Jacobsen responded to Plaintiffs letter. Plaintiff does not describe the contents of this response. (*Id.* ¶ 31) Plaintiff wrote two additional letters to Superintendent Nichols on January 19 and 22, 2008, complaining about the failure to enforce the facility's indoor smoking ban and alleging that correctional officers were smoking inside the facility. Plaintiff does not indicate who received these letters or whether he received any response. (*Id.* ¶ 37-38; Pltf. Exs. 18-19)

**\*3** On March 13, 2008, Plaintiff filed a second inmate grievance, requesting the creation of a "non-smoking dormitory" to house non-smoker inmates. (Schulman Dec. Ex. B at 19-20) Plaintiff provided a lengthy discussion of the dangers associated with exposure to secondhand smoke. (*Id.* at 20-22, 27-32) Although Plaintiff did not explicitly request that the existing non-smoking policy be enforced, he stated that his "health has been compromised and ... [that his] health and safety is in jeopardy." (*Id.* at 28, 29; Cmplt. ¶ 43) On March 27, 2008, the facility grievance committee instructed Plaintiff to resubmit his grievance in the form of a project proposal and to submit it to the Deputy Superintendent of Programs. (Cmplt. ¶ 44; Schulman Dec. Ex. B at 18) Plaintiff instead appealed to Superintendent Nichols, who issued a decision on March 28, 2008, noting that indoor smoking was already prohibited by DOCS policy and advising Plaintiff to submit his proposal to the facility executive team. (Schulman Dec. Ex. B at 17)

Plaintiff chose instead to appeal Defendant Nichols' decision to CORC. His appeal states: "Grievant request[s] the facility to provide a smoke-free dorm and conduct a logistical survey to determine the practicality of implementation of grievant's request." (*Id.*) On May 7, 2008, CORC denied Plaintiff's proposal for a non-smoking dormitory, noting that there was no evidence suggesting malfeasance by staff members and that Plaintiff should

address complaints about indoor smoking to security staff. (*Id.*) The Complaint does not allege that Plaintiff ever made such a complaint.

## II. *PLAINTIFF SUFFICIENTLY ALLEGES DELIBERATE INDIFFERENCE*

To prevail on his claim against the individual defendants under 42 U.S.C. § 1983, Plaintiff must show: (1) that the defendants "were acting under color of state law;" and (2) that "their actions deprived the plaintiff of a right guaranteed by the constitution or laws of the United States." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). Here, Plaintiff attempts to establish the second element of his Section 1983 claim by alleging that the individual defendants violated the Eighth Amendment of the United States Constitution. (Cmplt.¶¶ 16-17)

Alleged Eighth Amendment violations by prison officials are governed by a two-part test: (1) whether the conditions of confinement objectively posed "a substantial risk of serious harm" to the inmate; and (2) whether the prison official, as a subjective matter, was "deliberate[ly] indifferent" to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (internal citations and quotation marks omitted). An objective risk of substantial harm may exist even if an inmate experiences no current symptoms. A risk of serious future harm is sufficient, *Smith v. Carpenter,* 316 F.3d 178, 188 (2d Cir.2003) (noting that "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm and ... actual physical injury is not necessary in order to demonstrate an Eighth Amendment violation."), but the inmate must show that the risk of future harm is "so grave that it violates contemporary standards of decency." *Helling v. McKinney,* 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

**\*4** A plaintiff must also demonstrate that the defendants were deliberately indifferent in that "the acts of defendants involved more than lack of due care, but rather involved obduracy and wantonness in placing [plaintiff's] health in danger.... In other words ... defendants knew of the health dangers and yet refused to remedy the situation." *LaBounty v. Coughlin,* 137 F.3d 68, 72-73 (2d Cir.1998). This subjective element "entails something more than mere negligence ... but something less than acts

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citing *Farmer,* 511 U.S. at 835). This means that "a prison official must know of and disregard an excessive risk to inmate health or safety; the official must ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ... draw the inference and fail to take reasonable measures to abate it." *Trammell v. Kean,* 338 F.3d 155, 164 (2d Cir.2003) (citing *Farmer,* 511 U.S. at 837, 847). "Plaintiff need not show actual knowledge of the risk of harm, but rather can present[ ] evidence showing that a substantial risk ... was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer,* 511 U.S. at 842.

Applying these principles to Braxton's claims, he must demonstrate that he was subjected to a substantial risk of harm, current or future, from exposure to ETS and that this substantial risk was caused by the deliberate refusal of Defendants to remedy the situation when they could have. The Second Circuit has ruled that "a plaintiff [may state] a cause of action under the Eighth Amendment by alleging that prison officials have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health.' " *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002) (quoting *Helling,* 509 U.S. at 35). Defendants argue, however, that Braxton has failed to allege any substantial injury resulting from ETS exposure, either in the Complaint or in his grievances. Even if he had alleged substantial injury, Defendants argue that Braxton has failed to plead facts demonstrating that Defendants were deliberately indifferent to his health or welfare. (Def.Br.8-10)

In the Complaint, Braxton refers to "irritation" he experienced due to secondhand smoke (Cmplt.¶ 26), and alleges that "exposure to unreasonable levels of Secondhand smoke posed a risk of serious damage to Plaintiff's current and future health ... [and that he] continues to suffer from nausea, headaches, and congestion as a proximate result of Defendants deliberate indifference." (Cmplt.¶ 49) In his opposition brief,

Plaintiff attaches medical records demonstrating that he has repeatedly complained to physicians over a period of years about lung and nasal congestion due to secondhand smoke. (Opp.Exs.1-2, 35-41) Plaintiff also alleges in his brief that he "suffered blackouts due to secondhand smoke, and was admitted to the emergency room with respect to blackouts." (Opp. at 2 n. 1) In support of this allegation, Braxton submits an emergency room record from Bellevue Hospital dated May 10, 2009, in which the doctor states: "Please arrange for the patient to be in non-smoking quarters." (*Id.* Ex. 2)

**\*5** While these documents do not establish that Plaintiff has suffered a serious injury or faces a risk of future harm, they suggest with sufficient plausibility that Plaintiff may be able to demonstrate through discovery that a serious present injury or a future risk of serious injury exists. *See Davis v. New York,* 316 F.3d 93, 100-01 (2d Cir.2002) (finding plaintiff's allegations "that the smoke caused him to suffer dizziness, difficulty breathing, blackouts, and respiratory problems .... are not mere conclusory allegations, but may be sufficient to create an issue of fact as to the level of smoke to which [ plaintiff] was exposed and, thus, whether his Eighth Amendment rights were violated"). Affidavits from the medical personnel who treated Plaintiff, for example, might describe his ETS-triggered congestion as chronic and severe, or otherwise shed light on the status of Plaintiff's health. Affidavits from fellow inmates, similarly, could establish that indoor smoking in Plaintiff's vicinity was excessive, commonplace, and ignored by prison officials. *See Enigwe v. Zenk,* No. 03 Civ. 854(CBA), 2007 WL 2713849, at \*4 (E.D.N.Y. Sept.14, 2007). Accordingly, dismissal for failure to allege substantial injury is inappropriate.[FN5]

> FN5. The cases cited by Defendants are inapposite, as the plaintiffs in those cases either submitted no medical records or failed to allege that they suffered from serious medical conditions caused by prison conditions. In *Enigwe v. Zenk,* 2007 WL 2713849, at ----2-6 (E.D.N.Y. Sept.14, 2007), for example, the court granted defendant's motion for summary judgment in part because Enigwe had not presented evidence that ETS had damaged his

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

health. Discovery had revealed that Enigwe had never sought medical treatment for any of the health problems alleged in his complaint and had not previously reported severe health effects. Moreover, no physician had ever suggested that Enigwe was suffering health problems due to ETS exposure. *Id.* at ----3-4. Enigwe had also failed to offer evidence to support the claim that he was exposed to unreasonably high levels of ETS-such as affidavits from other inmates and his deposition testimony contradicted these allegations. *Id.* at *4. Here, in contrast, Braxton has supplied numerous medical records demonstrating that he complained of medical conditions caused by ETS exposure, and that a physician had requested that Braxton be moved to a non-smoking dormitory. In sum, neither *Enigwe* nor any other case cited by Defendants suggests that dismissal would be appropriate here.

Defendants also argue that even if Braxton could satisfy "the objective prong of the deliberate indifference test, he fails to adequately allege ... subjective deliberate indifference," because "liability cannot be established simply by alleging that a problem existed unabated on a defendant's watch." (Def. Br. at 9-10) Defendants further contend that "[w]hether a prison has a non-smoking policy bears heavily on the question of deliberate indifference." *Enigwe, 2007 WL 2713849, at *6* (citing *Helling, 509 U.S. at 36*).

To state a valid claim, Plaintiff must allege and later adduce evidence demonstrating a risk of harm from ETS exposure that was unreasonably high and dangerous to his future health, *Warren v. Keane, 196 F.3d 330, 332-33 (2d Cir.1999)*, and that prison officials "knew of the health dangers and yet refused to remedy [them]." *LaBounty v. Coughlin, 137 F.3d 68, 72-73 (2d Cir.1998)*. *See also Shepherd v. Hogan, 181 Fed. Appx. 93, 95 (2d Cir.2006)* ( "In order to be entitled to a jury trial, [plaintiff] must proffer evidence from which a reasonable juror could infer that (1) [defendant] was subjectively aware of the seriousness of [plaintiff's] situation, and (2) [defendant] had the ability to take some action that would have significantly alleviated [plaintiff's] ETS exposure,"). The

pleadings and incorporated documents sufficiently allege unreasonable exposure to ETS due to deliberate indifference.

While "imperfect enforcement of [a non-smoking policy] alone may not support a finding of deliberate indifference," *id.* at *18 (citing *Scott,* 139 F.3d at 944), courts making such a finding have done so at summary judgment, after full discovery. *See, e.g., Id.* at *19. Here, there has been no discovery and it is not clear whether the indoor smoking ban was enforced consistently, if at all. In any event, Braxton has alleged more than imperfect enforcement of the indoor smoking ban.

**\*6** Plaintiff has offered evidence that-through letters and grievances-he put prison officials, including Superintendent Nichols, on notice that inmates were smoking regularly in common spaces and that this was causing Plaintiff to experience "headaches as well as sinuses and nausea." (Pltf.Exs.16, 18, 19) Indeed, Plaintiff's correspondence and grievances, and the allegations in his complaint, cite nearly constant exposure to ETS on a daily basis. (Cmplt. ¶¶ 19, 22, 24, 30, 37-38, 43; Schulman Dec. Exs. A, B; Pltf. Exs. 16, 18, 19)

In his grievances, Plaintiff discusses the secondhand smoke issue in detail. For example, in a March 2008 grievance, Plaintiff states:

Irrespective to the Non Indoor Smoking Policy, inmates continue to smoke in the school administration's bathroom, cottage bathrooms, toilet stalls, shower rooms, dayrooms, and single rooms. Grievant asserts that because of the underenforcement, grievant is at risk to respiratory complications.

...

Grievant asserts that he is susceptibility [sic] to develop respiratory diseases because he is currently in a Block with 37 inmates whereas half of them are frequent or chain smokers. In 15-20 minute intervals they enter the Block bathrooms, dayrooms, bathrooms, bathroom stalls, shower rooms, and single rooms to smoke. Furthermore, grievant stats [sic] that he must hold his breath as he goes by and/or enter these rooms these

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

rooms [sic], and raise his saliva dampened T-shirt to cover his nose and mouth while he is in these rooms. Grievant also states that he must raise his collar of his dampened T-shirt to cover his nose and mouth to avoid inhalation while he is in his room, when their smoking ritual begins. The ventilation is inadequate; therefore, your immediate assistance is appreciated. I also feel my health has been compromised, and my health and safety is in jeopardy. I request also the ventilation to be checked out because the smoke from the constant cigarette smoking takes quite a while to decrease the "level" of residual gases from the cigarettes smoke after they have left.

(Pltf. Ex. 34 at 9-10) *Cf. Enigwe*, 2007 WL 2713849, at *6 (granting summary judgment where plaintiff did not assert that "he informed prison officials that the non-smoking policy was being violated ... [and] does not claim that he specifically told .... any prison official [ ] that there was smoking in his cell or in other areas of the housing unit where smoking was forbidden")

The Second Circuit has held that an "an official [may] exhibit [ ] deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 255 (2d Cir.2001). Braxton has offered three letters to the Superintendent as well as a grievance demonstrating that he complained about the routine violation of the indoor smoking ban and the deleterious effects of the secondhand smoke on his health. This is sufficient to demonstrate on a motion to dismiss that prison officials were on notice of the unreasonable exposure.[FN6]

> FN6. As the Court in *Warren v. Keane*, 196 F.3d at 332-33, stated in denying summary judgment:
>
> "plaintiffs' allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from, *inter alia*, under-enforcement of inadequate smoking rules, overcrowding of inmates and poor ventilation." *Warren v. Keane*, 937 F.Supp. 301, 305 (S.D.N.Y.1996). Until the facts are determined, we are unable to say that

any prison official reasonably could have believed that the alleged severe exposure to ETS did not violate the plaintiffs' Eighth Amendment rights.

## III. *PLAINTIFF ALLEGES SUFFICIENT PERSONAL INVOLVEMENT OF DEFENDANTS*

**\*7** Defendants also argue that Plaintiff has inadequately pled their personal involvement in the alleged constitutional violations (Def. Br. at 12), which is a "prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir.2006) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994)). Personal involvement may be shown in one of five ways: [that] (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *Jean-Laurent v. Wilkinson*, 438 F.Supp.2d 318, 325 (S.D.N.Y.2006).

As an initial matter, supervisory officials are not liable under the doctrine of *respondeat superior. See, e.g., Iqbal*, 129 S.Ct. at 1948 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Al- Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir.1989). Accordingly, Count II of Plaintiff's Complaint, entitled "Respondeat Superior Liability," must be dismissed.[FN7]

> FN7. To the extent the Complaint could be read as asserting Section 1983 claims against the Defendants in their official capacities, those claims are barred by the Eleventh Amendment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

*See Hater v. Melo,* 502 U.S. 21, 25-27, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Ying Jing Can v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993).

As for Plaintiff's deliberate indifference claims, the Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (2009). "[W] here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]' 'that the pleader is entitled to relief'" *Iqbal,* 129 S.Ct. at 1949 (citing Fed.R.Civ.P. 8(a) (2)). As noted above, because Plaintiff is proceeding *pro se,* the Court will consider facts alleged in and documents attached to Plaintiff's opposition papers. Based on the Complaint and the supplementary facts set forth in Plaintiff's opposition papers, the Court will not dismiss the Complaint on the ground that Plaintiff has failed to adequately plead the Defendants' personal involvement in the alleged constitutional violation.

### A. *Defendant James Nichols*

Plaintiff sent Defendant Nichols three letters informing him of frequent indoor smoking by inmates and guards, as well as the symptoms Plaintiff experienced as a result. It is also undisputed that Defendant Nichols reviewed Plaintiff's second grievance requesting the creation of a smoke-free dormitory. (*See* Def. Br. at 14) This grievance contained a detailed discussion of Plaintiff's exposure to ETS and the medical consequences he suffered. (*See supra* pp. 11-13) Defendants' argument that Superintendent Nichols "did not understand plaintiff to be complaining about underenforcement of the indoor smoking ban" (Def. Reply Br. at 6) is conclusory and is not a fair inference from the evidence currently before the Court.

*8 Defendants also argue that Nichols may not have been aware of the letters addressed to him, given that Acting Superintendent Jacobson answered Braxton's first letter and that Nichols was not the superintendant as of April 2007. (Def. Br. at 14) This argument presents a question of fact that must be addressed through discovery,

and cannot be resolved on a motion to dismiss. For purposes of Defendants' motion to dismiss, Plaintiff has demonstrated that it is plausible that Nichols was personally involved in the alleged failure to address Braxton's complaints.

### B. *Defendants John Nuttall, Lucien J. Leclair, Jr., Gayle Haponik, Anthony J. Annucci, and Lester Wright*

The Complaint fails to state a claim against the remaining Defendants. For example, while the Complaint asserts that Defendants Annucci and Leclaire disseminated DOCS' no-smoking policy on November 8, 2000, it does not allege that they had any involvement with Plaintiff or his complaints and grievances. [FN8] (Cmplt.¶ 16) Defendants Wright and Nutall are not mentioned at all in the Complaint's factual allegations. Defendant Haponik is mentioned only insofar as he directed Plaintiff to submit his request for a non-smoking dormitory through the prison's grievance process, (Cmplt.¶¶ 46-47)

> FN8. In any event, any claim based on November 2000 conduct would be barred by Section 1983's three-year statute of limitations. *See Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997); *Taylor v. City of New York Dept. of Hous., Preserv. & Dev.,* No. 08 Civ. 150(JSR)(GWG), 2008 WL 2485410, at *3 (S.D.N.Y. Jun. 19, 2008).

In his opposition memorandum of law, however, Plaintiff alleges that Defendants Nuttal, Leclair, Haponik, Annucci and Wright were CORC panel members and were present at and responsible for the "appellate administrative review and decision" concerning Plaintiff's March 13, 2008 grievance. (Opp. at 12-13, 17) If these allegations are true, Plaintiff's grievance, quoted above, arguably could have put each of these defendants on notice of Plaintiff's claimed constitutional violations.

It is not clear in this Circuit whether mere membership on a grievance panel is sufficient to demonstrate "personal involvement" for Section 1983 purposes. In *McKenna v. Wright,* 386 F.3d 432 (2d Cir.2004), plaintiff alleged an ongoing constitutional violation related to his serious liver disease, and argued that a deputy superintendent was liable because he had "denied treatment for McKenna by rejecting McKenna's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

grievance." *McKenna,* 386 F.3d at 437. The Circuit stated, in *dicta,* that "it is questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of," [FN9] citing *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002), in which the court dismissed a claim against a superintendent based on his denial of the plaintiff's grievance regarding alleged inadequate medical care. In discussing this issue, however, the Circuit did not address earlier decisions which found personal involvement where a constitutional violation was brought to a supervisor's attention and the supervisor did not remedy the violation. *See, e.g., Wright v. Smith,* 21 F.3d 496, 502 (2d Cir.1991) (finding personal involvement where defendant superintendent was notified of alleged due process violation through plaintiff's petition for a writ of habeas corpus but failed to provide a remedy); *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (finding personal involvement where defendant superintendent denied plaintiff's appeal of an administrative hearing where plaintiff was deprived of his due process right to call witnesses).

> FN9. The Court found personal involvement because the deputy superintendent was responsible for the prison's medical program: "When allegations of improperly denied medical treatment come to the attention of a supervisor of a medical program, his adjudicating role concerning a grievance cannot insulate him from responsibility for allowing the continuation of allegedly unlawful policies within his supervisory responsibility." *McKenna,* 386 F.3d at 438.

**\*9** Courts in this district are split as to whether review and denial of a grievance constitutes personal involvement in the underlying allegedly unconstitutional conduct. [FN10] *See Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (citing cases and noting disagreement). Some courts have dismissed claims founded on the denial of a grievance (*see supra* note 10); some courts have found personal involvement where a grievance adjudicator investigated the prisoner's complaint, *see Warren v. Goord,* 476 F.Supp.2d 407, 413 (S.D.N.Y.2007); others have made a distinction between a *pro forma* denial and a detailed response to a grievance, *see Brooks v. Chappius,*

450 F.Supp.2d 220, 226 (W.D.N.Y.2006); and still others have decided that personal involvement may be found where the grievance alleges an "ongoing" constitutional violation such that the " 'supervisory official who reviews the grievance can remedy [it] directly.' " *See Burton v. Lynch,* 664 F.Supp.2d at 360 (quoting *Vega v. Artus,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009)); *see also Hall v. Leclaire,* No. 06 Civ. 0946(GBD)(JCF), 2007 WL 1470532, at \*10 (S.D.N.Y. May 22, 2007), *adopted in relevant part,* 2007 WL 2815624 (S.D.N.Y., Sept.24, 2007). The "ongoing" constitutional violation analysis, of course, does not address the Circuit's *dicta* in *McKenna,* which involved an alleged ongoing constitutional violation that the defendant deputy superintendent could have remedied.

> FN10. *Compare Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (holding that personal involvement can be found where the grievance alleges an "ongoing" constitutional violation such that the " 'supervisory official who reviews the grievance can remedy [it] directly' ") (quoting *Vega v. Arms,* 610 F.Supp.2d 185, 198 (N.D.N.Y.2009); *Atkinson v. Selsky,* No. 03 Civ. 7759(LAK), 2004 WL 2319186, at \*1 (S.D.N.Y. Oct.15, 2004) (stating that " *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986), made it sufficiently clear that a prison official's denial of a grievance or grievance appeal is sufficient personal involvement to render that official liable under Section 1983"); *Moore v. Scully,* No. 90 Civ. 3817, 1993 WL 22129, at \*3 (S.D.N.Y. Jan.26, 1993) (denying summary judgment where plaintiff alleged that a disciplinary hearing violated due process and defendant superintendent affirmed result); *Smith v. Tucker,* No. 88 Civ. 2798, 1991 WL 211209, at \*7 (S.D.N.Y. Oct.4, 1991) (same) with *Manley v. Mazzuca,* No. 01 Civ. 5178, 2007 WL 162476, at \*10 (S.D.N.Y. Jan.19, 2007) (dismissing claims where defendant superintendent denied plaintiff's grievance alleging improper medical treatment); *Foreman v. Goord,* No. 02 Civ. 7089, 2004 WL 1886928, at \*7 (S.D.N.Y. Aug.23, 2004) (dismissing claims against superintendent for lack of personal involvement

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

where plaintiff complained of excessive use of force and superintendent denied grievance on appeal); *Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (dismissing claims against defendant superintendent who, on appeal, denied plaintiff's grievance for deliberate indifference to medical needs); *Scott v. Scully,* No. 93 Civ. 8777, 1997 WL 539951, at *4 (S.D.N.Y. Aug.28, 1997) (same), *abrogated on other grounds, Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999).

Given the uncertainty in the law and the lack of any discovery in this case, this Court will not dismiss Plaintiff's claims against the members of the CORC panel at this time. Discovery will reveal, *inter alia,* whether the members of the panel were in a position to remedy the alleged ongoing constitutional violation Plaintiff complains of.[FN11]

> FN11. Defendants also argue that the CORC panel members are not personally involved because they suggested to Plaintiff that his complaints about indoor ETS should be referred to security personnel. (Def. Reply Br. at 7). The CORC panel, however, did not make a formal referral of Plaintiffs' complaint to other prison personnel. Accordingly, the cases Defendants cite are not on point and this argument is unavailing.

## IV. *THE COMPLAINT WILL NOT BE DISMISSED ON QUALIFIED IMMUNITY GROUNDS*

Qualified immunity protects government officials "from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits," *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 817-18, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The defense shields government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818.

The Second Circuit has held that "a traditional

qualified immunity defense may [ ] be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint." *McKenna,* 386 F.3d at 436. Defendants are entitled to dismissal on qualified immunity grounds where the rights allegedly violated were not clearly established at the time of any alleged deliberate indifference, *Islam v. Fischer,* No. 07 Civ. 3225(PKC), 2008 WL 110244, at *6 (S.D.N.Y. Jan.9, 2008), or there is no plausible factual dispute as to " 'whether ... a reasonable police officer should have known he acted unlawfully....' " *Id.* (quoting *Lennon,* 66 F.3d at 421). Where a complaint's allegations are such that "reasonable officials in defendants' positions could disagree as to whether defendants' ... actions against plaintiff were unlawful," judgment as a matter of law on the issue of qualified immunity is appropriate on a motion to dismiss. *Id.* (citing *Lennon,* 66 F.3d at 421).

**\*10** Here, the rights at issue are clearly established.[FN12] The Supreme Court has acknowledged that exposure to secondhand tobacco smoke may satisfy the objective prong of an Eighth Amendment claim, *Helling,* 509 U.S. at 31-35, and the Second Circuit has held that the right not to be exposed to unreasonably high levels of ETS is "clearly established." *Warren v. Keane,* 196 F.3d at 333 ("We hold that after *Helling,* it was clearly established that prison officials could violate the Eighth Amendment through deliberate indifference to an inmate's exposure to levels of ETS that posed an unreasonable risk of future harm to the inmate's health."); *see also Islam v. Fischer,* 2008 WL 110244, at *6.

> FN12. Rights are "clearly established" when supporting Supreme Court or Second Circuit precedent existed at the time of the alleged unconstitutional conduct. *See Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1994).

Moreover, Plaintiff's Complaint does not demonstrate that reasonable officials in Defendants' positions would not have known that they were acting unlawfully. "The plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna,* 386 F.3d at 436 (holding pre-*Iqbal* that "not only must the facts supporting the defense appear on the face of the

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief" (internal citation omitted)).

Plaintiff has alleged sufficient facts to make plausible his claims that Defendants were deliberately indifferent to the violation of his constitutional rights. As the district court in *Warren* found, "plaintiffs' allegations, if believed, overwhelmingly describe a prison environment permeated with smoke resulting from, *inter alia,* underenforcement of inadequate smoking rules, overcrowding of inmates and poor ventilation." *Warren v. Keane,* 937 F.Supp. 301, 305 (S.D.N.Y.1996); *accord, Warren,* 196 F.3d at 332-33 ("Until the facts are determined, we are unable to say that any prison official reasonably could have believed that the alleged severe exposure to ETS did not violate the plaintiffs' Eighth Amendment rights.") Absent further evidence, this Court cannot find that "[g]iven the known dangers of ETS, [ ] a reasonable person [in Defendants' position] would [not] have understood that exposing an inmate to high levels of ETS could violate the Eighth Amendment." *Id.* Accordingly, the Complaint will not be dismissed on qualified immunity grounds.

**V. THE COMPLAINT WILL NOT BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**

Defendants argue that the Complaint should be dismissed because Braxton failed to exhaust his administrative remedies, "Where it appears from the face of the complaint that a plaintiff concedes lack of exhaustion, or non-exhaustion is otherwise apparent, a court may decide the exhaustion issue on a Rule 12(b)(6) motion," *Verley v. Goord,* No. 02 Civ. 1182(PKC)(DF), 2004 WL 526740, at *27 (S.D.N.Y. Jan. 23, 2004) (citing *Rivera v. Pataki,* No. 01 Civ. 5179(MBM), 2003 WL 21511939, at *4 (S.D.N.Y. My 1, 2003); *McCoy v. Goord,* 255 F.Supp.2d 233, 250-52 (S.D.N.Y.2003)). Because failure to exhaust is an affirmative defense, however, exhaustion need not be pleaded in a complaint. *See Jones v. Bock,* 549 U.S. 199, 212, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). From the pleadings in this action, it is not evident that Braxton failed to exhaust his administrative remedies.

**\*11** The Prison Litigation Reform Act ("PLRA") requires that "no action [ ] be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U .S.C. § 1997e(a) (1996). Under the PLRA, a plaintiff complaining about prison conditions must fully utilize the prison facility's internal grievance procedures before filing suit. *See Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (holding the exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes"). A plaintiff, in other words, must fully comply with the prison facility's grievance rules and procedures and must appeal any issue raised through the highest level of administrative review. *See* 42 U.S.C. § 1997e(a); *Woodford v. Ngo,* 548 U.S. 81, 93, 95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *Booth v. Churner,* 532 U.S. 731, 735, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). These rules apply even where the relief sought in an action for example, money damages is unavailable at the administrative stage. *See Grey v. Sparhawk,* No. 99 Civ. 9871(HB), 2000 WL 815916, at *2 n. 2 (S.D.N.Y. June 23, 2000). Where it is clear that a inmate did not exhaust his administrative remedies, the court must dismiss the action. *See Booth,* 532 U.S. at 735; *Neal v. Goord,* 267 F.3d 116, 117-18 (2d Cir.2001); *Harris v. Bowden,* No. 03 civ. 1617(LAD), 2006 WL 738110, at *2 (S.D.N.Y. Mar. 23, 2006) ("Statutory exhaustion requirements are mandatory; courts may not dispense with them freely ." (citing *Bastek v. Federal Crop Ins. Corp.,* 145 F.3d 90, 94 (2d Cir.1998)).

Three circumstances, however, may excuse a plaintiff from the PLRA's exhaustion requirements: (1) when administrative remedies are not available; (2) when defendants have either waived this defense or acted so as to estop them from raising the defense; or (3) when special circumstances, such as a reasonable misunderstanding of the grievance procedures, otherwise justify the prisoner's failure to comply with the exhaustion requirement. *Ruggiero v. County of Orange,* 467 F.3d 170, 175-76 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)

(Cite as: 2010 WL 1010001 (S.D.N.Y.))

The "applicable procedural rules" are "defined not by the PLRA, but the [local] prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). New York DOCS' Inmate Grievance Program ("IGP") procedures provide for a three-tiered process for adjudicating inmate complaints: First, a prisoner files a grievance with the Inmate Grievance Resolution Committee ("IGRC") at each facility; second, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility; and finally, a prisoner may appeal an adverse decision by the superintendent to CORC. N.Y. COMP.CODES R. & REGS., tit. 7, § 701.7 (1999). An "expedited" process is also available for harassment grievances, *id.* § 701.11, which pertain to "[e]mployee conduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.11(a). *See also* Hemphill, 380 F.3d at 682-83. Harassment grievances are sent directly to the superintendent, *id.* § 701.11(b)(2), and the superintendent must initiate an investigation and render a decision. COMP.CODES R. & REGS., tit. 7, § 701.11(b)(3-5). A prisoner may then appeal to CORC. *Id.* § 701.11(b)(7).

**\*12** The relevant DOCS regulations state that "the grievance must contain a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint." *Id.* § 701.7(a)(1)(i). The complaint form provides a space for the inmate to include a "[d]escription of [the][p]roblem," and directs the inmate to be "as brief as possible" but to include a statement of the "[a]ction requested." *Id.* While New York IGP regulations do not require a prisoner's grievance to state the names of the alleged responsible parties, *Espinal,* 554 F.3d at 224, the inmate "must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[A]grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." *Id.* at 697 (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)).

Defendants argue that neither of Braxton's grievances

"fairly raises the issue of underenforcement of DOCS's indoor smoking ban." (Def.Br.20) As discussed above, however, Braxton's second grievance clearly communicates that indoor smoking is pervasive and is compromising his respiratory functions. (Pltf. Ex. 34 at 9-10) The fact that the CORC panel reviewing the grievance suggested that Braxton take up the issue with security staff demonstrates that the panel understood that Braxton was alleging a widespread violation of the indoor smoking ban. (Pltf.Ex. 8) Moreover, Braxton's first grievance makes clear that he is suffering lung irritation as the result of exposure to secondhand smoke. (Ex. A at 6)

Because the pleadings here do not demonstrate that Plaintiff failed to exhaust his administrative remedies, dismissal for failure to exhaust is not appropriate.

### *CONCLUSION*

For the reasons stated above, Count II of the Complaint is DISMISSED. Defendants' motion to dismiss (Docket No. 9) is otherwise DENIED. The Clerk of the Court is directed to terminate the motion.

SO ORDERED.

S.D.N.Y.,2010.

Braxton v. Nichols
Not Reported in F.Supp.2d, 2010 WL 1010001 (S.D.N.Y.)
END OF DOCUMENT



Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Aurel SMITH, Plaintiff,
v.
Dale ARTUS, et al., Defendants.
No. 9:07-CV-1150 (NAM/ATB).

Sept. 30, 2010.
Aurel Smith, Malone, NY, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, Christina L. Roberts-Ryba, AAG, Justin C. Levin, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM-DECISION and ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.
   ***1** In this *pro se* civil rights action, plaintiff Aurel Smith claims that defendants violated his First Amendment right to freely practice his chosen religion and the First Amendment Establishment Clause, as well as his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* and the Religious Freedom Restoration Act of 1993 ("RFRA"). Dkt. Nos. 6, 38. Plaintiff also claims that defendants have violated his right to Equal Protection in connection with the right to practice his chosen religion. *Id.* Finally, plaintiff alleges that defendants' conduct violated state law, regulations and Department of Correctional Services ("DOCS") Directives. *Id.*

**I. FACTUAL BACKGROUND**

   The facts in this case, unless otherwise noted, are undisputed.[FN1]

   FN1. The facts set forth in this section are taken from: (1) the amended complaint; (2) the answer to the amended complaint; (3) the supplemental complaint; (4) the answer to the supplemental complaint; (5) defendants' statements of material

facts ("defendants' Rule 7.1 Statement"); (6) the exhibits and evidence submitted by defendants in support of their motion for summary judgment; (7) plaintiff's deposition transcript; (8) the exhibits and evidence submitted by plaintiff in opposition to defendants' motion for summary judgment; and (9) plaintiff's motion for partial summary judgment. With minor exceptions, plaintiff does not challenge the recitation of facts set forth in defendants' Rule 7.1 Statement. *See* Dkt. No. 91 at 1-2.

**A. Plaintiff's Religious Beliefs**

   Plaintiff is in faith a Muslim, an adherent of the Religion of Islaam, and belongs to the Sunni branch of Islaam. Dkt. No. 93 at 2, ¶ 6. His religion requires that he pray five times a day, at definitive time-frames occurring at particular phases of the day. *Id.* ¶ 6. The prayer is a formal prayer known as As-Salaah, also known as Salaah, Salaat, Salah, and Salat.[FN2] Salaah requires specific recitations as well as physical acts. *Id.* ¶ 7. As a Muslim, plaintiff is required to pray the Salaah, preferably in congregation, with two Salaah being the minimum number of the five that must be prayed in congregation. *Id.* ¶ 9. While group prayer is preferable to individual prayer, even if he is alone, plaintiff is required to pray the Salaah individually wherever he is at the times prescribed for the prayer. *Id.* Plaintiff is also required to attend Jumu'ah (sermon and prayer) every Friday after noon time, at approximately 12:30 p.m., which must be in a congregate setting. *Id.* ¶ 10. While Jumu'ah takes the place of the midday Salaah, the midday Salaah may not replace Jumu'ah. *Id.* It is sinful to omit Jumu'ah in preference to simply praying the midday Salaah. *Id.*

   FN2. For purposes of this Order, the Court will refer to the prayer at Salaah.

**B. The Events Forming the Basis of this Action**

**1. Clinton Correctional Facility (Prayer in Recreation Yard)**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

Plaintiff was housed at Sing Sing Correctional Facility ("Sing Sing") from December 2002 until September 2005. Dkt. No. 93 at 3, ¶ 11. While there, he prayed his Salaah in the recreation yard when the recreation period overlapped a prescribed prayer time. *Id.* Plaintiff was housed at Clinton Correctional Facility ("Clinton") from September 2005 until September 2007. *Id.* ¶ 12. At Clinton, plaintiff alleges that he was denied the right to perform his Salaah in the recreation yard because defendants had in place, and enforced, "a facility-level policy prohibiting Muslim prisoners" from doing so, even though the daily recreation period coincided with Muslim mandated prayer times. Dkt. No. 6 ("Am.Compl .") ¶ 6. Plaintiff also alleges that he was threatened with disciplinary sanctions under DOCS Rule # 106.10 (refusing a direct order) if he chose to disobey the facility level policy which prohibited Muslim prayer in the recreation yard. *Id.* The prohibition against Muslim prayer in the recreation yard applied regardless of whether a Muslim inmate wished to pray individually or in a group. *Id.* ¶ 7.

**\*2** In March 2007, plaintiff wrote to defendants Artus and Turner, as well as to S. Racette, Deputy Superintendent of Security, requesting that Muslim inmates at Clinton be allowed to either individually, or in a group not to exceed six persons, perform their Salaah at the religiously prescribed times while in the recreation yard on the sectional recreation courts to which they are either a member or a guest of a member. Am.Compl. ¶ 8; *see also* Dkt. No. 6-1 at 3 (Ex. A). When plaintiff did not receive a response to his March 2007 letter, on April 16, 2007, he resubmitted his requests to Artus, Turner, and Racette. *Id.* ¶ 9; *see also* Dkt. No. 6-1 at 5 (Ex. B).

As of May 2007, plaintiff had not received a response to either his March or April 2007 letters. Am.Compl. ¶ 10. On May 2, 2007, plaintiff met with Sgt. Douglas (the facility Inmate Grievance Resolution Committee ["IGRC"] Supervisor) and Correctional Officer Bombard, and requested information on Clinton's policy regarding the ability (or lack thereof) of Muslim inmates to perform Salaah in the recreation yard. Am.Compl. ¶ 10. Plaintiff also asked how the Clinton policy compared to the policy at other state correctional facilities. *Id.* At this meeting, plaintiff was advised that Muslim prisoners may pray their

Salaah "on their sectioned recreation courts to which they are either members or guest thereof." *Id.* After plaintiff met with Douglas and Bombard, and in light of their statements at the meeting, plaintiff and other Muslim inmates thereafter performed Salaah on their sectioned recreation courts without incident. *Id.* ¶ 11. In mid-June 2007, when defendants (and other administrative personnel) observed plaintiff and other Muslim inmates individually performing their Salaah, plaintiff was told that he could not perform Salaah in the recreation yard and was threatened with disciplinary action under DOCS Rule # 106.10 for refusing a direct order if he did so. *Id.*

In June 2007, plaintiff filed a grievance complaining that the policy prohibiting performance of Salaah in the recreation yard was arbitrary and in violation of New York State Corrections Law, especially when performance of Salaah did not create any sort of disturbance to the safety or security of the facility. Am.Compl. ¶ 12; *see also* Dkt. No. 6-1 at 59 (Ex. G). Plaintiff also asked that he no longer be threatened with disciplinary action against him for praying Salaah in the recreation yard. Am.Compl. ¶ 12. Also in June 2007, plaintiff wrote to Brian Fischer, Commissioner of DOCS, and Anthony Annucci, Deputy Commissioner/Counsel of DOCS, regarding the alleged violation of plaintiff's right to freely practice his religion at Clinton. *Id.* ¶ 13; *see also* Dkt. No. 6-1 at 48-57 (Exs.E, F). John H. Nuttall, Deputy Commissioner of Program Services for DOCS, responded to plaintiff's letter on behalf of Commissioner Fischer, stating that "per the Department of Correction Services Directive # 4202, Religious Programs and Practices, K. Prayer or Devotions, the Superintendent determines the areas where religious worship may occur." Dkt. No. 6-1 at 52. Anthony Annucci also responded to plaintiff's letter, advising plaintiff that the issues raised by plaintiff were outside the jurisdiction of his Office and telling plaintiff that issues raised would be more properly addressed within the context of the Inmate Grievance Program at his facility. Dkt. No. 6-1 at 57. In June 2007, plaintiff, acting in his position as an Inmate Liaison Committee ("ILC") representative, placed on the ILC-Superintendent's meeting agenda the issue of Clinton's policy of refusing to allow Muslim inmates to pray Salaah in the recreation yard when the required time to pray Salaah coincided with the allotted recreation period. Am.Compl. ¶ 14; *see also* Dkt. No. 6-1 at 62 (Ex.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

H).

**\*3** On July 4, 2007, plaintiff filed a grievance challenging the Clinton policy which prohibited praying Salaah in the recreation yard and Clinton's failure to otherwise accommodate Muslim inmates' need to pray Salaah at designated times. Am.Compl. ¶ 15. On July 10, 2007, the IGRC denied plaintiff's grievance, advising plaintiff that demonstrative prayer was only permitted in the inmate's cell and in designated religious areas as determined by the Superintendent. Dkt. No. 6-1 at 66 (Ex. J). Plaintiff appealed the July 10, 2007, decision to defendant Artus. *Id.* On July 26, 2007, defendant Artus denied plaintiff's appeal, stating that "individual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters or in designated religious areas whenever feasible, and that congregate or group prayer may only occur in designated religious areas during a religious service. Therefore, per Department Policy, no demonstrative prayer will be allowed in the North Yard." Am.Compl. ¶ 17, Dkt. No. 6-1 at 70 (Ex. K). Plaintiff appealed defendant Artus's decision to the Central Office Review Committee ("CORC"), which unanimously denied plaintiff's appeal on September 12, 2007, "as without merit." Am.Compl. ¶ 18; *see also* Dkt. No. 6-1 at 71 (Ex. K).

**2. Upstate Correctional Facility (Congregate Religious Services)**

On November 6, 2007, plaintiff was transferred from Clinton to Upstate Correctional Facility ("Upstate"). Dkt. No. 27, Supplemental Complaint ("Supp.Compl.") ¶ 44. Upstate is a double-celled Special Housing Unit ("SHU") facility. Supp.Compl. ¶ 45. Plaintiff was transferred to Upstate as a result of being found guilty of a disciplinary infraction and sentenced to a term of fourteen months in SHU. *Id.* On December 26, 2007, the sentence was modified on appeal to six months in SHU. *Id.* Plaintiff's sentence was later reduced by Upstate's Disciplinary Review Committee based upon plaintiff's "positive adjustment." *Id.; see also* Dkt. No. 38-1 at 1.

When plaintiff arrived at Upstate, he wrote to the Chaplain's Office at Upstate requesting an interview with a Chaplain and information regarding religious services at Upstate. Supp.Compl. ¶ 46. Plaintiff learned that Upstate did not have a Chaplain designated to serve plaintiff's religion, Islam, nor did Upstate have religious materials, such as books and pamphlets, available on Islam. *Id.* Upstate did have weekly congregate religious services for general population Muslim inmates, namely Jumu'ah services on Friday afternoons. *Id.* ¶ 47. Plaintiff requested a copy of DOCS form # 2175, a Request to Attend Scheduled Religious Services by Keeplocked Inmates, but the form was not available in his housing unit. *Id.* ¶ 47. Plaintiff filed a grievance complaining that form # 2175 was not available in the prisoner housing units. *Id.; see also* Dkt. No. 38-1 at 2. Upstate's IGRC denied the grievance, stating that "attendance at congregate religious services by a SHU inmate is not permitted ... As such, there is no need for FORM # 2175 to be available to SHU inmates." Dkt. No. 38-1 at 3. Plaintiff claims that the IGRC decision is "inconsistent with Directive # 4202, J, which provides that disciplinary cell-confined prisoners may request (via Form # 2175) to attend weekly congregate religious services." Supp.Compl. ¶ 48. Plaintiff appealed from the IGRC decision; defendant Wood affirmed the decision for the same reasons set forth by the IGRC. *Id.* ¶ 49; *see also* Dkt. No. 38-1 at 4.

**\*4** On December 24, 2007, plaintiff wrote to defendant Leonard, and other DOCS' officials, asking if there was any way that plaintiff would be allowed to attend congregate religious services. Supp.Compl. ¶ 50; *see also* Dkt. No. 38-1 at 5-8. On February 6, 2008, defendant Leonard's office responded to plaintiff's December 24, 2007 letter, advising the plaintiff the "per SHU Directive" plaintiff should direct his request to attend congregate religious services to the Deputy Superintendent of Security. Supp.Compl. ¶ 60; *see also* Dkt. No. 38-1 at 19. On February 9, 2008, plaintiff wrote to the Deputy Superintendent of Security at Upstate requesting permission to attend congregate religious services. Supp.Compl. ¶ 61; *see also* Dkt. No. 38-1 at 21. On February 14, 2008, Captain Lacey replied to plaintiff on behalf of the Deputy Superintendent of Security, advising that, per Departmental guidelines, SHU inmates could not attend congregate religious services. Supp.Compl. ¶ 62; *see also* Dkt. No. 38-1 at 22. On January 15, 2008, defendant Bezio also responded to plaintiff's December 24, 2007 letter, advising plaintiff that pursuant to DOCS Directive 4933, SHU inmates are not allowed to attend congregate religious services. Supp.Compl. ¶ 53; *see also*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

Dkt. No. 38-1 at 10.

On January 15, 2008, plaintiff wrote to the IGRC requesting the status of a grievance that he had filed regarding his inability to attend congregate religious services because he was confined in SHU. Supp.Compl. ¶ 52; *see also* Dkt. No. 38-1 at 9. By Memorandum dated January 17, 2008, the IGRC informed plaintiff that his grievance complaining that he was barred from attending congregate religious services had not been received, but advised plaintiff that he could resubmit the grievance. Supp.Compl. ¶ 54; *see also* Dkt. No. 38-1 at 11. Plaintiff resubmitted his grievance on January 18, 2008. Supp.Compl. ¶ 55; *see also* Dkt. No. 38-1 at 12-13. In his grievance (# UST-34109-08), plaintiff stated that he was a Muslim inmate incarcerated in SHU and wished to attend weekly Jumu'ah services at Upstate, arguing that the blanket prohibition against all SHU inmates attending congregate religious services violated his constitutional and statutory rights to freely exercise his religion. Dkt. No. 38-1 at 12. Plaintiff requested that he be given permission to attend weekly Jumu'ah services. *Id.* The IGRC denied plaintiff's January 18, 2008, grievance. Supp.Compl. ¶ 56; *see also* Dkt. No. 38-1 at 14. Defendant Superintendent Woods affirmed the IGRC decision on appeal, stating that (1) SHU Directive 4933 prohibits inmates housed in SHU from attending congregate religious services but allows SHU inmates to possess religious materials in their cell, participate in special meals associated with religious holidays, and have access to facility Chaplains; (2) Directive 4202 (Religious Programs and Practices) provides that (a) to the extent possible and consistent with safety and security of the facility, authorized inmates should be allowed to attend congregate religious services and (b) SHU inmates are allowed to have various religious books and items in their cell. Supp.Compl. ¶ 57; *see also* Dkt. No. 38-1 at 15. Plaintiff appealed the denial of his grievance to CORC; on March 19, 2008, (after plaintiff had been transferred to Great Meadow) CORC affirmed defendant Superintendent Wood's decision denying plaintiff's grievance # UST-34109-08. Supp.Compl. ¶¶ 59, 63; *see also* Dkt. No. 38-1 at 16-18 and 23.

**\*5** While at Upstate, plaintiff was subject to the behavioral tracking system known as the Progressive Inmate Movement System ("PIMS") under which an inmate is rewarded for positive behavioral adjustment. Supp.Compl. ¶ 82. There are three levels in PIMS; a level III inmate has greater freedom of movement without restraint than a level I inmate. *Id.* ¶¶ 82-83. Because of his positive adjustment at Upstate, plaintiff progressed to from a level I inmate to a level III inmate under PIMS. *Id.* ¶ 83. CORC also reduced the length of plaintiff's SHU sentence. *Id.*

**3. Great Meadow Correctional Facility (Prayer in Recreation Yard)**

Plaintiff was transferred out of Upstate on February 22, 2008, and arrived at Great Meadow on February 25, 2008. Supp.Compl. ¶ 64. While at Great Meadow, plaintiff was not allowed to pray Salaah in the recreation yard and was not provided with a "religiously acceptable alternative" to accommodate his need to pray Salaah at the prescribed time. Supp.Compl. ¶ 65. Plaintiff filed a grievance (# GM-45,381-08) on March 25, 2008, claiming that he was being denied his right to freely exercise his religion because he was prohibited from performing his daily prayer in the recreation yard and told that if he did perform demonstrative prayer, he would receive a misbehavior report. Supp.Compl. ¶ 66; *see also* Dkt. No. 38-1 at 24-26. Plaintiff asked that "the facility Superintendent and Muslim, Imam (Elmi) establish an appropriate place for [plaintiff] to perform [his] daily prayer when [he is] not able to perform them while in [his] living quarters." Dkt. No. 38-1 at 24. The IGRC at Great Meadow recommended that the facility superintendent look into the feasibility of allowing the performance of Islamic daily prayer in an appropriate area at the prescribed times when prayer cannot be performed in the living quarters. Dkt. No. 38-1 at 27. On appeal, Superintendent Rock denied plaintiff's grievance. Supp.Compl. ¶ 68. Plaintiff appealed defendant Rock's decision to CORC. Supp.Compl. ¶ 69; *see also* Dkt. No. 38-1 at 29-32. On May 28, 2008, CORC upheld defendant Rock's decision which denied grievance # GM-45,381-08. Supp.Compl. ¶ 71.

On May 6, 2008, defendant LaPolt, Deputy Superintendent of Programs at Great Meadow, advised plaintiff that since he could pray in a non-demonstrative manner in the recreation yard, plaintiff was able to meet his religious obligations and did not need religious accommodation. Supp.Compl. ¶ 70; *see also* Dkt. No.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

38-1 at 94. Plaintiff wrote to Great Meadow Chaplain, Imam Elmy, seeking guidance on whether non-demonstrative prayer would fulfill plaintiff's obligation to perform Salaah and whether Imam Elmy told defendants LaPolt and Rock that the non-demonstrative prayer would suffice. Supp.Compl. ¶ 72. On June 17, 2008, plaintiff met with Imam Elmy, who advised plaintiff that he did not give defendants LaPolt and Rock authorization to advise plaintiff that the non-demonstrative prayer would meet plaintiff's religious obligation to pray Salaah and also told plaintiff that the non-demonstrative prayer would not suffice to meet plaintiff's religious obligation to pray Salaah. *Id.* ¶ 73.

**4. DOCS Policies Regarding Inmate Religious Practices**

**\*6** The sections of the DOCS Directives relevant to the pending motions follow.

New York State DOCS Directive 4202(K) reads as follows:

> 1. Individual demonstrative prayer by inmates will only be allowed in the privacy of their own living quarters and in designated religious areas whenever feasible as determined by the Superintendent.

> 2. Congregate or group prayer may only occur in a designated religious area during a religious service or at other times authorized by the Superintendent.

Dkt. No. 87-2 (Ex. E).

New York State DOCS Directive 4933 § 304.9, which applies only to SHU inmates, provides:

> (a) Counseling by a member of the facility's ministerial services staff will be provided upon written request of an inmate.

> (b) The facility senior chaplain or a designated member of the ministerial services staff will be required to make a minimum of one round per week in SHU.

> (c) No inmate religious advisor or assistant will be permitted to visit SHU.

(d) Attendance at congregate religious services will not be permitted.

Dkt. 87-2 (Ex. H).

**II. PROCEDURAL HISTORY**

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 by filing a complaint on October 29, 2007. Dkt. No. 1. On November 5, 2007, plaintiff filed an amended complaint as of right pursuant to Federal Rule of Civil Procedure 15(a).[FN3] Am.Compl. The amended complaint alleged that defendants Artus and Turner denied plaintiff the right to perform his Salaah in the recreation yard at Clinton. *Id.* The amended complaint requested monetary damages as well as declaratory and injunctive relief. *Id.* Defendants Artus and Turner filed an answer to the amended complaint. Dkt. No. 18. Plaintiff thereafter filed a supplemental complaint adding new defendants to this action, namely Fischer, Perlman, Leonard, Bezio, Woods, Rock, and LaPolt. Supp.Compl. In the supplemental complaint, plaintiff claimed that defendants refused to allow plaintiff to attend congregate religious services (Jumu'ah) while he was confined in the SHU at Upstate and denied plaintiff the right to perform his Salaah in the recreation yard at Great Meadow. *Id.* The supplemental complaint requested monetary relief. *Id.* Defendants Fischer, Perlman, Leonard, Bezio, Woods, Rock, and LaPolt filed an answer to the supplemental complaint. Dkt. No. 50. Construed liberally, plaintiff's amended complaint and supplemental complaint together allege that defendants violated his rights under (1) the Free Exercise Clause of the First Amendment; (2) the Establishment Clause of the First Amendment; (3) the Fourteenth Amendment's Equal Protection Clause; (4) RLUIPA; (5) RFRA; and (6) various state laws, regulations, and administrative policies.

> FN3. The amended complaint replaced and superceded the original complaint. See *Arce v. Walker*, 139 F.3d 329, 332 n. 4 (2d Cir.1998) (noting "an amended complaint ordinarily supercedes the original and renders it of no legal effect") (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir.1977)).

Presently before the court are two dispositive motions. Defendants have filed a motion for summary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

judgment pursuant to FED. R. CIV. P. 56. Dkt. No. 87. In support of their motion for summary judgment, defendants argue that (1) plaintiff cannot establish that he was denied the right to freely practice his religion in violation of the First Amendment; (2) plaintiff's First Amendment Establishment Clause claim fails as a matter of law; (3) plaintiff has not been denied his rights under the Equal Protection Clause of the Fourteenth Amendment; (4) plaintiff's claims under RLUIPA fail as a matter of law; (5) defendants are entitled to qualified immunity; (6) plaintiff cannot demonstrate that defendants Fischer, Leonard, and Perlman were personally involved in any of the alleged constitutional or statutory violations; (7) plaintiff's RFRA claims should be dismissed because RFRA has been declared unconstitutional; (8) plaintiff's claims that defendants violated New York state law or regulations should be dismissed as not actionable under Section 1983; and (9) some of plaintiff's claims for injunctive and declaratory relief should be dismissed as moot. Dkt. No. 87-4. As part of their motion, defendants have submitted (1) the transcript of plaintiff's deposition testimony; (2) a declaration from each defendant; (3) DOCS Directives 4202 and 4933; (4) various interdepartmental correspondence addressed to plaintiff; and (5) the Central Office Review Committee decision denying plaintiff's grievance number CL-55183-07. Dkt. No. 87-2.

**\*7** Plaintiff has submitted a response in opposition to defendants' motion for summary judgment. Dkt. No. 91. As part of that response, plaintiff indicates that he wishes to withdraw all of his claims asserted under (1) the First Amendment Establishment Clause; (2) the Equal Protection Clause; (3) RFRA; and (4) all state law claims. *Id.* ¶ 6. Plaintiff indicates that he only wishes to pursue his claims brought pursuant to the First Amendment Free Exercise Clause and RLUIPA. *Id.* ¶ 7. Plaintiff has also filed a motion for partial summary judgment pursuant to FED. R. CIV. P. 56 which seeks summary judgment on his remaining claims. Dkt. No. 93. Defendants have filed a reply to plaintiff's response. Dkt. No. 90. Defendants also oppose plaintiff's motion for partial summary judgment. Dkt. Nos. 94, 102. Plaintiff has replied to defendants' opposition to his motion. Dkt. Nos. 97, 104.

Plaintiff also submitted two motions for injunctive

relief. Dkt. Nos. 105, 109. Defendants oppose the first motion. Dkt. No. 106. Plaintiff replied to defendants' opposition. Dkt. No. 107.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983) (citing *Adickes v. Kress & Co.,* 398 U.S. 144, 157 (1970)). However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). At that point, the nonmoving party must move forward with "specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587.

### IV. CLAIMS WITHDRAWN BY PLAINTIFF

In his response to defendants' motion, plaintiff expressed his intention to withdraw all of his claims brought under (1) the First Amendment Establishment Clause (Am.Compl., Count 2 and Supp.Compl., Count 6); (2) the Equal Protection Clause (Am.Compl., Count 3); (3) RFRA; and (4) state law. Dkt. No 91 ¶ 6. Plaintiff cannot unilaterally withdraw his claims without a Court Order, because an Answer (as well as a motion for summary judgment) have already been filed. FED. R. CIV. P. 41(a)(1)(A)(i). To the extent that the Court could liberally construe plaintiff's withdrawal of his claims as a request for a Court Order dismissing those claims *without prejudice* "on terms that the court considers proper" pursuant to FED. R. CIV. P. 41(a)(2), the Court denies that request based on a finding that a dismissal *with prejudice* is more appropriate. This is because (1) defendants have expended the time and effort to file a motion for summary judgment requesting the dismissal of those claims, and (2) the Court, having independently reviewed the merits of the claims that plaintiff seeks to withdraw, agrees with the reasons set forth in defendants'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

memorandum of law that the those claims have no merit.[FN4] Accordingly, pursuant to plaintiff's request, and for the reasons set forth above, plaintiff's claims brought pursuant to (1) the First Amendment Establishment Clause; (2) the Equal Protection Clause; (3) RFRA; and (4) state law are dismissed **with prejudice.** *See also Rosen v. City of New York,* 667 F.Supp.2d 355, 359 (S.D.N.Y.2009) (granting summary judgment with respect to claims withdrawn by plaintiff).

> FN4. The claims withdrawn lack merit because, among other things: (1) plaintiff has demonstrated that defendants' actions violated the Establishment Clause of the First Amendment; (2) plaintiff has not established that, for purposes of the Equal Protection clause, he was treated any differently than any member of another religion; (3) RFRA was declared unconstitutional by the Supreme Court in 1997 and was amended by the RLUIPA, *see Hamilton v. Smith,* No. 06-CV-805, 2009 WL 3199531, at *1, n. 3 (N.D.N.Y. Jan. 13, 2009) (citation omitted); and (4) a violation of a state law or regulation, in and of itself, does not give rise to liability under Section 1983, *see Doe v. Conn. Dep't of Child and Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990).

**\*8** The only claims remaining are plaintiff's allegations that defendants violated his First Amendment right to freely exercise his religion and his free-exercise rights under RLUIPA. In light of this, defendants' motion for summary judgment and plaintiff's motion for partial summary judgment address identical claims, therefore the Court will review the motions jointly. Each side is arguing that, as to the claims remaining in this action, there are no questions of material fact and therefore each side argues that it is entitled to judgment as a matter of law.

### V. PLAINTIFF'S RELIGIOUS CLAIMS

Plaintiff asserts two separate claims with respect to violations of his religious rights. Plaintiff claims that his rights have been violated because he has been prohibited from praying Salaah in the prison yard during his designated recreation period at both Clinton and Great Meadow. Plaintiff also asserts that he was denied the

ability to attend Jumu'ah services while he was confined in SHU. Plaintiff asserts these claims under the First Amendment Free Exercise Clause and RLUIPA.

It is well-settled that inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990). As more fully discussed below, the analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz,* 482 U.S. 342 (1987) and *Turner v. Safley,* 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is "less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford,* 352 F.3d at 588 (citations omitted).

As to a First Amendment claim, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is "reasonably related to legitimate penological interests." *O'Lone,* 482 U.S. at 349 (quoting *Turner,* 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord,* 467 F.3d 263, 274 n. 4 (2d Cir.2006) (citation omitted). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, a court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." The Supreme Court established four factors that are relevant to the analysis of whether a regulation is reasonably related to legitimate penological interests:

**\*9** (i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities.

*Covino v. Patrissi,* 967 F.2d 73, 78-79 (2d Cir.1992) (citing *Turner,* 482 U.S. at 89-91. Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." *Ford,* 352 F.3d at 595 (citations omitted).

RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment. *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009) (citation omitted). Under RLUIPA, a plaintiff must demonstrate that the state has imposed a substantial burden on the exercise of his religion.... *Redd v. Wright,* 597 F.3d 532, 536 (2d Cir.2010). "[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest. *Id.* RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S .C. § 2000cc-5(7)(A).

RLUIPA was upheld against constitutional challenge in *Cutter v. Wilkinson,* 544 U.S. 709 (2005). In *Cutter,* however, the Supreme Court also stated "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* at 722. The Court also stated that RLUIPA permits compelling state interests to outweigh an inmate's claim to a religious accommodation, and while the Act does adopt the compelling state interest standard, " 'context matters' in the application of that standard." *Id.* at 722-23. The Supreme Court noted that supporters of RLUIPA in Congress anticipated that courts would apply this standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' " *Id.* at 723 (citing Joint Statement S7775 (quoting S. REP. NO.

103-111, p. 10 1993)). Lower courts have also held that maintaining security and preserving order are both compelling governmental interests. *Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), rev'd on other grounds, *Orafan v. Rashid,* 249 Fed.Appx. 217 (2d Cir.2007) (citing *Cutter,* 544 U.S. at 723 n. 11). Additionally, "[f]iscal, staffing, and space considerations are part of maintaining security and preserving order." *Id.* (citing *Marria v. Broaddus,* No. 97 Civ 8297, 2004 WL 1724984, at *2 (S.D .N.Y. Jul. 30, 2004)).

**A. Sincerely Held Religious Beliefs**

*10 As a threshold matter, the Court must determine, under both the First Amendment Free Exercise Clause and RLUIPA, whether a prisoner's particular religious beliefs are entitled to free exercise protection. *Singh v. Goord,* 520 F.Supp.2d 487, 498 (RLUIPA), 508 (First Amendment) (S.D.N.Y.2007). In this regard, "the relevant inquiry is not whether, as an objective matter, the belief is 'accurate or logical.' " *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996)). Rather, the inquiry is whether the plaintiff's beliefs are " 'sincerely held and whether they are, in his own scheme of things, religious.' " *Id.* (quoting *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984)). A "[s]incerity analysis seeks to determine an adherent's good faith in the expression of his religious belief." *Patrick,* 745 F.2d at 157 (citing *Int'l Soc. for Krishna Consciousness v. Barber,* 650 F.2d 430, 441 (2d Cir.1981)). The test allows the court to differentiate between beliefs that are held as a matter of conscience and those that are motivated by deception or fraud. *Id.*

Courts recognize that they are "singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs." *Patrick,* 745 F.2d at 157. Thus, in analyzing this first factor, courts have rejected an objective, content-based approach "in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system." *Ford,* 352 F.3d at 588 (citations omitted). The Second Circuit has adopted an "expansive" definition of "religion" as "the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Patrick,* 745 F.2d at 158 (quoting *United States v. Moon,*

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

718 F.2d 1210, 1227 (2d Cir.1983)).

As many courts have held, a determination of whether beliefs are "sincerely held" is often a question of fact and requires the court to "delve into the internal workings of [plaintiffs' minds] and assess the credibility of [their] claims." *Patrick,* 745 F.2d at 159; *see also Marria v. Broaddus,* 200 F.Supp.2d 280, 292 (S.D.N.Y.2002) (denying summary judgment to defendants in a Five Percenters' case).

In this case, defendants claim that "plaintiff does not specifically allege that he sincerely believes that praying the Salaah and attending Jumu'ah are necessary for his scheme of beliefs ." Dkt. No. 87-4 at 13. However, without conceding the point, defendants state that, for purposes of the motions before the Court, they "accept that plaintiff's beliefs are sincerely held." *Id.* Moreover, at his deposition, as well as in his affidavit in support of his motion for partial summary judgment, plaintiff recounted in detail his beliefs under Islaam, including the requirements that he pray Salaah five times daily in a demonstrative manner and attend Jumu'ah services every Friday. *See* Dkt. No. 87-2, Deposition Transcript ("Trans."); *see also* Dkt. No. 93 at 2-3; Dkt. No. 91-9 (Ex A) (outlining the components of a valid prayer). In light of the foregoing, the Court will assume for purposes of this motion that (1) plaintiff is a sincere believer in Islaam and (2) that praying Salaah in a demonstrative manner at the religiously prescribed time and attending Jumu'ah services on a weekly basis are part of his "scheme of beliefs." Having concluded for purposes of this motion that plaintiff's beliefs are sincerely held, the Court must now analyze whether defendants' conduct or policies created a substantial burden upon those beliefs and whether defendants, in creating the burden, exercised the least restrictive means in furtherance of a legitimate penological interest, or in the case of RLUIPA, a compelling governmental interest.

**B. Substantial Burden**

**\*11** Next, for a claim under both the First Amendment Free Exercise Clause and RLUIPA, a plaintiff must demonstrate that his or her sincerely held religious beliefs were substantially burdened by defendants'

conduct. *Singh,* 520 F.Supp.2d at 498 (RLUIPA), 509 (First Amendment).<sup>FN5</sup> In order to be considered a "substantial burden," the plaintiff "must demonstrate that the government's action pressure[d] him to commit an act forbidden by his religion or prevent[ed] him from engaging in conduct or having a religious experience mandated by his faith." *Muhammad v. City of New York Dep't of Corr.,* 904 F.Supp. 161, 188 (S.D.N.Y.1995) (citations omitted). The burden must be more than an inconvenience, it must substantially interfere with a tenet or belief that is central to the religious doctrine. *Id.* (citations omitted); *see also Jones v. Shabazz,* 352 Fed. Appx. 910, 913 (5th Cir.2009) (holding that a "government action or regulation only creates a substantial burden on a religious exercise if it truly pressures an adherent to significantly modify his religious behavior and significantly violate his religious beliefs"); *see also Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at \*1 (S.D.N.Y. Jul. 6, 2000) ("A substantial burden is more than a mere inconvenience ... but rather involves, for example, a situation where an adherent is forced to modify his behavior and violate his beliefs.") (discussing substantial burden in the context of a First Amendment Free Exercise claim) (citations omitted).

FN5. In *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004), the Second Circuit had previously declined to reach the question of whether a claim under the Free Exercise Clause, as opposed to RLUIPA, requires a substantial burden on religious exercise. However, in *Salahuddin,* 467 F.3d at 275, the Circuit stated that a substantial burden was required for a claim under the Free Exercise Clause, even though it indicated that it was *not addressing* the plaintiff's argument that a substantial burden was not required. *Id.,* 467 F.3d at 274-74, 275 n. 5 (noting that plaintiff "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs). In view of the Second Circuit's statements in *Salahuddin,* this Court finds that a substantial burden on free exercise is required for a plaintiff to make out a claim under the First Amendment Free Exercise Clause.

Plaintiff believes that he should be allowed to pray

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

Salaah in the recreation yard when the religiously prescribed time to pray Salaah coincides with the designated recreation period. Plaintiff says that at both Clinton and Great Meadow, he was prohibited from praying Salaah while in the recreation yard as a result of a facility-level policy at each of those facilities. Am.Compl. ¶ 6; Supp.Compl. ¶ 65. After filing grievances at both facilities, plaintiff was told that per DOCS Directive 4202, individual demonstrative prayer is only allowed in the privacy of the inmate's cell or in designated religious areas; and that group or congregate prayer may only occur in designated religious areas. Am.Compl. ¶¶ 15-18; Dkt. No. 6-1 at 70; Supp.Compl. ¶¶ 66-71; Dkt. No. 38-1 at 28. Plaintiff was further advised that at Clinton and Great Meadow, demonstrative prayer would not be allowed in the recreation yard, but that plaintiff may pray silently and non-demonstratively in the recreation yard. Am.Compl. ¶¶ 15-18; Supp.Compl. ¶¶ 66-71; Dkt. No. 87-5 at 12; Dkt. No. 87-11 at 12. Plaintiff has testified that demonstrative acts-namely standing, bowing, sitting, and prostrating-are essential to praying Salaah and that therefore introspective, non-demonstrative prayer would not suffice to meet his religious obligations. Trans. at 78 [FN6] (plaintiff testified that "the acts ... such as standing, bowing, sitting, and prostrating are essential acts that the prayer cannot do without"); Dkt. No. 91-9 at 9; *see also* Dkt. No. 38-1 at 61-93 ("Understanding Conditions, Pillars & Obligations of the Prayer").

> FN6. When citing to pages in the deposition, the Court will cite the page referenced in the actual deposition transcript rather than to the page referenced in this Court's docket.

**\*12** Defendants however contend that the referenced DOCS' policies do not create a substantial burden on plaintiff's right to pray Salaah at the prescribed time because plaintiff has other options available to him. Dkt. No. 87-4 at 13-14. Defendants assert that plaintiff himself conceded that he was not required to go to the recreation yard during the recreation period, but could choose to remain in his cell where he could freely pray Salaah in a demonstrative fashion. *Id.* at 14; *see also* Trans. at 47-48; Dkt. No. 87-5 ("Artus Decl.") ¶ 47; Dkt. No. 87-11 ("Rock Decl.") ¶ 56. Plaintiff also stated that he "[v]ery often" chose to remain in his cell and pray rather than go

to the recreation yard. Trans. at 48. Defendants also state that plaintiff could attend recreation and then choose to go back to his cell during the designated go back period [FN7] and thus pray Salaah demonstratively in the privacy of his cell. *See* Artus Decl. ¶ 48; Rock Decl. ¶ 57.

> FN7. The designated go back period is a process whereby inmates may return to their cells from the recreation yard under the supervision of staff at a scheduled time. *See* Artus Decl. ¶ 49; Rock Decl. ¶ 58.

In contrast, plaintiff argues that his right to pray Salaah is substantially burdened because he is forced to choose between praying Salaah and foregoing recreation, and that the compulsion, though indirect, is a burden just the same. Dkt. No. 91 at 8.

The question therefore becomes whether having to choose between attending recreation (which includes additional privileges, as more fully described below) or fulfilling his obligation to pray Salaah in a demonstrative manner would substantially burden plaintiff's religious rights. Although facts produced at trial may show otherwise, the present record, *when viewed in the light most favorable to plaintiff,* shows that plaintiff's free exercise rights were substantially burdened by defendants' policy of requiring plaintiff to either forego his Salaah prayer or give up other privileges accorded him as an inmate.

Plaintiff states that when he was incarcerated in Upstate SHU, he was not allowed to attend Jumu'ah services. [FN8] Supp.Compl. at 4-7. The defendants concede, and the Court agrees, that plaintiff's inability to attend Jumu'ah while housed in SHU substantially burdens his right to attend congregate religious services. *See* Dkt. No. 87-4 at 13; *see also Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (noting prisoners have a constitutional right to participate in congregate religious services) (citing *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989)).

> FN8. Plaintiff has now been transferred back to Upstate. Dkt. No. 108.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

**C. Demonstrative Prayer in the Recreation Yard**

**1. First Amendment Free Exercise Clause**

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened, with respect to a First Amendment free exercise claim, "[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; 'the burden remains with the prisoner to show that these articulated concerns were irrational.' " *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595). Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the ***actual*** reason for the defendants' actions. "Post hoc justifications with no record support will not suffice." *Id.* at 277. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had "a valid, rational connection to a legitimate governmental objective"; (2) whether the prisoner has an "alternative means of exercising the burdened right"; (3) "the impact on guards, inmates, and prison resources of accommodating the right"; and (4) "the existence of alternative means of facilitating [the plaintiff's] exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Id.* at 274 (citing *Turner,* 482 U.S. at 90-91).

**\*13** Defendants contend that their prayer policy has a valid, rational connection to a legitimate penological interest. In respective affidavits, Superintendent Artus (Clinton) and Superintendent Rock (Great Meadow) listed several reasons for prohibiting demonstrative prayer in the recreation yard, essentially claiming that allowing demonstrative prayer would pose a threat to the safety or security of inmates and guards alike. Artus Decl.; Rock Decl. Artus and Rock each state that, in their respective roles as a superintendent of a correctional facility, they are aware of the penological interests served by banning demonstrative prayer in the prison's recreation yard. Artus Decl. ¶ 18; Rock Decl. ¶ 25. The recreational yards at Clinton and Great Meadow are large, 5.5 acres and 5 acres respectively, and have present on any given day a large number of inmates supervised by a relatively small number of staff. Artus Decl. ¶¶ 19-21; Rock Decl. ¶¶

27-28. On a typical day at Clinton, the recreation yard has approximately 300 inmates present during the recreation period, and these inmates are supervised by as few as 10 staff members. Artus Decl. ¶¶ 20-21. At Great Meadow, approximately 100 to 400 inmates are present, supervised by 7 to 9 staff members depending upon the time of day. Rock Decl. ¶ ¶ 27-28. A large gathering of inmates in one location presents difficulties in maintaining the facility's safety and security; and large areas where inmates gather, such as the yard or mess hall "are areas of a facility where unusual incidents such as serious fights and assaults typically occur." Artus Decl. ¶¶ 22-23; Rock Decl. ¶¶ 31-32.

Demonstrative prayer is not allowed in the yard because it constitutes a substantial threat to facility safety and security, as it singles individuals out as members of a particular religious group. Artus Decl. ¶¶ 25-26; Rock Decl. ¶¶ 34-35. Identification of an inmate's religious affiliation could lead to conflicts between different faith groups, or different sects of the same faith group, or could encourage other inmates to come to the aid of someone of their faith, resulting in escalation of an individual incident to a larger scale, placing staff and other inmates in danger. Artus Decl. ¶¶ 29-35 Rock Decl. ¶¶ 38-44. "Further, during the confusion created by such incidents, an inmate may attempt to escape from the facility or inmates may attempt to take over the prison." Artus Decl. ¶ 35 Rock Decl. ¶ 45.

Demonstrative prayer also negatively impacts the staff's ability to control inmates. Artus Decl. ¶¶ 37-44; Rock Decl. ¶¶ 46-53. For example, an inmate engaged in demonstrative prayer is likely to ignore legitimate direct orders from staff or may view any interruption as an insult to his religion, which might in turn lead to a conflict between the inmate and staff. Artus Decl. ¶¶ 38-40; Rock Decl. ¶¶ 47-49. Moreover, "because the inmate's religion has been identified by his demonstrative prayer, other inmates may join in the conflict, rapidly escalating the situation." Artus Decl. ¶ 41; Rock Decl. ¶ 50. Additionally, a staff member may hesitate to interrupt an inmate engaged in demonstrative prayer out of respect for the inmate's religion, and therefore be "unable to communicate necessary information" to the inmate. Artus Decl. ¶¶ 42-43; Rock Decl. ¶¶ 51-52.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

**\*14** Based upon their concerns that allowing demonstrative prayer in the yard could lead to conflict or could result in a loss of control over inmates who are praying, defendants assert that "the prohibition of demonstrative prayer in [the] recreation yard[s at Clinton and Great Meadow] is reasonably related to the legitimate penological interest of facility safety and security." Artus Decl. ¶ 69; Rock Decl. ¶ 82.

Defendants have identified a legitimate penological interest-namely maintaining a safe prison-to justify the prohibition on demonstrative prayer in the recreation yards at Clinton and Great Meadow. *See Pell v. Procunier,* 417 U.S. 817, 823 (1974) (stating that "institutional consideration[s] of internal security within the corrections facilities" are "central to all other corrections goals"). The burden now shifts to plaintiff "to show that these articulated concerns [are] irrational ." *Salahuddin,* 467 F.3d at 275.

Plaintiff argues that defendants' asserted interest in prohibiting behavior which might identify an inmate's chosen faith (on the presumption that an inmate's religious identity might lead to conflict) is irrational in light of provisions contained in the very DOCS Directive which defendants use to support their prohibition against demonstrative prayer in the recreation yard. Dkt. No. 91 at 10. Plaintiff points to DOCS Directive 4202(M), which permits inmates to wear religious headcoverings in accordance with their religious beliefs. Dkt. No. 91 at 10; *see also* Dkt. No. 87-2 at 129-30, DOCS Directive 4202(M). For example, an inmate of the Jewish faith may wear a Yarmulke; a Rastafarian may wear a Tsalot-Kob; and a Muslim inmate may wear a Kufi. Dkt. No. 91 at 10; DOCS Directive 4202(M). Plaintiff further points out that these headcoverings may be worn throughout the day, which would include in the recreation yard. *Id.* Plaintiff states that adherents of other religions are also easily identifiable by other means. For example, only Rastafarians are allowed to have their hair in dredlocks and certain religions are allowed to grow their beards longer than the general one inch length restriction. *Id.* at 10-11. Plaintiff also points out that Jewish inmates receive their kosher meals on different colored trays in the mess hall-a location that defendants identified as a highly

populated area prone to disturbances (which defendants claim might arise upon identification of inmate's religion). *Id.* at 11. Finally, plaintiff argues that by virtue of socialization alone (within the housing units, in classes, and during work assignments), and by observing another inmate's comings and goings (leaving the housing unit during a particular religious service or observance), inmates frequently know the religious designation of other inmates. *Id.*

In response to defendants' assertion that correctional officers will lose control over inmates who are allowed to pray demonstratively, plaintiff argues that this concern is also irrational. Dkt. No. 91 at 11-12. First, plaintiff says that defendants "have not explained how this would be any different for a person praying 'introspectively, devoid of symbolism,' which they assert all can pray throughout the facility." *Id.* at 11. Plaintiff further contends that a person praying introspectively would present a greater risk than a person praying demonstratively because there is nothing to alert a correctional officer that the person *is praying,* "thereby an unwitting person may more likely disrupt them or give an order (and thus penalize them for not responding), than to one praying demonstratively by which they knew he was praying." *Id.* at 12. Plaintiff also argues that other activities in the recreation yard (such as sports and table games) have led to conflict in the yard, yet those activities are not banned. Dkt. No. 93 at 27.

**\*15** Additionally, plaintiff asserts that the policy in place at Clinton and Great Meadow is unreasonable because inmates are allowed to pray in recreation yards in other New York state facilities. Dkt. No. 91 at 13-14; Dkt. No. 93-2 at 43. Plaintiff testified that at Attica Correctional Facility ("Attica"), inmates are allowed to pray demonstratively in the yard, in groups of five, if they do so off to the side of the yard, near the wall. Trans. at 64-65; *see also* Dkt. No. 91-1 at 35-39. Plaintiff also testified that when he was at Sing Sing as recently as 2005, he was allowed to pray in the yard, "individually ... off to the side, and it didn't create a disturbance." Trans. at 50; Dkt. No. 93-2 at 43. Plaintiff also states that he was previously allowed to demonstratively pray in the Clinton recreation yard.[FN9] Trans. at 51. The Court finds it noteworthy that defendants have not responded to this statement, either by denying that inmates were previously

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

allowed to pray demonstratively, or if they were previously allowed to pray demonstratively in the yard, by explaining what brought about the change. Finally, plaintiff provides affidavits from other inmates who aver that they have been allowed to pray demonstratively during outdoor recreation at other facilities. *See* Dkt. No. 91-1 at 23-26 (affidavits from three different inmates stating that Muslim inmates are allowed to pray Salaah in the recreation yards, with all its movements and postures, at Sing Sing, Five Points Correctional Facility, Eastern Correctional Facility, and Attica). One of the inmate affidavits submitted states that at Auburn Correctional Facility, when prayer time coincided with outdoor recreation, the Muslim Chaplain and administration of that facility made an arrangement whereby an announcement was made over the loudspeaker that Muslim inmates could be escorted from the recreation yard to the mess hall to pray. Dkt. No. 91-1 at 24-25. The fact that other facilities allow inmates to pray demonstratively in the recreation yard is not necessarily instructive in this case, since DOCS Directive 4202 leaves it to each individual superintendent to determine where in his or her own facility demonstrative prayer should be allowed. That being said, defendants have not come forward with some credible evidence to justify the prohibition *at Clinton and Great Meadow.* For example, defendants have not shown that the lay-out, staffing, etc. at Clinton or Great Meadow differ from the lay-out, staffing, etc. at those facilities where demonstrative prayer is allowed in the recreation yard. Plaintiff has thus raised at least an inference that defendants' security concerns are irrational in light of the fact that other facilities are able to accommodate demonstrative prayer in the prison yard. Additionally, plaintiff argues that defendants' concerns for safety and security are conclusory and speculative and that "the hypothesized potential of security concerns are too remote to outweigh religious freedoms." Dkt. No. 91 at 12.

> FN9. Plaintiff testified that when he first arrived at Clinton, he prayed several times in the recreation yard without incident. Trans. at 51. Plaintiff stated that "[s]ome officers [at Clinton] don't mind. Some officers adhere to what the policy was before." *Id.*

**\*16** Although facts produced at trial may show otherwise, the present record, *when viewed in the light most favorable to plaintiff,* shows that plaintiff's free exercise rights were substantially burdened by the prayer policy in place at Clinton and Great Meadow. Although defendants have asserted that the policy is justified by a legitimate penological interest, plaintiff has put forth enough evidence for a reasonable jury to conclude that defendants' concerns are irrational or are an exaggerated response to those concerns. Plaintiff has not however submitted sufficient evidence for the Court to conclude as a matter of law that defendants cannot justify their policy on the record at trial. Neither party has carried its burden on this first *Turner* factor, namely whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it.

Notwithstanding the refusal to allow demonstrative prayer in the recreation yard, defendants state that inmates wishing to pray during the recreation period have several alternatives. Plaintiff argues that the alternatives suggested by the defendants are neither reasonable nor the least restrictive means of accommodating his free exercise rights with respect to praying Salaah. Dkt. No. 91 at 15-17.

First, defendants state that inmates may make silent, non-demonstrative prayer in the recreation yard. Artus Decl. ¶ 46; Rock Decl. ¶ 55. Plaintiff has testified that praying Salaah without the required movements does not fulfill his obligation to conduct the prayer, as the various movements are integral and essential aspects of the prayer. Trans. at 53, 56-57; *see also* Am.Compl. ¶ 27. For example, plaintiff testified that "the prayer is broken into things that are called pillars that [are] essential like a building has its foundation, its pillars, it can't do without ... The acts that they talk about, such as standing, bowing, sitting, and prostrating are essential acts that the prayer cannot do without." Trans. at 57. When asked, "So the prayer is invalid without those acts?" plaintiff responded, "Yes." *Id.* Plaintiff has also submitted a portion of a book describing the manner in which Salaah is to be performed. [FN10] Dkt. No. 38-1 at 61-95. Defendants have presented no evidence, such as testimony from an expert on Islaam and its practices, that silent, non-demonstrative prayer would suffice to fulfill plaintiff's religious obligation to pray Salaah. There remains a question of fact as to whether

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

silent, non-demonstrative prayer is a reasonable alternative.

> FN10. Plaintiff also cites *Chatin v. State,* No. 96 Civ. 420, 1998 WL 196195, at *2 (S.D.N.Y. Apr. 23, 1998), which contains in the findings of fact, a description of the requirements for Muslim prayer.

Defendants also suggest that inmates may remain in their cell during the recreation period, forgoing recreation, since they may pray demonstratively in the privacy of their own cell. Artus Decl. ¶ 47; Rock Decl. ¶ 56; *see also* DOCS Directive 4202(K) (providing that individual demonstrative prayer will be allowed in the privacy of an inmate's own living quarters). At his deposition, plaintiff stated that although he is not required to attend recreation, he is faced with "the dilemma to ... [e]ither attend recreation, because [inmates] are supposed to be mandated a minimum of one hour recreation by correctional law, you know ... so we are forced with the dilemma of either partaking the one hour recreation or prayer, so you give up one right." Trans. at 47-48. Plaintiff states that going to the recreation yard carries with it other privileges apart from exercise and socialization. Dkt. No. 91 at 7-8. For example, during recreation, inmates are afforded access to phones located in the yard, an opportunity to take an additional shower, and are exposed to fresh air. *Id.* Plaintiff states that because he suffers from asthma, the opportunity for fresh air is particularly important to him. *Id.* Plaintiff also contends that his "choice" is tempered by the threat of disciplinary action, namely, if he chooses to go to the recreation yard, he goes to the yard under the threat that he will receive a disciplinary ticket if he attempts to pray demonstratively. *Id.* Punishment for such an infraction could result in various sanctions including a loss of privileges, removal from programs, monetary sanctions, and a permanent strike on the prison record (which would be considered by the parole board and the Time Allowance Committee). *Id.*

**\*17** In *Sherbert v. Verner,* 374 U.S. 398 (1963), the plaintiff was put in the position of choosing to exercise her religious beliefs (which required her to not work on Saturdays) or forfeiting her right to receive unemployment benefits. The *Sherbert* court found that "[g]overnmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Sherbert,* 374 U.S. at 404. In the case at hand, plaintiff argues that, although he has the option to remain in his cell during recreation, this option forces him to choose between praying Salaah demonstratively in his cell but forfeiting his recreation yard benefits on the one hand, or on the other hand, abandoning his Salaah in order to exercise, use the phone, take an extra shower, and enjoy some fresh air. Dkt. No. 91 at 8. Construed liberally, plaintiff seems to argue that this *choice* puts him between a rock and a hard place, essentially offering him two equally unpleasant alternatives. In accordance with *Sherbert,* a reasonable juror could conclude that giving plaintiff the choice between prayer or recreation puts pressure on plaintiff to forego his religious practices. As such, absent further evidence to the contrary, defendants have not proven that this is a reasonable alternative.[FN11]

> FN11. While of course an inmate may at times be required to choose between two separate and distinct privileges, as must we all, defendants have failed to submit sufficient evidence to show that, as a matter of law, the alternatives that they suggest are the least restrictive means of accommodating plaintiff's religious free exercise.

Finally, defendants state that inmates may return to their cell during the designated "go back" period and then pray demonstratively in their cell. Artus Decl. ¶¶ 48-49; Rock Decl. ¶¶ 57-58. Plaintiff says that the early go back at Clinton and Great Meadow also does not provide a reasonable alternative to allowing plaintiff to pray in the recreation yard. Dkt. No. 91 at 15. Plaintiff states that there are times when the go back period occurs *after* the time to make his prayer has passed. Trans. at 47. Plaintiff also testified that unforeseen circumstances can sometimes delay the go back period. For example, if a fight breaks out during recreation, the go back may be delayed or may not occur at all. *Id.* at 48-49. Defendants have not responded to these concerns.

Plaintiff has raised sufficient factual issues regarding the reasonableness of the alternatives available to him to pray Salaah at Clinton and Great Meadow.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

The Court must also consider the impact that an accommodation would have on prison guards, other inmates, and the allocation of resources. In this case, defendants assert that changing the current policy regarding demonstrative prayer in the yard would pose a threat to prison security. However, as discussed *supra,* defendants have not met their burden of proving that the prayer policy instituted at Clinton and Great Meadow is a "rational" response to their security concerns. Defendants have therefore failed to meet their burden on this third factor as well. Conversely, plaintiff has not demonstrated to a legal certainty that a change in policy would not have an adverse impact upon guards, inmates, and prison resources.

**\*18** Finally, the Court must consider the possibility of alternatives. "[I]f an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard ." *Turner,* 482 U.S. at 91. Plaintiff has suggested several ways to accommodate his need to pray Salaah during recreation, each of which defendants claim are untenable.

First, plaintiff suggests that at both Clinton and Great Meadow, an additional go back period can be arranged for Muslim inmates to coincide with their prescribed prayer time. Dkt. No. 91 at 18; Supp .Compl. ¶ 90; Trans. at 78. Defendants state that this option would either create a threat to the safety and security of inmates and guards in the recreation yard, or would be cost prohibitive. Inmates must be escorted while they are transported from the recreation yard to and from their cells. Artus Decl. ¶ 51; Rock Decl. ¶ 60. Defendants contend that escorting Muslim inmates back and forth to their cells during a special, additional go back period would reduce the number of guards available in the recreation yard at a given time, creating risks for both staff and inmates. Artus Decl. ¶¶ 53-54; Rock Decl. ¶¶ 62-63. A diminished number of correctional officers in the yard would create security concerns. Artus Decl. ¶ ¶ 55-56; Rock Decl. ¶¶ 64-65. Correctional officers would be unable to appropriately respond to an incident; for example, correctional officers may be unable to subdue inmates

engaged in violent confrontation. Artus Decl. ¶¶ 57-59; Rock Decl. ¶¶ 66-68. To avoid the diminishment of staff in the yard during the extra go back period, each facility would have to hire additional correctional officers, or pay current correctional officers overtime, creating substantial fiscal concerns for the facilities. Artus Decl. ¶¶ 60-61; Rock Decl. ¶¶ 70-71. The Court finds that defendants have provided sufficient evidence to demonstrate that *this alternative* would have a negative impact upon prison security and the fiscal resources available to the facility, and that the impact would not be *de minimis.*

Plaintiff suggests that, at Clinton, inmates could be allowed to pray the Salaah "on the sectioned recreation courts." Am.Compl. ¶ 24; *see also* Dkt. No. 91 at 18; Am.Compl., Ex. A (plaintiff's request for reasonable accommodation).[FN12] Plaintiff testified that you can become a member of a sectioned recreation court at Clinton by signing up in the sergeant's office and that members can invite anyone they want to their court, as long as there are no more than six inmates on the private court at any one time. Trans. at 40. Plaintiff argues that what goes on in these individual courts would not interfere with the rest of the yard. *Id.* at 39-40. At Great Meadow, plaintiff suggests that inmates could be allowed to pray on the fenced in, unused basketball court. Trans. at 75; Supp.Compl. ¶ 93. Plaintiff alleges that "the recreation yard [at Great Meadow has] enough area for one to pray his Salaat without incident, and video footage of said yard during recreation would verify this point." Supp.Compl. ¶ 93.

> FN12. Plaintiff's request was denied by defendant Turner. Dkt. No. 87-12 at 8. In denying the request, defendant Turner referred to that part of DOCS Directive 4202 which states: "Congregate or group prayer may only occur in a designated religious area during a religious service or at other times authorized by the Superintendent ." *Id.*

**\*19** Defendants argue that these options are not viable because allowing inmates to pray demonstratively on the sectioned recreation courts or a fenced in, unused basketball court would lead to the same security concerns presented in the recreation yard as a whole, i.e., inmates'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

religious designations would be identified and staff would have diminished control over inmates praying demonstratively, leading to conflict, violent incidents, and possible loss of control over the yard. Artus Decl. ¶¶ 63, 66-67; Rock Decl. ¶¶ 72-75. The Court has already concluded, *supra,* that these concerns have not been sufficiently supported on the record to justify the prayer policy in place at Clinton and Great Meadow. Therefore a question of fact remains as to the feasibility of these options.

Additionally, defendant Rock states that "designation of a specific area of the recreation yard for demonstrative prayer purposes creates territorial issues between different groups of prisoners ... These territorial issues present a serious risk to facility staff and security because they could lead to conflict between different groups of inmates." Rock Decl. ¶¶ 76-77. In the case of Great Meadow, Rock states that allowing inmates to use the fenced in, unused basketball court for demonstrative prayer would create staffing and fiscal concerns because "[a]dditional correction officers would need to be assigned to supervise the fence and the actual special area designated for demonstrative prayer. Accordingly, more staff would have to be hired or staff would need to be diverted from the main yard, potentially causing understaffing and increased risks to facility safety and security." Rock Decl. ¶¶ 78-80. Plaintiff argues that territorial issues should not be a concern because admittance to the assigned courts at Clinton or the unused basketball court at Great Meadow would only be by permission. Dkt. No. 91 at 19.

Based on the record before it, this Court cannot find as a matter of law that the pray policy in place at Clinton and Great Meadow is rationally related to legitimate penological interests or that it is the least restrictive alternative that could be offered.

## 2. RLUIPA

The issue under RLUIPA is whether the defendants' prayer policy at Clinton and Great Meadow is justified by a compelling state interest and whether the policy is the least restrictive method for achieving those interests.

The defendants in this case allege that there are concerns for security, as well as staffing and fiscal

concerns, associated with accommodating plaintiff's request to pray demonstratively during the recreation period. It has been held that simply raising the "specter" of security is not sufficient to outweigh the inmates' interests. *See Spratt v. R.I. Dep't of Corrs.,* 482 F.3d 33, 38-39 (1st Cir.2007). In *Spratt,* the inmate wished to "preach" to inmates. *Id.* at 35. He had been ordained as a minister in the Universal Life Church, and the prison chaplains began allowing plaintiff to preach to inmates during weekly services. *Id.* Although there had been no problems with plaintiff's activities for seven years, the defendants in *Spratt* suddenly decided that he could no longer engage in his preaching activities. *Id.* at 35. The lower court dismissed the action as to claims of Constitutional violations as well as RLUIPA. *Id.* Spratt appealed only the denial of the RLUIPA claim. *Id.*

**\*20** The defendants' reasoning in *Spratt* included allegations that allowing inmates to be in actual or perceived leadership could be a threat to security. *Id.* at 36-37. Spratt argued that defendants' response was exaggerated and based on speculation, offering to submit to facility supervision of his preaching activities. *Id.* at 37. The First Circuit found under RLUIPA that Spratt's religious exercise, which included preaching, was substantially burdened and found that the defendants' response was not the least restrictive means of achieving their compelling state interest of security. *Id.* at 39. The court found that, other than citing one non-relevant case, the defendants in *Spratt* had not met their burden of showing that having inmates in a "leadership" position endangered security, and that defendants had not shown that they had considered and rejected the efficacy of less restrictive measures before adopting the *blanket ban* on inmate preaching. *Id.* at 40-41. In making this decision, however, the court did note that RLUIPA does not require prison administrators to refute "every conceivable option in order to satisfy the least restrictive means prong" of the statutory test. *Id.* at 41 n. 11 (quoting *Hamilton v. Schriro,* 74 F.3d 1545, 1556 (8th Cir.1996))

This case is not distinguishable from *Spratt.* Defendants here, as in *Spratt,* have not met their burden of showing that allowing inmates to prayer demonstratively during the recreation period endangered security. While it is certainly reasonable that defendants would want to

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

ensure the safety and security of their inmates and correctional officers, notwithstanding these articulated concerns, as more fully discussed *supra* in Section V.C. 1., defendants have not produced concrete evidence that the concerns are justified, but instead merely *speculate* as to what types of dangers *might* arise if an inmate is allowed to demonstratively pray in the recreation yard. Nor have defendants met their burden that their fiscal and staffing concerns amount to a compelling state interest. Moreover, even if defendants could establish a compelling state interest which would support prohibiting demonstrative prayer in the recreation yard, defendants have not demonstrated, as a matter of law, that their policy is the least restrictive means that could be employed to further that interest. In fact, plaintiff has proposed alternatives which a reasonable juror could conclude would have a *de minimis* impact on the facility as a whole. *See supra,* Section V.C.1. Conversely, however, plaintiff has not established as a matter of law that there can be no compelling governmental interest to support the policy. Accordingly, neither plaintiff nor defendants are entitled to judgment as a matter of law on the merits of plaintiff's RLUIPA claim which challenges the prayer policy at Clinton and Great Meadow.

**D. Congregate Services for SHU Inmates**

**1. First Amendment Free Exercise**

**\*21** The Second Circuit has "found it well established that a prisoner's free exercise right to participate in religious services is not extinguished by his or her confinement in special housing or keeplock." *Ford v. McGinnis,* 352 F.3d 582, 597 (2d Cir.2003) (citing *Salahuddin v. Coughlin,* 993 F.2d at 308). Thus, in order to limit this right, DOCS must provide a legitimate penological interest.

Pursuant to DOCS Directive 4933 § 304.9, "[a]ttendance at congregate religious services will not be permitted" when an inmate is housed in SHU. *See* Dkt. No. 87-2 (Ex. H). Defendants contend that they have a legitimate penological interest in implementing the policy which prohibits inmates confined in SHU from attending congregate religious services. Defendant Bezio, DOCS Director of Special Housing/Inmate Disciplinary Programs, has submitted an affidavit outlining the reasons

which support denying SHU inmates access to congregate religious services. Dkt. No. 87-6 ("Bezio Decl."). Inmates are assigned to SHU as a result of a disciplinary action (for their failure to comply with DOCS' rules and regulations) or to be segregated from the general population (because their presence in the general population "presents a danger to the safe, secure, and smooth operation of the facility". *Id.* ¶¶ 21-22. Special precautions are required to supervise inmates assigned to SHU. *Id.* ¶ 23. "[A]bsent special circumstances, inmates assigned to SHU are restrained at all times when they are escorted out of their cells, and extra supervision by staff is needed for SHU inmates to ensure facility safety and security." *Id.* ¶¶ 24-25.

PIMS, a standardized system designed to encourage good behavior by SHU inmates by providing certain privileges for good behavior, is in place at Upstate. Bezio Decl. ¶¶ 27-29. Whenever an inmate enters Upstate, he is classified as a PIMS Level I inmate. *Id.* ¶ 30. If an inmate is to progress from PIMS Level I to PIMS Level II, he must at a minimum have 30 days at Level I status with no disciplinary reports. *Id.* ¶ 31. Movement from PIMS Level II to Level III requires at a minimum that the inmate must remain at Level II for 30 days with no disciplinary reports. *Id.* ¶ 32. Certain procedures are in place in Upstate SHU which must be followed when a SHU inmate leaves his cell and is moved either within or outside of SHU. *Id.* ¶ 33; *see also id.* (Ex. D) Upstate Correctional Facility, Special Housing Unit Manual, Area 16 ("Area 16 SHU Manual"). Each inmate's hands are restrained before he is allowed to leave the cell and upon exiting the cell, his hand restraints are attached to a waist chain. Bezio Decl. ¶ 34. The number of correctional officers required to escort a given inmate depends on the inmate's PIMS Level as well as the number of other inmates being escorted at the same time. *Id.* ¶ 35; Area 16 SHU Manual. Two correctional officers are always required to escort a PIMS Level I inmate. Bezio Decl. ¶ 36. For PIMS Level II or III inmates, two correctional officers are required to escort one to three inmates and three correctional officers are required to escort four to six inmates. Bezio Decl. ¶ 37; Area 16 SHU Manual at 3. No more than six PIMS Level II or III inmates may be escorted in one group. Bezio Decl. ¶ 38; Area 16 SHU Manual at 3.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

**\*22** Congregate religious services at Upstate are conducted outside of SHU. Bezio Decl. ¶ 40. To attend services, a SHU inmate would need to be escorted to and from services, as set forth in the Area 16 SHU Manual, and the escort, or escorts, would have to remain with the inmate during services. *Id.* ¶¶ 41, 48. Upstate is staffed by about 328 correctional officers who must cover three shifts, 24 hours a day, seven days a week. *Id.* ¶¶ 43-45. Muslim services are conducted during the day shift; there are approximately 84 correctional officers assigned to the day shift in Upstate SHU to cover essential services for SHU inmates. *Id.* ¶¶ 46-47. There are about 1060 inmates assigned to Upstate SHU, and about 101 of the SHU inmates are identified as observants of Islam, therefore the staff would potentially have to restrain and escort 101 inmates to Jumu'ah services. *Id.* ¶¶ 42, 50-51. Additionally, if SHU inmates were allowed to attend congregate religious services, taking into account adherents of other faiths, during the course of a week, correctional officers could be required to escort all 1060 SHU inmates to various religious services. *Id.* ¶ 51. The number of staff required to escort and intensely supervise SHU inmates for congregate religious services would "negatively impact institutional order." [FN13] *Id.* ¶ 54. Additionally, DOCS would be forced to hire additional correctional officers to meet the escort need or pay current staff overtime wages, which would "present substantial fiscal concerns for DOCS and place a drain on scarce human resources, especially in the current economic climate." *Id.* ¶ 55.

> FN13. As outlined by defendant Bezio, transporting twelve PIMS Level III inmates to Jumu'ah services on a Friday afternoon would require six of the 84 day shift correctional officers to be removed from their posts to stay with the inmates for however long the services lasted. Since there are approximately 101 Muslim inmates assigned to Upstate SHU, the number of guards required as escorts for each Jumu'ah service would likely be greater. This is not even taking into account the fact that **each PIMS Level I inmate would require two correctional officers as an escort for services.** *See* Bezio Decl.

Defendant Bezio also states that, based upon his personal experience, having a large number of inmates in one area increases the possibility of disruptive behavior,[FN14] therefore DOCS has established procedures to limit inmates' opportunities to gather in large numbers. Bezio Decl. ¶¶ 57-61. SHU inmates are not allowed to attend mess hall or recreation yard because of the risk that they pose to prison security, but are served meals in their cell and exercise in individual recreation areas. *Id.* ¶¶ 62-63. Congregate religious services are also an activity where a large number of inmates gather in one location. *Id.* ¶ 64. Additionally, Upstate has developed procedures to ensure that inmates who are known to be enemies are not escorted to the same area at the same time, such as to medical call-outs. *Id.* ¶ 65. Since known enemies may be members of the same faith, Upstate would face the choice of having known enemies escorted to the same congregate religious services (which could lead to assaults or other unusual incidents), or in the alternative, would be forced to conduct numerous services to ensure that known enemies do not attend services together. *Id.* ¶¶ 67-70. The first option would be a threat to facility safety and security; the second option would strain prison resources, both in terms of manpower and finances. *Id.* ¶¶ 67-71. Finally, Bezio states that most SHU inmates have already demonstrated that they are unable to follow prison rules, therefore allowing them to attend congregate religious services "heightens the risk that an unusual incident will occur" at the service. *Id.* ¶ 68.

> FN14. Defendant Bezio states that large areas where inmates gather, such as the recreation yard or the mess hall, are areas where serious fights or assaults typically occur. Bezio Decl. ¶ 60.

**\*23** Defendants point out that SHU inmates may still practice their religion by, among other things, praying in their cell, requesting counseling from a member of the ministerial staff, receiving religiously appropriate meals, and possessing certain religious articles and publications.[FN15] Bezio Decl. ¶¶ 72-77.

> FN15. Plaintiff himself admits that, although Jumu'ah is an essential duty for a Muslim, a Muslim who is prevented from attending Jumu'ah for reasons beyond his control-such as

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

incarceration-is not considered to have sinned. Trans. at 71-72.

Since defendants have provided a legitimate penological interest to justify denying a SHU inmate the ability to attend congregate religious services, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." Plaintiff points to his progression in the PIMS system from a Level I inmate to a Level III inmate as evidence that his conduct is not a threat to prison security. Supp.Compl. ¶¶ 82-83. Plaintiff's lack of disciplinary reports for a period of time may provide some evidence that he, as an individual, is not a threat to prison security. However, plaintiff has offered no evidence to overcome defendants' asserted penological interest of not straining its manpower to the point where prison security is compromised. Additionally, plaintiff admits that SHU inmates of all religions, not just Muslim SHU inmates, are denied the ability to attend their respective congregate services. Trans. at 73. Plaintiff has failed to carry his burden of establishing that defendants' policies are irrational and has pointed to no alternative which would be compatible with defendants' concerns.

Finally, plaintiff states that he "never sought mandating allowance to attend services by every SHU prisoner [but r]ather he sought ... discretionary review and approval as given to other prisoners in segregated confinement (per Dir # 4202[J] )." Dkt. No. 91 at 23; *see also* Supp.Compl. (Ex. L). Directive 4202(J) provides, in relevant part that "[a]n inmate in keeplock status ... may request permission to attend regularly scheduled congregate religious services." Dkt. No. 87-2 (Ex. E). Plaintiff's argument in this regard is misplaced because, by its plain terms, DOCS Directive 4202(J) applies only to inmates in keeplock.[FN16] *Id.*

FN16. *See Webster v. Fischer,* No. 9:08-CV-0071, 2010 WL 890968, at *7 n. 11 (N.D.N.Y. Mar. 9, 2010) (explaining that SHU is different than keeplock because SHU is a more restrictive confinement than keeplock).

This Court finds that the enforcement of DOCS Directive 4933 § 304.9(d) is rationally related to a valid penological interest and is the least restrictive means of

serving that interest. *See o'Lone,* 482 U.S. 342 (prison officials did not violate inmate's right by assigning him to outside work detail that prevented his attendance at congregate religious services, because the rules relating to outside work assignments were reasonably related to legitimate penological objectives); *Salahuddin v. Jones,* 992 F.2d 447, 449 (2d Cir.1993) (SHU inmate may be denied the right to attend congregate religious services if based upon legitimate penological concerns); *Matiyn v. Henderson,* 841 F.2d 31 (2d Cir.) (plaintiff's First Amendment free exercise claim that he was prevented from attending congregate religious services is without merit because the denial was for reasons related to legitimate penological interests), *cert denied,* 487 U.S. 1220 (1988). Accordingly, plaintiff has not established that his right to freely exercise his religion under the First Amendment Free Exercise Clause was violated because of his inability to attend congregate religious services while housed in Upstate SHU.

**2. RLUIPA**

**\*24** Under RLUIPA, the Court must determine whether the defendants' policy of prohibiting attendance at congregate religious services by SHU inmates is a compelling state interest and whether their policy is the least restrictive method for achieving those interests.

Based upon the record evidence the court finds that, even though defendants may be "substantially burdening" plaintiff's religion by not allowing him to attend Jumu'ah services while incarcerated in Upstate SHU, defendants' policy is the least restrictive means of furthering the compelling state interests, namely concern for prison security, as well as fiscal and staffing considerations that would dictate against allowing SHU inmates at Upstate to attend congregate religious services. *See Orafan,* 411 F.Supp.2d at 160 (stating that "[f]iscal, staffing, and space considerations are part of maintaining security and preserving order") (citation omitted). Issues of safety and security are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Jones v. N.C. Prisoners' Labor Union,* 433 U.S. 119, 128 (1977) (quoting *Pell,* 417

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

U.S. at 827). Defendants have provided substantial evidence to support their compelling state interest in prohibiting SHU inmates from congregate religious services and have also demonstrated that their policy is the least restrictive method for achieving those interests. *See supra,* Section V.D.1.

This Court finds that the enforcement of DOCS Directive 4933 § 304.9(d), serves a compelling governmental interest and is the least restrictive means of addressing the compelling governmental interest. Accordingly, plaintiff has not established that his free exercise rights under RLUIPA were violated because of his inability to attend congregate religious services while housed in Upstate SHU.

### VI. PERSONAL INVOLVEMENT

Defendants Fischer, Leonard, and Perlman contend that plaintiff has failed to establish their personal involvement. Dkt. No. 87-4 at 34-35. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*25** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (quoting *Wright,* 21 F.3d at 501).

It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement. *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006). The same is true if the only involvement of the supervisory official is to refer the inmate's complaint to the appropriate staff for investigation. *Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007). Additionally, "[a] position in a hierarchical chain of command, absent something more, is insufficient to support a showing of personal involvement." *Shepherd v. Goord,* No. 9:04-CV-655, 2008 WL 4283410, at *5 (N.D .N.Y. Sept. 16, 2008).

Plaintiff attempts to show that defendant DOCS Commissioner Brian Fischer, as a supervisory defendant, is personally responsible because he was made aware of the alleged problem but failed to remedy the situation. There is no evidence in this case that defendant Fischer was personally involved in the alleged constitutional deprivation of plaintiff's rights to freely exercise his religion. Plaintiff sent a letter, dated June 15, 2007, to defendant Fischer complaining that he was not allowed to pray Salaah in the recreation yard at Clinton. Dkt. No. 87-7 ("Fischer Decl.") (Ex. A). Fischer's staff forwarded the letter to the Deputy Commissioner of Program Services John H. Nuttall. Fischer Decl. ¶¶ 15-20; *see also id.* (Ex. A). The letter was then addressed by Mr. Nuttall. Fischer Decl. (Ex. B). These allegations fail to demonstrate personal involvement by defendant Fischer in plaintiff's claims that he was denied the right to freely exercise his religion. Plaintiff's remaining allegations against Fischer are that Fischer received letters of complaint from other inmates regarding similar issues raised by plaintiff in this action, but Fischer "only forwarded [those letters] to lower officials without any relief nor correction." Supp.Compl. ¶ 37. Plaintiff also seems to allege that Fischer is responsible for the policy which prohibits SHU inmates from attending congregate religious services. Supp.Compl. ¶ 87. These allegations are conclusory and unsupported by the evidence, and only suggest that Fischer is responsible for the policy because he is in a position of authority. Additionally, at his deposition, when asked "You are suing [Fischer] as an administrator of the policy?" [FN17] plaintiff responded "Yes. That he didn't take any actions to correct it." Trans. at 66.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

Plaintiff has failed to demonstrate personal involvement by defendant Fischer in plaintiff's claims that he was denied the right to freely exercise his religion.

> FN17. Plaintiff wrote to Fischer regarding his inability to pray Salaah demonstratively in the recreation yard at Clinton, yet at his deposition, he appeared to claim that defendant Fischer is responsible for all DOCS policies that implicate plaintiff's claims regarding both his right to pray and his right as a SHU inmate to attend congregate religious services. Trans. at 66.

Defendant Mark Leonard is the Director of Ministerial, Family, and Volunteer Services for DOCS. Dkt. No. 87-9 ("Leonard Decl.") ¶ 5. Plaintiff alleges that in that capacity, defendant Leonard "was responsible for and oversaw the management, operations and policies affecting religious programs" for DOCS. Supp.Compl. ¶ 39. Plaintiff sent a letter, dated December 24, 2007, to defendant Leonard "discussing the issue of accommodation to attend weekly congregate religious services (Jumu'ah)." Id. ¶ 50; see also id. (Ex. E). Leonard's staff forwarded the letter to the Assistant Director of Ministerial, Family, and Volunteer Services, Omega B. Alston. Leonard Decl. ¶¶ 6-11. The letter was then addressed by Mr. Alston, who advised plaintiff that he in turn was referring the letter to Imam Abdulkhabir, Ministerial Program Coordinator for the Muslim faith. Leonard Decl. (Ex. B). Plaintiff also alleges that Leonard is responsible for the policy which prohibits SHU inmates from attending congregate religious programs. Supp.Compl. ¶ 87. These allegations are conclusory and unsupported by the evidence, and only suggest that Leonard is responsible for the policy because he is in a position of authority. Plaintiff has failed to demonstrate personal involvement by defendant Leonard in plaintiff's claims that he denied the right to freely exercise his religion.

*26 Defendant Kenneth Perlman is the Deputy Commissioner of Program Services for DOCS. Dkt. No. 87-10 ("Perlman Decl.") ¶ 3. Plaintiff alleges that, pursuant to DOCS Directives 4200 and 4202, defendant Perlman "is responsible for the operations, directives and policies affecting religious programs." Supp.Compl. ¶ 38. Plaintiff also alleges that defendant Perlman is responsible

for the policy which prohibits SHU inmates from attending congregate religious services. Supp.Compl. ¶ 87. The fact that Perlman signed DOCS Directive 4933 (see Dkt. No. 87-2 at 141) could lead a reasonable juror to conclude that Perlman was personally involved in the promulgation of the DOCS policy which prohibits SHU inmates from attending congregate religious services. Moreover, at his deposition, plaintiff testified that "I wrote to [Perlman] directly and received correspondence from him too showing there is no correction on his part for the policies or for prohibitions." Trans. at 68. The Court cannot find as a matter or law that defendant Perlman was not personally involved in the violation of plaintiff's rights.

Accordingly, defendants' request for summary judgment on the basis of lack of personal involvement is **granted** at to Fischer and Leonard, and **denied** as to Perlman.

## VII. QUALIFIED IMMUNITY

The doctrine of qualified immunity shields officials from liability from civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). In *Pearson,* the Supreme Court overruled its decision in *Saucier v. Katz,* 533 U.S. 194 (2001), to the extent that the Court in *Saucier* required a specific two-step sequence for deciding qualified immunity claims. *Pearson,* 129 S.Ct. at 815-22.

Under *Saucier,* when confronted with defendants' claim of qualified immunity, the court was mandated to use a two-step procedure. 533 U.S. at 201. The first step required the court to determine whether plaintiff's facts established the violation of a constitutional right. *Id.* If so, the court would then decide whether the right at issue was "clearly established" at the time of the defendants' alleged conduct. *Id.* Decisions prior to *Saucier* had "suggested" that the better approach was to determine whether a constitutional right was violated at all, but *Saucier* turned that suggestion into a requirement. *Pearson,* 129 S.Ct. at 816 (citing *Saucier,* 533 U.S. at 201; *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5 (1998) (stating that resolution of the constitutional issue first was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

the "better approach").

In *Pearson,* the Supreme Court rejected what it referred to as *Saucier* 's " 'rigid order of battle,' " in favor of allowing the courts to exercise their sound discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first. *See Pearson, 129 S.Ct. at 817-818* (citing *Purtell v. Mason, 527 F.3d 615, 622 (7th Cir.2008)* (referring to the *Saucier* standard as a "rigid order of battle")). The court in *Pearson* stated that the unnecessary litigation of constitutional issues is to be avoided, and there are cases in which it is "plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson,* 129 S. St. at 818.

**A. Prayer in the recreation yard**

**\*27** When analyzing qualified immunity, "[f]or a right to be clearly established it 'must have been recognized in a particularized rather than a general sense.' " *Farid v. Ellen, 593 F.3d 233 (2d Cir.2010)* (citing and quoting *Moore v. Andreno, 505 F.3d 203, 214 (2d Cir.2007)*). The analysis must therefore focus on the right in question "at the appropriate level of specificity." *Id.* (citing and quoting *Wilson v. Layne, 526 U.S. 603, 615 (1999)*). When measured against these principles, the specific question here presented is whether it was objectively reasonable for defendants to believe that plaintiff did not have a clearly established constitutional right to conduct his Salaah prayer in a demonstrative manner in the recreation yard. Although it is well-established that prisoners have a right to practice their religion while incarcerated, the Second Circuit has not yet definitively determined the boundaries of reasonableness with respect to restrictions on prayer in the prison yards.

In *Shabazz v. Coughlin, 852 F.2d 697, 700-02 (2d Cir.1988)*, the Second Circuit held that while an inmate's right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not well-established for purposes of qualified immunity.

In *Chatin v. Coombe, 186 F.3d 82 (2d Cir.1999)*, the court held that Disciplinary Rule 105.11, prohibiting the conduct of "religious services" could not be used to discipline an individual for silent demonstrative prayer in the prison yard. However, the court simply found that the rule was unconstitutionally vague for due process purposes. *Id.* Because the district court decided the case on the due process claim, the court did not reach the plaintiff's First Amendment claim. *See Chatin v. New York, No. 96 Civ. 420, 1998 WL 196195, at \*6-8 (S.D.N.Y. Apr. 23, 1998)*. The court in *Chatin* specifically stated, however, that it was not deciding the issue of whether such conduct could be prevented by using a rule that gave inmates the required notice of what was prohibited. *Id.* at 89-90. The *Chatin* court also stated that it was not suggesting that prison officials were prevented from preventing such conduct by utilizing already existing rules that prevented disturbances or interference with others when the circumstances warranted it. *Id.* Thus, nothing in the *Chatin* decision established that an inmate has the right to pray in the recreation yard as plaintiff was attempting to do.

In *McEachin v. McGuinnis, 357 F.3d 197 (2d Cir.2004)*, the plaintiff had been disciplined for failure to obey a corrections officer's order to return his tray and cup, an order plaintiff claims was "expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers in which he was then engaged." *Id.* at 204-05. As a result of the disciplinary hearing, plaintiff was subjected to a week-long restricted diet, resulting in his inability to break his Ramadan fast with the appropriate food. *Id.* at 199. District Court *sua sponte* dismissed the complaint; the Second Circuit reversed, stating:

**\*28** When McEachin's complaint is liberally construed, two First Amendment concerns arise. First, McEachin asserts that the seven-day restrictive diet imposed upon him as discipline by the defendants impinged upon his observance of Ramadan by depriving him of properly blessed food with which to break his daily fast. In addition, McEachin alleges that this discipline was itself a product of religious discrimination by a corrections officer who intentionally ordered McEachin to return his tray and cup during McEachin's prayer, knowing that the plaintiff's beliefs would not permit him to respond to the command before he had finished making salat. If these allegations are true, an unconstitutional burden

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

may have been placed on McEachin's free exercise rights.

*Id.* at 201 (footnote omitted). The *McEachin* court thus emphasized the allegation that the corrections officer intentionally ordered plaintiff to perform the task, knowing that obeying the order would require plaintiff to violate his religious beliefs. *Id.* at 204. The court observed that "[p]recedent suggests that inmates have a right not to be disciplined for refusing to perform tasks that violate their religious beliefs." *Id.* at 205 (citing *Hayes v. Long, 72 F.3d 70 (8th Cir.1995)* (inmate disciplined for refusing to handle pork while performing kitchen duties)). The court in *McEachin* ultimately did not rule on this issue because it remanded the case to the district court for consideration of the First Amendment claims. *McEachin* does not clearly establish the right asserted by plaintiff in the case at bar.

In *Withrow v. Bartlett, 15 F.Supp.2d 292 (W.D.N.Y.1998)*, the court granted summary judgment in a case in which plaintiff was disciplined for engaging in group demonstrative prayer in the prison yard and violating an officer's order to stop. *Withrow* and the case at bar may be distinguished from *McEachin* on the ground that in this case and *Withrow* the prohibited activity is the method of prayer, that is, a demonstrative prayer in an area of the prison where it is not authorized by the existing rules. In *Withrow,* the officers issuing the orders believed that the plaintiffs' religious conduct was not permitted, a belief that was supported by the DOCS Directive.

In this case, plaintiff relies heavily on *Aziz v. LeFevre, 642 F.2d 1109 (2d Cir.1981)* in support of his suggested accommodation that inmates at Clinton be allowed to pray Salaah demonstratively in groups of no more than six on the sectioned recreation courts. Dkt. No. 93 at 32. In *Aziz,* inmates brought action challenging Clinton's policy, based upon DOCS Directive 4203(A)(3)(a), [FN18] which prohibited small groups of inmates from praying their Salaah in the prison recreation yard. *Aziz, 642 F .2d at 1110.* The Second Circuit in *Aziz* did not rule on any of the issues presented, but instead remanded the case to the district court for consideration of the First Amendment claims. [FN19] *Aziz, 642 F.2d at 1112.* In doing so, the *Aziz* Court stated that it "was reluctant to decide the

constitutional question prematurely and unnecessarily, and indeed we have well in mind the Supreme Court's recent admonitions to us not to do so." *Id.* at 1112. The *Aziz* Court further stated, "we decline to reach the difficult constitutional question presented." *Id.* On remand, the District Court never reached the question presented in *Aziz.* After the remand, the case was ultimately dismissed, without resolution, in the District Court for failure of the parties to prosecute the action. *See* Dkt. No. 91-1 at 5, Order referenced at docket entry 70. [FN20] Contrary to plaintiff's assertions, *Aziz* does not clearly establish the right asserted by plaintiff in the case at bar.

> **FN18.** Then DOCS Directive 4203(A)(3)(a) provided that "[i]nmates will be allowed to pray only in the privacy of their own living quarters, during a religious service or in an area of the facility that has been designated for religious worship." *Aziz,* 642 F.2d at 1110. This directive differs from DOCS Directive 4202 in that, notably absent from 4203 is the language giving the superintendent of each facility to determine where, at his or her facility, inmates will be allowed to conduct demonstrative prayer, whether individually or as a group. The Second Circuit in *Aziz* seemed concerned that the ban on prayer in the recreation yard was not being followed uniformly at every DOCS' facility and "hence [making it] not a 'policy' at all." *Aziz,* 642 F.2d at 1111. This concern would not be relevant to DOCS Directive 4202 as the Directive makes clear that the actual "policy" is put in place by each superintendent.

> **FN19.** *Aziz* merely noted that "individual, silent prayer [was] permitted in the segmented areas of the prison yard known as 'courts .' " *Aziz,* 642 F.2d at 1112.

> **FN20.** The Court previously provided plaintiff with a copy of the docket report for the *Aziz* action. See Dkt. No. 91-1 at 2-5. Since that time, the Court was able to obtain from the Federal Records Center a copy of the Order referenced therein at docket number 70. That Order closed the action without disposition for the parties'

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

failure to prosecute.

**\*29** There has also been disagreement among New York State courts as to whether prohibiting demonstrative prayer in the recreation yard is a violation of religious rights. *Compare Jackson v. Coughlin,* 204 A.D.2d 939 (3rd Dep't 1994) (finding that facility policy that prohibits Muslim inmates from praying demonstratively in the recreation yard does not violate plaintiff's right to religious freedom under the New York Constitution or Correction Law § 610) *with Matter of Abudullah,* 115 Misc.2d 105, 108 (Sup.Ct.Wyo.Co.1982) (finding that the justification that demonstrative prayer would be disruptive was insufficient reason to curtail an inmate's right to freely exercise his religion, but noting the "narrowness of this ruling"),[FN21] *aff'd* 96 A.D.2d 742 (4th Dep't 1983).

> FN21. The court noted that there might be merit to some of defendants' other concerns. *Id.*

Thus, it still does not appear well established that an inmate has the right to pray demonstratively in the recreation yard. This court is not aware of any case at or before the time relevant to this action that would "clearly establish" that plaintiff had a right to pray in a demonstrative manner either alone, or together with six other inmates in a sectioned-off area of the recreation yard.

Additionally, DOCS Directive 4202, as implemented by each superintendent at Clinton and Great Meadow, supported defendants' actions; defendants could not reasonably have believed that their action in denying plaintiff the right to pray demonstratively, either individually or in a small group during the recreation period was in violation of plaintiff's constitutional rights. Thus, based on the facts in this case, any claim for damages would be barred by the doctrine of qualified immunity even if ultimately plaintiff's First Amendment rights had been infringed.

The qualified immunity would apply to plaintiff's RLUIPA claim. *See Orafan v. Goord,* 411 F.Supp.2d 153, 158 (N.D.N.Y.2006), vacated and remanded on other grounds sub nom. *Orafan v. Rashid,* 249 Fed. Appx. 217 (2d Cir.2007). In any event, it has been held that a

RLUIPA plaintiff may not obtain monetary damages under the statute either from defendants in their individual or official capacities. *Pugh v. Goord,* 571 F.Supp.2d 477, 506-09 .[FN22] Thus, plaintiff in this case would not be able to obtain money damages from defendants.

> FN22. The Fifth Circuit has recently held that RLUIPA affords inmates the ability to obtain declaratory and injunctive relief against a "government," but does not provide for damages against either a defendant in his individual capacity or the state, including defendants in their "official capacities." *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 326-331 (5th Cir.2009) (discussing cases, including those circuits that have allowed such actions, however, noting that where such a claim is allowed individually, the qualified immunity analysis would apply) (*cert. granted in part,* 130 S.Ct. 3319).

Qualified immunity would not, however, bar any claim for equitable relief. *See Pearson,* 129 S.Ct. at 822 (no qualified immunity in cases in which injunctive relief is sought instead of or in addition to damages); *Salahuddin,* 467 F.3d at 273 (qualified immunity is an affirmative defense to monetary liability). Plaintiff's only request for equitable relief is contained in his amended complaint against Clinton Superintendent Artus and Clinton Deputy Superintendent Turner. Am.Compl. at 10; *compare* Supp.Compl. at 14 (plaintiff requests only compensatory, punitive and monetary damages in the supplemental complaint). Plaintiff requests that defendants Artus and Turner "cease enforcing the policy" at Clinton that prohibits anything but silent, non-demonstrative prayer in the recreation yard at Clinton. However, plaintiff is no longer incarcerated at Clinton. An inmate's transfer from a facility generally renders moot any claims for declaratory and injunctive relief against officials of that facility. *Salahuddin,* 467 F.2d at 272 (citing *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (per curiam); *Young v. Coughlin,* 886 F.2d 567, 568 n. 1 (2d Cir.1989); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976)). Because plaintiff is no longer incarcerated at Clinton, his claims against Artus and Turner for declaratory and injunctive relief are dismissed as moot. In any event, even

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

if the Court were to construe plaintiff's supplemental complaint as seeking equitable relief, plaintiff is no longer at either Clinton or Great Meadow, therefore his claims that he was denied the ability to pray demonstratively during recreation at those facilities are also moot for purposes of any injunctive or declaratory relief.

**B. Congregate Services for SHU inmates**

*30 Inasmuch as this Court finds that plaintiff has failed to prove any constitutional violation with respect to his inability to attend congregate religious services while housed in Upstate SHU, defendants are entitled to summary judgment on this ground. *Dorcely v. Wyandanch Union Free Sch. Dist.,* 665 F.Supp.2d 178, 219 (E.D.N.Y.2009) (quoting *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E .D.N.Y.2005)) ("Without an underlying constitutional violation, qualified immunity cannot attach.").

**VIII. MOTIONS FOR INJUNCTIVE RELIEF**

Plaintiff filed a first motion for injunctive relief, asking for a temporary restraining order and preliminary injunction "enjoining defendants from enforcing their blanketed ban from religious services against SHU-prisoners upon plaintiff and directing defendants to permit plaintiff to attend his designated congregate religious services" of Jumu'ah on Friday afternoons plus additional services held during Ramadan. Dkt. No. 105. At the time plaintiff filed this motion, he was incarcerated in SHU at Coxsackie Correctional Facility ("Coxsackie"). *Id.* Defendants opposed the motion as it was not related to the claims in the underlying action, which claims occurred while plaintiff was incarcerated at Upstate, Clinton, and Great Meadow. Dkt. No. 106. Defendants also argued that, in any event, plaintiff's underlying claims were without merit. *Id.* Plaintiff has recently requested that the Court "strike" his first motion (Dkt. No. 105) for injunctive relief and, in light of changed circumstances (which include his transfer to Upstate SHU) replace it with his recently-filed second motion (Dkt. No. 109) for a temporary restraining order and preliminary injunction. Dkt. No. 109 at 2-3. In light of plaintiff's request to withdraw his first motion, plaintiff's first motion for a temporary restraining order and preliminary injunction

(Dkt. No. 105) is **DENIED as moot.**

Turning to plaintiff's second motion for a temporary restraining order and preliminary injunctive relief, plaintiff advises that he has now been transferred to Upstate SHU and is again being denied the ability to attend congregate religious services. Dkt. No. 109. Plaintiff requests a court order directing defendants "to permit and accommodate plaintiff's attendance" at congregate religious services while he is incarcerated in SHU at Upstate. Dkt. No. 109-1 at 5.

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* No. 00-CV-0912E, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 (8th Cir.1994) (per curiam)). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* No. 06-CV-403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008) (citing *Therrien v. Martin,* No. 3:07-cv-1285 (JCH), 2007 WL 3102181, at *5 (D.Conn. Oct. 19, 2007)).

*31 The Court has already determined that DOCS Directive 4933 is constitutional in its requirement that a SHU inmate may not attend congregate religious services as it has a valid, rational connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources (or in the case of RLUIPA, a compelling state interest of maintaining security, including adequate staffing levels and fiscal resources). Therefore, the second request for a temporary restraining order and preliminary injunction (Dkt. No. 109) is **denied.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3910086 (N.D.N.Y.)

(Cite as: 2010 WL 3910086 (N.D.N.Y.))

### IX. CONCLUSION

Based on a thorough review of a very extensive record, this court finds as follows.

Genuine issues of material fact remain as to whether (1) DOCS Directive 4202, *as specifically implemented* at Clinton and Great Meadow is rationally related to a valid penological interest, or in the case of RLUIPA, a compelling governmental interest, or (2) the alternatives offered by the defendants are the least restrictive alternatives available that would serve those interests. However, because the right to pray demonstratively in the prison recreation yard was not clearly established at the time of the events alleged herein, defendants are nonetheless entitled to qualified immunity in this regard with respect to monetary damages. Moreover, plaintiff's requests for injunctive and declaratory relief are moot.

DOCS Directive 4933 is constitutional in its requirement that a SHU inmate may not attend congregate religious services as it has a valid, rational connection to the legitimate penological interest of security, staffing, and the preservation of scarce fiscal resources. The Directive also does not violate RLUIPA because there is a compelling governmental interest in maintaining the security, fiscal soundness, and staffing levels of the correctional facility. Also, DOCS Directive 4933 is the least restrictive means of furthering those interests.

Accordingly, defendants' motion for summary judgment (Dkt. No. 87) is **GRANTED** in all respects and plaintiff's motion for partial summary judgment (Dkt. No. 91) is **DENIED.** Additionally, for the reasons set forth above, plaintiff's motions (Dkt.Nos.105, 109) for a temporary restraining order and a preliminary injunction are **DENIED.**

**Accordingly, it is hereby**

**ORDERED** that all claims brought pursuant to (1) the First Amendment Establishment Clause; (2) the Equal Protection Clause; (3) RFRA; and (4) state law are dismissed **with prejudice;** and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 87) is **GRANTED** in its entirety and

all claims and defendants in both the amended complaint and the supplemental complaint are **dismissed with prejudice;** and it is further

**ORDERED** that plaintiff's motion for partial summary judgment (Dkt. No. 93) is **DENIED;** and it is further

**ORDERED** that plaintiff's motions (Dkt. Nos. 105 and 109) for a temporary restraining order and a preliminary injunction are **DENIED** for the reasons set forth above; and it is further

**\*32 ORDERED** that the Clerk is directed to serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules; and it is further

**ORDERED** that pursuant to Local Rule 72.3, the parties are advised that the referral to a Magistrate Judge has been **RESCINDED,** as such, any appeal taken from this Memorandum-Decision and Order will be to the Court of Appeals for the Second Circuit.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Smith v. Artus
Slip Copy, 2010 WL 3910086 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Juan CANDELARIA, Plaintiff,

v.

Robert B. GREIFINGER; Bethlynn Terry; Anthony J. Annucci; Susan J. Butler; Dr. Lester Wright; Thomas Lavalley; Daniel A. Senkowski; Philip Coombe, Jr.; Mark R. Chassin, M.D.,M.P.P., M.P.H.; Public Health Council of the State of New York; Salvatore Canonico, Joseph Ostrowsky; Richard L. Herzfeld; David Neier; Quentin Moore; Kings County District Attorney; New York City Police Department; Supreme Court of the State of New York-County of Kings Criminal Term; George Pataki; Brown and Williamson Tobacco Corporation; Republic Tobacco Company, Defendants.

No. 96-CV-0017 (RSP/DS).

June 8, 1998.

Juan Candelaria, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Department of Law, the Capitol, Albany, New York, for State Defendants, Howard L. Zwickel, Asst. Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, J.

*1 This matter comes to me following a report-recommendation by Magistrate Judge Daniel Scanlon, duly filed on the 24th day of April, 1998. Ten days after service thereof, the Clerk of the Court has sent me the entire file, including any and all objections filed by the parties. No party filed objections.

In this action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes, Candelaria challenges the conditions of his confinement at Clinton Correctional Facility ("Clinton"). Candelaria moved for injunctive relief requiring Clinton to transport physically disabled inmates in a wheelchair-accessible vehicle. Dkt. No. 15. On April 9, 1997, I concluded that Candelaria's motion could not be addressed on the record before me and remanded the issue to the magistrate judge for further consideration. Dkt. No. 99. Candelaria also renewed his motion for appointment of counsel, dkt. nos. 115, 116, and 121, and requested an extension of time in which to provide the United States Marshall Service with information necessary to effect service of process on certain of the defendants, dkt. no. 121.

The magistrate judge recommended I deny as moot Candelaria's motion for injunctive relief, on the grounds that Candelaria had been transferred from Clinton to Elmira Correctional Facility. Dkt. No. 123. In addition, the magistrate judge denied Candelaria's motion for appointment of counsel, granted his motion for an extension of time in which to provide information relevant to service, and recommended that, in the event Candelaria fails to provide the Court with completed USM-285 forms for each of the unserved defendants within forty-five (45) days of the date of the magistrate judge's order, the action

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

be dismissed as to those defendants for whom Candelaria had not submitted the forms. *Id.*

After careful review of the record, including the report-recommendation, to which the parties submitted no objections, I conclude that the magistrate judge's findings were not clearly erroneous. It is therefore

ORDERED that the report-recommendation is approved, and it is further

ORDERED that Candelaria's motion for injunctive relief concerning the transportation of disabled inmates is DENIED as moot, and it is further

ORDERED that if Candelaria fails to provide, within forty-five (45) days of the date of this order, completed USM-285 forms for each of the unserved defendants, this action will be dismissed without further order of the Court as to those defendants for whom Candelaria has not submitted the forms, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.

ORDER and REPORT-RECOMMENDATION

SCANLON, Magistrate J.

Plaintiff Juan Candelaria filed this civil rights action in January 1996 to challenge his conviction and the conditions of his confinement at the Clinton Correctional Facility ("Clinton"). Candelaria alleges causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes. This matter is before the Court for further consideration of that portion of plaintiff's motion for injunctive relief which relates to the adequacy of Clinton's method of transporting physically disabled inmates, in light of the parties' submissions filed pursuant to this Court's Order filed July 9, 1997. *See* Dkt. No. 107. Also before the Court are renewed motions from Candelaria for the appointment of counsel (Dkt. Nos. 115, 116 and 121), and a request for a further extension of time in which to provide the U.S. Marshal Service with certain information necessary to effect service of process on the remaining defendants. *See* Dkt. No. 121.[FN1] These matters will be addressed separately below.

FN1. The Court notes that Candelaria submitted with one of his requests for appointment of counsel a document entitled "Consolidated Next of Kin-Powers of Attorney-and-Last Will and Testament." *See* Dkt. No. 116.

*I. Injunctive Relief*

**\*2** Candelaria is paralyzed from the waist down and is confined to a wheelchair. By his motion for injunctive relief, Candelaria sought an order of this Court requiring Clinton to transport physically disabled inmates such as himself in a wheelchair-accessible van. According to plaintiff, Clinton's use of a prison station wagon which was neither equipped nor designed to accommodate passengers with physical impairments was both unsafe and in violation of his civil and constitutional rights. *See* Dkt. No. 68 at ¶ 18.

District Judge Rosemary S. Pooler determined that Candelaria's claim regarding Clinton's method of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

transporting physically disabled inmates could not be addressed on the record then before the Court and remanded that issue to this Court for review upon further factual development. *See* Dkt. No. 99. By Order filed July 9, 1997, this Court directed the state defendants to submit affidavits, together with supporting documentary evidence, if any, on the adequacy of Clinton's method of transporting such inmates. *See* Dkt. No. 107. Plaintiff was afforded an opportunity to respond to such submission and the Court reserved decision on whether an evidentiary hearing would be required prior to the resolution of plaintiff's motion for injunctive relief. *Id.* at 4.

Pursuant to the Court's Order, the state defendants filed the affidavits of John Mitchell, the Nurse Administrator at Clinton, and Mark Vann, a Correctional Lieutenant at Clinton. *See* Dkt. No. 114. By these affidavits, the state defendants continue to assert that physically disabled inmates (including Candelaria) have been transported without incident while sitting on a seat in one of the vans used for this purpose. *See id.* Candelaria filed responding papers in which he asserts that inmates are sometimes required to sit on the floor of the van and that, moreover, disabled persons such as himself are not always able to sit safely on a van seat. *See* Dkt. No. 117.

Since the entry of the Court's Order, Candelaria has been transferred to the Elmira Correctional Facility ("Elmira"), where he has been housed since December 2, 1997. *See* Dkt. No. 121.[FN2]

> [FN2.](#) Candelaria was transferred to Green Haven Correctional Facility on July 27, 1997, and was thereafter hospitalized from August 25, 1997 until December 2, 1997, when he was discharged to Elmira. *See* Dkt. No. 121.

It is settled in this Circuit that a transfer from a prison

facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted) (finding request for injunctive relief moot where inmate transferred from subject facilities). Accordingly, the Court recommends that plaintiff's motion for injunctive relief be denied without prejudice to renew in the event that he is transported from Elmira to outside medical visits in a vehicle which is not equipped for the transport of wheelchair-bound inmates.[FN3]

> [FN3.](#) In recommending that plaintiff's motion for injunctive relief be denied as moot, the Court makes no findings with regard to the adequacy of the method of transport utilized at Clinton or the need for an evidentiary hearing to determine same.

## II. Appointment of Counsel

Turning to Candelaria's requests for the appointment of counsel, a review of the file in this matter, including plaintiff's most recent submissions requesting appointment of counsel (*see* Dkt. Nos. 115, 116 and 121), in conjunction with the factors a court is to consider when ruling on such motions, *see Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997), indicates no change of circumstances that would warrant appointment of counsel *pro bono* for the plaintiff at the present time. In this regard, Candelaria's apparent poor health does not appear as a matter of record in this action to have prevented him from effectively litigating this action. To the contrary, plaintiff has actively pursued his lawsuit against the defendants and has filed numerous motions during the course of this litigation.

**\*3** Accordingly, plaintiff's requests for appointment of counsel are denied for the reasons stated in this Court's prior order concerning this issue. *See* Dkt. No. 107.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

*III. Service of Process*

By its July Order, this Court granted Candelaria's requests for an extension of time in which to effect service of process on four individuals and seven entities named as defendants in this action. *See* Dkt. No. 107 at 18-20. Upon the completion of a new USM-285 form for each unserved defendant containing whatever information Candelaria possessed or was able to obtain in a reasonable period of time, the U.S. Marshals Service (the "Service") was directed to attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure. *See* Dkt. No. 107.[FN4]

FN4. The following defendants have not yet been served with the summons and complaint in this action: Mark E. Chassin, M.D.; Salvatore Canonico; Joseph Ostrowsky; Quentin Moore; Brown & Williamson Tobacco Corporation; Republic Tobacco, Company; Public Health Council of the State of New York; New York City Police Department; Supreme Court of the State of New York; County of Kings, Criminal Division; and Kings County District Attorney. *See* Dkt. No. 107.

Candelaria now seeks a further extension of time to permit him to provide the Service with the completed USM-285 forms. *See* Dkt. No. 121. According to Candelaria, his three transfers, including a lengthy hospitalization, prevented him from timely completing that paperwork.[FN5]

FN5. Candelaria also contends that he is now confined to the infirmary at Elmira Correctional Facility, where he is not permitted "to possess a large quantity of legal papers." *Id.* at 1.

Plaintiff is hereby granted a further extension of forty-five (45) days from the filing date of this Order in which to provide the Service with the completed USM-285 forms. Said forms shall contain any and all information presently known to plaintiff concerning (i) the whereabouts of the individual defendants, and (ii) the name(s) of the individual(s) upon whom service can be effected on behalf of the seven entities. Upon receipt of same, the Service shall attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure and the July Order.[FN6] Candelaria is advised that his failure to timely provide the Service with the completed USM-285 forms will result in the dismissal of his action as against those defendants for whom plaintiff has not completed them.

FN6. The Service is obligated to effect service of process in accordance with the Federal Rules of Civil Procedure and, if necessary, the Service must make multiple attempts at service. *See Armstrong v. Sears,* 33 F.3d 182, 188 (2d Cir.1994) (where defendant refused to acknowledge Service's request for waiver under Rule 4(d), Service must effect personal service under Rule 4(e)). *Accord, Hurlburt v. Zaunbrecher,* 169 F.R.D. 258, 259 (N.D.N.Y.1996) (Smith, M.J.).

WHEREFORE, it is hereby

RECOMMENDED, that Candelaria's motion for a preliminary injunction (Dkt. No. 19) be denied as moot insofar as it challenges the method of transporting physically disabled inmates at the Clinton Correctional Facility, and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

ORDERED, that Candelaria's requests for the appointment of counsel (Dkt. Nos. 115, 116 and 121) are denied, and it is further

ORDERED, that Candelaria's request for an extension of time in which to provide the Service with completed USM-285 forms for each of the unserved defendants in this action is granted. Candelaria shall provide such forms, containing all of the information presently known to him relative to effecting service of process on those defendants within forty-five (45) days of the filing date of this Order, and it is further

RECOMMENDED, that if plaintiff fails to timely provide completed USM-285 forms as discussed herein, this action be dismissed as against those defendants for whom plaintiff has not submitted them, and it is further

ORDERED, that the Service shall attempt to serve each of the remaining defendants in accordance with the Federal Rules of Civil Procedure and the terms of the July Order promptly upon receipt of the completed USM-285 forms from Candelaria, and it is further

**\*4** ORDERED, that the Clerk serve a copy of this Order on the parties hereto, and on the Service, by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW, *Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Secretary*

*of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

N.D.N.Y.,1998.

Candelaria v. Greifinger

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.